MICHAEL G. KING (SBN 145477)
mking@hgla.com
HENNELLY & GROSSFELD LLP
4640 Admiralty Way, Suite 850
Marina del Rey, CA 90292
Telephone: (310) 305-2100
Facsimile: (310) 305-2116

FRANK G. SMITH
frank.smith@alston.com
ROBIN L. MCGRATH
robin.mcgrath@alston.com
ALSTON & BIRD, LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777

*Attorneys for Plaintiffs and Counterclaim-Defendants,*
*MOVE, INC., NATIONAL ASSOCIATION OF REALTORS, and*
*NATIONAL ASSOCIATION OF HOME BUILDERS*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| MOVE, INC., ET AL.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>REAL ESTATE ALLIANCE LTD., ET AL.,<br><br>　　　　Defendants.<br>———————————<br>REAL ESTATE ALLIANCE LTD.,<br><br>　　　　Counterclaim-Plaintiff,<br><br>　　v.<br><br>MOVE, INC., ET AL.,<br><br>　　　　Counterclaim-Defendants. | CASE NO. CV 07-02185-GHK (AJWx)<br><br>Hon. George H. King<br><br>**PLAINTIFFS' SUMMARY OF EXPERT OPINIONS REGARDING CLAIM CONSTRUCTION**<br><br>Action Filed:　　　Apr. 3, 2007<br>2d Am. Complaint Filed:　Jan. 12, 2009<br>Counterclaims Filed:　Feb. 11, 2009<br>Trial Date:　　　　TBD |

Pursuant to the Court's Phase 1 Scheduling Order (Dkt. No. 211), Plaintiffs and Counterclaim-Defendants Move, Inc., National Association of Realtors, and National Association of Home Builders (collectively, "Plaintiffs") hereby submit this Summary of Expert Opinions to be offered by Professor Owen L. Astrachan and Dr. Todd S. Bacastow on which Plaintiffs intend to rely for the construction of certain terms and phrases in U.S. Patent Nos. 4,870,576 ("'576 Patent") and 5,032,989 ("'989 Patent").

Summary of Professor Owen L. Astrachan's Expert Opinions:

**1.    "creating a database" ('989 Patent, Claim 1)**

- The person of ordinary skill in the art for which the '989 Patent pertains is someone having experience with computers at least equivalent to an undergraduate degree in computer science or someone having at least one year of experience in Geographical Information Systems.

- Professor Astrachan is a person of ordinary skill in the art of the '989 Patent because (1) he has experience with computers at least equivalent to an undergraduate degree in computer science, and (2) as a computer science professor at Duke, he understands the knowledge and skill set of someone having an undergraduate degree in computer science.

- Persons of ordinary skill in the art, including Professor Astrachan, understand what it means to create a database and how to go about "creating a database."

- The phrase "creating a database" is not used in the '989 Patent any differently than the meaning of that phrase outside the context of the '989 Patent.

- Both as used in the '989 Patent and in all other contexts, "creating a database" is a computational design process necessarily comprising (in

no particular order) the steps of: (1) creating one or more database "tables"; (2) instantiating the tables with one or more database "fields"; and (3) defining the relationships between the tables and fields so that information contained therein can be quickly and efficiently queried using a computer system.

■ A table is a linear list of characteristics (otherwise known as "fields") related to the purpose of the database.  For example, if a user wanted to create a database containing information related to available real estate properties, they could create a table having fields related to real estate, such as address, zip code, number of bedrooms, square footage, and/or date of construction.

■ Neither the '989 Patent's specification nor file history alter the ordinary and customary meaning ascribed to the concept of "creating a database."

■ The act of "creating a database" is very different than and does not include the steps required to update or "maintain" a database.

■ Once the database is created and is in existence, the act of uploading data to, inserting data into, deleting data from, or modifying data within the database are all acts related to updating or "maintaining" the database, not creating the database.

■ Accordingly, those of ordinary skill in the art of the '989 Patent would understand that the phrase "creating a database" as used in claim 1 of the '989 Patent means "creating the structure that houses data relating to available real estate properties that are maintained and arranged for ease and speed of search and retrieval by a computer, such structure including the tables, the fields in each table, and the relationships between the fields and tables.  Creating a database is to be distinguished from

uploading, inserting, adding, modifying or providing data that is added to an existing database."

■ Plaintiffs' proposed construction is supported by the first two definitions provided for the entry "database" in the IBM Dictionary of Computing (1994) cited by REAL in its Supplemental Response to Move's Interrogatory No. 8. *See* Exhibit 1, IBM Dictionary of Computing (1994) at 165 ("(1) A collection of data with a given structure for accepting, storing and providing, on demand, data for multiple users"; and "(2) A collection of interrelated data organized according to a database schema to serve one or more applications.") These entries establish that the creation of a database involves the creation of "structure" or "database schema" to which data is subsequently added.

■ REAL's proposed construction – "organizing, assembling, inserting, providing, supplying, or modifying data" – is inconsistent with: (1) how that phrase is understood by those of skill in the art, and (2) how that term is used in the '989 Patent.

■ REAL's proposed construction is equivalent to what the '989 Patent describes as "maintaining" a database, a concept that the '989 Patent distinguishes from "creating" a database. ('989 Patent at 3:11-24.)

■ REAL's proposed construction reflects the process of creating a "listing file" which is transmitted and uploaded to a host system, as discussed in the '989 Patent specification (e.g., *id.* at 4:38-68).

■ According to the specification, the "listing file" contains data about a particular real estate property that is available (e.g., the address, price, number of bedrooms, etc.). (*Id.* at 4:59-68.)

■ The specification refers to the process of creating and updating a listing file as "a property listing *maintenance* system which enables a remote

user to create and update a property listing file and then transmit it to the host system." (*Id.* at 2:56 -59 (emphasis added).)

- This description supports the conclusion that creating and updating listing files is what is done in connection with the *maintenance* of a database, not the creation of a database.

- In addition, when read literally, REAL's construction of "creating a database" does not require the use of a computer or host system – a scenario that is not contemplated by the '989 Patent, which clearly discusses the use of computer implemented databases.

2.    **"selecting" ('576 Patent, Claims 1 and 3; '989 Patent, Claims 1 and 6)**

- The term "selecting" is used in a number of claims in both the '576 and '989 Patents.

- In claims 1 and 3 of the '576 Patent, the term "selecting" appears in the phrase: "selecting a landmark as a reference point from a list of available landmarks."

- In claim 1 of the '989 Patent, the term "selecting" appears in the phrase: "selecting a first area having boundaries within the geographic area" and "selecting a second area having boundaries within the zoomed first area."

- In claim 6 of the '989 Patent, the term "selecting" appears in the phrase: "selecting at least one of the characteristics of the available real estate properties."

- Persons of ordinary skill in the art, like Professor Astrachan, understand that the term "selecting" is used in each of these claims in its ordinary, colloquial context to mean "choosing" or "making a choice." *See, e.g.,* Exhibit 2, Dictionary.com Entries for "Select (defining "select" as "to

take as a choice from among several; pick out"; "to make a choice or selection"; and "to choose in preference to another or others").

■ REAL proposes to construe the term "selecting" as used in each of these claim phrases to mean "identifying a particular thing or things from among alternatives."

■ In the context of the '576 and '989 Patents, one of ordinary skill in the art would not understand the term "selecting" to mean "identifying."

■ The specification is very clear that it is the user, not the host system, that selects or chooses which landmark to use as a reference point. *See, e.g.*, '576 Patent at 9:28-30 ("*After selecting the landmark*, moving the window box, and selecting its size, *the user* activates a key sequence to 'zoom' the display.") The user does more than simply identify the landmark. The user actually chooses or decides which landmark he wishes to use.

■ The specification is also clear that it is the user, not the host system, that selects or chooses both the first area and the second area. *See, e.g.*, '989 Patent at Abstract ("*The user* begins with a region where they are interested in acquiring property and *select an inner area* within this region by using a pointing device such as a mouse to designate boundaries on a map displayed on a screen. This is then zoomed in on and *a second area is selected* within the zoomed region"); '989 Patent at 9:63-65 ("Once *the user has selected his search boundary* by selecting an appropriate circle, that data may be saved or changed"); '989 Patent at 11:13-19 ("Control then proceeds to decision block 610, where it is determined whether *the user has completed his location boundary selection*. If the *user has completed this selection*, control proceeds to block 636, where it is shown that the center and radius coordinates for the

map are changed to the new center and radius coordinates, just *selected*.") Again, the specification is clear that the user is doing more than simply identifying certain areas.  Rather, the user is actually choosing or deciding the areas in which he wishes to search.

■ The specification additionally makes clear that it is the user, not the host system, that selects the property characteristics the user wishes to search. *See, e.g.*, '989 Patent at 9:68-10:3 ("After saving the location data, *the user is prompted for numerical range data*, such as minimum and maximum price for the target listing. *After having selected several numerical ranges*, a series of menus are displayed so that *the user may select one or several selections* on each menu.")  Again, the specification indicates that the user is choosing which characteristics to focus on and is not merely "identifying" those characteristics.

■ REAL's expert witness, Professor Dennis Shasha, concedes that the "user is the subject" of the sentences in the specification that describe the selection of a landmark, property characteristics, and a first area and a second area, thereby conceding that it is the user that performs these functions.  *See* REAL's Summary of Expert Opinions of Dennis Shasha.

■ While Professor Shasha correctly notes that in the computer science context, when a computer user "selects" something, there is a corresponding action on the part of the computer "in order for there to be any effect on the user's actions," he is incorrect that the corresponding action is necessarily an act of "selecting."

■ In the context of the '576 and '989 Patents, the corresponding computer-performed action is not one of "selecting."   To the contrary, the specification uses terms such as "identifying," "retriev[ing]," "extract[ing]," and "check[ing]," when referring to the corresponding

6

actions of the host computer. *See, e.g.*, '576 Patent at Claim 1(i) ("*identifying* properties by said host processor within said database"); '989 Patent at Claim 1 (h) ("*identifying* available real estate properties within the database"); '989 Patent at 1:19-21 ("This computer-stored listing may be accessed through terminals for *retrieval* of specific information relating to a given property"); '989 Patent at 11:22-25 ("*If the user has not completed his boundary location selection*, processing proceeds from decision block 610 to block 612, where the last selected (most current) world coordinates are *retrieved from memory*"); '989 Patent at 14:49-53 ("Additionally, information *extracted* from the accounting file containing the buyers name and address information for mailing label purposes is written to a storage device for further processing"); '989 Patent at 3:30-31 ("Property data menu *selections* [made by the user] are *checked against* their associated search menu selection arrays.")

■ While Professor Shasha correctly notes that the word "select" is used in some database languages, such as the SQL language, to refer to the actions of the computer (*see* REAL's Summary of Expert Opinions of Dennis Shasha), that is because there are instances, not applicable here, in which the host computer, not the user, is making the selection.

■ For instance, using Professor Shasha's example of a SQL-based relationship database having a table "properties" and fields "name" and "postalcode," if the user chooses "90210" as the zip code of interest, the command "select name from properties where postalcode= 90210" would retrieve the names from those rows in properties having "90210" in the postalcode field.

■ In that example, the host computer is making a selection as to which names to retrieve, because the user has not identified which names to retrieve. Instead, the user has only provided certain information to the system (e.g., zip code) which allows the system to make the selection of the names (properties) with that zip code (even in this instance, the computer is not making a "choice" in the same way that a human being makes a choice).

■ While in this example it is the host computer that selects which names to retrieve, it is still the *user* who has selected, or chosen, the property characteristic to use – i.e., zip code 90210.

■ Professor Shasha's example is to be contrasted to the context in which the term "select" is used in the claims of the '576 and '989 Patents.

■ With respect to the phrase "selecting a landmark as a reference point," the host computer is not making any selections based on input from the user. Rather, the host computer is simply retrieving the very thing that the user has selected – the selected landmark.

■ Additionally, the phrase itself makes clear that the landmark is being "select[ed] as a *reference point*." No computer at the time of invention was capable of selecting a landmark "as a reference point." It is the user who decides which landmark it wishes to use as a "reference point" when defining his area of interest. In other words, the landmark enables the user to understand how the location of his desired search area (i.e., the selected area having boundaries) relates to a well-recognized marker (i.e., the selected landmark). One of ordinary skill in the art would understand that only the user can choose which landmark to use as a reference point for defining his search area. *See* Exhibit 3, U.S. Patent No. 6,496,776 at 2:18-29 (describing, in the "Description of the Related Art" section of the

specification, the mapping system in the '989 Patent as being "centered about a *user-selectable landmark . . . .*") (Emphasis added.)

■ With respect to the phrases "selecting a first area having boundaries within the geographic area" and "selecting a second area having boundaries within the zoomed first area," again, the host computer is not making any selections based on input from the user – as in the "90210 zip code" example above. Rather the host computer is simply identifying the very thing that the user has selected – the first area and second area chosen by the user.

■ Similarly, with respect to the phrase "selecting at least one of the characteristics of the available real estate properties," while the host computer may identify the properties that meet the user's characteristic, it is the user and the user alone that "selects" or "chooses" the characteristic.

■ Thus, persons of ordinary skill in the art would not understand the term "selecting" in any of these phrases to refer to the actions of anyone other than the user, and they would not understand the term to mean "identifying" as opposed to "choosing."

Summary of Dr. Todd S. Bacastow's Expert Opinions:

**1. "zooming . . . thereby displaying a higher level of detail" ('576 Patent, Claims 1 and 3) and "zooming in on . . . to display a higher level of detail" ('989 Patent, Claim 1)**

■ In the context of the '576 and '989 Patents, the term "zooming" means setting the visual scale of a map in a viewport. "Zooming" includes (i) zooming "in" or "down" by increasing the visual scale to get a closer view of a particular area on the map and (ii) zooming "out" or "up" by

9

decreasing the visual scale to get a farther view of a particular area on the map. The claim phrases "zooming" "thereby displaying a higher level of detail" in the '576 Patent and "zooming" "to display a higher level of detail" in the '989 Patent relate to zooming in by increasing the visual scale.

- In claim 1 of the '576 Patent, the term "zooming" and the phrase "thereby displaying a higher level of detail" appear in the larger phrase "zooming said displayed map to coincide with the boundaries of said first cursor thereby displaying a higher level of detail."

- In claim 3 of the '576 Patent, the term "zooming" and the phrase "thereby displaying a higher level of detail" appear in the larger phrase "zooming said displayed map to substantially coincide with the boundaries of said cursor, thereby displaying a higher level of detail."

- In claim 1 of the '989 Patent, the term "zooming" and the phrase "to display a higher level of detail" appear in the larger phrase "zooming in on the first area of the displayed map to about the boundaries of the first area to display a higher level of detail than the displayed map."

- The phrases "to coincide with the boundaries of said first cursor," "to about the boundaries of the first area" and "to substantially coincide with the boundaries of said first cursor" which appear in each of these three larger phrases make clear that the "zooming" function in the '576 and '989 Patents results in a closer view of *only* the portion of the map enclosed by a cursor or by boundaries.

- This requirement is also made clear by the specification. *See, e.g.*, '989 Patent at 2:1-2 ("The user can then change the world coordinate display to *equal* the boundaries of the window box."); 9:53-57 ("[T]he user activates a key sequence to 'zoom' the display. In other words, the

viewport will then display the *actual* boundaries of the window box . . .
.”); FIG. 3B (displaying an area equal to the area bounded by the window
box shown in FIG. 3A.)

- The specification further shows that zooming permits the user to see
more detail than was previously perceptible in the specific area he has
chosen to zoom in on. *See, e.g.*, ’576 Patent at 6:58 (“FIG. 3B is a map
showing greater detail . . . .”); 10:63-65 (“[T]his is indicative of the fact
that the user wishes to zoom the display downward, that is, obtain a more
detailed view of a smaller area of the map . . . .”)

- Thus, the appropriateness of Move’s proposed construction – causing the
computer to display closer up and with more detail perceptible only the
area enclosed by the actual boundaries of the cursor so that the display
appears to have zoomed down closer to Earth – is confirmed both by the
claims and the specification of the ’576 and ’989 Patents.

- According to REAL’s experts, the phrase “zooming . . . thereby
displaying a higher level of detail” in the ’576 and ’989 Patents “involves
more than simply magnifying the existing information to a larger scale,”
but requires additional elements such as town labels and boundaries to be
displayed that were not previously shown. *See* REAL’s Summary of
Expert Opinions of Dennis Shasha and Michael Dobson.

- The technique of adding elements to, or removing elements from, a map
display at different visual scales is known in the art, and is sometimes
referred to as “thresholding” or “scale dependent display.” The technique
may be called thresholding because certain elements are only shown
when the visual scale is set above a certain threshold associated with
those elements. For example, city symbols that are not shown on a
relatively small visual scale map of the United States might be added to

the display upon zooming in on a particular state and setting the visual scale above a threshold for city symbols.

■ Adding elements to, or removing elements from, a map display at different visual scales was well known in the art at the time of the '579 and '989 Patents as a technique for mitigating or preventing clutter on a map display. *See, e.g.*, Exhibit 4, Honey & Zavoli, A Novel Approach to Automotive Navigation and Map Display, IEEE Transactions on Industrial Electronics, Vol. IE-34, No. 1, pp. 40-43 (Feb. 1987) at 40 ("As the display scale is increased or decreased, features and labels appear and disappear in an orderly fashion according to their priority."); and at 42 (As the scale of the map is changed, road priority information encoded in the map database is used to select the roads to be displayed and still keep the display complexity limited.")

■ "Clutter" refers to the visual impact of including so many elements in the display area that the elements overlap and lose their individual significance. Zooming out to a smaller visual scale generally increases the degree of clutter because the elements are shown in closer proximity to one another on the map.

■ Providing for a scale dependent display prevents clutter on a map display by omitting certain elements from the display at smaller visual scales where they would tend to overlap and including those elements at larger visual scales where they would tend to be shown far enough apart to be independently perceived. This particular technique, however, is not the only way to alleviate clutter.

■ One skilled in the art of the '579 and '989 Patents at the time of invention would recognize that, just as zooming out tends to increase the degree of

clutter in a map display, zooming in tends to decrease the degree of clutter.

■ Accordingly, zooming in to a larger visual scale can result in the user being able to perceive elements in the zoomed map that, while present at the smaller visual scale, were not distinctly perceptible at the smaller visual scale.

■ For example, a city symbol that is included on a relatively small visual scale map of the United States might be overlapped by symbols for neighboring cities on a cluttered display and therefore not perceptible or discernable to the user. In fact, the overlapping symbols may appear to look like a single dot. Upon zooming in on a state, however, the city symbol and the symbols for neighboring cities may be shown far enough apart to be independently perceived as separate symbols on the map. Thus, what was shown only as a dot, is now shown as multiple symbols, thereby allowing the viewer to see additional detail that was not previously visible.

■ One of ordinary skill in the art would understand "zooming" which "display[s] a higher level of detail" in the '576 and '989 Patents to include zooming operations like the example above that make more detail perceptible *without* adding elements to the zoomed map, because there is nothing in the claims, specification or file history to indicate that such zooming operations are not included.

■ FIG. 6 of the '989 Patent, for example, is "a flow diagram of the generalized procedure for the zooming of the map display of the present invention." ('989 Patent at 7:9-11). This figure fails to disclose any procedure for adding elements to a display area based on an increase in

visual scale. FIG. 6 also fails to disclose any procedure for removing elements from a display area based on a decrease in visual scale.

- With regard to zooming in, FIG. 6 shows that pressing the page down (PgDn) key (block 419) "executes a selected zoom by changing the world coordinate system to match the view selector" (block 426) ('989 Patent at 12:16-18; 12:30-37). One of ordinary skill in the art would understand this to describe zooming in by increasing the visual scale to get a closer view of the area enclosed by the view selector. There is no disclosure of elements being added to the map display based on the increase in visual scale. Nothing in this disclosure would indicate to one skilled in the art at the time of invention that elements must be added to the map display upon zooming in that were not previously shown at the smaller visual scale.

- Similarly, FIG. 5, which includes the step of displaying a map (shown in block 166 of the '576 Patent and block 614 of the '989 Patent), lacks any disclosure relating to thresholding, scale dependent display or the notion of adding additional elements.

- There is also nothing in the inventor's Appendix that would indicate to one skilled in the art that elements are added to the display of a zoomed map that were not present at a lower magnification.

- Professor Shasha cites to FIGS. 3A and 3B in both patents to support his conclusion that this claim phrase requires the display of additional elements not previously shown. *See* REAL's Summary of Expert Opinions of Dennis Shasha. FIGS 3A and 3B in the '576 Patent are different from FIGS 3A and 3B in the '989 Patent.

- In the '576 Patent, there are town labels and boundaries in FIG. 3B that are not visible in FIG. 3A, which may be an example of adding elements that were not previously shown.

- However, persons of ordinary skill in the art would understand FIGS 3A and 3B to be merely an example of one way in which a computer user can "zoom" "thereby displaying additional details," and would not conclude that the invention is limited to this way.

- If the inventor had intended to *require* the addition of elements in the zoomed display, one of ordinary skill in the art would expect such functionality to be described in the detailed descriptions and flow diagrams of the patent specification. Instead, FIGS. 5 and 6 depict the steps of displaying a map and zooming in on an area of a map without describing the addition of elements such as town labels and boundaries to the zoomed display.

- FIGS. 3A and 3B in the '989 Patent support the conclusion that the claims do not require thresholding, as these figures provide an example of the type of zooming that allows for the display of additional detail without thresholding. In FIG. 3A, there are a number of property points present that are not individually visible due to cluttering and overlap. These property points, however, are individually visible in FIG. 3B, which thus displays a higher level of detail than does FIG 3A.

- Especially in light of FIGS 3A and 3B in the '989 Patent, it is incorrect to conclude that the claims require the addition of elements not previously shown. Rather, the zooming function in the claims of the '576 and '989 Patents, while certainly broad enough to *include* thresholding, is not *limited* to thresholding and is properly understood to include zooming

15

that makes more detail perceptible but does not necessarily add additional detail.

■ Professor Shasha's and Dr. Dobson's reliance on the '576 Patent file history to support their conclusion that additional detail is required is misplaced. There the inventor distinguished his claims relating to a digital mapping system from the *optical projection system* disclosed in U.S. Patent No. 4,312,577 to Fitzgerald. *See* Exhibit 5, Amendment dated Oct. 8, 1987 at 13:25-28 ("Because Fitzgerald teaches the use of an *optical projection system*, his zoom operation fails to provide a greater level of details [sic] as required.") (Emphasis added.)

■ Thus, the reference to Fitzgerald is significant only to distinguish digital mapping from optical projection systems.

■ But, as noted, even in digital mapping systems, elements may be shown in such close proximity to one another at certain visual scales that the elements overlap and cannot be independently perceived. Indeed, in some cases, two or more elements may be mapped to the same pixels on a display screen. Zooming in on an area of the map causes the elements to be repositioned farther apart from one another such that elements that were always present, but not individually perceptible, now become perceptible.

■ In the optical projection system of Fitzgerald, by contrast, the map elements are fixed on a translucent slide. Thus, there is no issue of detail being obscured as a result of cluttering. As shown in FIG. 11 of Fitzgerald, all of the map elements are perceptible because none of the elements overlap on the static slide. *See* Exhibit 6, U.S. Patent No. 4,312,577 at FIG. 11. With *optical* zooming such as Fitzgerald, there

will never be additional detail displayed, whereas, such detail can be displayed in *digital* systems with or without thresholding.

■ One of ordinary skill in the art would understand that the inventor distinguished his invention from Fitzgerald because Fitzgerald fails to disclose any technique for alleviating clutter in a digital mapping system, not because Fitzgerald fails to disclose additional elements not previously shown.

## 2. "substantially coincide" ('576 Patent, Claim 3) and "to about the boundaries" ('989 Patent, Claim 1)

■ The phrase "substantially coincide" appears in claim 3 of the '576 Patent within the larger phrase: "zooming said displayed map to substantially coincide with the boundaries of said cursor, thereby displaying a higher level of detail." Likewise, the phrase "to about the boundaries" appears in claim 1 of the '989 Patent within the larger phrase: "zooming in on the first area of the displayed map to about the boundaries of the first area to display a higher level of detail than the displayed map."

■ A person of ordinary skill in the art would understand these two phrases in the same way, as the words "substantially" and "about" both connote the idea of close, but not exact, correspondence or coincidence.

■ While skilled artisans would understand both phrases to mean "close" approximation, the specification does not teach persons of ordinary skill in the art how closely the zooming must coincide with the boundaries of the cursor in order for the coinciding to be "substantial."

■ In fact, except as used in claim 3, the words "substantially" or "about" do not appear in the specification of either patent in connection with the zooming feature. Instead, the specification suggests that the zooming

that is performed must be *equal* to the boundaries of the cursor. *See, e.g.*, '989 Patent at 2:1-2 ("The user can then change the world coordinate display to *equal* the boundaries of the window box."); 9:53-57 ("[T]he user activates a key sequence to 'zoom' the display. In other words, the viewport will then display the *actual* boundaries of the window box . . . ."); FIG. 3B (displaying an area equal to the area bounded by the window box shown in FIG. 3A.).

■ Not only does the specification fail to provide any guidance as to how closely the coinciding must be, if not exact, in order to be "substantial," but there is no common understanding among those of ordinary skill the art of the '576 and '989 Patents as to how closely the coinciding must be in order to be substantial.

■ While the specification does identify certain software that can be used to implement the invention ('576 Patent at 14:41-44), it gives no indication either directly or implicitly that the level of coinciding can be determined by the capabilities of this software.

■ The software identified in the specification ("MicroSoft MS-DOS™, HALO™ graphics, and a language compiler such as MicroSoft C") are *tools* for building an operational system. None of the software was or is capable of mapping or zooming, much less zooming a map to coincide with a boundary, without first designing and building a system with that functionality. Because these software tools could be used and manipulated by those of ordinary skill in the art in a variety of ways to build a variety of operational systems, the level of coinciding of the system cannot be determined just from knowing what software was used in the process.

- Thus, one of ordinary skill in the art would not understand the phrase "substantially coincide" to be tied to the capability of the software that performs the zooming.
- Indeed, if that were the case, it would result in this phrase covering software/hardware that is incapable of zooming the map anywhere close to the boundaries of the cursor, in effect, reading this limitation out of the claim.

**3.    "appropriate geographic location" ('989 Patent, Claim 1)**

- The phrase "appropriate geographic location" appears within the larger phrase in claim 1 of the '989 Patent:  "displaying the second area and a plurality of points within the second area, each point representing the appropriate geographic location of an available real estate property."
- During prosecution of the '989 Patent, the inventor explained the purpose of displaying property points on the map:

      The graphical display of information of Applicant's invention
      is important in simplifying the selection process of properties
      for various types of uses including sales, leases, rentals and
      other special purposes uses . . . .  In [the prior art] . . . [t]he user
      does not see a graphical display of location information and
      may not be able to understand *the location relationship of a*
      *property* within the regions specified in Applicant's claim 1.
      (*See* Exhibit 7, Amendment dated Dec. 20, 1990 at 6
      (emphasis added).)

- From these statements, one of ordinary skill in the art at the time of invention would understand that the "appropriate geographic location" of an available real estate property in the '989 Patent is a location that

allows the user to understand the location relationship of the property within the area of interest displayed on the map.

- In order to convey this location relationship to the user, the property must be displayed on the map at a location that corresponds as closely as possible to the property's actual physical location, i.e., the property's address.

- REAL's proposed construction of this phrase encompasses displaying an available real estate property on a map based on the level of location information that is in the database for the property. For example, according to REAL, if only the zip code of the property is specified in the database, then an appropriate geographic location of the property corresponds to the zip code.

- REAL's proposed construction is a concept that is not at all discussed or even implied the '989 Patent.

- REAL's expert Dr. Michael Dobson has agreed with REAL's proposed construction based not on what is described in the '989 Patent, but on the concept of "map generalization," which supposedly describes what "cartographers" do in the real world. *See* REAL's Summary of Expert Opinions of Michael Dobson.

- Dr. Dobson reliance on map generalization – a concept that appears nowhere in the '989 Patent – is to the exclusion of what a person of ordinary skill in the art would understand the term "appropriate geographic location" to mean based on reading the '989 Patent.

- As noted above, the purpose of the "invention" of the '989 Patent is to provide the user with as accurate a visual demonstration as possible of where properties that meet the user's criteria are located within the user's area of interest.

■ REAL's proposed construction would undermine this goal of the invention, because it would allow the property to be shown in a location that does not relate at all to where the property is actually located within the user's defined area. Indeed, if the boundaries of the user's area of interest correspond with a zip code, and the only location information for certain properties is the zip code, the property could be displayed anywhere within the zip code. Such a result would not provide the user with an accurate visual understanding of the property's actual location within the area of interest and would thus be of little utility, if any, to the user.

■ It is specifically to ensure that the user gets the most accurate visual understanding of the properties' location that the specification *requires* that the agent or seller who creates each property's listing file provide address information for the property: "the user is then prompted for the address of the property. The user *must* enter an address." ('989 Patent at 4:59-60) (emphasis added).

■ Even if skilled artisans were to apply concept of map generalization when reading the '989 Patent, doing so would not lead skilled artisans to understand the phrase "appropriate geographic location" in the manner proposed by REAL.

■ Map generalization relates to strategic methods for reducing the amount and complexity of data used to produce a map. In the interests of conserving data storage capacity, achieving faster data processing, or limiting visual confusion on the map, cartographers often find it beneficial to omit or manipulate data to approximate the real world. A cartographer might choose, for instance, to omit certain points in the outline of a polygon to display a simpler, generalized polygon on the

map.  *See, e.g.*, Exhibit 8, J. Dangermond, "A Classification of Software Components Commonly Used in Geographic Information Systems" (1983), *reprinted in*, D. Peuquet & D. Marble, Introductory Readings in Geographic Information Systems, pp. 30-51 (1990) at pp. 42-43 (describing map generalization techniques).

- Skilled artisans understand that map generalization methods, however, take into account the purpose of the map, with any generalization typically limited as much as possible to ancillary or unimportant details that are not essential to the map's purpose.

- In this case, as the specification notes, providing visual information that is as accurate as possible regarding the properties' location is one of the essential features of the '989 Patent, and tying that information to the property's address is key to that purpose.  *See* '989 Patent at 4:59-60 ("The user *must* enter an address.") (Emphasis added).

- Thus, in connection with the "invention" of the '989 Patent, a cartographer would not "generalize" the location of an available real estate property, such as by limiting the data to a zip code.

- Accordingly, persons of ordinary skill in the art would not understand the phrase "appropriate geographic location" as used in the '989 Patent to include such generalization because doing so would lead to a result that is contrary to the inventor's stated purpose for his invention.

4. **"values representative of geographic location and maximum distance from said geographic location" ('576 Patent, Claims 1, 2 and 4)**

- One skilled in the art of the '576 Patent at the time of invention would understand from the specification that the phrase "values representative of geographic location and maximum distance from said geographic

location" refers to values that are used to define the search area encompassed by the area selection cursor.

- The '576 Patent describes a specific method for locating available real estate properties. According to the Abstract, the method involves using "a graphical locator interface which permits definition of a desired area for search by placing a user-controlled selector on a map displayed on a CRT."

- As shown in FIG. 3B, the user-controlled selector is a "rubber band" circle whose radius is displayed in miles. ('576 Patent at FIG. 3B; 9:33-37.) The user "select[s] his search boundary by selecting an appropriate circle." (*Id.* at 9:39-41.) When the user is finished positioning the circle around his desired search area, "the new center and radius of the selected region are stored in variables indicative of the center CX and CY and indicative of the radius RAD . . . ." (*Id.* at 11:8-12.)

- These center and radius values are stored, along with other property search specifications such as price, in a specification file labeled "SRPROP.DAT." (*Id.* at 10:18-31; FIG. 4.) The completed specification file is "transmitted to a host system and is used for a search of a database of available properties." (*Id.* at Abstract.) The host system conducts the search by calculating "[t]he distance from the property data records' location to the search area center location" and then comparing this calculated distance to the "search boundary radius value." (*Id.* at 3:15-18.)

- In view of the specification, one of ordinary skill in the art would understand from the language of the claims that the "values" referenced in this claim phrase define the area enclosed by the user-controlled first cursor (i.e., the desired area to search). *See id.* at Claim 1(e) ("accepting

an indication of completion of said first cursor traversal and size change and converting the area enclosed by said first cursor to values representative of geographic location and maximum distance from said geographic location[;]); Claim 2(m) ("accepting an indication of completion of said cursor traversal and size change and converting the area enclosed by said cursor to values representative of geographic location and maximum distance from said geographic location); and Claim 4(g) ("accepting an indication of completion of the second cursor traversal and radius change and converting the area enclosed by said cursor to values representative of geographic location and maximum distance from said geographic location.")

- Specifically, one of ordinary skill in the art would understand that the values representative of "geographic location" indicate the center of the enclosed area and the values representative of "maximum distance from said geographic location" indicate the distance from the center of the enclosed area to the boundary of the enclosed area.

- Professor Shasha's understanding of this phrase seems consistent with this understanding, as he states that for a radius-based search, "[t]he center of the area selection cursor corresponds to the 'geographic location' and the radius of the area selection cursor corresponds to the 'maximum distance from said geographic location.'" *See* REAL's Summary of Expert Opinions of Dennis Shasha.

- As described, in order for the host system to retrieve properties within the search area as defined by the radius of the area selection cursor, it must convert both the center of the circle as well as the radius of the circle to a world coordinate system that represents their actual physical locations on the Earth's surface in order to calculate the maximum distance between

them and to identify which properties fall within that distance. Move's proposed construction correctly accounts for this aspect of the claimed invention.

- REAL's proposed construction for this phrase, on the other hand, is vague and is not supported by the specification.

- REAL's proposed definition is vague as to what "points on the map within the area selection cursor" are being referenced.

- If the reference to "points" is consistent with the use of that term in the claims to mean the points that represent available real estate properties, the construction is wrong because this claim phrase does not relate to the properties identified by the host system. Indeed, unlike the '989 Patent, the '576 Patent does not disclose the notion of displaying property points on the map within the area selection cursor. *See, e.g.,* '576 Patent at FIGS. 3A and 3B (showing no property points).

- If REAL's reference to "points" means something else, Dr. Bacastow will need to consider REAL's interpretation, as clarified, and will, if necessary, provide his opinions based on this new information.

Dated: May 11, 2009

By: /s/ Coby S. Nixon

HENNELLY & GROSSFELD LLP
MICHAEL G. KING (SBN 145477)
(mking@hgla.com)

ALSTON & BIRD LLP
FRANK G. SMITH
(frank.smith@alston.com)
ROBIN L. MCGRATH
(robin.mcgrath@alston.com)
COBY S. NIXON
(coby.nixon@alston.com)

*Attorneys for Plaintiffs and Counterclaim-Defendants Move, Inc., National Association of Realtors, and National Association of Home Builders*

MICHAEL G. KING (SBN 145477)
mking@hgla.com
HENNELLY & GROSSFELD LLP
4640 Admiralty Way, Suite 850
Marina del Rey, CA 90292
Telephone: (310) 305-2100
Facsimile: (310) 305-2116

FRANK G. SMITH
frank.smith@alston.com
ROBIN L. MCGRATH
robin.mcgrath@alston.com
ALSTON & BIRD, LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777

*Attorneys for Plaintiffs and Counterclaim-Defendants,*
*MOVE, INC., NATIONAL ASSOCIATION OF REALTORS, and*
*NATIONAL ASSOCIATION OF HOME BUILDERS*

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| MOVE, INC, ET AL.,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>REAL ESTATE ALLIANCE LTD., ET AL.,<br><br>　　　　Defendants. | Case No. 2:07-CV-02185<br>Assigned to: George H. King<br><br><br><br>**PROOF OF SERVICE** |
| REAL ESTATE ALLIANCE LTD.,<br><br>　　　　Counterclaim-Plaintiff,<br><br>v.<br><br>MOVE, INC., ET AL.,<br><br>　　　　Counterclaim-Defendants. | |

# PROOF OF SERVICE

I am a citizen of the United States and employed in the County of Fulton, State of Georgia. I am over the age of 18 and not a party to the within action. My business address is One Atlantic Center, 1201 West Peachtree Street, Atlanta, Georgia 30309-3424.

On May 11, 2009, I served the following document:

**PLAINTIFFS' SUMMARY OF EXPERT OPINIONS REGARDING CLAIM CONSTRUCTION**

on the interested party in this action as indicated below:

Ron M. Cordova                             Attorneys for Defendant
Ron M. Cordova Attorney at Law             Diverse Solutions, Inc.
16520 Bake Parkway, Suite 280
Irvine, CA 92618
Telephone:  949-748-3600
Facsimile:  949-759-0186
EM:   advokaat@aol.com

[ ] **(BY MAIL)** I am readily familiar with the business' practice at my place of business for collection and processing of correspondence for mailing with the United States Postal Service. I know that the correspondence is deposited with the United States Postal Service in the ordinary course of business.  I know that the envelope was sealed and, with postage thereon fully prepaid, placed for collection and mailing on this date, following ordinary business practices, in the United States mail at Atlanta, GA.

[X] **(BY E-MAIL)** I caused the above-referenced document(s) to be transmitted by e-mail transmission to the interested party at the appropriate e-mail addresses as listed above or on the attached service list. I did not receive, with a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

[X] **(FEDERAL)** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on May 11, 2009, at Fulton County, Atlanta, Georgia.

_Rosemary K. Underwood_

Rosemary K. Underwood
Name                                    Signature