BERT H. DEIXLER (SBN 070614)
(bdeixler@proskauer.com)
PROSKAUER ROSE LLP
2049 Century Park East, 32nd Floor
Los Angeles, CA 90067-3206
Telephone: (310) 557-2900
Facsimile: (310) 557-2193

LOUIS M. SOLOMON
(lsolomon@proskauer.com)
PROSKAUER ROSE LLP
1585 Broadway
New York, New York 10036-8299
Telephone: (212) 969-3000
Facsimile: (212) 969-2900

*Attorneys for Defendant and Counterclaim-Plaintiff
Real Estate Alliance Ltd.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| MOVE, INC., <br><br> Plaintiff, <br><br> v. <br><br> REAL ESTATE ALLIANCE LTD. and EQUIAS TECHNOLOGY DEVELOPMENT LLC, <br><br> Defendants. <br><br>———————————— <br> REAL ESTATE ALLIANCE LTD., <br><br> Counterclaim-Plaintiff, <br><br> v. <br><br> MOVE, INC. <br><br> Counterclaim-Defendant. | CASE NO. CV 07-02185-GHK (AJWx) <br><br> Hon. George H. King <br><br><br> **DEFENDANT REAL ESTATE ALLIANCE LTD.'S SUMMARY OF EXPERT OPINIONS REGARDING CLAIM CONSTRUCTION** <br><br><br> Action Filed: Apr. 3, 2007 <br> Counterclaims Filed: Aug. 8, 2007 <br> 2d Am. Complaint Filed: Jan. 12, 2009 <br> Counterclaims Filed: Feb. 11, 2009 <br> Trial Date: TBD |

Pursuant to the Court's Phase 1 Scheduling Order ("Scheduling Order") (Dkt. Entry 211), Defendant and Counterclaim-Plaintiff Real Estate Alliance Ltd. ("REAL") hereby submits its summary of expert opinions regarding claim construction on the disputed terms and phrases of U.S. Patent Nos. 4,870,576 ("'576 Patent") and 5,032,989 ("'989 Patent"), on which the parties seek the Court's constructions.

In accordance with the Scheduling Order, the parties met and conferred to determine the claim terms and phrases that will require construction by the Court. Then, by agreement, the parties exchanged both opening and rebuttal summaries of expert opinions, disclosing the identities of their respective claim construction expert witnesses; the witnesses' opinions regarding claim construction and the bases for them; the witnesses' *curriculum vitae*; and the intrinsic and extrinsic evidence upon which the witnesses relied to arrive at their opinions. On April 16, 2009, in compliance with the Scheduling Order, the parties filed their Joint Statement of Disputed Terms and Extrinsic Evidence Regarding Claim Construction (Dkt. Entry 243), setting forth, for each disputed term or phrase, their respective proposed constructions, along with citations to the extrinsic evidence upon which they rely, including expert witness opinions.

With respect to expert witnesses, for the purposes of claim construction, REAL intends to rely upon the opinions of Dennis E. Shasha, Ph.D., and Michael W. Dobson, Ph.D., which are set forth below. For the Court's convenience, REAL attaches hereto the *curriculum vitae* for each witness as, respectively, Exhibits 1 and 2. Additional materials upon which the expert witnesses rely are also attached hereto as Exhibits 3 through 13. Additionally, for the sake of completeness and clarity, REAL sets forth the status of certain other previously disputed terms and phrases of the '576 and '989 Patents.

I.     <u>Summary of Opinions by Dennis E. Shasha, Ph.D.</u>

A person of ordinary skill in the art is one who has an undergraduate degree in computer science or equivalent, including familiarity with a programming language comparable to the C programming language, familiarity with a graphics library comparable to the HALO graphics library, and familiarity with database design and construction. A person of ordinary skill in the art also has at least one year of experience involving programming and database deployment.

I am a full professor of computer science at New York University, Courant Institute of Mathematical Sciences. I have taught computer science at NYU since 1984 and hold a doctorate in applied mathematics from Harvard University. I have performed research and consulting in many aspects of data intensive systems, including those supporting interactive websites. I understand and have helped design the architecture of database-backed websites including the computer code at the browser level (what the user interacts with) and the computer code at the data access level (the "backend" that supplies information to be presented to the user).

Unless otherwise noted below, the terms of the '576 Patent and the '989 Patent are entitled to their plain and ordinary meaning, as understood by one of ordinary skill in the art at the time of the respective filing dates of the '576 and '989 Patents.

In accordance with my review of the '576 and '989 Patents, along with their prosecution histories, and consistent with the intrinsic evidence cited and relied upon by REAL in its response to MOVE's Interrogatory No. 8 (attached hereto as Exhibit 3), as understood by one of ordinary skill in the art at the time of the respective filing dates of the '576 and '989 Patents, I state the following:

1.     The term "selecting" in both the '576 and '989 Patents describes an action involving the identification of a particular thing or things from among a

group of alternatives.  Accordingly, the meaning of this term is not limited to actions capable of being performed by a human being (which it certainly includes), but, rather, also includes actions performed by, for example, a piece of software or other automated process.

In the computer science context – both at the time the '576 and '989 Patents were filed and today – when the verb "select" is used in a sentence where the user is the subject, there is an understanding that the computer performs a selection as well, in order for there to be any effect on the user's actions.  An eponymous example comes from the relational databases.  In the database language SQL (which dates back to the early 1970s), the command "select" is used to retrieve data matching specified parameters.  Thus, in a SQL-based relational database having a table "properties" and fields "name" and "postalcode," the command "select name from properties where postalcode=90210" would retrieve the names from those rows in properties having 90210 in the postalcode field.

This understanding is supported in both the '576 and '989 Patents.  For example, according to both patents, "After selecting the landmark, moving the window box, and selecting its size, the user activates a key sequence to 'zoom' the display."  '576, col. 9, lines 28-30; '989, col. 9, lines 52-54.  For the first selection (of a landmark) to be carried out, the computer system must take the key sequence corresponding to a specific landmark and pass that key sequence to a function to identify or choose among landmarks.  Similarly, for the second selection (of the size of the window box), the computer system must take the key sequence corresponding to a size and/or a size change and pass that key sequence to a function to identify a particular

size or size increment.  *See, e.g.,* '576 Patent, Appendix, boxes S05065 – S05110 and boxes T05270 – T05312 (attached hereto as Exhibit 4).  For example, the figure on page 367 of Designing the User Interface by Ben Shneiderman (attached hereto as Exhibit 5), shows a box entitled "SEARCH/SELECT MODE" and contains the phrase "SELECT documents based on issue date."  The arrow to the right shows a loop entitled "SELECT query" and the phrase, for example, "ALLDATE > 850831."  Thus, according to Shneiderman, the notion of selection entails the use of the "SELECT query."

Thus, I agree with REAL's proposed construction, and to the extent that Plaintiffs construe the term "selecting" in other phrases (selecting a landmark, selecting first area, etc.) to mean that only a human (and not a computer) can perform that step, I disagree with Plaintiffs' proposed construction of that term.

2.  The term "landmark" in the '576 Patent does not require that a landmark have any historical significance.  Any point on a map or any identifiable feature on the Earth can be used as a landmark.

The term "landmark" does not have a specific meaning in the general computing literature.  In terms of a software implementation of the '576 Patent, however, a landmark is simply a point at a certain location.  A software implementation would not need to depend at all on a particular point's historical significance.  Nowhere in the '576 Patent is the notion of historical significance relied upon or even mentioned.

Thus, I agree with REAL's proposed construction and disagree with Plaintiffs' proposed construction of this term.

3.      The term "displaying" in both the '576 and '989 Patents is not limited to showing something on a computer screen.  It is a general term having a broad definition that includes, for example, the use of a printer to show something on paper.

In general usage, the word "display" has long applied in a context having to do with paper as well as with computer monitors.  For example, the term "display advertising" refers to advertisements appearing in print periodicals.  In the computer science context – and, in particular, the C programming language as of the mid-to-late 80's – displaying or printing involves sending information to an output stream.  The "standard output" stream is typically a computer monitor, but the information can be sent to virtually any output device, including a printer.  *See*, *e.g.*, Microsoft C Compiler Documentation, p. 1-42 (attached hereto as Exhibit 6).

Thus, I agree with REAL's proposed construction and disagree with Plaintiffs' proposed construction of that term.

4.      The phrase "area selection cursor" in the '576 Patent refers to a tool or utility for identifying a specific geographic area or data within that specified area.  It is more than simply a boundary.

Generally, a "cursor" is a tool for identifying or specifying something.  For example, the "crosshair cursor" is used for specifying a particular point.

(*See*, *e.g.,* col. 4, lines 39 – 41:  "… a moveable crosshair cursor is displayed which allows the user to pinpoint a location on the map.")  Similarly, an "area selection cursor" is a tool for identifying or specifying a particular area, both for display and functional purposes (*e.g.*, such functional purposes including further processing by another computer procedure).  A simple boundary displayed on the map does not serve any functional purposes.  Additionally, the cursor must be interactive, so that a user can position and re-size the cursor to accomplish the user's goal.

Thus, I agree with REAL's proposed construction and disagree with Plaintiffs' proposed construction of that phrase.

5.    The phrase "values representative of geographic location and maximum distance from said geographic location" in the '576 Patent includes certain information derived from the map.  The derived information represents the positions of points on the map within the area selection cursor.

In the context of the '576 patent, Claim 1, and its predecessors during prosecution (*i.e.*, Claim 13 and originally filed Claims 1 and 4), the information gathered in step (e) is to be transmitted in step (f).  That transmitted information is referred to alternatively as a "completed specification" (as in the Abstract), a "data set" (as in Claim 1), or as the contents of the SAPROP.DAT file (as in FIGS. 4 and 7 and col. 10, lines 12-31).  In the disclosed embodiment, the geographic information for a radius-based search is the center and radius of an area selection cursor.   The center of the area selection cursor corresponds to the "geographic location" and the

radius of the area selection cursor corresponds to the "maximum distance from said geographic location."

Plaintiffs' construction of this phrase appears to be too narrow. First, it is unclear what exactly "actual physical" locations are intended to mean compared to, for example, simply "locations." To the extent that "actual physical" locations are necessarily expressed in physical coordinates such as latitude and longitude, I do not believe that such an expression is necessary. Moreover, this language suggests a degree of precision in locating the "actual physical" location of geographic location that may not be present in an embodiment of the claim due to technical limitations.

Thus, I agree with REAL's proposed construction and disagree with Plaintiffs' proposed construction of that phrase.

6. The phrase "information about distance and direction from the center of said first cursor to said landmark" in the '576 Patent includes explicit information (*e.g.*, information that is written out numerically) or information that is inherently contained in a to-scale map. The information allows one to determine – at least approximately – the distance and direction from the center of the cursor to the landmark.

In the described embodiment, the information about distance and direction from the center of the first cursor to the landmark is shown, for example, in FIG. 3A. Information about distance is displayed in text, above the map ("SEARCH WINDOW CENTER TO INDEPENDENCE HALL DISTANCE = 16.3 MILES.") Information about direction is displayed in

the map itself.  Although no compass is displayed to indicate the cardinal directions, the relative locations of the counties and/or towns inherently establish these directions.  For example, insofar as Whitpain is physically located west of Ambler, and Whitpain is shown to the left of Ambler, then the westerly direction points to the left on the map shown in FIG. 3B.

In a map that depicts the surface of the Earth in a to-scale fashion, information about distance from one point to another can be deduced in the same manner as direction can be deduced in FIG. 3B, as described above.  For example, if a pair of points are physically separated by one mile and are displayed on a map separated by one inch, then this information is sufficient to determine a distance scale applicable to the entire map (assuming the map is itself to-scale).

Thus, I agree with REAL's proposed construction and disagree with Plaintiffs' proposed construction of that phrase.

7.    The phrase "zooming . . . thereby displaying a higher level of detail" in the '576 Patent means that more information is displayed in the zoomed map than was previously displayed.  This is in contrast to magnification.  Magnification simply enlarges existing features, which, in some cases, makes already existent information more easily recognizable.  But magnification does not disclose or provide any new information.  The phrase "zooming in on . . . to display a higher level of detail" in the '989 Patent similarly means that more information is displayed in the zoomed map than was previously displayed.

The meaning of "higher level of detail" is evident in the '576 and '989 Patents themselves. For example, in the transition from FIG. 3A to FIG. 3B, town labels and boundaries are drawn. These town labels and boundaries in FIG. 3B are examples of additional information that was not present in FIG. 3A.

Moreover, this distinction was further clarified during the prosecution of the '576 Patent. In particular, in the October 8, 1987 Amendment (attached hereto as Exhibit 7), the patentee distinguished the Fitzgerald reference (U.S. Patent No. 4,312,577), in part, because Fitzgerald disclosed only an optical zoom ("Because Fitzgerald teaches the use of an optical projection system, his zoom operation fails to provide a greater level of detail[ ] as required.").

In Designing the User Interface, pp. 186 – 188 (attached hereto as Exhibit 8) describe a notion of zooming in which information is disclosed as a result of zooming that cannot be seen at all before the zoom. For example, on p. 188, Shneiderman states that, "by moving the joystick and zooming in on objects of interest, the user is taken through complex "information space" or "I-spaces" to locate the item of interest. A building floor plan showing departments might be shown, and when a department is chosen, individual offices become visible. On moving the cursor into a room, details about its occupant appear onscreen." This quote illustrates a type of process that is akin to the zooming according to REAL's construction.

Thus, with respect to both phrases, I agree with REAL's proposed constructions and disagree with Plaintiffs' proposed constructions of these phrases.

8. The term "substantially coincide" in the '576 Patent must be understood in contrast to the term "exactly coincide." Software or hardware limitations at the time prevented exact coincidence. In particular, such limitations appear in col. 14, lines 41 – 44. One of ordinary skill in the art at the time the '576 Patent was filed would have been aware of such limitations and consequently would have understood the phrase "substantially" as acknowledging the existence of such limitations. Accordingly, the phrase means to the extent practicable, as limited by the functionality of the software or hardware at issue. Thus, I agree with REAL's proposed construction and disagree with Plaintiffs' position that the term is indefinite because I believe it is not insolubly ambiguous and is amenable to construction.

9. Similarly, the phrase "to about the boundaries" in the '989 Patent must be understood in contrast to the phrase "to exactly the boundaries." Software or hardware limitations at the time (such as those appearing in col. 14, lines 41 – 44) prevented zooming to the precise boundaries. Accordingly, the phrase means to the extent practicable, as limited by the functionality of the software or hardware at issue. Thus, I agree with REAL's proposed construction and, to the extent that Plaintiffs purport that this phrase is indefinite, I disagree with that position.

10. The phrase "creating a database of the available real estate properties" in the '989 Patent includes the database schema itself and population of that schema with data. Merely creating a database schema alone is not "creating a database" within the meaning of the inventions disclosed in the patent.

The specification supports this construction. For example, the '989 Patent's Abstract states, "There is provided a method for locating available real estate properties for sale, lease, or rental using a database of available properties . . . ." The database of available properties must contain data in order to perform this method.

Similarly, col. 2, lines 34 – 38 provides, "A 'host system' having a database can be search from 'remote' computer systems . . . ." Again, a database cannot be searched without data. In FIG. 2, box 260 depicts the process "search database of properties using buyer's specifications," with corresponding text at col. 8, lines 19 – 41. Once again, data must be present for this search to be possible.

At no point does the '989 Patent or its intrinsic evidence suggest that the phrase "database" should be given anything but this plain and ordinary meaning.

Thus, I agree with REAL's proposed construction and disagree with Plaintiffs' proposed construction of that phrase.

11. I disagree with Professor Astrachan's opinion with respect to the educational background and/or experience of one of ordinary skill in the art.[1] Someone with an undergraduate degree in computer science (as of the mid-late 80's) would not necessarily have familiarity with certain components of the

---

[1] In its opening summary of expert opinions, Plaintiffs identified Owen Astrachan as one of its two expert witnesses regarding claim construction. Paragraphs 11 and 12 of Professor Shasha's summary of opinions responds to Professor Astrachan's opinions.

inventions in the '989 Patent. For example, it was then (and is now) possible to earn an undergraduate degree in computer science without one or more of: (a) significant exposure to computer graphics; (b) programming experience in a language equivalent to C; or (c) database design/construction. Moreover, it is my opinion that successfully deploying a database according to the invention would require undue experimentation – even for someone with an education in database construction and design – unless that person had at least one year of experience in database deployment. Similarly, someone with one year of practical experience in Geographic Information Systems may not have any or all of the education or experience mentioned above.

12. Professor Astrachan also asserts that creating a database consists entirely of the steps: (1) creating one or more database "tables"; (2) instantiating the tables with one or more database "fields"; and (3) defining the relationships between the tables and fields so that information contained therein can be quickly and efficiently queried using a computer system. Steps (1) – (3) described by Professor Astrachan result in creating a logical structure, also known as a "database schema." A database schema is *part* of a database, but is not the same as an entire database. As understood by one of ordinary skill in the art – both in the mid 1980's and today – the term "creating a database" means creating a logical structure or schema, together with contents in the form of stored data.

The extrinsic evidence cited by Professor Astrachan fails to support the position that "creating a database" excludes storing data in a logical structure. In fact, the extrinsic evidence actually supports the opposite

conclusion, namely, that "creating a database" includes storing initial data, and is wholly consistent with the intrinsic evidence. For example, in C.J. Date, *An Introduction to Database Systems* (attached hereto as Exhibit 9):

- "By way of illustration, we show in Fig. 1.1 a very small database containing a single file, the CELLAR file, <u>which in turn contains information concerning the contents of a wine cellar</u>." p. 3 (emphasis added).
- "For example, a given database might contain both an EMPLOYEE file, <u>giving name, address, department, salary, etc.</u>, and an ENROLLMENT file, representing <u>the enrollment of employees in training courses</u>." p. 7 (emphasis added).
- "Any enterprise must necessarily maintain a lot of data about its operation. This is its 'operational data' …. A database is a collection of stored <u>operational data</u> used by the application systems of some particular enterprise." p. 9 (emphasis added).
- "The significant point about relationships such as those illustrated in Fig. 1.5 is that *they are just as much a part of the operational data as are the basic entities*." p. 11 (emphasis in original).

Similarly, *Principles of Database Systems* by Jeffrey Ullman (attached hereto as Exhibit 10) does not support Professor Astrachan's assertions. In fact, this book also supports the opposite proposition, namely, that a database necessarily contains data. For example:

- "Data, such as the above [in an airline example, information about passengers, flights, aircraft, and personnel], that is stored more-or-less permanently in a computer we term a *database*." p. 1 (italics in original).
- In discussing the role of a database administrator, Ullman acknowledges the difference between "[t]he creation of the original description of the database structure [*i.e.*, the schema] and the way that structure is reflected by the files of the physical database [*i.e.*, stored data]." p. 5.
- "We may view the physical database itself at several levels of abstraction, ranging from that of <u>records and files</u> in a programming language such as Pascal ...." p. 6. Records and files both contain data, contrary to Professor Astrachan's assertions.
- In FIG. 1.2 (p. 6), Ullman again distinguishes between the "conceptual database" (table names and field names) and the "physical database" (the actual data); the entire database includes both of these.

Further, I disagree with Professor Astrachan's interpretation of the entries cited by REAL from the IBM Dictionary of Computing (1994). These entries refer to a "database" as "[a] collection of data with a given structure ...." and "[a] collection of interrelated data organized according to database schema ...." Thus, "creating a database" means creating the schema, together with its contents, and, in that regard, I also disagree with Professor Astrachan's assertion that REAL's proposed construction of "creating a database" is somehow equivalent to the concept of "maintaining a database" in the '989 Patent.

The notion that "creating a database" includes creating or storing initial data is borne out in the intrinsic evidence as well. For example:

- '989 Patent, col. 2, lines 30 – 34 (emphasis added): "The present invention comprises a system of computer software for creating and maintaining both a real estate property database and a corresponding file of hard-copy real estate property listing advertisements, and for <u>allowing searches of the database</u>." One cannot search a database that does not contain data.
- '989 Patent, FIG. 2, box 260: "Search Database of Properties Using Buyer's Specifications." Again, actual data must be present in order to search the database.

Finally, to the extent that Professor Astrachan relies on language in the specification of the '989 Patent to equate the process of creating a "listing file" with "maintaining a database," I disagree with his interpretation. A "listing file" could be a database, and, thus, creating a listing file would be consistent with creating a database.[2]

---

[2] In REAL's opening summary of expert opinions, Professor Shasha also disclosed his opinions on the claim phrase "said data set." Since then, however, the parties have reached an agreement as to the construction of that phrase, and, thus, REAL does not set forth those opinions here. *See infra* Section III.

II.    <u>Summary of Opinions by Michael W. Dobson, Ph.D.</u>

A person of ordinary skill in the art is someone with at least one year of practical experience involving computer mapping or geographic information systems, or someone having experience with computers equivalent to an undergraduate degree in computer science that included coursework in computer graphics.

Unless otherwise noted below, the terms of the '576 Patent and the '989 Patent are entitled to their plain and ordinary meaning, as understood by one of ordinary skill in the art at the time of the respective filing dates of the '576 and '989 Patents.

In accordance with my review of the '576 and '989 Patents, along with their prosecution histories, and consistent with the intrinsic evidence cited and relied upon by REAL in its response to MOVE's Interrogatory No. 8 (attached hereto as Exhibit 3), as understood by one of ordinary skill in the art at the time of the respective filing dates of the '576 and '989 Patents, I state the following:

1.    The term "landmark" in the '576 Patent does not require that a landmark have any historical significance.  It is a general term having a broad definition that includes any identifiable structure or feature on land that is noticeable, perceptible, or is distinct in some respect from other locations.  Any point of interest on a map can be used as a landmark.

My opinion is based on my review of pertinent reference materials in cartography/mapping and GIS, as well as my background in mapping, and my experience as Chief Cartographer for one of the world's largest commercial mapping companies.  In addition, it is my opinion that REAL's

proposed definition of the term "landmark" is consistent with the use of the term in the Patents and the patent prosecutions for Patents '576' and '989'.

Plaintiffs, in their response to REAL's Interrogatory No. 6 [seeking Plaintiffs' claim construction positions], appear to include historical significance as a component of the definition of the term "landmark." Historical significance is not, in my opinion, a requirement of any accepted definition of the term "landmark." While "history" may be a characteristic of some landmarks, it is not a qualifier for inclusion in the class of objects referred to as "landmarks."

Thus, I agree with REAL's proposed construction and disagree with Plaintiffs' proposed construction of this term.

2. The phrase "zooming . . . thereby displaying a higher level of detail" in the '576 Patent requires displaying one or more additional elements or items of information after performance of the zoom function that were not shown at the previous, lower level of magnification. That is, the zooming step involves more than simply magnifying the existing information to a larger scale. The phrase "zooming in on . . . to display a higher level of detail" in the '989 Patent similarly requires displaying one or more additional elements or items of information after performance of the zoom function that were not shown at the previous, lower level of magnification.

The constructions proposed by REAL for these terms are consistent with my understanding of the general use of the term "zooming" in computer mapping/computer graphics and as linked to the concept of specifying the

use of "zooming" to result in "greater detail" as described in the '576 and '989 Patents and file histories.

"Zooming" in computer mapping/computer graphics is a function designed to provide closer-up or further-away views of subject matter. The increase or decrease in apparent magnification is a result of manipulating the viewport and applying a positive or negative factor to apparently increase or decrease the magnification of the image.

It is important to note that not all zoom functions involved in computer graphics or computer mapping are designed to provide higher levels of detail as a result of zooming in. The concept of a "digital zoom," for instance provides the "impression" of being closer to an object, without actually presenting additional detail (information). Conversely, the inventor of Patents '576' and '989' very specifically linked "zooming in" with the presentation of a higher level of detail in the resulting viewport. The use of "zooming to display a higher level of detail" as used by the inventor, in my opinion, clearly means displaying one or more additional elements or items of information after the zoom function that were not shown at the previous, lower level of magnification.

My opinion of the definition of "zooming and a higher level of detail" is based on my review of pertinent reference materials in cartography/mapping/GIS and computer graphics, as well as my background in computer mapping, and my experience as Chief Cartographer for one of the world's largest commercial mapping companies. Finally, the prosecution histories of the patents (*e.g.*, the August 12, 1988 Amendment in

the '576 file history) (attached hereto as Exhibit 11) provide substantial indications of the tenacity with which the inventor defended his claim that zooming results in greater level of detail in the zoomed image than was available in the precursor image.

In its constructions of these terms, Plaintiffs appear to have ignored the inventor's intent to couple the concept of zooming with the display of a higher level of detail, including additional elements of information not shown at the lower magnification. Therefore, it is my opinion that Plaintiffs' proposed definition flawed, and unrepresentative of the zoom functionality described in the '576' and '989' Patents.

Thus, with respect to both phrases, I agree with REAL's proposed constructions and disagree with Plaintiffs' proposed constructions of these phrases.

3. The phrase "appropriate geographic location" in the '989 Patent refers to the specificity with which a property's location is specified or geocoded in the property database. For example, if the property's location is specified with an accuracy on the order of the size of the house, then an appropriate geographic location would be the address of the property. Another appropriate geographic location would be given by the metes and bounds of the property. Similarly, if the property's location is specified with an accuracy on the scale of a zip code, then an appropriate geographic location would be the zip code.

My opinion of the definition of "appropriate geographic location" is based on my review of pertinent reference materials in cartography/mapping/GIS and computer graphics (including chapters 1 and 8 of Robinson, *et. al.*, and chapters 1 and 2 of Muehrcke) (tables of contents for those publications attached hereto as Exhibits 12 and 13, respectively), as well as my background in computer mapping, and my experience as Chief Cartographer for one of the world's largest commercial mapping companies.

In order to understand the meaning of the phrase "appropriate geographic location" one needs to consider that maps are both representations of and simplifications of the "real world." As a consequence, the locations of the features shown on a map are subject to the elements and controls of a process known as map generalization. While the basic nature of maps is to preserve, to the degree possible, the position and topologic relations between and among the maps "features," this task is often difficult to achieve given variations in map scale, symbology used, data collection techniques, data display techniques, data collection constraints, data classification employed and other factors related to cartographic generalization. Although the cartographer's primary goal is to represent features with correct topology, it is not always possible to represent features with the specific attributes they possess in reality. Instead, the cartographer works with the elements and controls of generalization to produce a map that best represents a simplified reality at a reduced scale.

Thus, I agree with REAL's proposed construction and disagree with Plaintiffs' proposed construction of this phrase.

III.    <u>Previously Disputed Claim Terms and Phrases</u>

The parties have agreed upon the constructions for certain previously disputed claim terms and phrases, and, thus, the parties' respective expert witnesses have not opined on their meanings.  Instead, REAL respectfully requests that the Court adopt the following agreed-upon definitions for those terms and phrases in its eventual claim construction order:

| Claim Term/Phrase | Location in Patents[3] | Agreed-Upon Construction |
|---|---|---|
| said data set | 576:1(f), (g) | a group of information containing the criteria to be used in finding a desired real estate property, including absolute geographic location information |
| radius | 576:2(l)<br>576:4(f), (g) | the distance between the center and the perimeter of the circle |
| canter | 576:3(b) | center |
| points file | 989:4 | a computer-readable file containing information related to the available real estate property or properties |
| Characteristic information | 989:6(i) | information related to a feature of an available real estate property, such as number of bedrooms, square footage, or price |
| characteristic | 989:6(j), (k) | a category of information related to a feature of an available real estate |

---

[3] The location in the '576 and '989 Patents is indicated by noting the last three digits of the patent number(s), followed by the claim number(s) in the patent(s) within which the claim term/phrase can be found.

| | | property, such as number of bedrooms, square footage, or price |
|---|---|---|
| plurality of points | 989:1(g) | more than one point |

Additionally, the parties have agreed that certain claim terms should be accorded their plain and ordinary meanings, and, thus, the parties' respective expert witnesses have not opined on those meanings. However, the parties have also not reached agreement as to the precise plain and ordinary meanings. Moreover, the parties recognize the potential issue that may arise if one or the other of the parties argues differing inferences of these terms, and, in that regard, REAL believes that agreement as between the parties (or, alternatively, construction by the Court) regarding the actual definitions of these terms is required. *See generally O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351 (Fed. Cir. 2008) (holding that even the plain and ordinary meanings of claim terms require construction by the court when the parties dispute the scope those terms encompass).

Plaintiffs nonetheless decline to agree in advance on the definitions for those terms, even though REAL has already proposed constructions for them (in its responses to Plaintiffs' claim construction interrogatory, *i.e.*, Exhibit 3 hereto), and even though those definitions would not be read to the jury as part of the Court's final instructions. Rather, Plaintiffs will only agree to stipulate that the parties have not identified any current dispute as to the meaning of these terms, and that those terms do not need to be construed.

For the sake of completeness and clarity, REAL identifies the claim terms at issue and REAL's proposed plain and ordinary meanings:

//

//

| Claim Term/Phrase | Location in Patents | REAL's Proposed Construction |
|---|---|---|
| map | 576:1(b), (c), (d)<br>576:2(k), (l)<br>576:3(b), (c), (d), (e)<br>576:4(f)<br>989:1(b), (d) | a representation of all or a portion of the Earth's surface |
| transmitting | 576:1(f), (j) | sending |
| receiving | 576:1(g) | obtaining |
| desired geographic area | 989:1(b) | a geographic area that does or may contain an available real estate property for location |
| printing | 989:2 | directing output from a computer-implemented process |
| providing | 989:3<br>989:6(i) | making available |
| modifying | 989:6(k) | implementing any change |

Dated:  May 11, 2009        PROSKAUER ROSE LLP

BERT H. DEIXLER (SBN 070614)
(bdeixler@proskauer.com)
LOUIS M. SOLOMON
(lsolomon@proskauer.com)

By: _Louis M. Solomon_
_____
    Louis M. Solomon

*Attorneys for Defendant and Counterclaim-Plaintiff Real Estate Alliance Ltd.*

1

## PROOF OF SERVICE

2

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3

4

I declare that: I am employed in the county of Los Angeles, California. I am over the age of eighteen years and not a party to the within cause; my business address is 2049 Century Park East, Suite 3200, Los Angeles, California 90067-3206.

5

6

On May 11, 2009, I served the forgoing documents, described as:

7

**DEFENDANT REAL ESTATE ALLIANCE LTD.'S SUMMARY OF EXPERT OPINIONS REGARDING CLAIM CONSTRUCTION**

8

9

☒    by placing ☐ the original ☒ a true copy thereof enclosed in sealed envelopes addressed as follows:

10

11

Ron M. Cordova, Attorney at Law
16520 Bake Parkway, Suite 280
Irvine, CA 92618

12

13

☒    (By Mail) I am "readily familiar" with the Firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

14

15

16

17

18

19

☐    (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

20

21

☒    (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

22

23

Executed on May 11, 2009 at Los Angeles, California.

24

25

S. Montaye Sigmon

26

27

28