**R-10**

Move, Inc., et al. v. Real Estate Alliance Ltd, et al.
Mark A. Tornetta

2:07-CV-02185
August 3, 2009

Page 1

```
                UNITED STATES DISTRICT COURT
        FOR THE CENTRAL DISTRICT OF CALIFORNIA
                    WESTERN DIVISION
                Case No. 2:07-CV-02185


    -----------------------------------x

MOVE, INC., et al.,

        Plaintiffs,

    -v-

REAL ESTATE ALLIANCE LTD, et al.,

        Defendants.
    -----------------------------------x



        Videotaped deposition of MARK A.
    TORNETTA, taken on behalf of the Plaintiffs,
    held at the offices of Alston & Bird, LLP,
    90 Park Avenue, New York, New York 10016, at
    8:56 a.m. on Monday, August 3, 2009, before
    Janet Hamilton, RPR, (1991), and New York
    Notary Public.
```

R000643

EXHIBIT R-10

Page 2

```
1    APPEARANCES:
2         For Plaintiffs
             ALSTON & BIRD, LLP
3            One Atlantic Center
             1201 West Peachtree Street
4            Atlanta, Georgia 30309
5       BY:  ROBIN L. McGRATH, ESQ.
             FRANK G. SMITH, ESQ.
6            (404) 881-7000
             rmcgrath@alston.com
7
8         For Defendants
             PROSKAUER ROSE, LLP
9            1585 Broadway
10           New York, New York 10036
        BY:  LOUIS M. SOLOMON, ESQ.
11           (212) 969-3000
             lsolomon@proskauer.com
12
13
14   ALSO PRESENT:
             LEE BOWERY, Videographer
15
16
17
18
19
20
21
22
23
24
25
```

R000644

EXHIBIT R-10

Move, Inc., et al. v. Real Estate Alliance Ltd, et al.         2:07-CV-02185
Mark A. Tornetta                                                August 3, 2009

Page 10

1    correct?

2         A.    That's correct.

3         Q.    Now, you had your deposition taken in the

4    Sarkisian matter, did you not?

5         A.    Yes, I did.

6         Q.    Have you ever read your transcript from

7    the Sarkisian case?

8         A.    Yes.

9         Q.    How many times would you say you read it?

10        A.    Three or four.

11        Q.    When was the last time you read it?

12        A.    Yesterday.

13        Q.    Did you read it in its entirety

14   yesterday?

15        A.    No.

16        Q.    What did you do with the transcript

17   yesterday when you were reviewing it?  Did you skim

18   it?

19        A.    Well, I couldn't read the whole thing in

20   one day.  And I was traveling.  So I read some of it

21   on the train.  And I read some of it the day before.

22        Q.    Okay.  So between the last two days, did

23   you manage to read the entire deposition?

24        A.    Yes.

25        Q.    Okay.  Now, REALPRO, Limited, is named on

R000645

EXHIBIT R-10

Page 11

```
 1    the face of the patents as the assignee.  What is

 2    REALPRO, Limited?

 3          A.    It was a company.

 4          Q.    At the time that you filed the

 5    application that led to the '576 Patent, had that

 6    company been formed?

 7          A.    Yes.

 8          Q.    Do you recall when the company was

 9    formed?

10          A.    You have to be more specific.

11          Q.    Okay.  Well, the application was filed in

12    March of 1986.  Had REALPRO, Limited, been formed as

13    a company at that point?

14          A.    You have to be more specific.

15          Q.    In terms of what?

16          A.    There were two REALPRO, Limiteds.

17          Q.    Okay.  One was in Delaware and one was --

18    where?

19          A.    Pennsylvania.

20          Q.    Pennsylvania.  Which came first?

21          A.    Pennsylvania.

22          Q.    Okay.  At the time the '576 application

23    was filed in March of 1986, was the entity in

24    Pennsylvania yet formed?

25          A.    I don't remember.
```

R000646

EXHIBIT R-10

Move, Inc., et al. v. Real Estate Alliance Ltd., et al.                    2:07-CV-02185
Mark A. Tornetta                                                            August 3, 2009

Page 12

1        Q.    Okay.  Do you remember -- that one -- the
2    Pennsylvania company came first.  Is that what you
3    said?
4        A.    Yes.
5        Q.    Okay.  And you don't recall when you
6    formed it.  Is that right?
7        A.    I don't recall.
8        Q.    Okay.  What about the Delaware company?
9    Do you recall when you formed that?
10       A.    It was after the Pennsylvania company.
11       Q.    And you don't recall how long after?
12       A.    No.
13       Q.    Okay.  Who -- I take it you were involved
14   in the formation of REALPRO?
15       A.    Yes.
16       Q.    Who else, if anybody, was involved?
17       A.    It was -- well, the formation.  It was
18   David Tornetta.  Robert Maurer.  This is REALPRO
19   Pennsylvania I'm talking about.
20       Q.    Okay.
21       A.    David Tornetta.  Robert Maurer.  Joe
22   Nentwig.  And Larry Tornetta.
23       Q.    Is David Tornetta a relative of yours?
24       A.    Yes.
25       Q.    Who is he, in relation to you?

REPORTED BY: Janet Hamilton, RPR                    www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022  (404) 875-0400

R000647

EXHIBIT R-10

Move, Inc., et al. v. Real Estate Alliance Ltd, et al.          2:07-CV-02185
Mark A. Tornetta                                                 August 3, 2009

Page 13

1          A.   He is my brother.

2          Q.   What about Larry Tornetta?

3          A.   He is my cousin.

4          Q.   Were these people that you've named

5     employees of REALPRO at any point?

6          A.   No.

7          Q.   What was REALPRO formed to do?

8          A.   To develop a real estate search and

9     location system and method.

10         Q.   To develop that system and method.  Is

11    that what you said?

12         A.   Yes.

13         Q.   Does that suggest in any way to you that

14    it was formed prior to your development of the

15    inventions that are the subject of the patents?

16         A.   I don't remember.

17         Q.   Okay.  Does REALPRO, Limited, Delaware,

18    exist today?

19         A.   I don't know.

20         Q.   Okay.  Are you involved in any way in an

21    entity called REALPRO?

22         A.   I don't think so.  I don't know, though.

23         Q.   All right.  At one point you were active

24    with a company called REALPRO.  Correct?

25         A.   Yes.

REPORTED BY: Janet Hamilton, RPR          www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022  (404) 875-0400

R000648

EXHIBIT R-10

Page 67

```
 1    information -- I want to make sure I get the
 2    question.
 3         Q.   I understand.
 4         A.   Understand the question.  That's all.
 5         Q.   All right.  But how --
 6         A.   You're speaking a little fast to me.
 7    That's all.
 8         Q.   All right.  How is the medication that
 9    you're on right now affecting you?
10         A.   I'm afraid I'm not hearing things
11    perfectly when you speak fast.
12         Q.   Is there any other way it's affecting
13    you?
14         A.   No.
15         Q.   Okay.  Was this working system that you
16    developed that allowed the steps of the '576 Patent
17    to be performed the same system as the one that
18    allowed the steps of the '989 Patent to be
19    performed?  Or are they two separate systems?
20         A.   One system.
21         Q.   Okay.  Do you recall when you developed
22    that working system?
23         A.   Could you be more specific when you say
24    "develop"?  It's kind of a broad thing.
25         Q.   When -- at what point did the system
```

R000649

EXHIBIT R-10

Move, Inc., et al. v. Real Estate Alliance Ltd, et al.          2:07-CV-02185
Mark A. Tornetta                                      August 3, 2009

Page 68

1    exist such that it enabled the steps of both the

2    '576 and the '989 Patents to be performed?

3         A.   That system was finished development a

4    month before the application for the '989 Patent.

5         Q.   Okay.  That's when the development of the

6    system was finished.  I take it the development was

7    a work in progress, over time?

8         A.   Yes.

9         Q.   At any point prior to its being finished

10   a month before the application for the '989 Patent

11   was filed, was it in a state that it could perform

12   the steps of the '989 Patent and the '576 Patent?

13             MR. SOLOMON:  Asked and answered.

14        A.   Could you repeat the question, please?

15        Q.   (By Ms. McGrath) Sure.

16             I understand you finished its development

17        a month before the patent application for the

18        '989 Patent was filed.  At any point prior to

19        its development being finished, was it at a

20        stage whereby it could perform the steps of

21        the '989 and '576 Patents?

22   A.   There were -- I don't remember.

23   Q.   You don't remember.

24        Did that system have a name?

25   A.   No.

REPORTED BY: Janet Hamilton, RPR          www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022  (404) 875-0400

R000650

EXHIBIT R-10

Page 72

1   User Disk or the code that was used in connection

2   with the REALPRO User Disk?

3       A.   I don't remember.

4       Q.   Now, Rattner & Prestia.  That was the

5   firm that worked on the prosecution of those

6   patents.  Correct?

7       A.   Yes.

8       Q.   Was Lawrence Husick with that firm during

9   the prosecution of the patents?

10      A.   Lawrence Husick -- he left in the middle

11  of it.  So I don't remember when -- he was there

12  when I got there.  Let me put it to you that way.

13  And he left in the middle.

14      Q.   All right.  Were you the one that made

15  the decision to retain Rattner & Prestia as the firm

16  to prosecute the patents?

17      A.   I don't remember.

18      Q.   Did you know Mr. Husick before you

19  retained that firm?

20      A.   No.

21      Q.   So you met Mr. Husick in connection with

22  your retaining that firm.  Correct?

23      A.   Yes.                        R 00650.1

24      Q.   How did you come to Rattner & Prestia?

25      A.   By car.

EXHIBIT R-10

Move, Inc., et al. v. Real Estate Alliance Ltd, et al.          2:07-CV-02185
Mark A. Tornetta                                                 August 3, 2009

Page 87

```
 1   Correct?

 2        A.   I don't remember.

 3        Q.   On the last page of the license, after

 4   the signature block, it says, "Mark A. Tornetta, as

 5   an individual, hereby agrees to" -- and then there

 6   are two paragraphs below that with your signature.

 7   Correct?

 8        A.   Yes.

 9        Q.   Why was that a part of the agreement?

10        A.   Well, there was no system.  So

11   Synermation wanted me to develop a system.

12        Q.   So there was no system in existence at

13   this point.  Is that what your testimony is?

14        A.   No.  That's right.

15        Q.   So you had not developed a working system

16   at this point?

17        A.   I had not.  No.

18             A working system?

19        Q.   Correct.

20        A.   You've got to be more specific.

21        Q.   A system whereby the steps that are set

22   forth in the '989 and '576 Patents could be

23   performed.

24        A.   I don't remember that.  No.

25        Q.   You don't remember, meaning it didn't
```

REPORTED BY: Janet Hamilton, RPR          www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022  (404) 875-0400

Page 93

1         Paragraph 2.1 says, "Within 30 days after

2  the effective date of this agreement, REALPRO will

3  deliver to Synermation five copies of the user

4  documentation identified in Schedule A, attached

5  hereto, and five copies of each item of technical

6  information in tangible form."

7         Did, in fact, REALPRO deliver this

8  material to Synermation?

9     A.  I don't remember.

10     Q.  Do you still have copies of the material

11  that was obligated to be delivered to Synermation?

12     A.  No.

13     Q.  Okay.  The next paragraph says, "Within

14  30 days after delivery of material provided for in

15  Paragraph 2.1, REALPRO will meet with Synermation

16  for two man days at no expense to assist Synermation

17  to understand the contents of the material and to

18  transfer to Synermation additional information which

19  REALPRO has, not in tangible form, related to the

20  technical information."

21         Did REALPRO, in fact, do what was stated

22  in this paragraph?

23     A.  I don't remember.     R 00651.1

24     Q.  So you don't recall -- do you recall

25  personally meeting with folks at Synermation for two

EXHIBIT R-10

Page 94

1   days to assist them?

2        A.   I don't.

3        Q.   And you don't know whether you did or

4   not; you just don't recall it?

5        A.   I don't know.  Right.  I don't recall.

6        Q.   Okay.  2.3.  "Within 60 days after the

7   effective date of this agreement but after delivery

8   of the material provided for in Paragraph 2.1,

9   REALPRO will install the licensed software in

10  licensed hardware provided by Synermation.  REALPRO

11  will conduct all of its testing procedures on the

12  licensed software to ensure successful operation of

13  the licensed software, according to Schedule B

14  attached hereto."

15            Did that get done, Mr. Tornetta?

16       A.   I don't remember.

17       Q.   You don't recall whether REALPRO ever

18  installed licensed software into licensed hardware

19  for Synermation?

20       A.   I don't know whether it happened within

21  60 days.

22       Q.   Okay.  Do you know if it happened at all?

23       A.   It did.

24       Q.   Under Paragraph 2.2, do you know whether

25  that meeting ever took place, even if it didn't take

Move, Inc., et al. v. Real Estate Alliance Ltd, et al.          2:07-CV-02185
                    Mark A. Tornetta                              August 3, 2009

Page 99

1          Q.   I think you testified, correct me if I'm

2    wrong, that you don't know whether there was

3    previous testing that happened prior to September of

4    '88?

5          A.   I don't know.  No, I don't.

6          Q.   Okay.  So is your testimony that you

7    delivered the software late based on the fact that

8    the test results that were produced are dated

9    September of '88?  Or do you have a memory that you

10   produced software late?

11         A.   I have a memory that I produced software

12   late.

13         Q.   Do you have a memory as to when you

14   produced the software?

15         A.   I would say August or September 1988.

16   And I'll probably have to say September.

17         Q.   And why do you have -- what makes you

18   remember that, of all the things that you haven't

19   been able to remember?

20         A.   Because when I look at the evidence,

21   which is -- it's the result of a search.

22         Q.   So -- I'm sorry.

23         A.   There are a couple of them in there.  And

24   that shows me that they were testing it at that

25   point.  And that's what it was.              R 00663.1

REPORTED BY: Janet Hamilton, RPR              www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022  (404) 875-0400

EXHIBIT R-10

Page 101

1    around September.

2         Q.    And --

3         A.    Based on those documents I saw.

4         Q.    All right.  Let's go back to my question.

5              If you hadn't seen those documents, okay,

6    the extent of your memory would be "I know I was

7    late.  I just don't recall how late"?

8         A.    Exactly.

9              MR. SOLOMON:  Object to form.  Asked and

10        answered.

11             MS. McGRATH:  (To reporter) Did you get

12        the answer?

13             THE REPORTER:  Yes.

14        A.    Exactly.

15        Q.    (By Ms. McGrath) Do you remember who at

16   Synermation performed the testing?

17        A.    No, I don't.

18        Q.    As a result of that testing, did they

19   complain that the testing -- strike that.

20             As a result of that testing, did they

21   complain that the software did not operate as,

22   according to Schedule B, as required in

23   Paragraph 2.4?

24        A.    They terminated the agreement.

25        Q.    When did they terminate the agreement?

R000652

EXHIBIT R-10

Page 102

1          A.    After the testing.

2          Q.    So the testing was in September, you

3    think, of 1988.  And then they terminated it at what

4    point after September of '88?

5          A.    Probably -- I don't know how long they

6    tested it.  So -- I don't know.  Probably the end of

7    the year.

8          Q.    And did they terminate it because the

9    software failed to operate, according to Schedule B?

10         A.    I don't know if that was the reason.

11               Because it failed.

12         Q.    What does that mean?

13         A.    They said it didn't work.

14         Q.    Now, they were allowed to terminate it if

15   it didn't operate according to Schedule B.  Correct?

16         A.    You know.  I'm not a lawyer.  I really

17   haven't read this agreement.  I looked at it.  I

18   haven't seen it.  You know.  I looked at it the

19   other day.  It was in the pile of stuff to look at.

20         Q.    What didn't the software that you

21   delivered do?  You said it failed.  The system

22   failed?

23         A.    Right.  Failed.

24         Q.    What didn't it do that it was supposed to

25   do?

R000653

EXHIBIT R-10

Page 103

```
 1          A.    I don't remember.

 2          Q.    They didn't identify it for you?

 3          A.    I remember I got a punch list.  And they

 4    said, you know, fix this stuff.  And I tried to fix

 5    it.  And after a period of time they just terminated

 6    the agreement.

 7          Q.    Now, does that punch list -- we didn't

 8    get the punch list.  Does it still exist?

 9          A.    No.

10          Q.    Why not?  What did you do with it?

11          A.    I don't know.  It's gone.

12          Q.    And they said these are the things they

13    wanted you to fix.  That was the punch list?

14          A.    Exactly.

15          Q.    Did you agree that the things on the

16    punch list didn't work?

17          A.    I didn't agree with some of them -- I

18    agreed with some.  I didn't agree with others.

19          Q.    All right.  Do you recall which ones you

20    agreed with?

21          A.    No.

22          Q.    How long did you try to fix it?

23          A.    I would say a couple of months.

24          Q.    And you weren't able to?          R 00653.1

25          A.    They said I wasn't.  It didn't perform --
```

EXHIBIT R-10

Move, Inc., et al. v. Real Estate Alliance Ltd, et al.                    2:07-CV-02185
Mark A. Tornetta                                                          August 3, 2009

Page 104

1   you know.  That's what they said.

2        Q.   Did you agree?

3        A.   You know.  I don't remember.  I remember

4   it didn't work.  I remember afterwards thinking to

5   myself -- you know.  I don't know if it was right.

6   And then I looked into it.  And they were right.

7        Q.   So when you said "it didn't work," what

8   didn't it do that it was intended to do?

9        A.   It just didn't operate.

10        Q.   At all?  Did nothing?

11        A.   It's not that it did nothing.

12        Q.   What didn't it do that it was supposed to

13   do?

14        A.   I don't remember specifically.

15        Q.   Okay.  Did it allow for searches of a

16   database?

17        A.   Well, it was supposed to.  And that's

18   what the search results were.

19        Q.   Right.

20        A.   That we had.  And so there are search

21   results there.

22        Q.   Right.

23        A.   I mean, the forms are there.

24        Q.   Okay.                                R 00653.2

25        A.   Yet they still terminated the agreement.

EXHIBIT R-10

Move, Inc., et al. v. Real Estate Alliance Ltd, et al.          2:07-CV-02185
Mark A. Tornetta                                                August 3, 2009

Page 110

1    materials you provided in Paragraph 2.1 was

2    unacceptable?

3                   MR. SOLOMON:  Asked and answered.

4         A.    I think I've already answered the

5    question.

6         Q.    (By Ms. McGrath) You can answer it

7    again.

8         A.    Pardon me?

9         Q.    You can answer it.

10        A.    Could you ask the question again, please?

11        Q.    Did Synermation ever determine that the

12   material you delivered in Paragraph 2.1 was

13   unacceptable?

14        A.    Yes.

15        Q.    Okay.  The material we're talking about

16   is the user documentation and copies of technical

17   information; not the installation of the software

18   into the hardware.

19        A.    Okay.  Say the question again, please.

20        Q.    Paragraph 2.1 talks about delivery of two

21   things; copies of user documentation and copies of

22   technical information.  Did they ever complain that

23   that material was unacceptable?

24        A.    I don't remember.

25        Q.    Paragraph 2.6, which is on Page 69, Bates

R000654

EXHIBIT R-10

Page 122

1    Mr. Tatro would get that information, if not from

2    you?

3              A.    I probably said something like that to

4    him.

5              Q.    Okay.

6              A.    But I don't remember saying it to him.

7              Q.    Got it.

8                    This also contends that the funds from

9    the Synermation license were used to continue the

10   '989 filing.

11                   Was that, in fact, the case?

12             A.    Yes.

13             Q.    Okay.  Does that refresh your

14   recollection at all as to how much funds you

15   received from Synermation?

16             A.    You know.  It was more than $10,000.  It

17   was less than a trillion.  I don't know.

18             Q.    So somewhere between $10,000 and a

19   trillion?

20             A.    Right.

21             Q.    And you can't narrow it down any more?

22             A.    Well, listen to this.  I know it was less

23   than -- you know.  I can't even say.  But I know it

24   was more than $10,000.  Because they gave me a

25   $5,000 retainer.

R000655

EXHIBIT R-10

Move, Inc., et al. v. Real Estate Alliance Ltd, et al.          2:07-CV-02185
Mark A. Tornetta                                                August 3, 2009

Page 127

1              Do you know what WORKPLACE of America,

2   Inc., is?

3         A.   I think that was the company under which

4   Synermation had contemplated franchising technology

5   developed by REALPRO.

6         Q.   Do you know who was involved in the

7   entity WORKPLACE of America, Inc.?

8         A.   No, I don't.

9         Q.   The WORKPLACE software that is referenced

10  in these documents, who developed it?

11        A.   Can you be more specific?

12        Q.   Was it developed by WORKPLACE of America,

13  Inc.?  Or was it developed by REALPRO?  Or was it

14  developed by somebody else?

15        A.   I'm having trouble with your word

16  "developed."  Can you be more specific?

17        Q.   Who created the software?

18        A.   The WORKPLACE software?

19        Q.   Correct.

20        A.   I did.

21        Q.   Who owned the WORKPLACE software?

22        A.   Synermation.

23        Q.   So WORKPLACE of America, Inc., did not

24  have a separate license from REALPRO to this

25  technology.  It was the -- the license was under the

R000656
EXHIBIT R-10

Move, Inc., et al. v. Real Estate Alliance Ltd, et al.                2:07-CV-02185
Mark A. Tornetta                                                      August 3, 2009

Page 128

1     Synermation license.  Is that correct?

2          A.   I don't know that.

3          Q.   Do you know if you entered into a

4     separate license with WORKPLACE of America, Inc.?

5          A.   I don't remember.

6          Q.   Is it your belief that the Synermation

7     license extended to the WORKPLACE software?

8          A.   I don't know.

9          Q.   Were you aware of the WORKPLACE software?

10         A.   Yes.

11         Q.   You developed it?

12         A.   Yeah.

13         Q.   Correct?

14         A.   I created it.

15         Q.   You created it.  And who did you create

16    it for?

17         A.   Synermation.

18         Q.   Synermation.  Did you know that there

19    were advertisements and the like referring to

20    WORKPLACE of America, Inc.?

21         A.   I don't remember.

22         Q.   Do you recall ever objecting when you saw

23    the name WORKPLACE of America, Inc., if you saw it,

24    and saying, "Wait a minute.  They don't have a

25    license"?

R000657

EXHIBIT R-10

Move, Inc., et al. v. Real Estate Alliance Ltd, et al.       2:07-CV-02185
Mark A. Tornetta                                             August 3, 2009

Page 132

1            A user program, it says.

2       Q.   Was this part of the code that you

3    prepared for the WORKPLACE system?

4       A.   Probably.

5       Q.   If you flip to Bates Number 2435 --

6       A.   (Witness complies.)

7       Q.   2435.

8       A.   There you go.

9       Q.   Okay.  You can see -- almost the last

10   line.  It says -- it's code.  Right?

11      A.   This is C language.

12      Q.   Okay.

13      A.   I can't tell which one.

14      Q.   All right.  Where it says the words

15   "Command line format is WPEGA or WPCGA," is the WP

16   there a reference to WORKPLACE?

17      A.   Yes.

18      Q.   Does this refresh your recollection that

19   this is code that you wrote for WORKPLACE?

20      A.   Yes, it is.

21      Q.   Thank you.

22           And was this written on Synermation's

23   computers?

24      A.   This is WORKPLACE?

25      Q.   Yes.

R000658

EXHIBIT R-10

Move, Inc., et al. v. Real Estate Alliance Ltd, et al.            2:07-CV-02185
                        Mark A. Tornetta                          August 3, 2009

Page 133

1      A.   Yes.

2      Q.   Okay.  Where were Synermation's computers

3   located?

4      A.   At 1536 Dekalb Pike, Blue Bell,

5   Pennsylvania.

6      Q.   Okay.  Were you specifically at that

7   location when you wrote this code on Synermation's

8   computers?

9      A.   Sometimes.  Yes.

10     Q.   Was there another location you were when

11  you were writing this code on Synermation's

12  computer?

13     A.   Well, I would write it at home or write

14  it there.  But a lot of times I would write it

15  there.

16     Q.   All right.

17          Would you look at the first page; 2413?

18     A.   Okay.

19     Q.   It says Copyright 1986, 1987, 1988.

20  REALPRO, Limited.  And then, towards the right upper

21  third of the page, it says, "Last update MAT

22  12/17/87."

23     A.   Where is that?

24          MR. SOLOMON:  What page are you at?

25     Q.   (By Ms. McGrath) 2413.  Page 2413.

R000659

EXHIBIT R-10

Move, Inc., et al. v. Real Estate Alliance Ltd, et al.
Mark A. Tornetta

2:07-CV-02185
August 3, 2009

Page 168

```
 1        A.    September of '88.

 2        Q.    And it was not functioning before that?

 3        A.    No.

 4        Q.    And how do you remember that?

 5        A.    Because the -- this is the part that was

 6   the rub.  In other words, there's a server -- pardon

 7   me -- there's a host connected to remote systems.

 8   Okay.  And I don't remember having this

 9   functionality at all until September of '88.

10        Q.    Why does September of '88 stick out in

11   your mind?

12        A.    Because this is WORKPLACE stuff.

13        Q.    Uh-hum.

14        A.    And so WORKPLACE didn't exist until -- a

15   WORKPLACE network didn't exist until September of

16   '88.

17        Q.    But you were preparing the WORKPLACE

18   software before '88?

19        A.    Right.  Exactly.

20        Q.    So why does September of '88 stick out in

21   your mind as when this displaying map of new points

22   file was first functioning?

23        A.    Because the -- why is it sticking out in

24   my mind?

25        Q.    Yes.
```

R000660

EXHIBIT R-10

Move, Inc., et al. v. Real Estate Alliance Ltd, et al.          2:07-CV-02185
Mark A. Tornetta                                                August 3, 2009

Page 169

1        A.    Because those search results tell me that

2    the entire process is being tested.

3        Q.    And you're referring again to the testing

4    as represented by this document as search results in

5    September of '88?

6        A.    Exactly.

7        Q.    But you've already told me you couldn't

8    tell, one way or the other, whether there was

9    earlier testing done.  Right?

10            MR. SOLOMON:  I object to the form.

11        Misstates the testimony.

12        Q.    (By Ms. McGrath) Didn't you tell me that

13    you couldn't rule out the possibility of earlier

14    testing, prior to September of '88?

15        A.    There was earlier testing.

16        Q.    Okay.  So, again, why do you think --

17    well, strike that.

18            Did you write code for the display of a

19    map points file prior to September of '88?

20        A.    I don't remember.

21            See, the points file is just parallel to

22    the regular database.

23            MR. SOLOMON:  You have to wait for a

24        question to be asked.

25            THE WITNESS:  Okay.  I'm sorry.

R000661

EXHIBIT R-10

Move, Inc., et al. v. Real Estate Alliance Ltd, et al.                2:07-CV-02185
Mark A. Tornetta                                                          August 3, 2009

Page 184

```
 1          Q.    What about WORKPLACE network?
 2          A.    I did not deliver the software to them
 3    yet.
 4          Q.    You don't think you delivered it to them
 5    by April of --
 6          A.    April 22nd.  No.
 7          Q.    When do you think you delivered it to
 8    them?
 9          A.    Well, I gave them a buyer component in
10    May of '88.
11          Q.    Okay.  And you remember that -- why?
12          A.    Because there's a disk that has a file
13    that's the executable WORKPLACE file that has May of
14    '88 -- has a time and date stamp of May of '88.
15          Q.    And that time and date stamp suggests --
16    what?
17          A.    That just the buyer component and not a
18    production version of it was given to him; was given
19    to Synermation.
20          Q.    How does that suggest that that was given
21    to Synermation in May of '88?
22          A.    There was a reference for just C86 in
23    there.  There was a C86 reference with a compiler.
24          Q.    C86?
25          A.    Yes.
```

REPORTED BY: Janet Hamilton, RPR                    www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022  (404) 875-0400

R000662

EXHIBIT R-10

Move, Inc., et al. v. Real Estate Alliance Ltd, et al.                    2:07-CV-02185
Mark A. Tornetta                                                           August 3, 2009

Page 209

```
 1          A.   I think it's 1H.
 2          Q.   Could you explain what that step -- what
 3     are you talking about?
 4          A.   That's the search results.
 5          Q.   Search results.  So you don't think it
 6     could show someone search results?
 7          A.   That's correct.
 8          Q.   Could you have put properties into the
 9     database for the demonstration and allowed it to
10     show the search results?
11               MR. SOLOMON:  I object to the question.
12          It calls for speculation.
13               MS. McGRATH:  No.  It doesn't call for
14          speculation.
15               MR. SOLOMON:  When you begin a question
16          with "could you have" --
17               MS. McGRATH:  It either had that
18          capability or it didn't.  It's a fact.
19          A.   Well, what I'm saying is it didn't have
20     the capability.
21          Q.   (By Ms. McGrath) Did not?
22          A.   Just the buyer program does not have that
23     capability.
24          Q.   No.  I know just the buyer program.  I'm
25     talking about the entirety of the system as of June
```

R000663

EXHIBIT R-10

Page 230

```
 1          Q.    (By Ms. McGrath) You can answer.
 2          A.    I really wasn't in on the business end of
 3    this.
 4          Q.    Okay.  The second paragraph says, "You
 5    owe it to yourself to attend the WORKPLACE network
 6    sneak preview.  Better yet, send the person in your
 7    office who does data entry management, since we're
 8    going to give you a free search account so you can
 9    try it on your own personal computer; most IBM PCs
10    are compatible."
11                What was it they were going to be able to
12    do through this free search account?
13          A.    I don't know.
14          Q.    Perform searches?
15          A.    I don't know.  It was impossible, because
16    I didn't give them the software yet.  And this had
17    failed.
18          Q.    Yeah.  That's why I'm trying to figure
19    out why you're sort of advertising folks that
20    they're going to get a free search account to try it
21    on their own person computer; before the software
22    had been delivered, before the system had been
23    tested, before you knew whether this thing worked or
24    not.
25                MR. SOLOMON:  I object for the record to
```

EXHIBIT R-10

Move, Inc., et al. v. Real Estate Alliance Ltd, et al.          2:07-CV-02185
Mark A. Tornetta                                    August 3, 2009

Page 235

1    create a database.  That's what I think this is.

2         Q.   So you think the word "pilot program to

3    test the viability of the concepts" is just talking

4    about the advertisements and demonstrations to get

5    listings?

6         A.   At this point, yes.

7         Q.   What is the purpose of getting listings

8    for this program?

9         A.   Well, in any real estate search system,

10   the database is the money aspect of the system.

11        Q.   So it's for the search system?

12        A.   No.  Whoever has the best database has

13   the best system.

14        Q.   System for doing what?  What is that

15   database created for?

16        A.   For storing information.

17        Q.   To be used -- I'm sorry?

18        A.   For storing information about real

19   estate.

20        Q.   To be used for what purpose?

21        A.   For storing.

22        Q.   Why would you want to store information?

23        A.   So you can index it by price.  So you can

24   index it by size.

25        Q.   Why would you want to index it by price

REPORTED BY: Janet Hamilton, RPR          www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022  (404) 875-0400

R000664

EXHIBIT R-10

Move, Inc., et al. v. Real Estate Alliance Ltd, et al.                    2:07-CV-02185
Mark A. Tornetta                                                         August 3, 2009

Page 255

1        A.   Yes.

2        Q.   The points being displayed on the map in

3   their appropriate geographic location of the

4   available property?

5        A.   Yes.  But that functionality was not in

6   this.

7        Q.   Right.  You would need a host system to

8   be hooked up to this.  Correct?

9        A.   That's right.

10        Q.   And when did you create that host system?

11   Do you remember?

12        A.   I had been creating it since '86.  But I

13   did not finish it until right before I filed the

14   '989 application.  I did not have a functional

15   working version until the application -- until a

16   month before the application of the '989 Patent.

17        Q.   A functioning version, a workable version

18   of what?  The host system?

19        A.   Yes.

20        Q.   So nothing could be done with the host

21   system in terms of searching it or querying it up

22   until that point?

23        A.   You see, there's getting answers.  And

24   there's getting answers that are correct.

25        Q.   Okay.

REPORTED BY: Janet Hamilton, RPR                    www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022  (404) 875-0400

R000665

EXHIBIT R-10

Move, Inc., et al. v. Real Estate Alliance Ltd, et al.          2:07-CV-02185
Mark A. Tornetta                                                August 3, 2009

Page 256

```
1        A.    Okay.  So I know for sure that, on
2   September 16th of '88, if this date is correct, that
3   this test failed and it didn't work.
4        Q.    But you didn't think it failed?
5        A.    I did not think it failed.  But later on
6   I learned -- I believed that Synermation was right,
7   having looked into it.
8        Q.    And what --
9        A.    I don't remember.
10       Q.    All right.
11             And then last page.  It says Gloucester
12   County Landmarks.  These are the landmarks that you
13   programmed into --
14       A.    Wait.  Where are you?
15       Q.    Last page.  The very last page.
16             These are the landmarks that you
17   programmed into the system for Gloucester County.
18   Correct?
19       A.    Yes.
20       Q.    And somebody using the system could
21   select one of these landmarks as a reference point.
22   Correct?
23       A.    Yes.
24       Q.    And these were not -- these landmarks did
25   not represent the available properties in the
```

REPORTED BY: Janet Hamilton, RPR                    www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022  (404) 875-0400

R000666

EXHIBIT R-10

Move, Inc., et al. v. Real Estate Alliance Ltd, et al.          2:07-CV-02185
Mark A. Tornetta                                   August 3, 2009

Page 261

```
1            was leaving at five, which may not even be at
2            the seven hours.  And so we're going to try to
3            give you the seven hours.
4                 MS. McGRATH:  All right.
5            Q.   (By Ms. McGrath) So he's not going to
6    let me have you longer than seven hours.  So I
7    can't -- I can't do it.
8                 Let me ask you this.  If you turn to
9    Paragraph 4 -- I'm sorry -- Column 4, Lines 34 to
10   43.
11                Do you see where I am?
12           A.   Okay.  Yes.
13           Q.   Is that one of the references you're
14   referring to?
15           A.   Yes.
16           Q.   All right.  Now, am I right or wrong that
17   that's referring to the property listing file
18   program?
19           A.   That's correct.
20           Q.   And is the property listing file program
21   different than the property search file program?
22           A.   It's all one system.
23           Q.   Okay.  Can you answer my question?  Is
24   the property listing file program different than the
25   property search file program?
```

R 00666.1

EXHIBIT R-10

Move, Inc., et al. v. Real Estate Alliance Ltd, et al.                    2:07-CV-02185
Mark A. Tornetta                                                                August 3, 2009

Page 262

1          A.    It's all one system.

2          Q.    Are the programs different?

3          A.    I've answered your question.

4          Q.    You tell me that it's all one system.

5    But that doesn't tell me whether the programs are

6    different or not.

7          A.    It's all one system.

8          Q.    Do you see where it says Property Listing

9    File Program?

10         A.    I see that.

11         Q.    Okay.  Do you see on the next page --

12         A.    And my testimony is --

13         Q.    Can you let me finish my question,

14   please?

15               Can you see on the next page where it

16   says Property Search File Program?

17         A.    Uh-hum.

18         Q.    Is that a yes?
                                        R 00666.2
19         A.    Yes.

20         Q.    All right.  So the patent discusses, on

21   the one hand, the property listing file program.

22   And it also discloses a property search file

23   program.  Correct?

24               MR. SOLOMON:  Object to the form.

25         Misstates the document.

REPORTED BY: Janet Hamilton, RPR              www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022  (404) 875-0400

EXHIBIT R-10

Page 356

```
 1              Let me ask you to assume that the date on
 2    the disk that you described had the EXE date of
 3    May 23, 1988.  Okay.  I just ask you to assume that.
 4    All right?
 5         A.   I will assume that.  Yes.
 6         Q.   All right.  Prior to that time was there
 7    a working or operational code for the WORKPLACE
 8    software?
 9         A.   No.
10         Q.   Was it capable of being working or
11    operational before then?
12         A.   No.
13         Q.   You also talked about a date of September
14    of 1988.  Was there, prior to September of 1988, an
15    operational or working database for the WORKPLACE
16    software?
17         A.   No.
18         Q.   Was it capable of being operational or
19    working before September of 1988?
20         A.   No.
21         Q.   Was the full system available -- the full
22    system of the WORKPLACE network available,
23    operational -- capable of being available or
24    operational before February or March of 1989?
25              MS. McGRATH:  Objection.  Form.
```

R000667

EXHIBIT R-10

Page 357

1          A.    What was the question?

2          Q.    (By Mr. Solomon) Before February or

3    March of 1989, was the WORKPLACE network

4    operational?  Was the software operational?

5          A.    No.

6                MS. McGRATH:  Objection as to form.

7          Q.    (By Mr. Solomon) Was it capable of being

8    operational?

9          A.    No.

10         Q.    Were you responsible for any of the ads

11   or magazine or newspaper clippings that you were

12   shown?

13         A.    No.

14         Q.    Did you approve any of them before they

15   were run?  Assuming -- and I ask you just to assume

16   for the moment -- that everything she showed you

17   were run?

18                MS. McGRATH:  Objection.  Form.

19         A.    No.

20         Q.    (By Mr. Solomon) You were asked about

21   places in the '576 Patent that described the

22   displaying of points.  I don't want to go into a

23   long discussion of it.  Okay.  Do Figures 1 and 5

24   and 6 and 12, are they part of what you would have

25   answered?

R000668

EXHIBIT R-10

Move, Inc., et al. v. Real Estate Alliance Ltd, et al.
Mark A. Tornetta

2:07-CV-02185
August 3, 2009

Page 363

```
1                    CERTIFICATE OF REPORTER
2
3    STATE OF NEW YORK  )
4                       :ss
5    COUNTY OF NEW YORK )
6
7          I, JANET HAMILTON, a Registered Professional
     Reporter and a New York Notary Public,
8    do hereby certify:
9          I am the deposition officer who
     stenographically recorded the testimony taken
10   August 3, 2009, of MARK A. TORNETTA, in the
     foregoing deposition;
11
           Prior to being examined, the deponent was by
12   me first duly placed under oath;
13         The foregoing transcript is a true record of
     the testimony given;
14
           I am not related to any of the parties to
15   this action by blood or marriage and I am in no way
     interested in the outcome of this matter.
16
           The distribution of this transcript was
17   handled pursuant to Federal Rule of Civil Procedure
     30(f)(1).
18
           IN WITNESS WHEREOF, I have subscribed my
19   named this _____ day of August, 2009.
20
21
22                    _____
                      JANET HAMILTON, RPR
23                    Notary 01HA6140005
                      Expires 1/17/10
24
25
```

REPORTED BY: Janet Hamilton, RPR          www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022  (404) 875-0400

R000669

EXHIBIT R-10

| | Move, Inc., et al. v. Real Estate Alliance Ltd, et al.<br>Mark A. Tornetta | 2:07-CV-02185<br>August 3, 2009 |
| --- | --- | --- |

WITNESS NAME:                ERRATA SHEET
                             MARK A. TORNETTA
                                                          AUGUST 3, 2009

| Page | Line | Change To | Reason for Change |
| --- | --- | --- | --- |
| 52 | 8 | No. | I was not given sufficient time to review my notebook to answer the question. Now that I have had a chance to review my notebook I recall that I had thought farther into the invention than what I memorialized in writing. |
| 68 | 22 | No. | I did not have a chance to review the source code when I was asked this question. After reviewing the source code, I now recall that the system was never at a stage where it could perform the steps of the patents prior to its development being finished. |
| 70 | 17 | No. | I was not given a chance to review the source code or appendix to answer this question. After reviewing the flowcharts and source code, I now recall that the RealPro User disk did not allow the performance of the steps of the patents at that time. |
| 71 | 15 | No. | I was not given a chance to review the source code or appendix to answer this question. After reviewing the flowcharts and source code, I now recall that I did not ever offer the RealPro User disk for sale or leasing or licensing. |
| 72 | 3 | No. | I did not have any time to review my notebook, nor was I able to review the source code to answer this question. After reviewing both, I now recall that the source code for the patented system did not contain the RealPro user disk or the code that was used in connection with the RealPro user disk software. |
| 80 | 14 | No. | I did not have any time to review my notebook, nor was I able to review the source code to answer this question. After reviewing both, I now recall that I had only begun working on the RealPro user disk software at the time the agreement was entered.. |
| 86 | 17 | No. | I did not have any time to review my notebook, nor was I able to review the source code to answer this question. After reviewing both, I now recall that I did not have a system that could be demonstrated. |
| 86 | 22 | No. | Same as above |
| 87 | 2 | No. | I did not have any time to review my notebook, nor was I able to review the source code to answer this question. After reviewing both, I now recall that at the time of the license no system existed that could |

-1-

R000670

EXHIBIT R-10

| Move, Inc., et al. v. Real Estate Alliance Ltd, et al. Mark A. Tornetta | 2:07-CV-02185 August 3, 2009 |
|---|---|

WITNESS NAME:

**ERRATA SHEET**
**MARK A. TORNETTA**

AUGUST 3, 2009

| | | | |
|---|---|---|---|
| | | | perform the steps of the patents. |
| 88 | 3-5 | I had not developed a working system. | Same as above |
| 88 | 24 | No. | I did not have any time to review my notebook or the source code to answer this question. After reviewing both, I now recall that no system was demonstrated prior to the license being entered into because there was no system in existence. |
| 94 | 16 | Yes. | I did not have any time to review my notebook or the source code to answer this question. After reviewing both, I now recall that it was done in September 1988. |
| 94 | 20-21 | In September 1988. | Same as above |
| 95 | 14 | Yes. They were delivered in September 1988. | Same as above |
| 95 | 17 | They were delivered in September 1988. | Same as above |
| 96 | 6 | Yes. | I did not have any time to review the source code or the search summary reports to answer this question. After reviewing both, I now recall that the first time I delivered operational software to Synermation for testing was in September 1988. |
| 97 | 17 | Yes. | I did not have any time to review the source code or the search summary reports to answer this question. After reviewing both, I now recall that the first time Synermation ever tested the system was in September 1988. |
| 97 | 22 | Yes, I can rule it out. | Same as above |
| 131 | 5 | No. | I did not have any time to review the source code or the search summary reports to answer this question. After reviewing both, I now recall that I did not deliver software that would allow the steps of the patents to be performed until September 1988. |
| 170 | 4-6 | I wrote code for displaying a map points file but it did not work until September 1988. | Same as above |
| 190 | 8 | No. | I was not given sufficient time to review the source code or the search summary reports to answer this question. After reviewing both, I now recall that as of |

R000671

EXHIBIT R-10

| Move, Inc., et al. v. Real Estate Alliance Ltd, et al.<br>Mark A. Tornetta | 2:07-CV-02185<br>August 3, 2009 |
|---|---|

WITNESS NAME:

ERRATA SHEET
MARK A. TORNETTA

AUGUST 3, 2009

| | | | |
|---|---|---|---|
| | | | April 22, 1988, the Workplace software was not able to perform the steps recited in the question.. |
| 190 | 11 | I can say for sure it did not. | Same as above |
| 190 | 17 | No. | Same as above |
| 190 | 20 | It did not. | Same as above |
| 191 | 1 | No | Same as above |
| 191 | 4 | It did not. | Same as above |
| 191 | 11 | No. | Same as above |
| 191 | 14 | It did not. | Same as above |
| 191 | 23 | No | Same as above |
| 192 | 1 | It did not. | Same as above |
| 192 | 18 | No. | Same as above |
| 192 | 21 | It did not. | Same as above |
| 193 | 5 | No. | Same as above |
| 193 | 8 | It did not. | Same as above |
| 206 | 22 | No. | I was not given a chance to review the source code or the search summary reports to answer this question. After reviewing both, I now recall that in July or August of 1988 Workplace was not able to perform the steps recited in the question. |
| 207 | 10 | No. | Same as above |
| 207 | 17 | No. | Same as above |
| 207 | 21 | No. | Same as above |
| 217 | 10 | Yes. | I was not given a chance to review the source code or the search summary reports to answer this question. After reviewing both, I now recall that in May of 1988 Workplace did not have all of the software that would allow testing whether the system worked. |
| 238 | 23 | No. | I was not given any time to review the search summary reports or the source code to answer this question. After reviewing them, I now recall that there were no search summaries before September 1988. |
| 238:25 | -<br>239:3 | No. | Same as above |
| 239 | 12-15 | Yes I can. | Same as above |
| 239 | 23 | No. | Same as above |
| 240 | 20 | Yes. | I was not given any time to review the search summary reports or the source code to answer this question. After reviewing both, I now recall that the pilot |

-3-

R000672

EXHIBIT R-10

| | | | |
|---|---|---|---|
| | | | Move, Inc., et al. v. Real Estate Alliance Ltd, et al. <br> Mark A. Tornetta | 2:07-CV-02185 <br> August 3, 2009 |

WITNESS NAME:

**ERRATA SHEET**
**MARK A. TORNETTA**

AUGUST 3, 2009

| | | | program could not test the search functionality at that time. |
|---|---|---|---|
| 240 | 23 | It was not. | Same as above |
| 242 | 13 | I am certain. | Same as above |
| 248 | 6 | Some were and some weren't. | I was not given any time to review the search summary reports or source code to answer this question. After reviewing both, I now recall that some of the files were created prior to May of 1988 and some were not. |
| 260 | 7 | three references | Transcription error |
| 299 | 9 | 1998 | Transcription error |
| 308 | 21 | I am not experienced in patent matters | Transcription error |

I, MARK A. TORNETTA, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

MARK A. TORNETTA

Sworn to and Subscribed before me
_____, Notary Public.
This __15ᵗʰ__ day of __September__, 20 _09_.
My Commission Expires:

JOEL RIVAS
Comm# DD0907852
Expires 7/15/2013
Florida Notary Assn., Inc

-4-

** TOTAL PAGE.04 **

R000673

EXHIBIT R-10

**R-11**

Philip Dawley

Page 1

1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3                         WESTERN DIVISION

4

5      MOVE, INC., NATIONAL            )
       ASSOCIATION OF REALTORS, and )
6      NATIONAL ASSOCIATION OF NEW    )
       HOME BUILDERS,                 )
7                                     )
                        Plaintiffs, )
8                                     )  No. CV 07-02185
               VS.                    )
9                                     )
       REAL ESTATE ALLIANCE LTD.,     )
10     and EQUIAS TECHNOLOGY          )
       DEVELOPMENT LLC,               )
11                                    )
                        Defendants. )
12     _____)
       AND RELATED CROSS-ACTION.      )
13     _____)

14

15

16            VIDEOTAPED DEPOSITION OF MOVE, INC.,

17           PHILIP S. DAWLEY, 30(B)(6) DESIGNEE

18                  LOS ANGELES, CALIFORNIA

19                  FRIDAY, AUGUST 21, 2009

20

21

22

23     REPORTED BY:

24         JEAN F. HOLLIDAY

25         CSR No. 4535, RPR, CRR

R000674
EXHIBIT R-11

Philip Dawley

Page 2

```
 1                  UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3                       WESTERN DIVISION

 4

 5      MOVE, INC., NATIONAL           )
        ASSOCIATION OF REALTORS, and )
 6      NATIONAL ASSOCIATION OF NEW    )
        HOME BUILDERS,                 )
 7                                     )
                          Plaintiffs, )
 8                                     )  No. CV 07-02185
                   VS.                 )
 9                                     )
        REAL ESTATE ALLIANCE LTD.,     )
10      and EQUIAS TECHNOLOGY          )
        DEVELOPMENT LLC,               )
11                                     )
                          Defendants. )
12      _____)
        AND RELATED CROSS-ACTION.      )
13      _____)

14

15             Videotaped deposition of MOVE, INC.,

16             PHILIP S. DAWLEY, 30(B)(6) DESIGNEE,

17             taken on behalf of Defendants and

18             Counterclaim-Plaintiff, at 2049

19             Century Park East, 33rd Floor, Los

20             Angeles, California, beginning at

21             10:40 a.m., and ending at 2:19 p.m.,

22             on Friday, August 21, 2009, before

23             JEAN F. HOLLIDAY, Certified Shorthand

24             Reporter No. 4535.

25
```

EXHIBIT R-11

Philip Dawley

Page 3

```
 1       APPEARANCES:

 2          FOR THE PLAINTIFF MOVE, INC.:

 3              ALSTON & BIRD LLP
                BY:  ROBIN L. MCGRATH, ESQ.
 4              One Atlantic Center
                1201 West Peachtree Street
 5              Atlanta, Georgia  30309-3424
                (404)881-7000
 6              rmcgrath@alston.com

 7              -AND-

 8              ALSTON & BIRD LLP
                BY:  WES ACHEY, ESQ.
 9              One Atlantic Center
                1201 West Peachtree Street
10              Atlanta, Georgia  30309-3424
                (404)881-7000
11              wachey@alston.com

12
            FOR THE DEFENDANT AND COUNTERCLAIM-PLAINTIFF REAL
13          ESTATE ALLIANCE LTD:

14              PROSKAUER ROSE LLP
                BY:  ALEXANDER KAPLAN, ESQ.
15              1585 Broadway
                New York, New York  10036-8299
16              (212)969-3671
                akaplan@proskauer.com

17

18          FOR THE DEFENDANT AND COUNTERCLAIM-PLAINTIFF REAL
            ESTATE ALLIANCE LTD., AND DEFENDANT EQUIAS
19          TECHNOLOGY DEVELOPMENT LLC:

20              LIPTON, WEINBERGER & HUSICK
                BY:  LAWRENCE A. HUSICK, ESQ.
21              P.O. Box Box 587
                Southeastern, Pennsylvania  19399-0587
22              (610)296-8259
                lawrence@lawhusick.com

23

24       ALSO PRESENT:

25              SERGIO ESPARZA, VIDEOGRAPHER
```

R000676

EXHIBIT R-11

Philip Dawley

Page 55

1    always be the case but that's my general

2    understanding.

3            MR. KAPLAN:  Okay.

4       Q.   Mr. Dawley, if you look at Page 7 under

5    "Analysis" it says, "Significance testing was done at

6    the 90 percent level of confidence."  Does that mean

7    anything to you?

8       A.   No.

9       Q.   Do you know -- strike that.

10           If you could turn, please, to Page 12 of the

11   study, and at the top of Page 12 says, "Executive

12   Summary."  Do you see that?

13      A.   Yes.

14      Q.   Okay.  The first line under that says,

15   "Picture/Virtual tours, maps of homes, conducting a

16   home search and researching the selling price are all

17   'must have' features that the key target segments are

18   already utilizing."

19           Does Move as a company agree that maps of

20   homes are "must have" features on real estate search

21   websites?

22           MR. ACHEY:  Object to form.

23           THE WITNESS:  I'm not sure what's meant by

24   "must have."  What I do know is that Move considers

25   mapping extremely important to the home buying

R000677

EXHIBIT R-11

Philip Dawley

Page 56

1        process.

2        BY MR. KAPLAN:

3            Q.    Okay.  And if you could turn to Page 36 of

4        the document, and if you look in the bottom

5        right-hand corner in text it says, "Must have

6        features for sites include those that allow to see

7        the home, its location and similar homes in the

8        area."

9                 Would you agree that must have features for

10       Move websites are those that allow a user to see the

11       home and its location and similar homes in the area?

12                 MR. ACHEY:  Objection.  Form.

13                 THE WITNESS:  I would agree that maps are

14       important, and I would point out that we allow MLSs

15       to turn maps off, and so at least as far as my

16       understanding it's not a must have because we have

17       examples where it didn't exist and so my testimony

18       would be that -- that maps are important to Move and

19       that this study clearly indicates that it's must have

20       by the text.

21       BY MR. KAPLAN:

22            Q.    Right.  And the turning off of mapping for

23       MLSs, that's not because Move wants to do that,

24       that's because the MLS requires Move to do that;

25       right?

R000678

EXHIBIT R-11

Philip Dawley

1      the REALTOR.com Communities project?

2          A.   REALTOR.com Communities, my understanding

3      was a project to allow consumer feedback and

4      collaboration on the REALTOR.com website.

5          Q.   Okay.  And if you could look at the third

6      paragraph under "Summary," see it says, "In addition

7      to the static information noted above, consumers are

8      demanding interactive experiences, including dynamic

9      mapping," do you see that?

10         A.   Yes.

11         Q.   Is it your understanding that in May of 2006

12     consumers were demanding interactive experiences,

13     including dynamic mapping?

14         A.   Certainly as we sit here today after the

15     last two exhibits you gave me it is my understanding,

16     based on those studies, that consumers desired

17     mapping.  Demanding and dynamic I don't understand

18     what is meant here, but it is my understanding that

19     consumers desired mapping.

20         Q.   Do you know what dynamic mapping is?

21         A.   I know only that dynamic is differentiating

22     from static.

23         Q.   Have you ever heard the term "dynamic

24     mapping" before?

25         A.   Yes.

R000679

EXHIBIT R-11

Philip Dawley

```
 1    STATE OF CALIFORNIA    )
                             ) SS
 2    COUNTY OF LOS ANGELES  )

 3

 4         I, Jean F. Holliday, a Certified Shorthand

 5    Reporter, do hereby certify:

 6         That prior to being examined, the witness in the

 7    foregoing proceedings was by me duly sworn to testify to

 8    the truth, the whole truth, and nothing but the truth;

 9         That said proceedings were taken before me at the

10    time and place therein set forth, and were taken down by

11    me in shorthand and thereafter transcribed into

12    typewriting under my direction and supervision;

13         I further certify that I am neither counsel for,

14    nor related to, any party to said proceedings, nor in

15    anywise interested in the outcome thereof.

16         In witness whereof, I have hereunto subscribed my

17    name.

18

19    Dated:  September 5, 2009

20

21    _____
      Jean F. Holliday
22    CSR No. 4535, RPR, CRR

23

24

25
```

EXHIBIT R-11

**R-12**

```
 1              CONFIDENTIAL - ATTORNEYS EYES ONLY

 2          IN THE UNITED STATES DISTRICT COURT
         FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3                   WESTERN DIVISION

 4

 5      _____

        MOVE, INC., et al.,             )
 6                                       )
                         Plaintiffs,)
 7                                       )
               v.                        ) Case Number
 8                                       ) 2:07-CV-92185
        REAL ESTATE ALLIANCE, LTD.,     )
 9      et al.,                          )
                         Defendants.)
10      _____)
        REAL ESTATE ALLIANCE, LTD.,     )
11                                       )
              Counterclaim-Plaintiff, )
12                                       )
                    v.                   )
13                                       )
        MOVE, INC., et al.,             )
14                                       )
              Counterclaim-Defendant. )
15      _____)

16

17              VIDEOTAPED DEPOSITION
                        of
18              BERNARD JAY BAGDIS

19         Wednesday, September 9, 2009

20                  10:12 a.m.

21

22

23

24      Reported by:  Carl W. Girard, Notary Public

25      Videographer:  Ron Benson
```

```
1

2                     A P P E A R A N C E S

3

4      ON BEHALF OF PLAINTIFFS:

5           FRANK G. SMITH, Esquire
            ALSTON & BIRD, LLP
6           One Atlantic Center
            1201 West Peachtree Street
7           Atlanta, Georgia 30309
            (404) 881-7000
8           frank.smith@alston.com

9

10     ON BEHALF OF DEFENDANTS:

11          THEODORE K. CHENG, Esquire
            PROSKAUER ROSE, LLP
12          1585 Broadway
            New York, New York 10036-8299
13          (212) 969-3576

14          tcheng@proskauer.com

15     and
            LAWRENCE A. HUSICK, Esquire
16          LIPTON WEINBERGER & HUSICK
            P.O. Box 587
17          Southeastern, Pennsylvania 19399-0587
            (610) 296-8259
18          lawrence@lawhusick.com

19                          * * * *

20          Videotaped deposition of BERNARD JAY BAGDIS,
       called as an adverse witness by and on behalf of
21     the Plaintiffs, pursuant to the Federal Rules of Civil
       Procedure, taken at the Northern Neck Regional Jail,
22     3908 Richmond Road, Warsaw, Virginia on Wednesday,
       the 9th day of September, 2009, commencing at 10:12
23     a.m., pursuant to Notice and Order of the Court.

24

25
```

R000682

```
1                    BAGDIS - DIRECT - SMITH

2      taken pursuant to Notice, Subpoena, the Federal

3      Rules of Civil Procedure and Court order dated July

4      30, 2009.  Deposition transcript may be used for

5      all purposes permitted by law.

6                    DIRECT EXAMINATION

7      BY MR. SMITH:

8          Q    Mr. Bagdis, will you state your full

9      name for the record, please?

10         A    My first initial B, middle name Jay

11     J-A-Y, last name Bagdis, B-A-G-D-I-S.

12         Q    When and where were you born, sir?

13         A    I was born in Worcester, Massachusetts

14     on August 20, 1949.

15         Q    My understanding is that you are

16     presently incarcerated; is that correct?

17         A    Yes.

18         Q    And that is at the Northern Neck

19     Regional Jail in Warsaw, Virginia?

20         A    Yes.

21         Q    And as I understand it you are presently

22     awaiting sentencing following a conviction in April

23     of this year for conspiracy to defraud the United

24     States and various tax related crimes?

25                    MR. CHENG:  Objection to form.
```

R000683

```
1                    ATTORNEYS EYES ONLY

2    Objection, Fifth Amendment.

3    BY MR. SMITH:

4         Q    Can you answer my question?

5         A    With the objection, no, I'm not going to

6    answer that.

7         Q    And the basis for declination to answer

8    would be?

9              MR. CHENG:  Are you asking me or are you

10   asking Mr. Bagdis?

11             MR. SMITH:  No, I'm asking you.  Are you

12   instructing him not to answer the question?

13             MR. CHENG:  I'm not instructing him not

14   to answer.  I'm only making my objection for the

15   record.  It is up to Mr. Bagdis to decline or not.

16             MR. SMITH:  You indicated that you're

17   representing the witness.  So that we're clear

18   you're not instructing the witness not to answer

19   the question?

20             MR. CHENG:  That is correct.

21   BY MR. SMITH:

22        Q    Now, Mr. Bagdis, are you currently

23   awaiting sentencing following a conviction in April

24   of 2009 for conspiracy to defraud the United States

25   and failure to file income tax returns?
```

R000684

Baggia, Bernard J Vol. 7 08/09/2009

```
 1                    ATTORNEYS EYES ONLY

 2          A    Yes.

 3               MR. CHENG:   Objection to form.

 4      BY MR. SMITH:

 5          Q    And were you indicted originally in

 6      November of 2007 for those alleged offenses?

 7          A    I don't remember the date of the

 8      indictment.

 9          Q    Let me show you a document that we'll

10      mark as Exhibit 149, and we had to give up our

11      paper clips so it's little less than totally

12      convenient, but it's document of some 168 pages in

13      length, and I'll ask you if that is the original

14      indictment that was returned against you in April

15      of -- November of 2007?

16               (Exhibit 149 marked for identification.)

17      BY MR. SMITH:

18          Q    The document is not dated but do you

19      recognize that as the initial indictment?

20          A    (Witness perusing exhibit.)

21               MR. CHENG:   Instruct the witness to take

22      the time that you need to familiarize yourself with

23      the document sufficiently so that you can answer

24      Mr. Smith's questions.

25      BY MR. SMITH:
```

EXHIBIT R-12

R000685

```
 1                    ATTORNEYS EYES ONLY

 2     It bears the production number BGDS000434 and 435

 3     (proffered.)

 4               (Exhibit 47 previously marked.)

 5     BY MR. SMITH:

 6          Q    Have you ever seen this document?

 7          A    I've seen this document; yes.

 8          Q    Have you seen it in the last two days?

 9          A    Yes.

10          Q    Now, did you author the text on the

11     second page of Exhibit 47?

12          A    Yes.

13          Q    And you understand that this document

14     was published in April of -- on April 22nd of 1988?

15          A    No.

16               MR. CHENG:  Objection to form.

17     BY MR. SMITH:

18          Q    I'm sorry, I did not hear you answer,

19     sir.

20          A    I -- I -- repeat the question.

21          Q    Was this text on the second page of

22     Exhibit 47 published on April 22, 1988?

23               MR. CHENG:  Objection to form.

24          A    I believe it was printed for April 22nd

25     of 1988.
```

R000686

```
1                    ATTORNEYS EYES ONLY
2        in the Sarkisian litigation?
3            A    Yes.
4            Q    Now, if you would turn to the second
5        page of Exhibit 48.  You see about halfway down or
6        a little further on the left-hand column, it says,
7        "How do I use WORKPLACE?"
8            A    Yes.
9            Q    Paragraph reads, "Running on your PC,
10       the WORKPLACE software displays a map of the United
11       States.  You can then select the metropolitan area,
12       (for example, the City of Philadelphia and the
13       surrounding counties in Pennsylvania and New
14       Jersey) from a menu or by pointing to the city on
15       your PC screen."
16                 Do you see that?
17           A    Yes.
18           Q    Did the WORKPLACE software perform that
19       function in the spring of 1988?
20           A    No.
21                 MR. HUSICK:  Object to form.
22       BY MR. SMITH:
23           Q    Did the WORKPLACE system perform that
24       function?
25           A    No.
```

EXHIBIT R-12
Page 57
R000687

```
 1                  ATTORNEYS EYES ONLY

 2        A    I gave that.  That's the question and

 3   that's the answer.

 4        Q    Thank you.  Back on the second page of

 5   Exhibit 48 in the top right-hand column, it says,

 6   "How does WORKPLACE work?"  Do you see that?

 7        A    Yes.

 8        Q    It says, "WORKPLACE allows you to point

 9   at a specific location on the national map to

10   select available properties in the metropolitan

11   area, consider price range ($/sq. ft.) and the size

12   range (100 to 10,000,000 sq. ft.) and zoom this map

13   down to the detail and select the properties of

14   interest to you."

15            Do you see that?

16        A    Yes.

17        Q    Would the WORKPLACE software perform

18   that function in the spring of 1988?

19        A    No.

20            MR. HUSICK:  Object to form.

21   BY MR. SMITH:

22        Q    Would the WORKPLACE system perform that

23   function?

24            MR. HUSICK:  Object to form.

25        A    No.
```

R000688

```
 1                    ATTORNEYS EYES ONLY

 2         A    Chester County Biz, I believe it says.

 3         Q    What was the Chester County Biz in 1988?

 4         A    It was a publication that served the

 5    Chester County, Pennsylvania commercial and

 6    business community.

 7         Q    And then the advertisement which, I

 8    believe you indicated, you assisted or directed its

 9    preparation, it says, "The WORKPLACE is the newest

10    concept in commercial property information

11    exchange."

12              Do you see that?

13         A    Yes.

14         Q    And then it says, "Whether you have or

15    want 250 or 2,500,000 square feet WORKPLACE matches

16    lessors and lessees."

17              Do you see that?

18         A    Yes.

19         Q    Would the WORKPLACE system do that in

20    the summer of 1988?

21         A    Did the WORKPLACE system?

22         Q    Yes, sir.

23         A    No; it didn't have any data.

24         Q    So the database was not populated with

25    listings; is that what you're saying?
```

R000689

```
 1                    ATTORNEYS EYES ONLY

 2          A    That was one of the issues.

 3          Q    Was the database capable of being

 4     populated with listings?

 5          A    I believe so.

 6          Q    Then the advertisement says "For a free

 7     demonstration call 215-272-7000."

 8               Do you see that?

 9          A    Yes.

10          Q    Whose telephone number was that?

11          A    That was the WORKPLACE Network's

12     telephone number.

13          Q    Was that also a telephone number for you

14     or your office?

15          A    The telephone rang in my building.

16          Q    This advertisement indicates that a free

17     demonstration of the WORKPLACE was available at

18     that time?

19          A    A demonstration was available; yes.

20          Q    Then if you look at the upper right-hand

21     portion of the first page Exhibit 56, there's text

22     under the heading "WORKPLACE available."  Do you

23     see that?

24          A    Yes.

25          Q    Did you write that text?  Just on the
```

R000690

```
 1                    ATTORNEYS EYES ONLY

 2        A     Merry Christmas and Happy Hanukkah.

 3        Q     Very good.  And it then says, "What's

 4   Next - who are the first targets - trusts, Tower,

 5   MLS, Hotel, Portal, Builder???"

 6              Do you see that?

 7        A     Yes.

 8        Q     What's that a reference to?

 9        A     Where would the first efforts be

10   expended or the next efforts be expended in terms

11   of developing economic benefit from these patents

12   in whatever form.

13        Q     By whatever form, you mean either

14   licensing or, if necessary, litigation?

15        A     Yes.

16        Q     And No. 3, "How many in first round?"

17              Is that a reference to how many

18   companies or individuals the Real Estate Alliance

19   will pursue for either licensing or litigation

20   efforts?

21        A     Yes.  I think it had to do with the

22   scope of, we had finite resources and there were

23   thousands of potentials.

24        Q     You had Mr. Rooke's $4 million to work

25   with, too, didn't you?
```

R000691

```
 1                    ATTORNEYS EYES ONLY

 2          A    Yes.

 3          Q    And then it says, "What needs to be done

 4     prior to filing?"

 5               What do you understand that to mean or

 6     what did that mean?

 7          A    Well, it meant exhausting all of the

 8     peaceful alternatives of licensing, negotiation,

 9     joint venture, whatever the arrangements could be

10     worked out, and, if not, filing would be a last

11     resort.

12          Q    Filing of litigation?

13          A    Filing of litigation.

14          Q    When did you most recently see this

15     document?

16          A    Yesterday.

17          Q    And item 5 "Records-Kreamer Rooke."

18               Do you see that?

19          A    Yes.

20          Q    What is that a reference to?

21          A    Kreamer Rooke is Andy Rooke's son.  He

22     was to put all of the records and stuff like that

23     that we went through with all this other stuff and

24     I guess in computerized usable format so that it

25     could be accessed efficiently.
```

```
1                    BAGDIS - CROSS - HUSICK

2         Q    I believe that Exhibit 47 was taken from

3    your own personal files.  Do you recall having this

4    document in your personal file?

5         A    This particular document?  I have parts

6    of it.  I mean...

7         Q    What specific parts did you have?

8         A    These look like the cutouts of the

9    purported supplement.

10        Q    And how did you receive the copy of this

11   supplement that was in your files?

12        A    I think I received ten copies in a

13   manila envelope either dropped off or in the mail

14   from the Times Herald.

15        Q    And at this time, in April of 1988, were

16   you a subscriber to the Times Herald?

17        A    Yes; it was our local newspaper.

18        Q    Do you recall receiving the Times Herald

19   paper on April 22nd 1988?

20        A    Yes.

21        Q    Did this material appear in the paper on

22   that date, to your recollection?

23             MR. SMITH:  Object to form.

24        A    Not to my recollection.

25   BY MR. HUSICK:
```

**R-13**

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

-----------------------------------x

MOVE, INC., et al.,                    :

              Plaintiffs        :      Case No.

        v.                     :      CV07-02185-GHK

REAL ESTATE ALLIANCE LTD. AND          :       (AJWx)

EQUIAS TECHNOLOGY DEVELOPMENT, LLC ,:   Hon. George H.

         Defendants        :        King

-----------------------------------x

REAL ESTATE ALLIANCE LTD.,             :

      Counterclaim-Plaintiff :

        v.                     :

MOVE, INC., et al,                     :

      Counterclaim-Defendants :

-----------------------------------x

Videotaped Corporate Deposition of

NATIONAL ASSOCIATION OF REALTORS

By and Through its Designee

ROBERT GOLDBERG

Washington, D.C.

Friday, September 11, 2009

9:00 a.m.

R000694
EXHIBIT R-13

Robert Goldberg

2

1    Job No.:  1-163654

2    Pages 1 - 215

3    Reported by:  Alda Mandell, RPR, CRR

4

5            Videotaped Deposition of ROBERT GOLDBERG,

6    held at the offices of:

7

8                        ALSTON & BIRD, LLP

9                        950 F Street, Northwest

10                       Washington, D.C.  20004

11                       (202) 756-3300

12

13           Pursuant to agreement, before Alda Mandell,

14   Registered Professional Reporter and Notary Public of

15   the District of Columbia.

16

17

18

19

20

21

22

23

24

25

3

1                    A P P E A R A N C E S

2

3            ON BEHALF OF NATIONAL ASSOCIATION OF HOME

4            BUILDERS, NATIONAL ASSOCIATION OF REALTORS,

5            AND MOVE, INC.:

6                      ROBIN L. McGRATH, ESQUIRE

7                      COBY S. NIXON, ESQUIRE

8                      ALSTON & BIRD, LLP

9                      One Atlantic Center

10                     1201 West Peachtree Street

11                     Atlanta, Georgia  30309-3424

12                     (404) 881-7000

13

14           ON BEHALF OF REAL ESTATE ALLIANCE LTD.:

15                     HARRY FRISCHER, ESQUIRE

16                     ALLISON E. MEYER, ESQUIRE

17                     PROSKAUER ROSE, LLP

18                     1585 Broadway

19                     New York, New York  10036-8299

20                     (212) 969-3000

21

22           Also Present:  AKIM GRAHAM - Videographer

23

24

25

R000696
EXHIBIT R-13

Robert Goldberg

88

| 11:49:53 | 1 | of mapping that they liked had been taken down? |
| 11:49:59 | 2 | A    Like I had mentioned earlier, through an |
| 11:50:02 | 3 | assortment of different communications where my |
| 11:50:05 | 4 | staff would get calls, boards of realtors would |
| 11:50:08 | 5 | call, members would call.  Emails. |
| 11:50:11 | 6 | You know, I can't say specifically which |
| 11:50:14 | 7 | ones came on mapping.  I do know that there were |
| 11:50:19 | 8 | members that were -- I won't use the word |
| 11:50:24 | 9 | complaining -- but were asking about what happened |
| 11:50:27 | 10 | to the feature.  And I use that in a generic word, a |
| 11:50:31 | 11 | feature. |
| 11:50:33 | 12 | Q    Okay.  And when you say you were pushing |
| 11:50:35 | 13 | for that to be replaced, how did you or the NAR |
| 11:50:41 | 14 | staff go about pushing Move to replace it during the |
| 11:50:44 | 15 | prior year? |
| 11:50:44 | 16 | A    Well, pushing meaning that you had |
| 11:50:46 | 17 | something up, members liked, you took it away.  When |
| 11:50:50 | 18 | are you coming back with a replacement for fixing |
| 11:50:55 | 19 | the technical problem. |
| 11:50:59 | 20 | Q    Who did you convey that to, if anyone, at |
| 11:51:05 | 21 | Move? |
| 11:51:05 | 22 | A    That would have been through our staff |
| 11:51:06 | 23 | every day talking to them, asking for updates as to |
| 11:51:07 | 24 | where things are that they were fixing a problem. |
| 11:51:14 | 25 | What is the time frame so that we can educate |

R000697
EXHIBIT R-13

Robert Goldberg

89

11:51:18    1    ourselves.

11:51:20    2         Q    Were you --

11:51:24    3         MR. FRISCHER:   Let's have this document,

11:51:25    4    please.   Let's -- let's mark as Exhibit 9, please,

11:51:49    5    another email from Bob Goldberg to the L Team dated

11:52:00    6    March 8th, 2006.   Bears production number

11:52:05    7    MOVE-NAR38117.

11:52:07    8         (Exhibit 9 was marked for identification and

11:52:07    9    was attached to the transcript.)

11:52:44   10    BY MR. FRISCHER:

11:52:45   11         Q    Let me call your attention to the date of

11:52:46   12    Exhibit 9.   It's March 2006, a little more than a

11:52:54   13    couple of months after Exhibit 8.   You see that?

11:53:00   14         A    Okay.   Yes.

11:53:01   15         Q    And the -- Exhibit 9, that's another memo

11:53:10   16    or an email that you sent to the Leadership Team?

11:53:12   17         A    Uh-huh.

11:53:13   18         Q    And calling your attention to the second

11:53:17   19    heading that says mapping information.   It says

11:53:21   20    Realtor.com launched a Beta version of a map centric

11:53:28   21    search results page on December 15th, 2005.   This

11:53:32   22    page was created in response to the growth in

11:53:35   23    popularity of map search on portal sites such as

11:53:40   24    Yahoo and Google and the adoption of map search

11:53:44   25    interfaces on emerging competitor sites such as

Robert Goldberg

90

| | | |
|---|---|---|
| 11:53:46 | 1 | Trulia.com, Oodle.com, HousingMaps.com, and |
| 11:53:52 | 2 | Propsmart.com.  Do you see that? |
| 11:53:55 | 3 | A    Yes. |
| 11:53:57 | 4 | Q    Do you recall -- is it consistent with |
| 11:54:00 | 5 | your understanding that the new mapping features |
| 11:54:09 | 6 | that were released in Beta version on December 15th, |
| 11:54:14 | 7 | 2005 were developed in response to competitor sites? |
| 11:54:23 | 8 | A    I couldn't tell you as to what their |
| 11:54:25 | 9 | motivation was -- |
| 11:54:26 | 10 | Q    Okay. |
| 11:54:27 | 11 | A    -- for doing that. |
| 11:54:28 | 12 | Q    As part of what -- what you and your staff |
| 11:54:32 | 13 | were doing at NAR, was part of that to look at what |
| 11:54:38 | 14 | competitive sites were doing? |
| 11:54:43 | 15 | A    Not typically.  That wasn't our role. |
| 11:54:45 | 16 | Q    Okay.  And was -- was -- did you ever push |
| 11:54:56 | 17 | Move.com -- I'm sorry.  Did you ever push Move -- as |
| 11:55:01 | 18 | part of your pushing of Move, did you ever push Move |
| 11:55:05 | 19 | to implement new mapping features because there were |
| 11:55:10 | 20 | better mapping features on other competitive |
| 11:55:12 | 21 | websites? |
| 11:55:13 | 22 | A    Not at all. |
| 11:55:14 | 23 | MS. McGRATH:  Objection.  Form. |
| 11:55:15 | 24 | A    Not at all. |
| | 25 | |

R000699
EXHIBIT R-13

Robert Goldberg

91

BY MR. FRISCHER:

Q    Okay.  So if Move was looking at other websites and deciding they needed to meet the competitive -- the competition by improving the mapping features, that's something that Move decided without input from NAR?

A    I can't attest to what was in their minds other than they regularly wanted to make sure that they had the best product.

Q    Okay.

Q    Do you know Mr. Lesswing?

A    Yes.

Q    Okay.  He's the Chief Technology Officer of National Association of Realtors?

A    Correct.

Q    Let me read you a question and answer of some testimony that Mr. Lesswing gave at his deposition and then ask you a question about it.

A    Okay.

Q    Okay.  And the question appears on page 89 at line 17.

Do you have an understanding as to whether NAR has a position on the usefulness of mapping on the Realtor.com website?

Answer: I don't know of a particular

R000700
EXHIBIT R-13

Robert Goldberg

92

```
11:56:53   1    position that NAR had at that time on it.  I believe
11:56:58   2    that NAR was concerned that there were other --
11:57:04   3    there were the other websites because we are all
11:57:08   4    staff at NAR where the other websites ahead of
11:57:13   5    Realtor.com were not and what could we do about it.
11:57:16   6    That was a concern.
11:57:18   7            And my question is are you aware of any
11:57:22   8    concern within the staff of NAR as to whether there
11:57:26   9    were any websites ahead of Realtor.com in terms of
11:57:33  10    mapping in the 2005 time frame, or 2006?
11:57:39  11       A    Not at all.
11:57:40  12       Q    Okay.  Are you aware of whether there
11:57:42  13    were -- or whether anyone at NAR had concerns about
11:57:48  14    mapping -- withdrawn.
11:57:51  15            Were you aware at anytime whether there
11:57:53  16    were folks at NAR who had concerns because other
11:57:58  17    websites were ahead of Realtor.com in connection
11:58:01  18    with mapping features?
11:58:02  19       A    Not at all.
11:58:41  20            MR. FRISCHER:  I'm sorry.  Let's mark as
11:58:42  21    Exhibit 10, please, a document entitled Protecting
11:58:46  22    Realtor.com's Leadership Position.  Bears production
11:58:50  23    numbers NAR2231 to 2232.
11:58:59  24            (Exhibit 10 was marked for identification
11:59:00  25    and was attached to the transcript.)
```

R000701
EXHIBIT R-13

Robert Goldberg

93

| | | |
|---|---|---|
| 11:59:46 | 1 | BY MR. FRISCHER: |
| 11:59:46 | 2 | Q    Have you seen this document before? |
| 11:59:48 | 3 | A    I have. |
| 11:59:48 | 4 | Q    Okay.  Can you tell me what this is? |
| 11:59:55 | 5 | A    If I recall correctly, it was a result of |
| 12:00:02 | 6 | a meeting or -- a meeting that involved a couple of |
| 12:00:07 | 7 | the key board members of Move with a couple of our |
| 12:00:12 | 8 | key leadership and myself in that meeting.  And they |
| 12:00:21 | 9 | were just discussions that talked about how might |
| 12:00:29 | 10 | NAR and Move work more effectively with the other |
| 12:00:37 | 11 | threats going on in the internet. |
| 12:00:40 | 12 | Q    Okay.  And specifically with respect to |
| 12:00:44 | 13 | the situation on the competitive analysis, were |
| 12:00:49 | 14 | threats from competitive sites showing real estate |
| 12:00:56 | 15 | listings discussed? |
| 12:00:56 | 16 | A    Only in a broad sense of the fact that |
| 12:00:58 | 17 | other sites were about to surpass Realtor.com as the |
| 12:01:02 | 18 | number one search site. |
| 12:01:04 | 19 | Q    Okay.  And was there discussion about |
| 12:01:10 | 20 | protecting Realtor.com's leadership position in the |
| 12:01:15 | 21 | face of competition from these other sites? |
| 12:01:20 | 22 | A    The answer was -- I'll say it a little |
| 12:01:31 | 23 | differently.  There was discussion by Move to us of |
| 12:01:35 | 24 | what they'd like to see in that respect. |
| 12:01:38 | 25 | Q    Okay.  Who prepared this document? |

Robert Goldberg

212

17:00:30   1      5:00 p.m.

2                (Signature having not been waived, the

3      deposition was concluded at 5:00 p.m.)

4

5

6                  ACKNOWLEDGMENT OF DEPONENT

7                I, ROBERT GOLDBERG, do hereby acknowledge

8      that I have read and examined the foregoing testimony,

9      and the same is a true, correct and complete

10     transcription of the testimony given by me and any

11     corrections appear on the attached Errata sheet signed

12     by me.

13

14     _____     _____

15              (DATE)                      (SIGNATURE)

16

17

18

19

20

21

22

23

24

25

Robert Goldberg

213

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2              I, Alda Mandell, Registered Professional

3    Reporter, the officer before whom the foregoing

4    proceedings were taken, do hereby certify that the

5    foregoing transcript is a true and correct record of

6    the proceedings; that said proceedings were taken by

7    me stenographically and thereafter reduced to

8    typewriting under my supervision; and that I am

9    neither counsel for, related to, nor employed by any

10   of the parties to this case and have no interest,

11   financial or otherwise, in its outcome.

12       IN WITNESS WHEREOF, I have hereunto set my hand

13   and affixed my notarial seal this 20th day of

14   September, 2009.

15   My commission expires:

16   June 30, 2012

17

18

19   _____

20   NOTARY PUBLIC IN AND FOR THE

21   DISTRICT OF COLUMBIA

22

23

24

25

R000704
EXHIBIT R-13

**R-14**

Move In, Inc., et al. v. Real Estate Alliance Ltd, et al.
Barry Indyke - 30(b)(6)

2:07-CV-02185
September 17, 2009

Page 1

```
              UNITED STATES DISTRICT COURT

       FOR THE CENTRAL DISTRICT OF CALIFORNIA

                  WESTERN DIVISION

               Case No. 2:07-CV-02185

-------------------------------x

MOVE IN, INC., et al.,

      Plaintiffs,

    -v-

REAL ESTATE ALLIANCE LTD, et al.,

      Defendants.

-------------------------------x

REAL ESTATE ALLIANCE LTD.,

      Counterclaim-Plaintiff,

    -v-

MOVE IN, INC., et al.,

      Counterclaim-Defendants.

-------------------------------x
```

30(b)(6) Videotaped Deposition of Pitney
Bowes, Incorporated by BARRY INDYKE, taken on
behalf of the Plaintiffs, held at the Hotel
Indigo, 254 Wolf Road, Latham, New York,
scheduled at 10:00 a.m., on September 17,
2009, before Gregory T. DiDonato, Certified
Realtime Reporter and New York Notary Public.

* * * * *

REPORTED BY: Gregory T. DiDonato, CRR        www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022  (404) 875-0400

R000705
EXHIBIT R-14

Move In, Inc., et al. v. Real Estate Alliance Ltd, et al.                          2:07-CV-02185
Barry Indyke - 30(b)(6)                                        September 17, 2009

2 (Pages 2 to 5)

**Page 2**

```
 1  APPEARANCES:
 2
 3  For Plaintiffs:
       ALSTON & BIRD, LLP
 4     One Atlantic Center
       1201 West Peachtree Street
 5     Atlanta, Georgia 30309
    BY: WESLEY ACHEY, ESQ.
 6     (404) 881-7000
       wes.achey@alston.com
 7
 8
 9  For Defendants
       PROSKAUER ROSE, LLP
10     1585 Broadway
       New York, New York 10036
11  BY: JACOB K. BARON, ESQ.
       617.526.9886
12     jbaron@proskauer.com
13
14  For the Witness and Pitney Bowes:
       MICHAEL J. CUMMINGS, ESQUIRE
15     Corporate Counsel
       Pitney Bowes, Incorporated
16     MSC 26-22
       35 Waterview Drive
17     Shelton, CT 06484
       203.924.3934
18     michael.cummings@pb.com
19
20
21
22
23  ALSO PRESENT: Beth Arnold, Videographer
24
25
```

**Page 3**

```
 1        SEPTEMBER 17, 2009
 2           I N D E X
 3
    WITNESS      EXAMINATION BY      PAGE
 4
 5  Barry Indyke  By Mr. Achey    4, 43
 6                By Mr. Baron   29, 47
 7
 8  INDYKE/PITNEY BOWES EXHIBITS: *
 9
    EXHIBIT        PAGE
10
11  Exhibit 230   7 Letter dated August 31st,
                    2009 from Michael
12                  Cummings to Wes Achey, 1
13                  page
    Exhibit 231   8 Photocopies of 4 CDs, 1
14                  page
15  Exhibit 232  16 Affidavit of Barry
                    Indyke, Bates BJB001200
16                  -1201
17  Exhibit 233  20 The MapInfo User's
                    Newsletter, Bates
18                  PBHC0043 - 52
19  Exhibit 234  26 Handwritten document, 1
                    page
20
21
22
23
24  * Exhibits attached to transcript.
25
```

**Page 4**

```
 1        P R O C E E D I N G S
 2        THE VIDEOGRAPHER:  This is the
 3  beginning of disk number one in the deposition
 4  of Mr. Barry Indyke in the matter of MOVE,
 5  Inc. versus Real Estate Alliance and others,
 6  Case Number 02185.  Today's date is
 7  September 17, 2009, and the time on the
 8  monitor is approximately 9:59.
 9        My name is Beth Arnold, and I am the
10  videographer.  The court reporter is Greg
11  DiDonato.  We are with Huseby, Incorporated.
12        Counsel, please introduce yourselves,
13  after which the court reporter will swear in
14  the witness.
15        MR. ACHEY:  Wes Achey with Alston &
16  Bird representing plaintiffs.
17        MR. CUMMINGS:  Michael Cummings with
18  Pitney Bowes.  I'm for the witness and Pitney
19  Bowes Incorporated.
20        MR. BARON:  Jake Baron from Proskauer
21  Rose for Real Estate Alliance.
22        THE REPORTER:  Raise your right hand,
23  please.
24        Do you solemnly swear that the
25  testimony you will give today will be the
```

**Page 5**

```
 1  truth, the whole truth, and nothing but the
 2  truth, so help you God?
 3        THE WITNESS:  I do.
 4  WHEREUPON,
 5        BARRY INDYKE, on behalf of Pitney
 6  Bowes, Incorporated, called as a 30(b) (6)
 7  witness, and having been first duly
 8  sworn, was examined and testified as follows:
 9  EXAMINATION BY COUNSEL FOR PLAINTIFFS
10  BY MR. ACHEY:
11      Q.  Mr. Indyke, could you first just
12  state your home address for the record.
13      A.  5 Robinia Drive Loudonville, New
14  York.
15      Q.  Mr. Indyke, have you ever been
16  deposed before?
17      A.  Not -- I signed a written deposition
18  but that's...
19      Q.  But you've never sat in a room and
20  had the lawyer ask you questions?
21      A.  No.
22      Q.  Let me just kind of give you some
23  kind of ground rules that will help us get
24  through this as fast as possible.
25        First, as you'll notice, we have a
```

REPORTED BY: Gregory T. DiDonato, CRR          www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022  (404) 875-0400

R000706
EXHIBIT R-14

Move In, Inc., et al. v. Real Estate Alliance Ltd, et al.
2:07-CV-02185
Barry Indyke - 30(b)(6)
September 17, 2009

9 (Pages 30 to 33)

**Page 30**

1 for a lot of the data conversion utilities.
2     After the first five years, I moved
3 to manage our consulting group, and I did that
4 for approximately three years.
5     After that I went to work for A
6 quality assurance department for approximately
7 a year-and-a-half.
8     Since then, I resumed the role as a
9 software engineer and have been working on
10 various versions of our software:  MapInfo,
11 Map X, Map Extreme.
12     Q.  And, in your role as a software
13 engineer, do you work on the source code?
14     A.  Yes, I do.
15     Q.  Are you familiar with what source
16 code?
17     A.  Yes, I am.
18     Q.  Could we look at your affidavit
19 that's marked Exhibit 232; look at that for a
20 moment.
21     I guess during the late '80s, your
22 responsibilities were as a software engineer,
23 is that correct, at MapInfo?
24     A.  That's correct; yes.
25     Q.  Did you have sales responsibilities?

**Page 31**

1     A.  No.
2     Q.  Were you a salesman for the company?
3     A.  I was not a salesman for the company.
4     Q.  Did you ever sell any of the MapInfo
5 products personally?
6     A.  It's hard to say.  The organization
7 that I used to work with at RPI, Rensselaer
8 Polytech the Freshwater Institute, was
9 actually one of customers shortly after I
10 started working for the company.
11     So, in a sense, I was involved in
12 them buying the software, but I don't know if
13 I'd say I sold them.  It was not an official
14 role for me.
15     Q.  In your affidavit here in paragraph
16 five, it states that Version 1.2X was on sale
17 as early as the beginning of August 1987.
18     Do you see that?
19     A.  Yes, I do.
20     Q.  Did you have any sales documentation
21 to provide the basis for that statement there?
22     A.  No, I did not.
23     Q.  Is it just based on what your memory
24 of what might have happened?
25     A.  Yes.

**Page 32**

1     Q.  So, are you a hundred percent certain
2 that the product was sold in August of 1987?
3     A.  I know that we had customers for our
4 software in '87.  That's what I recall.
5     Q.  But you did not have sales
6 documentation; is that correct?
7     A.  No, I don't.
8     Q.  In paragraph six there is, it states
9 that Version 2.0 was on sale and shipped to
10 customers as early as January of 1988.
11     Do you see that?
12     A.  Yes, I do.
13     Q.  And did you have any sales
14 documentation that showed sales in January of
15 1988?
16     A.  No, I don't.
17     Q.  So, if there were, if the sales took
18 place somewhat later, would that surprise you
19 later than January 1988?
20     MR. ACHEY:  Objection to form.
21     THE WITNESS:  I'm sorry?
22     MR. ACHEY:  I just objected.  You can
23 answer.
24     THE WITNESS:  Oh.
25     A.  I'm sure there were sales later, but

**Page 33**

1 it would surprise me if the only sales were
2 later.
3     Q.  Is it possible that the first sales
4 were later than January 1988?
5     MR. ACHEY:  Objection; form, asked
6 and answered.
7     A.  It would surprise me if the first
8 sales were after.
9     Q.  After January of 1988?
10     A.  January 1988.
11     Q.  Why would it surprise you?
12     A.  Because MapInfo 2.0 was a revision to
13 a previous version of software, and generally
14 customers upgrade to the new revision.  So,
15 even if there were no new sales to new
16 customers, I would have expected that some of
17 the earlier customers would have purchased the
18 software.
19     Q.  But you haven't seen any sales
20 documentation that actually shows that?
21     A.  No.
22     Q.  Could we look at the second page
23 there that talks about, it's marked Exhibit A.
24     Do you see that?
25     A.  Yes.

**REPORTED BY: Gregory T. DiDonato, CRR**
**www.huseby.com**
**HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022  (404) 875-0400**