MX. 50

EXHIBIT D

M1839
EXHIBIT MX-50

RLMV001133

United States Patent: ~~4,870,576~~5,032,989


( 1 of 1 )


United States Patent ~~4,870,576~~5,032,989
Tornetta ~~September 26, 1989~~July 16, 1991


Real estate search and location system and method


Abstract
~~A novel system and~~There is provided a method for locating available real estate properties for ~~potential~~
~~purchase including a graphical locator interface which permits definition of a~~
~~desired area for search by placing of a user-controlled selector on a map~~
~~displayed on a CRT. Additional search qualifications including price, type of~~
~~structure and others are also specified. The completed specification is then~~
sale, lease or rental using a database of available properties at a central
location and remote stations which use a graphic interface to select desired
regions on a map of the areas in interest. The user begins with a region where
they are interested in acquiring property and select an inner area within this
region by using a pointing device such as a mouse to designate boundaries on a
map displayed on screen. This is then zoomed in on and a second area is selected
within the zoomed region. The second area is then cross-referenced with the
~~transmitted to a host system and is used for a search of a~~database of available
properties whose approximate locations are then
~~properties.~~
pictorially displayed on screen. Information about the properties can then be
obtained in textual form.


Inventors: Tornetta; Mark A. (Plymouth Meeting, PA)
Assignee: Realpro, Ltd. (Plymouth Meeting, PA)
Appl. No.: ~~841515~~342577
Filed: ~~March 19, 1986~~April 24, 1989

Current U.S. Class:705/1; 345/667; 705/26
Intern'l Class: ~~H04N 007/08~~G06F 015/21
Field of Search: ~~340/945,286 M,731,712,709  364/401,200,900~~364/401
340/731,995 434/150


References Cited [Referenced By]


U.S. Patent Documents


1

~~3949191Apr., 1976Crowther et al.235/380.~~
~~4312577Jan., 1982Fitzgerald340/286.~~
~~4400780Aug., 1983Nague et al.340/731.~~
3936667Feb., 1976Loubal364/409.
4429385Jan., 1984Cichelli et al.364/900.
4532605Jul., 1985Wallet364/900.
4553206Nov., 1985Smutek et al.364/300.
4635136Jan., 1987Ciampa et al.~~364/900.~~358/342.
4870576Sep., 1989Tornetta364/401.
Foreign Patent Documents
2105075Mar., 1983GB364/401.

Other References

~~Schiffres, M., "Mortage Hunting Made Easier", U.S. News of World Report, Blue Chip Edition, Mar. 31, 1986, BC.sub.3 (Nexis .TM. excerpts).~~
~~Naylor, B., "Ground Control to Major Match", American Banker, Apr. 19, 1985, 23 (Nexis.TM. excerpts).~~
~~Young, C., "Computer Form to Help Buyer Shop for Loans", Washington Post, Virginia Real Estate Section, Apr. 4, 1984, E1, (Nexis.TM. excerpts).~~
~~"Introduction to the PRC Multiple Listing Service System", PRC Realty Systems, pp. 1-4.~~
Real Estate Agent (software), Albion, Div. of Queue, 338 Commerce Dr., Fairfield, CT 06430, released 9/1/86 (abstract only).
"Digitizer Option Introduced With StreetSmart 3.0", Computer Shopper, vol. 8, No. 12, Dec. 1988, p. 609 (abstract only).
"Once-ailing Mindbank Rebounds With Real Estate Package", Pittsburgh Press (PA), May 24, p. D9 (abstract only).
"System Technology Develops CD-ROM Map Display System", Comline Computers, Aug. 23, 1989, p. 3 (abstract only).
"Meitec Develops Network System Connecting Map Information System with ISDN", Comline Telecommunications, Nov. 8, 1989, p. 4.
"New MAPINFO 4.0: Desktop Mapping on Network", PTS New Product Announcements, News Release May 10, 1990, p. 1.
"Graphic Real Estate", Varbusiness, Oct. 1990, p. 16.

Primary Examiner: Smith; Jerry
Assistant Examiner: ~~Tbui; Kimthanh T.~~Huntley; David
Attorney, Agent or Firm: Ratner & Prestia

Parent Case Text

TECHNICAL FIELD

This is a continuation-in-part of application Ser. No. 841,515 filed Mar. 19, 1986 of common inventorship and assignment now U.S. Pat. No. 4,870,576 .

Claims

2

I claim:

1. A method using a computer for locating available real estate properties for purchase
comprising the steps performed by a computer of:

(a) selecting a landmark as a reference point from a list of available landmarksa) creating a database of the available real estate properties;

(b) displaying a map showing said selected landmark, a first area selection cursor having boundaries and information about distance and direction from the center of said first cursor to said landmarkof a desired geographic area;

(c) accepting commands to cause the location of said cursor to traverse said displayed map in any cardinal direction and to change the size of said first cursor;
c) selecting a first area having boundaries within the geographic area;

(d) zooming saidin on the first area of the displayed map to coincide withabout the boundaries of said
the first cursor thereby displayingarea to display a higher level of detail than the displayed map;

(e) accepting an indication of completion of said first cursor traversal and size change and converting the area enclosed by said first cursor to values representative of geographic location and maximum distance from said geographic location.

(f) transmitting said data set to a host processor;
e) displaying the zoomed first area;

(g) receiving said data set by said host processor;
f) selecting a second area having boundaries within the zoomed first area;

(h) searching a database of properties by said host processor using said received data set;
g) displaying the second area and a plurality of points within the second area, each point representing the appropriate geographic location of an available real estate property; and

(ih) identifying available real estate properties by said host processor within said database whichthe database which are
match data indicative of criteria contained in said received data set; and

(j) transmitting by said host processor, information about said identified properties.
located within the second area.

2. The method of claim 1 comprisingin which step (e) includes the stepsfurther step of: printing

3

RLMV001136

~~(k) displaying said zoomed map, a second area selection cursor enclosing an area, and information about the distance and direction from the center of said second cursor to said landmark;~~

~~(l) accepting commands to cause the location of said second cursor to traverse said displayed map in any cardinal direction, and to change the radius of said second cursor;~~

~~(m) accepting an indication of completion of said cursor traversal and size change and converting the area enclosed by said cursor to values representative of geographic location and maximum distance from said geographic location.~~
<u>a report containing the location of the available real estate properties identified within the database.</u>

3. ~~A method for specifying the approximate geographic location of a~~<u>The method of claim 2 in which there is included the further step of</u> <u>providing additional information regarding the features of the available</u> real estate property ~~comprising the steps of:~~<u>.</u>

~~(a) selecting a landmark as a reference point from a list of available landmarks;~~

~~(b) displaying a map showing said selected landmark, a first area selection cursor having boundaries, and information about the distance and direction from the center of said first cursor to said landmark;~~

~~(c) accepting commands to cause the location of said first cursor to traverse said displayed map in any cardinal direction and to change the size of said first cursor;~~

~~(d) zooming said displayed map to substantially coincide with the boundaries of said cursor, thereby displaying a higher level of detail;~~

~~(e) displaying said zoomed map, a second area selection cursor enclosing an area and information about the location of the center of said second cursor relative to said landmark.~~

4. The method of claim 3 ~~further including~~<u>1 in which there is included the further step of storing</u>
the points in a separate points file, containing at least the location information of the available real estate property.

5. <u>The method of claim 1 wherein steps (d) and (e) utilize a pointing device.</u>

6. <u>The method of claim 1 further comprising</u> the steps of:

<u>i providing characteristic information of the available real estate properties in the database of available real estate properties;</u>

<u>j selecting at least one of the characteristics of the available real estate properties; and</u>

<u>k modifying the display of points to represent the available real estate properties having the selected characteristics.</u>

4

7. The method of claim 1 wherein the database of the available real estate properties created in step (a) includes available commercial properties.

8. The method of claim 1 wherein the database of the available real estate properties created in step (a) includes available residential properties.

9. The method of claim 1 wherein the data base of the available real estate properties created in step (a) includes available real estate properties for rental purposes.

10. The method of claim 1 wherein the database of the available real estate properties created in step (a) includes available real estate properties for lease purposes.

(f) accepting commands to cause the location of said second cursor to traverse said displayed map in any cardinal direction, and to change the radius of said second cursor;
11. The method of claim 1 wherein the database of the available real estate properties created in step (a) includes available real estate properties for commercial purposes.

(g) accepting an indication of completion of the second cursor traversal and radius change and converting the area enclosed by said cursor to values representative of geographic location and maximum distance from said geographic location.
12. The method of claim 1 wherein the database of the available real estate properties created in step (a) includes available real estate properties for residential purposes.


Description


TECHNICAL FIELD

The present invention pertains to data processing systems for the location of real estate properties for purchase through the use of an interactive graphical locator interface for developing geographic area indications.

BACKGROUND OF THE INVENTION

Listings of available real estate are typically stored in a central computer system, generally referred to as a "multiple listing service". This computer-stored listing may be accessed through terminals for retrieval of specific information relating to a given property. However, search of the stored information is typically dependent on the operator's intricate knowledge of the local area, its political subdivisions, and informal housing tract designations. Furthermore, such listings are usually maintained for each county, and multiple accesses of diverse systems are often required for a complete location of all available properties. Finally, no provision for searches by multiple criteria, including geographic location is made in prior systems.

THEORY OF THE INVENTION

M1844
EXHIBIT MX-50

RLMV001138

The system and method of the present invention comprises a host system for
maintaining a database of available properties, receiving data from both buyers
and sellers of properties, and searching the database using buyer's criteria.
The system and method of the present invention also comprises seller and remote
systems for creating, storing, updating, and transmitting buyer and seller data
to the host. The system and method of the present invention are applicable for
residential, commercial, industrial and other special purpose uses of the real
estate involving sale, lease or rent. All geographic location performed by the
system of the present invention employs a graphical locator interface for
specifying property locations.

The user can create a property search file by selecting the "Create" option from
the Main Menu. A viewport is displayed and map boundaries are drawn ~~onscreen~~ on-
screen.
Inside this display the user can control the position and size of a "rubberband"
window box. Properties appear as dots on the map.

A labeled distance indicator is displayed which calculates the distance between
the window box center and the selected landmark location. The user can change
the landmark location from a menu of landmarks. The label and distance indicator
are then updated automatically. As the user changes the window box position, the
labeled distance indicator changes to reflect the distance from the displayed
landmark. The user can center the window box over the landmark automatically
[via the home key]. Price and size minimum and maximum indicators appear below
the viewport. The user can change the minimum and maximum indicators to refresh
the points display. Only these property points within the minimum-maximum limits
are drawn. The data for these points are referred to as the points file. The
user can change the size of the window box.

The user can then change the world coordinate display to equal the boundaries of
the window box. The size of the viewport remains constant so that the display
now appears to have zoomed down closer to earth. Map boundary lines are
displayed with greater detail and a "rubberband" circle is displayed which
allows the user to enclose a search boundary on the map. The user can then
either return to the original zoom-up display or save the center location and
radius values of the rubberband circle.

The labeled distance indicator is redisplayed and now calculates the distance
between the rubberband circle center and the current landmark location. The user
can change the size of the rubberband circle. A radius indicator is displayed
which calculates the radius of the rubberband circle. As the user changes the
position and size of the rubberband circle, the labeled distance and radius
indicators are updated to reflect the changes.

Having entered the search location boundary, the user is then prompted for the
numerical range data entries.

Having selected numerical range data values, the user is then prompted with a
series of menus and asked for selections.

When the final menu is displayed and all data entries have been successfully
entered, the user has successfully created a property search file and is
returned to the Main Menu.

6

RLMV001139

The present invention comprises a system ~~for~~of computer software for creating and
maintaining both a real estate property database and a corresponding file of
hard-copy real estate property listing advertisements, and for allowing searches
of the database. A "host system" having a database can be searched from "remote"
computer systems by the use of a public domain software program that is menu
driven and includes a graphical locator interface to specify accurate search
location boundaries.

The search facility enables a remote user to obtain a custom selected portion of
the hard-copy property listing file without having to obtain the entire file.
The search facility also enables the user to obtain many different
custom-selected sets of files from the hard-copy property listing file.

The system of the present invention is implemented as three main computer
systems:

1. A host system which accepts both property listing files and property search
files from remote locations, maintains the property database and performs
searches, reports system errors, maintains customer accounts, and calculates
statistics. <u>The host system has:</u>

<u>(a) Download options - news files and points files</u>

<u>(b) Search options - search summaries and custom searches</u>

2. A property listing maintenance system which enables a remote user to create
and update a property listing file and then transmit it to the host system.

3. A property search maintenance ~~program~~<u>system</u> that enables a remote user to
create and
update a property search file and then transmit it to the host system. <u>The
system also maintains archive files of searches that were already processed.</u>

~~HOST RECEIVING SYSTEM~~
Host Receiving System

The host system polls a standard telephone line while waiting for remote data
transmissions. When the host system receives a call, it brings the telephone
line off-hook. If a carrier signal is detected, the host system conforms to the
specified communication parameters and waits for incoming data.

The host system ~~receives and echoes a start of message protocol followed by
and~~<u>downloads a data file using an XMODEM protocol. (downloads user</u>
~~echoed data file transmission followed by an echoed end-of-message signal. The
host system then checks the received data file against customer account lists
and determines an appropriate diagnostic response which it transmits back to the
remote system.~~<u>file with XMODEM). See 1.</u> The host system then goes back on-hook
and polls the
telephone line for more calls.

Any data transmission errors <u>of spurious calls</u> occurring after the host system
brings the telephone line off-hook ~~cause~~<u>causes</u> the host system to hang up and
poll
for more calls.

M1846
EXHIBIT MX-50

RLMV001140

~~MAINTAIN~~
Maintain

Received data files are placed on queues set up for batch processing. A search queue, an addition queue, and a deletion queue are all processed for application to the property database. When batch processing in the host system begins, the host reads the property database into memory and processes the deletions queue. Next, the addition queue is added to the property database. The updated property database is then sorted so that the search queue may be processed. When all the search processing is complete, the property database is then sorted again for filing and over-written to the property database file on disk.

~~SEARCH~~
Custom Search

The search processing procedure compares property data records to the search being processed. ~~Numerical~~ Minimum/maximum numerical fields in the property data records
are checked against the associated numerical ranges of the search. Property data menu selections are checked against their associated search menu selection arrays. The distance from the property data records' location to the search area center location is calculated with the distance formula and compared to the search boundary radius value. The search processing produces several files that are used for further processing. A file of search results is produced which contains an identification for each search on the search queue plus a list (if any) of the properties that were selected in the search. From this file, a file of customer mailing labels is produced. Another file is also created which contains a count of the number of times each property data record was selected during the search processing. This simplifies hard-copy duplication tasks and eliminates unnecessary duplications.

During the subsequent processing, hard-copy duplicates are made for materials relating to each property selected. The results of each search are collected and assembled from the duplicates and labeled for shipping. The finished search results are then shipped to customers. See 2.

~~ACCOUNTING~~
Accounting

Customer accounts are created and maintained by separating the customers into two groups--Buyers and Sellers. Buyer accounts are used to search the property data file while Seller accounts are used for property listings.

The Buyer account list contains records with identification data fields and financial resource data fields. The Buyer account system interactively prompts for new Buyer accounts--automatically assigning serial numbers, and new payment data. The Buyer account list is then read into memory from the Buyer account file so that new accounts and payments can be added. The resource field that accounts for time on the system is automatically updated. Buyer account records with deficient resource fields are automatically deleted. The Buyer account file is then overwritten.

Similarly, the Seller account list also contains records with identification data fields plus a resource data field. The Seller account system interactively

8

RLMV001141

prompts for Seller accounts to be terminated, new Seller accounts--automatically assigning serial numbers, and new payment data. The Seller account list is then read into memory from the Seller account file so that new accounts and payments can be added and terminations processed. The resource field that accounts for time on the system is automatically updated. Seller account records with a deficient resource field are automatically deleted. The Seller account file is then overwritten.

A log is written during the accounting process to document all entries. It also serves to document any automatic processing which may occur.

Both the Buyer and Seller accounting systems produce receipt files which are printed to inform the customer of the results of processing. Serial numbers and payment receipts are issued in this manner. Seller terminations receipts are also issued in this manner.

~~STATISTICS~~
Statistics

The host system calculates statistics by reading the property data file into memory and traversing the property database. Minimum, maximum, count, percentage, mean, and standard deviation statistics are then calculated where applicable and written to a file with all statistics being clearly labeled. This file includes special printer functions so that a neat and organized report can be printed. Price, size, X, and Y data are written to the points file.

A system check routine is included to track potential errors in both the Buyer and Seller accounting systems. In the Seller accounting system, the Seller account file is checked against the property database and the errors are reported. In both the Buyer and Seller accounting systems, accounts with deficient resources are also reported.

~~PROPERTY LISTING FILE PROGRAM~~
Property Listing File Program

The Property Listing File Program is used to create, maintain, and transmit property listing files to the host system. It interactively prompts for entries, is error trapped, and requires no previous knowledge about either the remote or host systems.

The user can create a property listing file by selecting the "Create" option from the Main Menu. A viewport is displayed and map boundaries are drawn on screen. Inside this display, the user can control the position of a rubberband window box.

The user may then change the world coordinate display to equal the boundaries of the window box. The size of the viewport remains constant so that the display now appears to have zoomed down closer to earth. Map boundary lines with erasable labels are displayed with greater detail and a ~~moveable~~movable crosshair cursor
is displayed which allows the user to pinpoint a location on the map. The user can then either return to the original zoom-up display or save the location of the crosshair cursor.

Having selected a location, the user is then prompted for the address of the

9

RLMV001142

property. The user must enter an address.

Having entered the address, the user is then prompted for numerical property
data entries. If an invalid value is entered the user is again prompted for the
same input.

Having entered the numerical property data entries, the user is then prompted
for tracking directions to the property. If an invalid value is entered, the
user is prompted for the same input.

Having selected numerical property data values, the user is then prompted with a
series of menus and asked for selections. If an invalid menu selection value is
entered the user is again prompted for the same input.

When the final menu is displayed and all data entries have been successfully
entered, the property listing data is over-written to a disk file. The user has
successfully created a property listing file and is returned to the Main Menu.

From the Main Menu the user can then choose to update the property listing file
currently on disk. By selecting the "Display/Update" option the property listing
data is read into memory and the Display/Update menu is displayed to allow the
user to update either the location, address, numerical or menu data sections
separately. When the user is finished editing a section, he ~~is~~is returned back to
the Display/Update menu to allow him to edit another section. ~~When the user is
finished updating the property listing data, the property listing data is
over-written to the disk file and the user is returned to the Main Menu.~~

The ~~address~~traveling directions update procedure displays the property address
data and
allows the user to edit each portion of the address separately. After editing a
portion of the ~~address~~traveling directions, the entire ~~address is~~ traveling
directions are
redisplayed. When the user is satisfied with the address data, he is returned to
the Display/Update menu.

The location update procedure is identical to the property listing map/location
interface described previously.

The numerical data update procedure displays the numerical data and allows the
user to edit each portion separately. After editing a portion of the numerical
data, the numerical data is redisplayed. When the user is satisfied with the
numerical data, he is returned to the Display/Update menu.

The menu data update procedure displays the menu data and allows the user to
edit each portion separately. After editing a portion of the menu data, the menu
data is redisplayed. When the user is satisfied with the menu data, he is
returned to the Display/Update menu.

When the user is satisfied that the property listing file is complete, he can
select the "Print" option from the Main Menu to print the Property Listing File.
The property listing data is read into memory and copied to the printer with
each value clearly labeled. When the printing is completed, the user is returned
to the Main Menu.

The completed property listing file may be transmitted to the host system by

10

M1849
EXHIBIT MX-50

RLMV001143

selecting the "Send" option from the Main Menu. The user is then prompted for account identification data. The property listing file is read into memory and the account identification data added to it. All dialing and communications parameters are set automatically and the program takes the remote system off-hook and dials the host system. The remote system then waits for a carrier tone. If no carrier is present the remote system times-out and returns a diagnostic error message to the user. If a problem exists with the remote system while off-hook, the program brings the system back on-hook and displays a diagnostic error message or aborts processing.

If the remote system receives a carrier tone from the host system, ~~he~~the connection is established and the remote system ~~issues~~uploads the ~~echoed start of message protocol. The echoed~~ property listing file ~~is then sent~~ to the host ~~computer followed by an echoed end of message signal~~system using the XMODEM protocol. The remote system then waits for a diagnostic message from the host system and displays the message to the user. The program then brings the telephone line back on-hook and returns the user to the Main Menu.

~~PROPERTY SEARCH FILE PROGRAM~~
Property Search File Program

The Property Search File Program is used to create, maintain, and transmit property search files to the host system. It interactively prompts for entries, is error trapped, and requires no previous knowledge about either the remote or host systems.

From the Main Menu the user can then choose to update the property search file currently on disk. By selecting the "Display/Update" option the property search data is read into memory and the Display/Update menu is displayed to allow the user to update either the location, numerical ranges or menu data sections separately. When the user is finished editing a section, he is returned back to the Display/Update menu to allow him to edit another section. When the user is finished updating the property search data, the property search data is over-written to the disk file and the user is returned to the Main Menu.

The location update procedure is identical to the search location map interface described previously.

The numerical range data update procedure displays the numerical range data and allows the user to edit each portion separately. After editing a portion of the numerical range data, the numerical range data is redisplayed. When the user is satisfied with the numerical range data that is displayed, he is returned to the Display/Update menu.

The menu data update procedure displays a category menu to allow the user to edit each portion of the menu data separately. After editing a portion of the menu data, the menu data is redisplayed. When the user is satisfied with the menu data, he is returned to the Display/Update menu.

When the user is satisfied that the property search file is complete, he can select the "Print" option from the Main Menu to print the Property Search File. The property search data is read into memory and copied to the printer with each value clearly labeled. When the printing is completed, the user is returned to the Main Menu.

M1850
EXHIBIT MX-50

RLMV001144

The completed property search file may be transmitted to the host system by selecting the "Send" option from the Main Menu. The user is then prompted for account identification data, search name data, baud rate data, and dialing prefix data. The property search file is read into memory and this data is added to it. The remaining communications parameters are set automatically and the program takes the remote system off-hook and dials the host system. The remote system then waits for a carrier tone. If no carrier is present the remote system times-out and returns a diagnostic error message to the user. If a problem exists with the remote system while off-hook, the program brings the system back on— hook and displays a diagnostic error message or aborts processing.

If the remote system receives a carrier tone from the host system, the connection is established and ~~the remote system issues the echoed start of message protocol. The echoed property search file is then sent~~uploads the request to the host system. After ~~computer followed by an echoed end of message signal. The remote system then waits for a diagnostic message from the host system and displays the message to the user~~waiting for processing, it downloads the results. The program then brings the
telephone line back on-hook and returns the user to the Main Menu.

BRIEF DESCRIPTION OF THE FIGURES

FIG. 1 is an overall block diagram of a system typical of the present invention.

FIG. 2 is a functional block diagram of the system of the present invention.

FIG. 3A is a depiction of a map generated on a CRT according to the present invention.

FIG. 3B is a map showing greater detail and displayed on a CRT according to the present invention.

FIG. 4 is a flow diagram of the procedure create buyers search specification file.

FIG. 5 is a flow diagram of the procedure obtained new center and radius for display circle.

FIG. 6 is a flow diagram of a generalized procedure for the zooming of the map display of the present invention.

FIG. 7 is a more detailed flow diagram of the procedure close SRPROP.DAT and ~~transmit~~upload data to host system.

FIG. 8 is a more detailed flow diagram of the procedure ~~transmit data~~upload request to host
computer and prompt for CR.

FIG. 9 is a flow diagram of the procedure maintain data base.

FIG. 10 is a flow diagram of the procedure receive buyers search specifications.

M1851
EXHIBIT MX-50

RLMV001145

FIG. 11 is a flow diagram of the procedure receive file from remote system and
acknowledge.

FIG. 12 is a flow diagram of the procedure search data base of properties using
buyers specifications.

FIG. 13 is a flow diagram of the procedure update accounting data for buyers and
sellers.

DETAILED DESCRIPTION

Referring now to FIG. 1, there is shown an overview block diagram of the entire
system of the invention which includes a host computer system 200 which is
connected by telecommunications links 20 to a plurality remote computer systems
100A, 100B and 100C. Host system 200 maintains a database of property listings
202 which contains a plurality of property listings submitted by those with
properties to sell, lease or rent. The database is used for search and delivery
of relevant property information to those inquiring of the system with certain
specifications to be described later. Host system 200 also maintains a set of
client accounts 204, one account per client (either a buyer or seller). Charging
for the use of the system is based upon a continual update of these client
accounts. Host system 200 also uses a mail service 30 such as the U.S. mail
service (but not limited thereto) for communication and billing purposes. Each
remote system, 100A, 100B and 100C, is capable of interrogating the database 202
by communicating a set of specifications for a desired property to be purchased
to host system 200. These specifications are derived from buyer input data 12A,
12B and 12C. The buyer input data is interactively gathered from the buyer by
the remote system, formatted, and transmitted with an error-checking protocol to
the host system which then. The host system either processes the search data
(also points
files and news files) on-line and returns a summary result or batches the
interrogation requests for subsequent processing off-line. Similar to the
communications functions by host system 200, communications also occur with
sellers and remote system operators through mail service 30.

Referring now to FIG. 2, there is shown a procedural overview block diagram of
the present invention. The system 10 of the present invention comprises three
principal components, host system 200, remote system 100, and seller system 500.
It will be understood that although only one seller system 500 is shown, a
plurality of such systems exist and interface to host 200.20 . Similarly,
although
only one remote system 100 is shown a plurality of such systems exist and
interface to host 200. The procedural components of host system 200 include
maintain database procedures 210, search database procedures 260 receive buyers
search specification procedures 230, prepare output of search result procedures
280, statistical analysis procedures 290, 290 (which includes generation of the
points file which consists of X, Y, price and size data values for each
property), and accounting procedures 300.

Maintain database procedures 210 first deletes listings that are no longer of
use and then adds new listings to the database. The source of new properties in
the database is seller system 500 wherein complete specifications are prepared
and delivered to host system 200 through a variety of means. Database
maintenance procedures 210 also include an additional amount of information

M1852
EXHIBIT MX-50

RLMV001146

added through a location system for new properties to be described later.

Database search procedures 260 ~~includes~~include an application of buyer search specifications to the database. The receiving of buyer search specifications is conducted via telecommunications link 20 depicted in FIG. 1. Remote systems according to the present invention are interfaced via a modem or other such telecommunications device to host system 200 which controls its own telecommunications line and receives information from remote systems with validation and error-checking procedures. On receipt of such valid information a search specification is built within host system 200 and is queued for later processing during an off-line period in the host. Receipt of a buyer specification file is acknowledged to the remote system and a status message is delivered prior to termination of the telecommunications link. The output of a database search, if successful, ~~is either a summary of the property record or~~ will include a listing of a given buyer identification number followed by the serial numbers of those property listings in the database which fall within the range of specification created by the buyer. This listing which pairs buyers with located properties then permits further processing in host system 200.

The output listing from host system 200 is stored in three files. The first file is the identification of the search which identifies the actual buyer, the search name, and the serial numbers of any properties which have been selected. In addition, a list of mailing labels is created with the names and addresses of the buyers for whom searches have been performed. This list of mailing labels is created by referencing the buyer identification number against the host system accounting files.

Another procedure in host system 200 counts the number of times each property listing serial number was selected during batch processing and writes that information to a file. Subsequently duplicates of the individual property advertisements are made. Then, during ~~the~~ further processing, the searches are collected from these duplicates and placed with the printed search results into an envelope with the corresponding mailing label and shipped to the buyer.

Another function of host system 200 is accounting functions 300. These accounting functions include charging for services rendered to both sellers and buyers. Sellers are charged by the number of days that their property advertisement is listed in the database. The buyer is charged by the search. ~~For~~The each property selected the buyer is charged. Similarly, the buyer is charged for a~~type of~~ search ~~having a null result~~can involve varying costs.

Typically the charge to buyers is done on a declining balance arrangement, wherein a minimum charge of a certain number of ~~balance units~~requests is applied regardless of the outcome of any ~~transmitted~~search, including invalidity of search data.

Yet another function of host system 200 is statistical analysis functions 290. Statistical analysis may occur on the total contents of the database at any given time, the average contents of the database over a longer period of time, or statistical analysis may be performed to detail the nature of search specifications being transmitted to host system 200. X, Y price & size points file is written.

There are three basic types of variables used in the system of the present

14

RLMV001147

invention: (1) numerical; (2) array or menu selection; and (3) floating point location. ~~For numerical data,~~Average minimum, maximum and standard deviation is computed. ~~For a percentage of the total for each selection is computed~~ for numerical data. Finally a count of the number of property listings in the database and a percentage of those with a mortgage, and an average mortgage rate are calculated. A second major component of system 10 is remote system 100. Remote system 100 is comprised of two principle ~~subsystems~~sub-systems: create search
specification file 110 and transmit search file 150. Create search specification file 110 is the module seen by potential buyers of properties wishing to interrogate host system database 202. The unique user interface incorporated within module 110 includes a graphical locator which permits precise location of desired area for property purchase with reference to a global coordinate system. This location is ~~done~~selected through the use of manipulator keys or pointing devices such as a mouse, light pen or other known devices which allow positioning of a graphical interface selector in order to locate both property location and distance specifications without resort to numeric data on the part of the user.

From the main on-screen menu, the user selects the create option. The system displays the graphical locator interface which draws a map on the display (shown in FIG. 3A) with points indicators. Superimposed over the map is a window box that is non-destructive. The user has control of the position and size of the window box through a set of keys or locator. Also on-screen is a distance indicator which calculates the distance in miles from the center of the window box to a changeable landmark location on the map. The user can display a list of landmarks; change the selected landmark and the actual display is automatically updated. The landmark is also labeled on the map. The minimum/maximum indicators appear below the viewpoint. These indicators can be changed so that when refreshed, only those points whose price and size are within the minimum/maximum limits are displayed. The user can also automatically center the window box over the current landmark. After selecting the landmark, moving the window box, and selecting its size, the user activates a key sequence to "zoom" the display. In other words, the viewport will then display the actual boundaries of the window box so ~~that~~that display appears to have zoomed down closer to earth (shown in FIG. 3B). A "rubber band" circle then appears which is normalized to the size of the viewport. The user may move this circle on the display and also change its size. There is displayed a radius indicator indicating the actual radius of the circle in miles along with a corresponding distance indicator from the specified landmark. Once the user has selected his search boundary by selecting an appropriate circle, that data may be saved or changed.

After saving the location data, the user is prompted for numerical range data, such as minimum and maximum price for the target listing. After having selected several numerical ranges, a series of menus are displayed so that the user may select one or several selections on each menu.

After the completion of the questioning cycle, all data entered by the user is stored as a search specification. The user is then allowed to print hard copy of the search specification prior to subsequent transmission of the search specification to the host system. A second procedure allows editing of a previously created search specification. This process termed "update" presents a list of the parameters entered by the user and allows any given parameter to be modified, subsequently re-saving the data and again presenting menu choices for

15

RLMV001148

transmission to the host, further update, and creation.

After creation and validation of search specifications and approval of the final
specification by the buyer, such specification is transmitted via
telecommunications links 20 to host system 200 for application to the database.
After database search, results are prepared as previously described and are
transmitted or mailed back to the potential buyer for his use.

A final component of system 10 is seller system 500, which comprises preparation
of a property specification 510. Such a property specification contains the same
data which is interrogated by a potential buyer, but such data is definite and
not in ranged numerical form. This is obvious since a seller generally only has
a fixed number of, for instance bedrooms in his house, and would not necessarily
specify that he has a house containing 2 to 4 bedrooms. After preparation of a
seller specification for a property, that information is transmitted to host
system 200 and used in database maintenance for entry of new property
information into the database. After entry, such new property information
becomes available for search by all buyers.

Referring now to FIG. 4, there is shown a detailed flow chart for Create
Specification Procedure 110, which is part of remote system 100. Create
Specification Procedure 110 begins at the block labeled start 112 and proceeds
to initialize the various memory locations and variables required for its own
internal processing at block 114. After initialization, the procedure obtains a
new center and radius (location information) , and price and size information
from the user at 116. Obtaining location information will be described more
fully hereinafter. After locating a desired search boundary, the system prompts
for and receives input regarding various specifications of a property at 118.
Such specifications include ranges for price, lot size (in minimum/maximum
indicators), number of bedrooms, and other numerical data, as well as menu
selections for home style, sewage system, roof type, and other such housing
elements. After receiving and validating all such information, a specification
file labeled SRPROP.DAT is written to a mass storage device for saving until
future processing can commence at 120. Finally, the file so written is
transmitted to host system 200 at block 122 and processing to create a property
stops at stop block 124. Block 122 is depicted on FIG. 2 as procedure block 150,
"transmit
buyer's search file to host 150 ."

Referring now to FIG. 5, there is shown a more detailed view of procedures
required for obtaining new center and radius for property location purposes
shown as block 116 on FIG. 4. The procedures for obtaining a new radius and
center depend upon the creation of a scaled map (shown in FIGS. 3A,B) of the
target area over which the database contains properties. This map is generated
on a display screen for use by the user. Procedure 116 begins at start block
154602
and initializing its own variables in order to begin processing. Such variables
are local in scope and do not interfere with initialization processing conducted
by the calling routine at 114. At decision 158,

Control travels from start block 602 to block 604, where it is seen that the
variables are initialized. After the variables are initialized, the world
coordinates are set to their maximum values in block 606. Next, the points file
must be read into memory from the downloaded points file sitting in the user's
disk storage medium, as shown in block 608.

M1855
EXHIBIT MX-50

RLMV001149

Control then proceeds to decision block 610, where it is determined whether the user has completed his location boundary selection process for location and is through with the. If the user has completed this selection, control proceeds to block 636, where it is shown that the center and radius coordinates for the map are changed to the new center and radius coordinates, just selected. Then, the data values corresponding to the min and max indicators displayed on the screen are saved to a disk file. Then the procedure. stops at block 640. If the user is not through, processing proceeds at block 164 whereinhas not completed his boundary window coordinates are maximized in order to give a maximal overview of the map location selection, processing proceeds from decision block 610 to block 612, where the last selected (most current) world coordinates are retrieved from memory. These world coordinates are then used in block 614 to redisplay the map through the fixed viewport. The points file is then drawn, as shown in block 616. The min/max indicators, which are displayed on screen, are set in block 617.

In decision block 618, it is determined whether the min/max indicators have changed. If they have, the points file is erased in block 622. A "filter" is area contained within the database. In this way, the fullest amount of area used to eliminate points not within the limits of the min/max indicators set in block 617. In this way, when control leaves block 620 to block 616, only the new availablepoints within the database is shown on the screen at once.set min/max indicators will be redrawn. If it is determined

The map is then displayed according to these set coordinates at block 166. At block 168 user input is taken in the form of pre-defined key strokes which indicate a desired user action. The procedure interprets these key strokes and sets a pair of variables to indicate the next action to be performed. At decision block 170,618 that the min/max indicators have not been changed, control proceeds to decision block 624.

At decision block 624, an evaluation of the variable "DONE" is performed. If DONE is equal to 0, this is indicative of the fact that the user wishes to zoom the display downward, that is, obtain a more detailed view of a smaller area of the map, and zoom down procedure 172,628, described more fully hereinafter, is executed. In the event that done is not equal to 0, evaluation 174626 checks whether done is equal to 2. If it is, this is an indication that the user wishes to zoom up, that is, view a larger area of the map with correspondingly less detail, also described hereinafter. In the event that done is not equal to 0 or 2 as determined in decisions 170624 and 174,626, processing continues by looping to execute decision 158610 to determine whether the user has indicated that he is finished with the property location selection procedure. If the user is finished, as indicated at decision 158,610, the new center and radius of the selected region are stored in variables indicative of the center CX and CY and indicative of the radius RAD and processing terminates at stop operation 162.640.

Operations 172628 zoom-down and 176630 zoom-up are depicted as a general procedure type in FIG. 6 as zoom view system 400. Processing begins at start block 410 and proceeds through a local initialization of variables at block 412.

17

RLMV001150

After variable initialization, actual key strokes and locator position are
monitored by the program so that the initialized position variable can be
incremented or decremented to change the size or location of the circle or
window box. All corresponding variables that are associated with the center
locations are updated with these incremental values.

In the specific case of operation of the remote system on an IBM personal
computer, various. Various special keys located on the cursor key pad are
indicative of
desired functionality within the zooming procedures. For instance the plus (+)
symbol key is indicative of the users desiring a zoom-out operation while the
minus (-) symbol key is indicative of the users desiring to zoom-in the display.
The cursor keys, left arrow, right arrow, up arrow, and down arrow, move the
center location of the viewing selection region (whether a rectangle or a
circle) in directions corresponding to north, south, east, and west. The page
down (PgDn) key actually executes a selected zoom by changing the world
coordinate system to match the view selector. The page up (PgUp) key resets the
world coordinate system to its maximum, thus zooming out. After the selection of
zoom mode and function, the bounds of the region which is to be visible on the
screen, are calculated at operation 420. Decision 422 indicates whether the user
has attempted to move the window box past the bounds of the viewport. If such an
attempt has been determined at decision 422, operation 424 resets the
incremental step value applied to the location variable to 0 to prevent further
movement of the window box. Processing then loops and continues at scan for
cursor key operation 414.

In the special case of the actuation of the page down (PgDn) key, detected in
operations 416 and 418, and compared for in decision 419, the indication that
the user is satisfied with the new coordinates of the window box results in
operation 426 wherein the global coordinates are reset to the parameters defined
for the new window box. Processing then terminates at stop operation 428.

Close and transmit operation 122 of system 110 is detailed more fully in FIG. 7
which depicts system 122, prepare to transmit search file to host. FIG. 7
depicts the preparation of the search file for transmission which commences
operation at start block 124 and proceeds to process the information number
which is indicative of the particular buyer using the system at 134. At 136, the
user is prompted to enter a password and that password is verified for its
format.

At I/O operation 138, the search name information number and password are read
and, if valid, at block 140 a file "BUYTELSUYTEL.DAT" is opened for writing.
Decision
142 verifies that the previously created SRPROP.DAT file exists. If the file
does not exist, no search data is available and no branch is taken to operation
144 which closes all files and importsaborts the transaction because of a lack
of
search data. Assuming such search data exists, the data is copied from
SRPROP.DAT to BUYTEL.DAT at operation 146. Processing then proceeds to
transmitting the data at operation 150, and then terminates at stop block 152.

Referring now to FIG. 8, there is shown a more detailed flow chart of the
operations of transmission operation 150. Transmission operation 150 commences
operation at start block 154. At operation 156, the previously created

18

RLMV001151

BUYTEL.DAT file is open for read, and at block 158 the modem is instructed to dial the telephone to the host system 200 and wait for verification of connection with that system. At decision 160, a verification of correct connection parameters is made. If the connection is incorrect due to telecommunications network conditions such as busy signal or no answer, a connection error is indicated at block 162 and processing continues by displaying a connection error message at block 163 and terminating at stop block 172. Provided that the connection has occurred successfully as determined at decision 160, operation ~~164 transmits a start-of-message sequence~~166 the remote system uploads the request to the host ~~processor using an echoed protocol. This start-of-message sequence is transmitted and a loop is entered to verify that an identical message is returned from the host via the telecommunication link. The loop also contains a loop counter which permits only a predetermined number of errored returns before a communications line error is indicated and the transmission processing is~~ using an XMODEM protocol and waits for the request to be processed in block 167. After host processing, the remote system downloads the response file from the ~~aborted. This echoed~~host in block 169. The XMODEM protocol is used for all transmission from the remote system 100 to host system 200 and assures integrity of transmitted and received data.

~~At block 166 the entire~~The contents of ~~file BUYTEL~~BUYTEL.DAT are transmitted ~~one~~to the host processor with XMODEM and ~~character at a time with a similar echoed protocol for error checking purposes. Assuming a correct transmission having less than the specified number of permissible errors, at block 168 the remote system transmits an end-of-message sequence which is similarly echoed by the host. After receiving the end-of-message sequence, the remote system waits for a message transmission indicating the status of the received file as determined by host 200 at block 170. After receiving and displaying to the user the message transmission status,~~ after processing ~~terminates at stop block 172.~~results are returned to the remote system with XMODEM.

Referring now to the processes and systems comprising host system 200, maintain database processing 210 shown in FIG. 9 commences at start block 212 and first queues for deletion property listings whose time in the database has expired as indicated by explicit orders to remove or an expiration indicated from the seller account file at 214. At block 216 the changes to current records in the database are processed by update. This process includes a verification of the presence of a record for the property in the database, a queuing of a deletion of that existing record, and a ~~queueing~~queuing of the adding of the updated record for that property. At block 218 all new properties are queued for addition to the database, and at block 219 the deletions queue and then the additions queue are applied to the database in order to bring the database up to current daily condition. Finally, a statistical analysis and points file generation procedure of the newly ~~_~~updated database is performed at 220 and processing terminates at stop block 222.

Referring now to FIG. 10, there is shown a more detailed description of the ~~The~~receive buyer ~~search specification process 230 within host 200 is detailed more fully in FIG. 10.~~'s processing request, 230. Processing begins at start block ~~232~~702

M1858
EXHIBIT MX-50

RLMV001152

and proceeds to ~~initialize~~block 704, where the ~~required~~ variables ~~for its operation at 234. At 236~~ are initialized. In block 706, the modem is reset to ~~standard settings in order to enable automatic answering and speed~~an operational state. ~~parameters for a particular communications device. At decision 238 an analysis of whether a special command from the operator termed "Break" has been encountered as performed. If "Break" has been encountered, the Yes branch is taken to block 240 and the run is terminated and the operating system for the CPU restarted. Processing then terminates at stop block 248. If "Break" has not~~

Decision block 708 determines whether a break in communications has occurred. If it has, the program is terminated in block 710 and processing stops in block 712. If no break is detected at block 708, processing proceeds to block 714, ~~been detected, then the operating~~where the communications operation parameters ~~of the system~~ are displayed ~~for~~on-screen to the ~~host operator at block 242 and at block 246 final reception is performed and acknowledged. Processing then loops to another determination of whether the operator has requested a "Break" in the system.~~ user. Processing then proceeds to block 716, where the process request file is downloaded from the remote system to the host using XMODEM.

Decision block 718 determined whether a custom report request has been entered. If not, processing goes to decision block 720, where it is determined whether a summary report request has been entered. If not processing proceeds to decision block 722, where it is determined whether a points file has been requested. If not, processing then proceeds to block 724, where, by default, it is known that the news file is to be returned to the user.

Should decision block 718 determine that a custom report has been requested, processing proceeds to block 726, where the file is stored for batch processing to later produce a bound custom report which is then sent to the user in block 728. If decision block 720 determines that a summary report request has been entered, processing proceeds to block 730, where the database is searched for the information necessary to generate the summary report, and then the summary report is returned in block 732. If decision block 722 determines that a points file request has been entered, processing proceeds to block 734, where the points file is returned to the user.

Block 736 uploads the files returned in blocks 728 or 732 or 734 or 724 to the remote system using XMODEM.

Referring now to FIG. 11, there is shown a more detailed view of block 246 receive file ~~for~~from remote system and acknowledge. Processing begins at start block ~~232~~802 and proceeds to decision ~~250~~804 wherein a carrier detect (CD) is monitored. If no carrier has been detected, ~~then~~processing proceeds to block ~~257~~812 wherein the phone line is hung up and the modem is reset for the next call. Processing then terminates at block ~~259.~~814. If a carrier is detected at decision ~~250,~~ 804, then the modem is taken off-hook and ready to receive information. At block ~~251 a~~ ~~start-of-message sequence is received and echoed to the remote system. It should be noted that the remote system will continue to transmit the start of message sequence until it has received a valid echo of the start-of-message sequence and thus operation 251 is in fact a loop which does not terminate until a~~

M1859
EXHIBIT MX-50

RLMV001153

~~non-start-of-message sequence character is detected. At block 252 a~~
~~non-start-of-message character is received from the remote system. Decision 253~~
~~determines whether that received character is an end-of-message. If the~~
~~character received is not an end-of-message, block 256 is executed to echo the~~
~~character to the remote system for validation. The valid character is then~~
~~stored for further processing and the loop reiterated by branching to block 252~~
~~to receive yet another character. If a received character is determined at~~
~~decision 253 to be an end-of-message signal then processing continues at block~~
~~254 which buffers the file and validates the data contained in the file as being~~
806, the user file is downloaded with XMODEM. Processing then proceeds to block
~~accurate. At~~808, where the user file is processed. Then, at block ~~255~~810, the
results of the ~~validation are transmitted as a~~
~~message transmission status to the remote system and at~~processing from 808 are
uploaded to the user. At block ~~257~~812 the phone line is
hung up and the modem reset for the next call. Processing then terminates at
block ~~259.~~814. See revised FIG. 10.

Referring now to FIG. 12, there is shown a more detailed view of function 260
search database of properties. Processing commences at start block 262 and first
proceeds to operation 264 wherein the ~~data-base~~database is sorted according to
the price
of properties contained therein. At block 266 the first property having the
buyers specified minimum price is located, and at block 268 a pointer is set to
point to that record containing the property. At block 270 the last property
having the buyer specified maximum price is located and at block 272 a second
pointer is set to the record containing that property. At block 274 a complete
scan of all properties between the two pointers is conducted for matching all
parameters specified by the buyer in the transmitted file. ~~Those properties~~At
decision block
275, it is determined whether results are the same for custom search processing.
If customer search processing is required, control proceeds to block 276 where
~~matching the specified~~parameters are saved as property custom serial numbers.
Selected data items are
copied to a file and at I/O operation 276 the buyer ID for the particular search
being processed together with the property serial numbers located during the
matching process are written to a storage device for further processing.
Additionally, information extracted from the accounting file containing the
buyers name and address information for mailing label purposes is written to a
storage device for further processing.

If custom search processing is not required, control proceeds to block 277,
where the selected summary data items are stored. Processing then terminates
block 278.

Referring now to FIG. 13, there is shown the accounting function 300 of host
system 200. Processing begins at start block 302 and proceeds to block 303 where
explicit seller listing account terminations are entered into the accounting
system. Such terminations occur upon the sale of a property, generally, and
cause the seller to be immediately cleared from the system. At block 304 new
accounts received are added to the client files for both sellers and buyers. At
block 306 old expired accounts are removed from the client files, both for
buyers and sellers. At block 308 new cash receipts are entered into the system
and at block 310 buyer accounts are debited according to the number of searches
~~and/or properties located in searches,~~ according to the formulas previously
described. At block 312 seller accounts

21

are charged for the maintenance of property listings within the database. At block 314 the accounting files are scanned and statements are prepared for transmission to clients. Processing terminates at block 316.

Further details pertaining to the preferred embodiment are presented in the Appendix. ~~This Appendix can be found in the patented file~~.

Preferably, the present invention may be implemented on an IBM or compatible personal computer system. Assuming sufficient memory and mass storage, the host system, seller system and remote system may operate on separate computers which communicate via the public telephone network using conventional modems.

The system software used to implement the system may include Greenleaf Softwar Communications Library MicroSoft MS-DOS.TM., HALO.TM. graphics, and a language compiler such as MicroSoft C, or its equivalent.

While the present invention has been described with reference to certain specific instances and examples, it will be understood by those skilled in the art that these are merely illustrative and are in no way intended to limit the scope of the invention. The true spirit and scope of the invention should therefore be construed only by reference to the appended claims.

\* \* \* \* \*

M1861
EXHIBIT MX-50

RLMV001155

Document comparison done by DeltaView on Monday, February 13, 2006 5:36:52 PM

| Document 1 | file://C:/Documents and Settings/pt12210/Desktop/United States Patent 4,870,576.txt |
| Document 2 | file://C:/Documents and Settings/pt12210/Desktop/United States Patent 5,032,989.txt |
| Rendering set | Standard |

| | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| | Count |
|---|---|
| Insertions | 300 |
| Deletions | 248 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 548 |

M1863
EXHIBIT MX-50

RLMV001157

Serial No. 07/342,577                                          -2-

Art Unit   236

1.   The following correspondence is in response to the application
as filed.

2.   The oath or declaration is defective.   A new oath or
declaration in compliance with 37 C.F.R. § 1.67(a) identifying this
application by its Serial Number and filing date is required.   See
M.P.E.P. §§ 602.01 and 602.02.

     The oath or declaration is defective because:

     The present application has been filed as a continuation-in-
part of an earlier application, serial number 06/841,515.  As such,
the declaration of the present application must include a statement
identifying it as a CIP, and giving the serial number and filing
date of the earlier 06/841,515 application.

     Also the declaration should state that the person making the
oath or declaration in a continuation-in-part application filed
under the conditions specified in 35 U.S.C. § 120 which discloses
and claims subject matter in addition to that disclosed in the
prior copending application, acknowledges the duty to disclose
material information as defined in 37 C.F.R. § 1.56(a) which
occurred between the filing date of the prior application and the
national or PCT international filing date of the continuation-in-
part application.

3.   The following is a quotation of 35 U.S.C. § 103 which forms
the basis for all obviousness rejections set forth in this Office
action:

     A patent may not be obtained though the invention is not
     identically disclosed or described as set forth in section

RLMV001158

RPR-011                                    PATENT

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant:  Mark A. Tornetta          : Art Unit 236
Serial No.: 07/342,577                 : Examiner D. Huntley
Filed:      April 24, 1989             : RECEIVED
FOR:  REAL ESTATE SEARCH AND           :
      LOCATION SYSTEM AND METHOD        :
                                        GROUP 230

AMENDMENT

Honorable Commissioner of Patents and Trademarks
Washington, D.C.  20231

    S I R :

         This is in response to the Official Action
dated June 21, 1990.  Please amend the application as
follows:

IN THE CLAIMS:

         1.  (Amended)  A method using a computer for
locating available real estate properties comprising the
steps of:
         a)  creating a database of the available
real estate properties;
         b)  displaying a map of a desired
geographic area;
         c)  selecting a first area having
boundaries [wihtin] within the geographic area;
         d)  zooming in on the first area of the
displayed map to about the boundaries of the first area
to display a higher level of detail than the displayed
map;

als15 ⊲ RPR-011\amnd01

RLMV001159

RPR-011 — 2 —

e) displaying the zoomed first area;

f) selecting a second area having boundaries within the zoomed first area;

g) displaying the second area and a plurality of points within the second area, each point representing the appropriate geographic location of an available real estate property; and

[g] h) identifying available real estate properties within the database which are located within the second area.

Please cancel claim 2.

Claim 3, line 3, delete "lcoation" and insert --location--.

Claim 5, line 2, delete "2" and insert --1--.

Insert the following new claims:

7. The method of claim 1 further comprising the steps of:

i. providing characteristic information of the available real estate properties in the database of available real estate properties;

j. selecting at least one of the characteristics of the available real estate properties; and

k. modifying the display of points to represent the available real estate properties having the selected characteristics.

RLMV001160

RPR-011                           - 3 -

7.   The method of claim 1 wherein the database of the available real estate properties created in step (a) includes available commercial properties.

8.   The method of claim 1 wherein the database of the available real estate properties created in step (a) includes available residential properties.

9.   The method of claim 1 wherein the database of the available real estate properties created in step (a) includes available real estate properties for rental purposes.

10.   The method of claim 1 wherein the database of the available real estate properties created in step (a) includes available real estate properties for lease purposes.

11.   The method of claim 1 wherein the database of the available real estate properties created in step (a) includes available real estate properties for commercial purposes.

12.   The method of claim 1 wherein the database of the available real estate properties created in step (a) includes available real estate properties for residential purposes.

## REMARKS

1.   Applicant acknowledges receiving the Office Action dated June 21, 1990.

RLMV001161

RPR-011                    — 4 —


2.  Applicant will submit a new oath or declaration as requested by the examiner, shortly.


3.  Claims 1 to 6 stand rejected under 35 U.S.C. §103 as being unpatentable over Cichelli et al. in view of Waller and Loubal.  Applicant respectfully traverses this rejection, and requests consideration of the new claims and reconsideration of the original claims which are still pending.


Cichelli describes a method and apparatus for digital serial scanning with hierarchical and relational access of databases broadcast on a serial-type digital data transmission system.  This system is based on a continuously transmitted stream of data frames, each containing an encoded "headnote" as to specific characteristics of its included data.  In order for a frame to be presented to a user of the system, encoded headnote information must pass through a selector circuit which matches a user defined pattern of information with that pattern contained in each headnote.  When a match is detected, the associate frame of data is "grabbed" and displayed to the user.  There is no description or suggestion of a map or graphic display in this reference.


Loubal describes a process and apparatus for evaluating information in subregions of districts, identified by a map, for example.  The evaluation of the information uses a chain-wise topological ordering of analyzed elements.  This analysis may be used for recalculating regions on a map, for example.  There is no description or suggestion of selection of first and

RPR-011                    - 5 -

second bounded areas, with the second bounded area being
within the first bounded area.  There is also no mention
of displaying a plurality of points representing the
approximate geographic location within a subregion of the
desired information.

          Waller describes a graphics display terminal
for performing a zoom operation on a displayed image.
There is no description or suggestion of displaying
desired information in the areas being zoomed, and thus,
no suggestion of displaying desired information as a
plurality of points representing the approximate
geographic location of the desired information.

          The Examiner has noted in the response that
Applicant's invention is an improvement over the prior
art as described in Cichelli, William, Ciampa and Smutek.

          Applicant respectfully traverses the Examiner's
contention that it would be obvious to combine the
features in the prior art to achieve Applicant's real
estate location method.  As noted above, Applicant has
been unable to find any suggestion or motivation in any
of the references for making such a combination of these
prior art references.  Further, even if the cited
references were combined, the combination would still not
describe or suggest Applicant's invention.  Namely, there
would be no "displaying the second area and a plurality
of points within the second area, each point representing
the appropriate geographic location of an available real
estate property" as recited in Applicant's amended claim
1.

RLMV001163

#9  Page 1 of 2

RPF-011

MAIL ROOM
85  15
1991
PAT. & TRADEMARK OFF.

# Declaration and Power of Attorney For Patent Application

## English Language Declaration

As a below named inventor, I hereby declare that:

This Declaration is of the following type:  Continuation-in-Part

My residence, post office address and citizenship are as stated below next to my name.

I believe I am the original, first and sole inventor (if only one name is listed below) or an original, first and joint inventor (if plural names are listed below) of the subject matter which is claimed and for which a patent is sought on the invention entitled

REAL ESTATE SEARCH AND LOCATION SYSTEM AND METHOD

the specification of which

(check one)

☐ is attached hereto.

☒ was filed on     April 24, 1989                                                                    as

Application Serial No. 0 7/ 342,577

and was amended on     December 24, 1990

(if applicable)

I hereby state that I have reviewed and understand the contents of the above identified specification, including the claims, as amended by any amendment referred to above.

I acknowledge the duty to disclose information which is material to the examination of this application in accordance with Title 37, Code of Federal Regulations, §1.56(a).

I hereby claim foreign priority benefits under Title 35, United States Code, §119 of any foreign application(s) for patent or inventor's certificate listed below and have also identified below any foreign application for patent or inventor's certificate having a filing date before that of the application on which priority is claimed:

Prior Foreign Application(s)                                                      Priority Claimed

| (Number) | (Country) | (Day/Month/Year Filed) | Yes ☐ | No ☐ |
|----------|-----------|------------------------|-------|------|
| (Number) | (Country) | (Day/Month/Year Filed) | Yes ☐ | No ☐ |
| (Number) | (Country) | (Day/Month/Year Filed) | Yes ☐ | No ☐ |

I hereby claim the benefit under Title 35, United States Code, §120 of any United States application(s) listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in the prior United States application in the manner provided by the first paragraph of Title 35, United States Code, §112, I acknowledge the duty to disclose material information as defined in Title 37, Code of Federal Regulations, §1.56(a) which occurred between the filing date of the prior application and the national or PCT international filing date of this application:

Form PTO-FB-110 (8-83)                                      Patent and Trademark Office-U.S. DEPARTMENT OF COMMERC

M1870
EXHIBIT MX-50

RLMV001164

| **06/** 841,515 | 3/19/86 | U. S. Pat. No. 4,870,576 |
|---|---|---|
| (Application Serial No.) | (Filing Date) | (Status)<br>(patented, pending, abandoned) |

| **0 /** | | |
|---|---|---|
| (Application Serial No.) | (Filing Date) | (Status)<br>(patented, pending, abandoned) |

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

POWER OF ATTORNEY: As a named inventor, I hereby appoint the following attorney(s) and/or agent(s) to prosecute this application and transact all business in the Patent and Trademark Office connected therewith. (*list name and registration number*)

| Paul F. Prestia | Reg. No. 23,031 | Kenneth N. Nigon | Reg. No. 31,549 |
|---|---|---|---|
| Allan Ratner | Reg. No. 19,717 | Guy T. Donatiello | Reg. No. 33,167 |
| Andrew L. Ney | Reg. No. 20,300 | Benjamin E. Leace | Reg. No. 33,412 |
| | | Kevin R. Casey | Reg. No. 32,117 |

Send Correspondence to:  Allan Ratner, Ratner & Prestia, 500 N. Gulph Rd.,
PO Box 980, Valley Forge, PA 19482

Direct Telephone Calls to: (*name and telephone number*)  Allan Ratner, (215) 265-6666

| Full name of sole or first inventor | |
|---|---|
| Mark Anthony Tornetta | |
| Inventor's signature | Date  3/11/91 |
| Residence | |
| 307 Anthony Drive, Plymouth Meeting, PA 19462 | |
| Citizenship | |
| United States of America | |
| Post Office Address | |
| 307 Anthony Drive, Plymouth Meeting, PA 19462 | |

| Full name of second joint inventor, if any | |
|---|---|
| Second Inventor's signature | Date |
| Residence | |
| Citizenship | |
| Post Office Address | |

(Supply similar information and signature for third and subsequent joint inventors.)

Form PTO-FB-110 (8-83)

RLMV001165

MX. 51



FRESH NEW LOOKS
at up to 60% off          Join Now          GILT



Merriam-Webster®
m-w.com

Word Games    Word of the Day    New Words & Slang    Video

**choose**                                                    Subm

**choose**                                          Popularity

6 ENTRIES FOUND:

choose (verb)
chose
chuse

Ads by Google
**State Farm Auto Insurance**
Switch To State Farm & Save $480. Get Your Free Quote In Minutes.
www.statefarm.com

**?!**  Quiz
**Test Your Vocabulary**
Take Our 10-Question Quiz



Jamba Juice

The easy way to make it a meal.

Click here to receive special insider offers.



Our Free Apps

Merriam-Webster's Dictionary
For **iPhone**, **iPad**, and **Android** *New!*

Get them now!

**choose**        *verb*   \ˈchüz\

chose        cho·sen        choos·ing

Definition of CHOOSE

*transitive verb*

**1**  **a :** to select freely and after consideration <*choose* a career>

**b :** to decide on especially by vote : ELECT <*chose* her as captain>

**2**  **a :** to have a preference for <*choose* one car over another>

**b :** DECIDE <*chose* to go by train>

*intransitive verb*

**1**  **:** to make a selection <finding it hard to *choose*>

**2**  **:** to take an alternative —used after *cannot* and usually followed by *but* <when earth is so kind, men cannot *choose* but be happy — J. A. Froude>

— choos·er    *noun*

See choose defined for English-language learners »
See choose defined for kids »

Examples of CHOOSE

The political party *chose* a leader.

They *chose* her as the team captain.

We've *chosen* a different time to go.

He was *chosen* because he's qualified for the job.

She was *chosen* from a long list of people.

He *chose* his words carefully.

Which shirt would you *choose*?

How do I *choose* when there's so much available?

Let everyone *choose* for themselves.



NETFLIX

CLICK HERE ▸



GET 20% OFF
weekend stays when you book early.*

COURTYARD
Marriott
IT'S A NEW STAY.*

BOOK NOW ▸



**Name That Thing**
Our Visual Vocab Quiz
**Test Your Knowledge »**



**Zeitgeist & More: Words For Ideas Worth Thinking About**
Top 10 Words for Useful & Intriguing Concepts

**Should You "Flush Out" or "Flesh Out" Your Plan?**
Top 10 Commonly Confused Words, Vol. 2



**"Oblique"**
After two baseball players injured theirs during the playoffs ... more »

You can *choose* from among a number of alternatives.

Each year thousands of college students *choose* volunteer-service trips over beach bumming during their spring breaks and summer vacations. —Edward M. Kennedy, *Time*, 22 Sept. 2008

[+] more

**Origin of CHOOSE**

Middle English *chosen,* from Old English *cēosan;* akin to Old High German *kiosan* to choose, Latin *gustare* to taste

First Known Use: before 12th century

**Related to CHOOSE**

**Synonyms:** cherry-pick, cull, elect, handpick, name, opt (for), pick, prefer, select, single (out), tag, take

**Antonyms:** decline, refuse, reject, turn down

[»] more

**Rhymes with CHOOSE**

blues, booze, bruise, cruise, cruse, Druze, flews, fuse, lose, Meuse, muse, news, ooze, Ouse, roose, ruse, schmooze, snooze, trews, use, whose

**Learn More About CHOOSE**

Thesaurus:    All synonyms and antonyms for "choose"

Spanish-English Dictionary:    Translation of "choose"

**Browse**

Next Word in the Dictionary:    choose up
Previous Word in the Dictionary:    choop
All Words Near:    choose

❝ **Seen & Heard** ❞

What made you want to look up *choose*? Please tell us where you read or heard it (including the quote, if possible).

View Seen & Heard highlights from around the site »

Merriam-Webster on Facebook

**The Merriam-Webster**
**Unabridged Dictionary**



Online access to a legendary resource
Log In or Sign Up »

**Learning English?**
**We can help.**



Visit our free site designed especially for learners and teachers of English
LearnersDictionary.com »



**Our Dictionary,**
**On Your Devices**

Merriam-Webster,
*With Voice Search*
Get the Free Apps! »

**Visit Our Store**

Mugs
• T-Shirts
• Baby & Toddler
• Pet Bowls
• Totes
• & More



**Join Us**

Merriam-Webster
on Twitter »

**Bookstore: Digital and Print**



**Other Merriam-Webster Dictionaries**

...er's ESL Dictionary »
...l Dictionary »

Home    Help    About Us    Shop    Browser Tools    Advertising Info

Privacy Policy    Contact Us

© 2011 Merriam-Webster, Incorporated

Browse the Dictionary
Browse the Thesaurus
Browse the Spanish-English Dictionary
Browse the Medical Dictionary
Browse the Concise Encyclopedia

MX. 52

Page 1

```
 1              CONFIDENTIAL - ATTORNEYS EYES ONLY
 2          IN THE UNITED STATES DISTRICT COURT
           FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3                    WESTERN DIVISION
 4
 5    _____
      MOVE, INC., et al.,            )
 6                                   )
                        Plaintiffs,)
 7                                   )
              v.                     ) Case Number
 8                                   ) 2:07-CV-92185
      REAL ESTATE ALLIANCE, LTD.,    )
 9    et al.,                        )
                        Defendants.)
10    _____)
      REAL ESTATE ALLIANCE, LTD.,    )
11                                   )
           Counterclaim-Plaintiff, )
12                                   )
                   v.                )
13                                   )
      MOVE, INC., et al.,            )
14                                   )
           Counterclaim-Defendant. )
15    _____)
16
17              VIDEOTAPED DEPOSITION
                        of
18              BERNARD JAY BAGDIS
19          Wednesday, September 9, 2009
20                 10:12 a.m.
21
22
23
24    Reported by:  Carl W. Girard, Notary Public
25    Videographer:  Ron Benson
```

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

---

**Page 2**

```
1
2         A P P E A R A N C E S
3
4   ON BEHALF OF PLAINTIFFS:
5     FRANK G. SMITH, Esquire
      ALSTON & BIRD, LLP
6   One Atlantic Center
    1201 West Peachtree Street
7   Atlanta, Georgia 30309
    (404) 881-7000
8   frank.smith@alston.com
9
10  ON BEHALF OF DEFENDANTS:
11    THEODORE K. CHENG, Esquire
      PROSKAUER ROSE, LLP
12  1585 Broadway
    New York, New York 10036-8299
13  (212) 969-3576
14  tcheng@proskauer.com
15  and
      LAWRENCE A. HUSICK, Esquire
16  LIPTON WEINBERGER & HUSICK
    P.O. Box 587
17  Southeastern, Pennsylvania 19399-0587
    (610) 296-8259
18  lawrence@lawhusick.com
19             * * * *
20    Videotaped deposition of BERNARD JAY BAGDIS,
    called as an adverse witness by and on behalf of
21  the Plaintiffs, pursuant to the Federal Rules of Civil
    Procedure, taken at the Northern Neck Regional Jail,
22  3908 Richmond Road, Warsaw, Virginia on Wednesday,
    the 9th day of September, 2009, commencing at 10:12
23  a.m., pursuant to Notice and Order of the Court.
24
25
```

---

**Page 4**

```
1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2         INDEX OF EXHIBITS (continued)
    66  e-mail 9/24/2004 to Rooke RLMV007030-31  165
3  110  Unanimous Consent 11/10/09 R005413      170
   111  Unanimous Consent 11/10/2004 R005411     171
4  141  e-mail 12/15/2004 EQUIAS003598           173
   78  Letter 6/1/2005 to Sarkisian RLMV007407-  174
5  160  Distributor/Participation Agreement
       EQUIAS000740-752                          175
6
7                  * * * *
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 3**

```
1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2            INDEX OF WITNESSES
3  WITNESS          D    X   RD  RX
   BERNARD JAY BAGDIS    6  189  202
4              * * * *
5
6          INDEX OF EXHIBITS
7  NO. DESCRIPTION              IDENT
8  149  Original Indictment          7
   150  Criminal Docket 2:07-cv-00730-JCJ-1    8
9  151  Venture Agreement R000089-92      20
   105  Unanimous Consent 12/15/2002 R005409    30
10 106  Unanimous Consent 12/15/2002 R005406-408  38
   25  Patent '576 9/26/1989          45
11 27  Patent '989 7/15/1991 REAL003600-621     45
   60  Sales Manual BGDS000519-528       104
16 119  Letter 8/16/94 to Marvin REALPRO000205  109
   47  License Agreement 1/15/1988 REALPRO064-90  50
   47  Times Herald Article, 4/22/88 BGDS434-435  53
   152  Bagdis Declaration EQUIAS002397-98    54
13 48  Advertisement BGDS000001-02      71
   56  Documents BGDS000436-445        79
14 57  Advertisement BGDS000529-536      87
   59  Trans-O-Gram BJB001865        93
15 58  Various documents BGDS000015-38     99
   60  Sales Manual BGDS000519-528      104
16 119  Letter 8/16/94 to Marvin REALPRO000205  109
   69  Letter to Jansen 12/30/97 MOVE100176582  110
17 70  Letter to Morrill 1/5/98 MOVE-NAR00414  111
   123  Memorandum 1/29/89 MOVE-NAR00177    112
18 153  Letter 2/20/1998 R004168        116
   154  Complaint R005472-78        120
19 155  Order R005810              121
   156  Civil Cover Sheet R005626-36      122
20 157  Order R005511              123
   158  E-mails 9/5/2000 REAL008022-30     126
21 115  Documents R000096-168        128
   118  Letter to Friedman R000093       137
22 117  Draft letter 11/25/2002 R000566-569    138
   75  Agenda 12/10/2003 RLMV007383       142
23 131  e-mail 6/11/2003 EQUIAS005781-799    153
   134  Covenant Not to Sue 4/16/04 MI00001-08  119
24 121  Letter 4/21/2004 from Dilworth
       BGDS000262-265             160
25 159  e-mail 8/11/2004            161
```

---

**Page 5**

```
1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2       THE VIDEOGRAPHER:  We are on the record
3   at 10:12.  Would counsel please introduce
4   themselves starting with the Plaintiffs' counsel,
5   indicate who you represent and then the court
6   reporter will swear in the witness.
7       MR. SMITH:  My name is Frank Smith.  I
8   represent the Plaintiffs.
9       MR. CHENG:  Theodore Cheng law firm of
10  Proskauer, Rose, representing The Real Estate
11  Alliance, Ltd. and Mr. Jay Bagdis.
12      MR. HUSICK:  Lawrence Husick of Lipton,
13  Weinberger & Husick representing Real Estate
14  Alliance, Inc., Jay Bagdis, RealPro, Mark Tornetta
15  and Equias Technology.
16          BERNARD JAY BAGDIS
17  being called as an adverse witness, by and behalf of
18  the Plaintiffs, pursuant to the Federal Rules of Civil
19  Procedure, being by me first duly sworn, as hereinafter
20  certified, was examined and testified as follows:
21      MR. CHENG:  I would also designate the
22  entire transcript as confidential, attorneys eyes
23  only.
24      MR. SMITH:  We'll deal with that later.
25  This is the deposition of Mr. Bernard Jay Bagdis
```

2 (Pages 2 to 5)

M1875
EXHIBIT MX-52

CONFIDENTIAL                      Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.                    2:07-CV-92185
ATTORNEYS EYES ONLY                              Bernard Jay Bagdis                              September 9, 2009

Page 6

BAGDIS - DIRECT - SMITH
2 taken pursuant to Notice, Subpoena, the Federal
3 Rules of Civil Procedure and Court order dated July
4 30, 2009.  Deposition transcript may be used for
5 all purposes permitted by law.
6        DIRECT EXAMINATION
7 BY MR. SMITH:
8     Q   Mr. Bagdis, will you state your full
9 name for the record, please?
10    A   My first initial B, middle name Jay
11 J-A-Y, last name Bagdis, B-A-G-D-I-S.
12    Q   When and where were you born, sir?
13    A   I was born in Worcester, Massachusetts
14 on August 20, 1949.
15    Q   My understanding is that you are
16 presently incarcerated; is that correct?
17    A   Yes.
18    Q   And that is at the Northern Neck
19 Regional Jail in Warsaw, Virginia?
20    A   Yes.
21    Q   And as I understand it you are presently
22 awaiting sentencing following a conviction in April
23 of this year for conspiracy to defraud the United
24 States and various tax related crimes?
25        MR. CHENG:  Objection to form.

Page 7

ATTORNEYS EYES ONLY
2 Objection, Fifth Amendment.
3 BY MR. SMITH:
4     Q   Can you answer my question?
5     A   With the objection, no, I'm not going to
6 answer that.
7     Q   And the basis for declination to answer
8 would be?
9         MR. CHENG:  Are you asking me or are you
10 asking Mr. Bagdis?
11        MR. SMITH:  No, I'm asking you.  Are you
12 instructing him not to answer the question?
13        MR. CHENG:  I'm not instructing him not
14 to answer.  I'm only making my objection for the
15 record.  It is up to Mr. Bagdis to decline or not.
16        MR. SMITH:  You indicated that you're
17 representing the witness.  So that we're clear
18 you're not instructing the witness not to answer
19 the question?
20        MR. CHENG:  That is correct.
21 BY MR. SMITH:
22    Q   Now, Mr. Bagdis, are you currently
23 awaiting sentencing following a conviction in April
24 of 2009 for conspiracy to defraud the United States
25 and failure to file income tax returns?

Page 8

ATTORNEYS EYES ONLY
2     A   Yes.
3         MR. CHENG:  Objection to form.
4 BY MR. SMITH:
5     Q   And were you indicted originally in
6 November of 2007 for those alleged offenses?
7     A   I don't remember the date of the
8 indictment.
9     Q   Let me show you a document that we'll
10 mark as Exhibit 149, and we had to give up our
11 paper clips so it's little less than totally
12 convenient, but it's document of some 168 pages in
13 length, and I'll ask you if that is the original
14 indictment that was returned against you in April
15 of -- November of 2007?
16        (Exhibit 149 marked for identification.)
17 BY MR. SMITH:
18    Q   The document is not dated but do you
19 recognize that as the initial indictment?
20    A   (Witness perusing exhibit.)
21        MR. CHENG:  Instruct the witness to take
22 the time that you need to familiarize yourself with
23 the document sufficiently so that you can answer
24 Mr. Smith's questions.
25 BY MR. SMITH:

Page 9

ATTORNEYS EYES ONLY
2     Q   Mr. Bagdis, at some point in time did
3 you see the original indictment that was returned
4 against you?
5     A   I believe; yes, I did.
6     Q   Let me show you another document beer
7 going do mark as Exhibit 150 and perhaps we can
8 speed things along a little bit.
9         (Exhibit 150 marked for identification.)
10 BY MR. SMITH:
11    Q   Mr. Bagdis, you can set Exhibit 149
12 aside for a moment.
13        We've handed you Exhibit 150 which is
14 the criminal docket for Case No. 2:07-cr-00730 and
15 if you would turn to the page 5 of 127 in the upper
16 right-hand corner?
17    A   (Witness complied.)
18    Q   This is 5 of 17 in the upper right-hand
19 corner, I believe, sir.
20    A   Okay.
21    Q   The first entry there at the bottom,
22 does that that reflect a sealed indictment as to
23 Bernard Jay Bagdis dated November 27, 2007?
24    A   That's what it says.
25    Q   Does that refresh your recollection as

3 (Pages 6 to 9)

M1876
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 10

ATTORNEYS EYES ONLY
1
2    to when the initial indictment against you was
3    returned?
4        A    I don't understand that question.
5        Q    Having looked at Exhibit 150, is your
6    recollection refreshed as to when you were
7    originally indicted for the offenses for which you
8    are awaiting sentencing?
9        MR. CHENG:  Objection to form.
10       A    I didn't get a chance to look through
11   all of that.  This says "a sealed indictment."  I
12   don't know what the sealed indictment was.
13   BY MR. SMITH:
14       Q    Was a subsequent superseding indictment
15   returned against you charging additional federal
16   tax crimes?
17       MR. CHENG:  Objection to form.
18       A    I don't understand the question.
19   BY MR. SMITH:
20       Q    Let's do it this way:  At the bottom of
21   page 5 of 17 of Exhibit 150, there is an entry,
22   November 27, 2007.
23           Do you see that?
24       A    I do.
25       Q    And can you read the docket text there?

Page 11

ATTORNEYS EYES ONLY
1
2        A    I can.
3        Q    Who you please do that out loud?
4        A    It says sealed indictment as to Bernard
5    Jay Bagdis, counts 1, 2, 10, 17, 26, 36, 38, 40,
6    42, 45, 47, 48-to-59, 60, 61, 62-to-64, 65-to-67,
7    68-to-72.
8           Bertram R. Russell, counts 1, 2, 3-to-8,
9    9, 11-to-16.
10          John P. Leichner, counts 1, 17,
11   18-to-20, 21-to-25.
12          Richard J. Frase, counts 1, 26,
13   27-to-32, 33-to-35.
14          Kenneth W. Klinger, counts 1, 36, 37.
15          Stephen Schulz, counts 1, 38, 39.
16          Michael S. Klein, counts 1, 40, 41.
17          Kathleen Williams, counts 1, 43.
18          Stephen Hedrick, counts 1, 44.
19          William K. Acosta, counts 1, 45, 46.
20          Helen M. Gramaski, counts 1, 73-to-74.
21          SBSL, additional attachment added on
22   11/29/2007.
23          JCZSL, entered 11/28/2007.
24       Q    Thank you.  Would you also turn to page
25   10 of 17 in Exhibit 150?

Page 12

ATTORNEYS EYES ONLY
1
2        A    (Witness complied.)
3        Q    It's docket entry 178?
4        A    Okay.
5        Q    Do you see docket entry dated June 17,
6    2008, item 178?
7        A    Okay.
8        Q    It says, "Sealed superseding indictment
9    as to Bernard Jay Bagdis" and then recites a number
10   of counts and other defendants, does it not?
11       A    Okay.
12       Q    Now, you were tried in April of 2009
13   pursuant to these indictments, were you not?
14       A    Yes.
15       Q    And that was in Philadelphia in Federal
16   Court?
17       A    Yes.
18       Q    And you were represented by Mr. Peter
19   Scuderi?
20       A    Yes.
21       Q    You were afforded the opportunity to
22   testify in your own defense at that trial?
23       MR. CHENG:  Objection to form.
24   Objection to Fifth Amendment.
25   BY MR. SMITH:

Page 13

ATTORNEYS EYES ONLY
1
2        Q    Did you testify in your own defense at
3    the trial in Philadelphia?
4        A    I did testify in my own defense.  I was
5    not allowed to complete testimony.
6        Q    And in your testimony, you testified
7    that you did not file personal income tax returns
8    for approximately 20 years; did you not?
9        MR. CHENG:  Objection to form.
10   Objection, Fifth Amendment.
11       I assert the Fifth Amendment privilege
12   at that point.  The record speaks for itself.
13       THE WITNESS:  I want to ask you a
14   question.
15       MR. CHENG:  Can we go off the record to
16   consult, please?
17       THE VIDEOGRAPHER:  Yes.  We are off the
18   record at 10:22.
19       (Off the record.)
20       We are back on the record at 10:23.
21       MR. SMITH:  Let the record reflect
22   consultation between the witness and his attorney.
23       Q    At the trial in April of 2009, were you
24   asked the following question by the prosecutor
25   Mr. Ingal?

REPORTED BY: Carl W. Girard, RMR                          www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022        (404) 875-0400

M1877
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 14

ATTORNEYS EYES ONLY
1
2     "Mr. Bagdis, you didn't file a personal
3  tax return in more than 20 years, right?
4     "Answer:  That's probably correct."
5     Did you give that testimony at the trial
6  in April?
7        MR. CHENG:  Objection, Fifth Amendment.
8     A  I'm going to assert my Fifth Amendment
9  privileges at this point. I don't believe that's
10 germane to this issue at all.
11 BY MR. SMITH:
12    Q  Are you declining to testify because you
13 don't believe the question is relevant, or are you
14 declining to testify based on your Fifth Amendment
15 rights?
16       MR. CHENG:  Objection to form.
17    A  I decline on the basis of my Fifth
18 Amendment rights at this point.
19 BY MR. SMITH:
20    Q  Now, you were, in point of fact,
21 convicted of at least some of the charges in the
22 indictment returned against you, were you not?
23    A  Yes.
24    Q  And your bail was revoked?
25    A  Yes.

Page 15

ATTORNEYS EYES ONLY
1
2     Q  And you're presently awaiting sentencing
3  set for September 30th 2009?
4     A  Currently, correct.
5     Q  Have you seen the presentencing report?
6     A  Yes.
7     Q  Do you know what sentence is recommended
8  in the presentencing report?
9        MR. CHENG:  Objection, Fifth Amendment.
10    A  I believe that's a confidential
11 document. I'll assert my Fifth Amendment
12 privilege. It's also a draft.
13 BY MR. SMITH:
14    Q  Do you have an understanding as to what
15 the maximum sentence is you face?
16       MR. CHENG:  Objection, Fifth Amendment.
17    A  I'll assert my Fifth Amendment
18 privilege.
19 BY MR. SMITH:
20    Q  Now, you are represented by Mr. Cheng
21 and Mr. Husick at this deposition. Am I right
22 about that?
23    A  That's correct.
24    Q  And have you had an opportunity to speak
25 with them in advance of the deposition?

Page 16

ATTORNEYS EYES ONLY
1
2     A  Yes.
3     Q  And that was this morning; am I correct
4  about that?
5     A  That was this morning.
6     Q  Have you had a chance to speak with them
7  about the deposition prior to this morning?
8     A  Yes.
9     Q  When was that?
10    A  I spoke with them yesterday and I have
11 spoken with Mr. Cheng on telephone setting all this
12 stuff up.
13    Q  Was the conversation yesterday in person
14 or by telephone?
15    A  Yesterday was in person.
16    Q  And approximately how long did you meet
17 with Mr. Cheng and Mr. Husick?
18    A  Most of the day.
19    Q  And was that here at the Northern Neck
20 Regional Jail?
21    A  Yes.
22    Q  Have you spoken with any other attorney
23 in preparation for your deposition other than
24 Mr. Husick and Mr. Cheng?
25    A  For this deposition?

Page 17

ATTORNEYS EYES ONLY
1
2     Q  Yes, sir.
3     A  No.
4     Q  Have you spoken with Mr. Tornetta at any
5  point in time in the last three months?
6     A  No.
7     Q  Mr. Andrew Rooke, anytime in the last
8  three months?
9     A  No. As far as attorneys for the
10 preparation for the deposition, I spoke with my
11 criminal counsel, also.
12    Q  Mr. Scuderi?
13    A  No, Mr. Shapiro.
14    Q  Have you spoken with Mr. Scott Tatrot at
15 any time in last three months?
16    A  No.
17    Q  Were you able to review any documents in
18 preparation for the deposition?
19    A  Yes.
20    Q  Do you have any current understanding as
21 to any testimony given in depositions in this case
22 by Mr. Tornetta?
23       MR. CHENG:  Objection to form.
24    A  I don't understand the question.
25 BY MR. SMITH:

5 (Pages 14 to 17)

REPORTED BY: Carl W. Girard, RMR
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022
www.huseby.com
(404) 875-0400
M1878
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 18

ATTORNEYS EYES ONLY

1
2  Q   Mr. Tornetta gave a deposition in this
3  case approximately a month ago.  Do you have any
4  understanding as to the substance of that
5  testimony?
6        MR. CHENG:  Objection to form.
7  A   I don't understand the objection.  I
8  don't understand the form, so...
9  BY MR. SMITH:
10  Q   Well, it's not necessary you understand
11  the objection.  It's not necessary any of us
12  understand the objection, but the question is has
13  anyone told you what Mr. Tornetta testified to or
14  have you read his transcript of his deposition in
15  the case?
16  A   That's two questions.
17  Q   Well, I will ask them separately.  Have
18  you read Mr. Tornetta's deposition transcript in
19  this case?
20  A   No.
21  Q   Have you spoken with anyone about the
22  substance of his testimony in this case?
23  A   No.
24  Q   Have you read Mr. Andrew Rooke's
25  deposition transcript in this case?

Page 19

ATTORNEYS EYES ONLY

1
2  A   No.
3  Q   Have you spoken with anyone about the
4  substance of his testimony in this case?
5  A   No.
6  Q   You gave a deposition in the litigation
7  that Real Estate Alliance, Ltd. brought against
8  Ms. Diane Sarkisian.  Do you recall that?
9  A   Yes.
10  Q   Have you had a chance to review that
11  deposition transcript in preparation for your
12  testimony here today?
13  A   Yes.
14  Q   When did you do that?
15  A   I did some of it yesterday, and I
16  basically, as I knew this deposition was coming,
17  thought about what had been covered in that
18  deposition.
19  Q   Let's talk a little bit about your
20  background for a moment.  Did you attend college?
21  A   I did.
22  Q   Did you graduate?
23  A   I did.
24  Q   When and from what college?
25  A   I graduated from Princeton University in

Page 20

ATTORNEYS EYES ONLY

1
2  June of 1971.
3  Q   And after that did you have any other
4  formal education?
5  A   I attended the graduate school at
6  Princeton University, received a master's degree in
7  1973.
8  Q   And thereafter did you attend law school
9  at some point?
10  A   I went to Temple University School of
11  Law evenings.  I graduated in January of 1982.
12  Q   And thereafter did you commence private
13  practice?
14  A   I did.
15  Q   And at some point did you come to
16  specialize in tax law?
17  A   No.
18        MR. CHENG:  Objection.
19  BY MR. SMITH:
20  Q   Did you have any subspecialty in the
21  law?
22  A   I was an entrepreneur.  I specialized in
23  essentially small business enterprises.
24  Q   At some point did you meet Mark
25  Tornetta?

Page 21

ATTORNEYS EYES ONLY

1
2  A   Yes.
3  Q   Approximately when was that?
4  A   It was in the 1980s at some point.
5  Q   Now, are you familiar with the company
6  known as the Real Estate Alliance, Ltd.?
7  A   Yes.
8  Q   And is it okay with you if we call that
9  REAL, R-E-A-L, four capital letters?
10  A   I prefer you call it Real Estate
11  Alliance.
12  Q   But if I happen to slip up and say REAL,
13  you'll understand what I'm saying?
14  A   Or I'll ask you.
15  Q   Either way.  Let me show you a document
16  we're going do mark as Exhibit 151 (proffered.)
17        (Exhibit 151 marked for identification.)
18  BY MR. HUSICK:
19  Q   This appears to be a document entitled
20  Venture Agreement, November 26, 2002 and it
21  continues on and contains documents entitled "Real
22  Estate Alliance, Ltd. Agenda, November 25, 2002."
23        Have you seen this document before?
24  A   (Witness perusing exhibit.)
25        This document?  No; it has writing on it

6 (Pages 18 to 21)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 22

ATTORNEYS EYES ONLY

1  that I don't recognize.
2      Q   Let's talk about that. Let's go to the
3  last page of Exhibit 151. There's some handwriting
4  on the last page. Do you recognize that
5  handwriting?
6      A   Which page are you speaking of?
7      Q   The last age, it has digit R92 in the
8  lower right-hand corner.
9      A   Okay. (Perusing.)
10         No; I don't recognize the handwriting.
11     Q   Not yours?
12     A   It's not mine, no.
13     Q   Then on the prior pages, there's also
14  some handwriting, this double sided, may be double
15  sided copy. It ends in digits R91?
16     A   Okay.
17     Q   Okay. You've got it.
18         Is that your handwriting at the bottom?
19     A   No.
20     Q   Do you recognize it?
21     A   No.
22     Q   Pages R91 and R92 are both titled "Real
23  Estate Alliance, Ltd. Agenda, November 25, 2002,
24  9:30 a.m." Do you see that?

Page 23

ATTORNEYS EYES ONLY

1      A   (Witness perusing exhibit.)
2          Basically the same printed page.
3      Q   Yes, sir, that's my point.
4      A   Okay.
5      Q   We just need to look at one, we don't
6  need to look at both.
7          It says, "No. 1-opening remarks Mark
8  Tornetta."
9          Do you have any recollection as to
10  remarks Mr. Tornetta may have made?
11     A   No. I mean it was most likely -- no, I
12  don't really have any recollection of it.
13     Q   Item No. 2 is review/execution of
14  Venture Agreement - Jay Bagdis."
15         Do you recall any remarks you made in
16  that regard?
17     A   I think the Agreement speaks for itself.
18     Q   That's the first two pages of Exhibit
19  151?
20     A   That would be, yes.
21     Q   And then item 3, review of '989
22  infringement records-Lawrence Husick."
23         Do you see that?
24     A   I do.

Page 24

ATTORNEYS EYES ONLY

1      Q   '989 infringement records, that refers
2  to a patent, does it not?
3          MR. CHENG: Objection to form.
4      A   Well, yeah, I guess I don't understand
5  the question.
6  BY MR. SMITH:
7      Q   Well, it says '989 infringement records:
8  Do you have an understanding as to what that is a
9  reference to?
10     A   I believe that the '989 is the last
11  three digits of the second of the Tornetta patents
12  that were issued by the United States Patent &
13  Trademark Office in favor of Mark Tornetta for his
14  invention for a real estate mapping and location
15  technology.
16     Q   Do you recall any discussion that
17  Mr. Husick had at that meeting on November 25th? I
18  realize it's been quite some time.
19         MR. CHENG: Objection to form.
20         MR. HUSICK: Objection, attorney/client
21  privilege.
22         MR. SMITH: Let's just have one of you
23  guys on the record at a time, so pick. I don't
24  much care which one.

Page 25

ATTORNEYS EYES ONLY

1          MR. HUSICK: We represent different
2  parties and those parties --
3          MR. SMITH: So your objections are not
4  on of behalf of either REAL or on behalf of the
5  witness? Am I right about that?
6          You said attorney/client privilege; that
7  would sound like you're representing the witness.
8  Mr. Cheng is already making objections on the
9  record for the witness.
10         MR. CHENG: I am representing Mr. Bagdis
11  and I'm representing the Real Estate Alliance.
12         MR. SMITH: Fine.
13         MR. CHENG: Mr. Husick is representing
14  other parties. When he makes objections, he's
15  making objections on behalf of his clients.
16         MR. SMITH: But the only one -- never
17  mind. I hear you.
18     Q   Item 4, "Review of 'Bigger' Law Firm
19  proposals."
20         Do you have any understanding as to what
21  that refers to?
22     A   Well, I believe that that's privileged
23  information because it discusses relationships
24  between the Real Estate Alliance and potential

REPORTED BY: Carl W. Girard, RMR
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022
www.huseby.com
(404) 875-0400

M1880
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 26

ATTORNEYS EYES ONLY
1
2    representation.
3        Q    With regard to the '989 patent?
4        A    Is that a question?
5        Q    Yes, sir.
6        A    I don't understand the question then.
7        Q    You referred to representation of the
8    Real Estate Alliance.  My question is, does that
9    refer to representation of the Real Estate Alliance
10   with regard to the '989 patent?
11       A    I believe it refers to representation of
12   the Real Estate Alliance with respect to anything
13   that would be represented.
14       Q    Okay.  Fifth is "Discussion what to do
15   next."
16           Do you recall any discussion in that
17   regard?
18       A    I believe that's also privileged
19   information.
20       Q    Let's talk about the first two
21   attorney/client privilege.  Am I correct about
22   that?
23       A    Yes, attorney/client privilege.
24       Q    There are a number of privileges.  I
25   want to make sure we're talking about the same one.

Page 27

ATTORNEYS EYES ONLY
1
2        A    Okay.  Well, let's start with the
3    attorney/client privilege.
4        Q    Fair enough.  On the first page of
5    Exhibit 151 it says "Venture Agreement."  Do you
6    see that?
7        A    Yes.
8        Q    And is that your signature toward the
9    bottom of the second page Exhibit 151?
10       A    On the second-to-last line?
11       Q    Yes, sir.
12       A    Yes.
13       Q    Okay.  And then, if you look at the
14   first page of Exhibit 151, under the fourth whereas
15   clause it says, "Whereas, Bagdis has invested funds
16   to assist Tornetta in developing the technology to
17   exploit '989."
18           Do you see that?
19       A    Yes.
20       Q    Had you in point in fact invested funds
21   to assist Mr. Tornetta in that regard as of late
22   November of 2002?
23       A    Yes.
24       Q    Approximately how much?
25       A    I don't have a total number.

Page 28

ATTORNEYS EYES ONLY
1
2        Q    Ballpark?
3        A    It's in the --
4            MR. CHENG:  Objection to form.  Calls
5    for speculation.
6        A    I don't have an exact number.
7    BY MR. SMITH:
8        Q    I'm not asking for an exact number.
9    Ballpark?
10           MR. CHENG:  Objection to form.  Calls
11   for speculation.
12       A    To give an amount, I'm going to
13   speculate.  It was a substantial amount.
14   BY MR. SMITH:
15       Q    In excess of a hundred thousand dollars?
16           MR. CHENG:  Objection to form.  Calls
17   for speculation.
18           MR. SMITH:  No, sir; it calls for
19   recollection.
20       A    That was certainly --
21       Q    I beg your pardon?
22       A    Yes; it was in excess of that.
23       Q    In excess of a million dollars?
24           MR. CHENG:  Objection to form.
25       A    Now we're getting into, I don't remember

Page 29

ATTORNEYS EYES ONLY
1
2    all of that.
3    BY MR. SMITH:
4        Q    But your best recollection,
5    understanding it is not perfect, is that it was in
6    excess of a hundred thousand dollars?
7        A    Yes.
8        Q    Thank you.  Now, a few paragraphs down,
9    it says, "Now, therefore, for and in consideration
10   of the mutual promises the parties hereby agree as
11   follows:
12           "No. 1, the parties will cause to be
13   chartered a Delaware Corporation, a 'C' corporation
14   to be called Real Estate Alliance, Ltd.,
15   (hereinafter the company.)"
16           Do you see that?
17       A    Yes.
18       Q    Was that in point of fact done?
19       A    Yes.
20       Q    And then paragraph 4 says, "Bagdis will
21   become Chief Executive Officer and a Director of
22   the Company and will receive seventeen percent
23   (17%) of the capital stock of the company."
24           Do you see that?
25       A    Yes.

M1881
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 30

ATTORNEYS EYES ONLY

1
2    Q   And did that happen?
3    A   Yes.
4    Q   And did you receive 17 percent of the
5  stock of the company?
6    A   Yes.
7        MR. CHENG:  Objection to form.
8  BY MR. SMITH:
9    Q   It is my understanding that you were
10 serving as an officer and director of the company
11 and not as a lawyer for the company; am I correct
12 about that?
13   A   No.
14   Q   You were also serving as a lawyer for
15 the company?
16   A   I'm a licensed attorney.
17   Q   I understand that, but were you serving
18 as the Real Estate Alliance, Ltd.'s attorney or
19 were you serving as its director and chief
20 executive officer?
21       MR. CHENG:  Objection to form.
22 Compound.
23   A   Yes; straighten that out again.
24 BY MR. SMITH:
25   Q   In what capacities -- strike that.

Page 31

ATTORNEYS EYES ONLY

1
2  Did you become the Real Estate
3  Alliance's chief executive officer?
4    A   Yes.
5        MR. CHENG:  Objection to form.
6  BY MR. SMITH:
7    Q   Did you become a director of Real Estate
8  Alliance?
9        MR. CHENG:  Objection to form.  When?
10       MR. SMITH:  After the formation of the
11 company in early December 2002.
12   A   Repeat the question, again.
13   Q   Did you become a director of the Real
14 Estate Alliance in late 2002?
15   A   Yes.
16   Q   After the Real Estate Alliance was
17 formed, did you provide legal services to the
18 company?
19   A   Yes.
20   Q   Did you charge the company for those
21 legal services?
22   A   No.
23   Q   Let me show you a document we previously
24 marked as Exhibit 105.
25       (Exhibit 105 previously marked.)

Page 32

ATTORNEYS EYES ONLY

1
2    A   (Witness perusing exhibit.)
3  BY MR. SMITH:
4    Q   This document is dated December 15, 2002
5  and is titled "Unanimous Consent in Lieu of
6  Organization Meeting of Incorporators."
7        Do you see that at the top?
8    A   Yes; I'm reading it.
9    Q   Pursuant to this document, did you
10 become a director of the Real Estate Alliance?
11       MR. CHENG:  Objection to form.
12   A   I don't understand what you mean by
13 pursuant to this document.
14 BY MR. SMITH:
15   Q   The document says, in the third resolved
16 paragraph, "Resolved, that the following are
17 designated to constitute the initial Board of
18 Directors of this corporation, to hold office for
19 the ensuing year and until his successor is chosen
20 and qualified..."  And it lists three individual,
21 Mr. Tornetta, yourself and Mr. Rooke?
22       Do you see that?
23   A   Yes.
24   Q   Did that happen?
25   A   Yes.

Page 33

ATTORNEYS EYES ONLY

1
2    Q   Let's go back to Exhibit 151 for just a
3  moment, Mr. Bagdis.  The second page at the top
4  item 5, it says, "Rooke will make a capital
5  contribution to the Company in the amount of up to
6  $4 million and will receive 15 percent of the stock
7  of the Company."
8        Do you see that?
9    A   Yes.
10   Q   Did that happen?
11       MR. CHENG:  Objection to form.
12   A   Did what happen?
13 BY MR. SMITH:
14   Q   Did Mr. Rooke contribute up to
15 $4 million to the company?
16   A   He contributed capital.  I haven't been
17 associated with the company for years, so I don't
18 know the balance of his capital account.
19   Q   Do you know if he received 15 percent of
20 the capital stock of the company?
21   A   He received up to $4 million for 15
22 percent of the capital stock of the company.  I
23 can't answer that question because I don't know
24 whether he's completed his commitment.
25   Q   If Mr. Rooke did not put $4 million into

9 (Pages 30 to 33)

M1882
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 34

ATTORNEYS EYES ONLY
1
2  the company, but rather put in, let's say,
3  hypothetically, $1 million, would he be entitled to
4  15 percent of the capital stock of the company?
5      MR. CHENG:  Objection; calls for
6  speculation.
7      A   Yeah; I don't understand that question.
8  BY MR. SMITH:
9      Q   What do you understand about it?
10     A   I don't understand -- it's a
11  hypothetical question.  It's not relevant.
12     Q   Well, not understanding and it is not
13  being relevant your judgment are two different
14  issues.
15         MR. CHENG:  Objection to the question.
16  BY MR. SMITH:
17     Q   Do you know how much money Mr. Rooke has
18  put into the company?
19     A   No.
20     Q   Do you know how much stock he has in the
21  company?
22     A   No; I don't know that, either.
23     Q   If Mr. Rooke did not put in $4 million
24  into the company, would he be entitled to the full
25  15 percent of the capital stock of the company?

Page 35

ATTORNEYS EYES ONLY
1
2      MR. CHENG:  Objection to the question;
3  calls for speculation.
4  BY MR. SMITH:
5      Q   Pursuant to this document which you
6  signed in November of 2002?
7         MR. CHENG:  Same objection.
8      A   No; pursuant to this document and this
9  document, it says, "The Board will issue whatever
10  it considers to be adequate."
11         It says here, "The Board of Directors is
12  authorized to issue capital stock in amounts and
13  proportions as shall be determined by the Board and
14  to accept in full or in part payment thereof as the
15  Board may determine shall be good and sufficient
16  consideration."
17         I'm no longer a member of the Board.  I
18  don't know what they have done.
19  BY MR. SMITH:
20     Q   When you were a member of the Board, had
21  you ever authorized Mr. Rooke to receive the full
22  15 percent?
23         MR. CHENG:  Objection to the form.
24     A   Yes.  I don't understand that question,
25  either.

Page 36

ATTORNEYS EYES ONLY
1
2  BY MR. SMITH:
3      Q   You were a member of the Board?
4      A   I was a member of the Board.
5      Q   When you were a member of the Board, did
6  you ever authorize Mr. Rooke to receive 15 percent
7  of the shares of the Real Estate Alliance?
8      A   Under the terms of this agreement, I was
9  a signatory to the agreement.
10     Q   Did you ever approve him receiving 15
11  percent?
12     A   Was there a formal -- again, how would I
13  approve that?
14         MR. CHENG:  Mr. Bagdis, I just want to
15  caution you just to let Mr. Smith finish his
16  question before you answer and that way the record
17  will be clearer.
18         THE WITNESS:  Okay.
19  BY MR. SMITH:
20     Q   But you were a director for some period
21  of time, were you not?
22     A   I was.
23     Q   While you were a director, do you recall
24  ever authorizing Mr. Rooke to receive the full 15
25  percent of his shares?

Page 37

ATTORNEYS EYES ONLY
1
2      A   You mean with the formal --
3      Q   Yes?
4      A   With a formal resolution?
5      Q   Or informal or any nature.
6      A   As far as I know, this is the resolution
7  that is controlling.
8      Q   Exhibit 105?
9      A   As the Board would determine.
10     Q   That's my question:  While you were a
11  member of the Board, did the Board ever make that
12  determination?
13     A   While I was the member of the Board, the
14  Board did not make a full determination.
15     Q   Thank you.  Now, if you would back to
16  the second page of Exhibit 151, item 9 reads, "When
17  necessary the Company will initiate litigation to
18  enforce its right under the patents."
19         Do you see that?
20     A   I do.
21     Q   And does that indicate that at this
22  point in time in late November of 2002, the company
23  was contemplating the possibility of initiating
24  litigation to enforce its rights under the Tornetta
25  patents?

REPORTED BY: Carl W. Girard, RMR                    www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022        (404) 875-0400

M1883
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 38

ATTORNEYS EYES ONLY

1
2      MR. CHENG: Objection to the question.
3  It calls for -- to the extent you can answer
4  without revealing attorney/client or attorney work
5  product, you may answer.
6      A   If you look at paragraph 7, it says,
7  "The Company will seek strategic partners for
8  licensing in specific industries or sectors."
9          The name of the company is Real Estate
10  Alliance.  That was the primary purpose of the
11  company.
12  BY MR. SMITH:
13      Q   And if it became necessary, was the
14  company also contemplating initiating litigation to
15  enforce its patent rights at this point in time?
16      MR. CHENG: Objection to the extent it
17  calls for attorney/client or attorney work product.
18  You may answer.
19      A   Yes; that observation, it was
20  attorney/client -- it was discussions held by the
21  Board and I believe those are confidential and are
22  privileged.
23  BY MR. SMITH:
24      Q   But discussions with regard to seeking
25  strategic partners for licenses are not privileged.

Page 39

ATTORNEYS EYES ONLY

1
2  You answered that question.  In point of fact you
3  volunteered the answer.
4      MR. CHENG: Objection to the extent that
5  question calls for attorney/client privilege and
6  work product information.  You can answer.
7      A   Yes; I think the document speaks for
8  itself.
9  BY MR. SMITH:
10      Q   Let me show a document we've marked
11  previously as Exhibit 106?
12          (Exhibit 106 previously marked.)
13      A   (Witness perusing exhibit.)
14  BY MR. SMITH:
15      Q   This is titled "Unanimous Consent in
16  Lieu of Meeting of Directors"; on the last page it
17  dated December 15, 2002.  Is that your signature on
18  the last page, Mr. Bagdis?
19      A   That's my signature on the last page.
20  Let me look at read through the document.
21      Q   I'm just going to ask you to focus on
22  the second page under the third paragraph marked
23  "resolved."  It's really not necessary for you to
24  study the document, Mr. Bagdis.  I'm only going to
25  talk about a brief portion of the second page.

Page 40

ATTORNEYS EYES ONLY

1
2      MR. CHENG: Mr. Bagdis, you just review
3  whatever portions of the documents you need in
4  order to answer Mr. Smith's upcoming question.
5      MR. SMITH: That would only be on the
6  second page.
7      MR. CHENG: That would be whatever you
8  think is necessary.
9      MR. SMITH: Well, you're going to waste
10  a lot of time this way.  Our time is limited and
11  we're not going away just because you waste the
12  time.  If we have to, we'll come back tomorrow.  If
13  we have to, we'll come back the next day.
14      MR. CHENG: I think the record will
15  reflect you're wasting more time making speeches;
16  just ask your next question.
17  BY MR. SMITH:
18      Q   Mr. Bagdis, direct your attention to the
19  second page of Exhibit 106.  This says, "Resolved,
20  that full paid and non-assessable shares of the
21  Corporation be issued as follows:"
22          Do you see that?
23      A   Yes.
24      Q   And pursuant to that provision, 170
25  shares were issued to yourself?

Page 41

ATTORNEYS EYES ONLY

1
2      A   That's correct.
3      Q   And it says, "Further Resolved, that
4  Andrew K. Rooke shall receive up to 150 shares upon
5  completion of his funding commitment as outlined in
6  the Venture Agreement."
7          Do you see that?
8      A   Yes.
9      Q   Doesn't that indicate to you that
10  Mr. Rooke was to receive the full 150 shares only
11  if he funded the $4 million?
12      MR. CHENG: Objection to form.
13      A   Again, I think that calls for
14  speculation.  I think that it says here, "The Board
15  of Directors" on page 1 "is authorized to issue
16  capital stock as the Board may determine shall be
17  good and sufficient consideration."
18  BY MR. SMITH:
19      Q   And on the second page it says, "Further
20  resolved, that Andrew K. Rooke shall receive up to
21  150 shares upon completion of his funding
22  commitment as outlined in the Venture Agreement,"
23  does it not?
24      MR. CHENG: Objection, asked and
25  answered.

11 (Pages 38 to 41)

REPORTED BY: Carl W. Girard, RMR
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022

www.huseby.com
(404) 875-0400

M1884
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 42

ATTORNEYS EYES ONLY

1
2 BY MR. SMITH:
3     Q  It says that, doesn't it, sir?
4         MR. CHENG:  Objection; asked and
5 answered.
6     A  I answered that question.
7 BY MR. SMITH:
8     Q  And the answer is yes?
9         MR. CHENG:  Objection, asked and
10 answered.
11    A  What's the question?
12 BY MR. SMITH:
13    Q  Let's move on.  In October of 2004 there
14 was a search warrant executed at your place of
15 business.  Am I correct about that?
16    A  I'm going to assert my Fifth Amendment
17 privilege and not answer those questions.
18    Q  At the trial that was held in April of
19 this year, were you asked the following questions
20 by Mr. Ignall, one of the prosecutors.
21        "Let's go to October 20, 2004.  Do you
22 remember that date?
23        "Answer:  Oh, yes.
24        "Question, IRS searched your office that
25 day?

Page 43

ATTORNEYS EYES ONLY

1
2        "Answer:  Apparently.
3        "Question:  The IRS had searched your
4 home that day, right?
5        "Answer:  That I know of."
6        Were you asked those questions and did
7 you give that testimony at your criminal trial in
8 April of 2009.
9        MR. CHENG:  Objection, Fifth Amendment.
10       THE WITNESS:  I'm sorry, objection what?
11       MR. CHENG:  Fifth Amendment.
12 BY MR. SMITH:
13    Q  Are you declining to answer my question,
14 Mr. Bagdis?
15    A  I'm declining to answer your question.
16    Q  Now at some point you placed your stock
17 in REAL into a trust; did you not?
18    A  Yes.
19    Q  And am I correct that your family
20 members are the beneficiaries of that trust?
21    A  I don't believe that's relevant but --
22    Q  Are your family members beneficiaries of
23 the trust?
24    A  Yes.
25    Q  Thank you.  The shares are still in

Page 44

ATTORNEYS EYES ONLY

1
2 trust?
3     A  Yes.
4     Q  Who is the trustee?
5     A  Catherine Bagdis.
6     Q  Is that your wife?
7     A  No.
8     Q  A relative?
9     A  Yes.
10    Q  Has Mr. Andrew Rooke ever been a trustee
11 of that trust?
12    A  No.
13       MR. CHENG:  Can we go off the record,
14 please?
15       THE VIDEOGRAPHER:  We are off the record
16 at 1050.
17       MR. CHENG:  Go ahead.
18       THE VIDEOGRAPHER:  We're back on the
19 record at 1050.
20       MR. SMITH:  Let the record reflect
21 consultation between witness and his attorney.
22    Q  You are aware that in the 1980s
23 Mr. Tornetta applied for patents; are you not?
24       MR. CHENG:  Objection to the form.
25    A  Yes; I guess I don't understand that

Page 45

ATTORNEYS EYES ONLY

1
2 question.
3 BY MR. SMITH:
4     Q  You understand that during the 1980s
5 Mr. Mark Tornetta applied for patents with regard
6 to certain mapping functions related to real
7 estate?
8        MR. CHENG:  Objection to form.
9 BY MR. SMITH:
10    Q  Do you have that understanding?
11       MR. CHENG:  Objection to form.
12    A  I understand that he applied for
13 patents; yes.
14 BY MR. SMITH:
15    Q  And you understand that the litigation
16 that we're involved in here, pursuant to which your
17 deposition is being taken, involves those patents?
18    A  Yes.
19       MR. CHENG:  Objection to form.
20 BY MR. SMITH:
21    Q  Let me show you a document previously
22 marked as Exhibit 25 and a document previously
23 marked as Exhibit 27 and can you simply just
24 identify those as the patents that have been issued
25 to Mr. Tornetta that relate to this litigation

12 (Pages 42 to 45)

REPORTED BY: Carl W. Girard, RMR
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022

www.huseby.com
(404) 875-0400

M1885
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 46

ATTORNEYS EYES ONLY
1
2  (proffered?)
3         (Exhibit 25 previously marked.)
4         (Exhibit 27 previously marked.)
5  BY MR. SMITH:
6      Q   Again it is not necessary for you to
7  study the documents, I don't think.
8      A   (Witness perusing exhibits.)
9         MR. SMITH:  Mr. Cheng, to move things
10  along, can we stipulate that these are the Tornetta
11  patents, Exhibit 25 being the '576 and Exhibit 27
12  being the '989?
13         MR. CHENG:  (counsel perusing exhibits.)
14         We can stipulate to that.
15         MR. SMITH:  Thank you.
16      Q   You can put the document down now,
17  Mr. Bagdis.  Now, you are a lawyer but you don't
18  have any particular expertise in patent law, do
19  you?
20      A   No, I don't; that's correct.
21      Q   You've never applied -- you've never
22  written a patent application, have you?
23      A   I have a patent.  I don't remember who
24  did the application.
25      Q   Have you ever litigated a patent

Page 47

ATTORNEYS EYES ONLY
1
2  infringement case?
3      A   No.
4      Q   Now, you are not a person of ordinary
5  skill in the art with regard to the subject matter
6  claimed in either of the Tornetta patents, are you?
7         MR. CHENG:  Objection to form.
8      A   I don't understand that question.
9  BY MR. SMITH:
10      Q   Okay.
11         MR. CHENG:  Also calls for a legal
12  conclusion.
13  BY MR. SMITH:
14      Q   Do you recall the deposition you gave in
15  the Sarkisian case?
16      A   Yes.
17      Q   Mr. Husick represented you at that
18  deposition?
19      A   Yes.
20      Q   Let me direct your attention to page 44
21  line 22 of your deposition (proffered.)
22      A   (Witness perusing.)
23         Page what?
24      Q   44.  Line 22:  "Question:  Would you
25  characterize yourself as a person skilled in the

Page 48

ATTORNEYS EYES ONLY
1
2  art of the subject matter of this patent," which
3  refers to the '989 patent?
4      A   I don't have that here.
5      Q   Right here, page 44, line 22.
6         Were you asked, "Would you characterize
7  yourself as a person skilled in the art of the
8  subject matter of this patent," referring to the
9  '989 patent.
10         Your answer at page 45 line 1, "Not
11  really."
12         Were you asked that question and did you
13  give that testimony?
14      A   Yes.
15      Q   Thank you.
16         MR. CHENG:  Let the record reflect
17  subject to objection.
18  BY MR. SMITH:
19      Q   Now, are you also familiar with the
20  company known as RealPro, which is owned by
21  Mr. Tornetta?
22      A   Yes.
23      Q   And did you form that company for him?
24      A   Which RealPro are you speaking about?
25      Q   The one you testified about at page 22

Page 49

ATTORNEYS EYES ONLY
1
2  of your deposition transcript which you are holding
3  in your hand.
4      A   (Witness perusing exhibit.)
5      Q   Line 10, "And part of that was the
6  formation of RealPro?
7         "Answer:  Yes."  Do you see that?
8      A   Yes.
9      Q   Were you asked that question and did you
10  give that answer?
11      A   Yes.
12      Q   Okay, and did you assist Mr. Tornetta in
13  forming RealPro?
14         MR. CHENG:  Objection to form.
15      A   Yes.  That's RealPro, Ltd. a Delaware
16  corporation.
17  BY MR. SMITH:
18      Q   Thank you.  And was the purpose of
19  RealPro to license the Tornetta patents that have
20  been marked as Exhibit 25 and 27?
21      A   Yes.
22      Q   You also know a Mr. William A, Acosta,
23  A-C-O-S-T-A?
24      A   Do I know him?
25      Q   Did you know him?

13 (Pages 46 to 49)

M1886
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 50

ATTORNEYS EYES ONLY

1
2      A   I did know him, yes.
3      Q   Unfortunately he's deceased as I
4   understand?
5      A   Yes; he's deceased.
6      Q   Do you recall approximately when he
7   passed away?
8      A   In early 2000.
9      Q   Have you ever been Mr. Acosta's
10   attorney?
11      A   Yes.
12      Q   Did you introduce Mr. Acosta to Mr. Mark
13   Tornetta?
14      A   Yes.
15      Q   And was Mr. William Acosta's son,
16   William K. Acosta also a codefendant with you in
17   the recent criminal proceedings?
18      A   Yes.
19      Q   Did he plead out rather than go to
20   trial?
21      A   I think that the record speaks for
22   itself.
23      Q   Now, are you aware that Mr. William A.
24   Acosta had a company named Synermation?
25      A   Yes.

Page 51

ATTORNEYS EYES ONLY

1
2      Q   Are you aware that he and Mr. Tornetta
3   or rather Mr. Tornetta's company, RealPro, the
4   Delaware corporation, entered into a licensing
5   agreement in 1988?
6      A   Yes.
7      Q   Let me show you a document previously
8   marked as Exhibit 45 (proffered.)
9          (Exhibit 45 previously marked.)
10   BY MR. SMITH:
11      Q   Do you recognize that as the licensing
12   agreement to which I just referred?
13      A   (Witness perusing exhibit.)
14      Q   Have you seen this document before,
15   Mr. Bagdis?
16      A   This particular -- there a number of
17   versions of this document that were circulated.
18      Q   Let me ask you to turn to the last page
19   of the document?
20      A   (Witness complied)
21      Q   Do you recognize Mr. Tornetta's and
22   Mr. Acosta's signatures there on the last page of
23   Exhibit 45?
24      A   (Witness perusing exhibit.)
25      Q   Do you recognize the signatures on page

Page 52

ATTORNEYS EYES ONLY

1
2   27?
3      A   I'm getting there.  Yes.
4      Q   Did you assist in the preparation of
5   this license agreement?
6      A   I believe that's attorney work product
7   discussions.
8      Q   Well, were you contemplating litigation
9   at the time you prepared this document?  Strike
10   that.
11          Was to your knowledge RealPro or
12   Synermation, Inc. contemplating litigation at the
13   time of the preparation of this document?
14      A   What type of litigation, any kind of
15   liti --
16      Q   Any type of litigation.  You asserted
17   work product.  That necessarily presupposes the
18   imminence of litigation.
19      A   Well, no.  This is the attorney/client
20   work product.  There were discussions with both
21   parties leading to the preparation and ultimate
22   execution of this document.
23      Q   Did you have those discussions?
24      A   I had discussions with them; yes.
25      Q   Who did you represent in connection with

Page 53

ATTORNEYS EYES ONLY

1
2   the preparation of this document?
3      A   At the time I believe I represented
4   Mr. Acosta.
5      Q   Not Mr. Tornetta?
6      A   No.
7          THE WITNESS:  I have a question.
8          MR. CHENG:  Let's go off the record.
9          THE VIDEOGRAPHER:  We're off the record
10   at 1101.
11          (Discussion had off the record.)
12          We're back on the record at 1101.
13          MR. SMITH:  Again, let the record
14   reflect consultation between the witness and his
15   attorney.
16      Q   Are you familiar with the program
17   called -- software program called WORKPLACE?
18      A   Yes.
19      Q   You understand that was developed by
20   Mr. Tornetta in the 1980s?
21      A   Yes.
22          MR. CHENG:  Objection to form.
23   BY MR. SMITH:
24      Q   Let me show you a document that we have
25   previously marked as Exhibit 47 in this litigation.

14 (Pages 50 to 53)

M1887
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 54

ATTORNEYS EYES ONLY

1  It bears the production number BGDS000434 and 435
2  (proffered.)
3       (Exhibit 47 previously marked.)
4  BY MR. SMITH:
5       Q   Have you ever seen this document?
6       A   I've seen this document; yes.
7       Q   Have you seen it in the last two days?
8       A   Yes.
9       Q   Now, did you author the text on the
10 second page of Exhibit 47?
11      A   Yes.
12      Q   And you understand that this document
13 was published in April of -- on April 22nd of 1988?
14      A   No.
15      MR. CHENG:  Objection to form.
16 BY MR. SMITH:
17      Q   I'm sorry, I did not hear you answer,
18 sir.
19      A   I -- I repeat the question.
20      Q   Was this text on the second page of
21 Exhibit 47 published on April 22, 1988?
22      MR. CHENG:  Objection to form.
23      A   I believe it was printed for April 22nd
24 of 1988.

Page 55

ATTORNEYS EYES ONLY

1  BY MR. SMITH:
2       Q   Okay.  It says at the top of the second
3  page, The Times Herald, Friday April 22, 1988.  Do
4  you see that?
5       A   Yes; I do.
6       Q   In 1988 what was the Times Herald?
7       A   It would be the local Norristown,
8  newspaper.
9       Q   Norristown, Pennsylvania?
10      A   Norristown, Pennsylvania.
11      Q   And you did author this text?
12      A   I did.
13      MR. SMITH:  Mark that as the next
14 exhibit.
15      (Exhibit 152 marked for identification.)
16 BY MR. HUSICK:
17      Q   This is Exhibit 152.  It's titled
18 "DECLARATION OF B. JAY BAGDIS, ESQ. IN SUPPORT OF
19 THE PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTIONS
20 FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT AND
21 INVALIDITY."
22      Do you see that?
23      A   Yes.
24      Q   And is that your signature on the second

Page 56

ATTORNEYS EYES ONLY

1  page?
2       A   Yes.
3       Q   Paragraph 10 says, "Pursuant to 28 U.S.
4  C Section 1746, I declare under penalty of perjury
5  that the foregoing is true and correct, to the best
6  of my knowledge and belief."
7       Do you see that?
8       A   Yes.
9       Q   You signed this document in March of
10 2007 under penalty of perjury?
11      A   Yes.
12      Q   And you took an oath that your
13 statements here were true?
14      A   Yes.
15      Q   The same oath that you took in this
16 deposition?
17      A   Yes.
18      Q   The same oath that you took in the
19 deposition of Diane Sarkisian?
20      A   Yes.
21      Q   Let me draw your attention to paragraph
22 5 on the second page of Exhibit 152.
23      A   Yes.
24      Q   Third line -- well, the first line,

Page 57

ATTORNEYS EYES ONLY

1  "Also for the purpose of generating interest, I
2  authored a newspaper article that described in
3  general terms the functions that RealPro and
4  Synermation expected to offer in the WORKPLACE."
5       Do you see that?
6       A   Yes.
7       Q   That is a reference to the text on the
8  second page of Exhibit 47, is it not?
9       A   Yes.
10      Q   And then one next sentence begins, "That
11 article was published on April 22, 1988."
12      Do you see that?
13      A   I do.
14      Q   That was what you testified to in March
15 of 2007?
16      A   Yes.
17      Q   Now, with regard to the second page of
18 Exhibit 47, let me find my copy?
19      A   Can I go off the record for a second?
20      Q   Yes.
21      THE VIDEOGRAPHER:  We are off the record
22 at 1105.
23      (Discussion had off the record.)
24      We're back on record at 1107.

15 (Pages 54 to 57)

M1888
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 58

ATTORNEYS EYES ONLY

1   BY MR. SMITH:
2       Q   Can we go back to Exhibit 47,
3   Mr. Bagdis?
4       A   (Witness complied.)
5       Q   Second page?
6       A   Okay.
7       Q   In the column on the center of the page
8   about halfway down it says, "How do I use
9   WORKPLACE?"
10          Do you see that?
11      A   Yes.
12      Q   And then it says below that "Running on
13  your PC, the WORKPLACE software displays a plan of
14  the Philadelphia Metropolitan area (the City of
15  Philadelphia and the eight surrounding counties in
16  Pennsylvania and New Jersey) with a special
17  viewport on your PC screen."
18          Now, did the WORKPLACE software have
19  that functionality in April of 1988...specifically
20  at the time of this article, April 22, 1988?
21      A   Did the WORKPLACE software?  Yes, the
22  WORKPLACE software displayed that.
23      Q   Okay.  And then in the next paragraph it
24  says, "On the map are series of landmarks to help

Page 59

ATTORNEYS EYES ONLY

1   you define your area of interest.  In addition,
2   each county contains municipal reference points for
3   areas of particular interest (Norristown, King of
4   Prussia, Lansdale, etc.)"
5           Did the WORKPLACE software have that
6   functionality as of April 22, 1988?
7       MR. CHENG:  Objection to form.
8       A   I'm not sure what the landmarks -- I'm
9   not sure if landmarks were displayed.
10  BY MR. SMITH:
11      Q   Let's limit it to "on this map are a
12  series of landmarks to help you define your area of
13  interest."
14      MR. CHENG:  Objection to form.
15  BY MR. SMITH:
16      Q   Was that part of the functionality of
17  the WORKPLACE software as of April 22, 1988?
18      MR. CHENG:  Same objection.
19      A   What do you mean by functionality?
20  BY MR. SMITH:
21      Q   Is that what the software is capable of
22  doing?
23      MR. CHENG:  Objection to form.
24      A   I think we need to define certain terms

Page 60

ATTORNEYS EYES ONLY

1   because of what I think may be coming back over and
2   over and over again.
3           There was the WORKPLACE, which was a
4   system that was to perform a certain set of
5   functions.  There are various components of the
6   network:  There's a host system, there's a client
7   system, there's a telecommunications system,
8   there's a data entry system, there's a data
9   retrieval system.
10          All of this stuff is described in the
11  patents that Tornetta was issued, so if you're
12  going to pick out specific little pieces, then
13  we're going to have to be very specific in what
14  you're talking about so I can answer these
15  questions truly and properly and truthfully and not
16  have any misunderstanding.
17          So when you say the WORKPLACE software,
18  the WORKPLACE software is a component of the
19  system, and the software did certain things.  There
20  are two sets of software:  There was a host system,
21  there was a client system or a user system,
22  espoused by a disk that was distributed -- would be
23  distributed to people that were going to use the
24  software remotely.

Page 61

ATTORNEYS EYES ONLY

1       Q   Okay.
2       MR. SMITH:  Motion to strike as
3   non-responsive.
4       MR. CHENG:  Objection to motion.
5   BY MR. SMITH:
6       Q   Let's move further down that column.
7   Now, the article which you authored states, "The
8   view port be zoomed down to the township level
9   allowing easy definition of your target area."
10          Was the system able to do that.
11      MR. CHENG:  Objection to form.
12      A   Was the system or was the software?
13  BY MR. SMITH:
14      Q   Was the software?
15      A   Was the software.
16      MR. CHENG:  Objection to the form.
17      A   What component of the software?
18  BY MR. SMITH:
19      Q   The user.
20      A   The user version of the software had
21  that capability.  It was a standalone piece.
22      Q   Do you also equate the user software
23  with the client software?
24      A   Yes; in terms of there's client software

16 (Pages 58 to 61)

REPORTED BY: Carl W. Girard, RMR
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022

www.huseby.com
(404) 875-0400

M1889
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 62

ATTORNEYS EYES ONLY
1   ATTORNEYS EYES ONLY
2   and there's host software. The client software is
3   subservient to the host, so the user software would
4   be client software that would be distributed.
5       Q   All right. Thank you. If you look at
6   the column on the extreme right, first paragraph it
7   says, "Superimposed on this map is a series of
8   'points', each of which represents at least one
9   property in the WORKPLACE database."
10      Was the software able to do that.
11      MR. CHENG: Objection to form.
12      A   Which software?
13  BY MR. SMITH:
14      Q   Again, client.
15      A   The client software.
16      MR. CHENG: Objection to form. You may
17  answer.
18      THE WITNESS: Say that again?
19      MR. CHENG: Objection to form. You may
20  answer.
21      THE WITNESS: Okay. Fine.
22      A   Yes; the client software was able to
23  display a series of points.
24  BY MR. SMITH:
25      Q   And then skipping down a paragraph -- in

Page 63

1   ATTORNEYS EYES ONLY
2   the next paragraph it says, "by setting broad
3   geographic, price, and size ranges, you can get and
4   meet 'overview' of the entire Metropolitan
5   Philadelphia commercial rental market."
6       Do you see that?
7       A   Yes.
8       Q   Could the client software do that?
9       MR. CHENG: Objection to form.
10      A   If the -- again, the client software was
11  a tool. It had the ability to display all of this
12  information. The WORKPLACE was a system. Without
13  all of the information, what you're displaying is
14  irrelevant.
15  BY MR. SMITH:
16      Q   Can get your deposition in front of you
17  in the Sarkisian case? It should be in your stack
18  of documents.
19      A   (Witness complied.)
20      Okay.
21      Q   Turn, if you would, please, to page 68?
22      A   Okay.
23      Q   Line 14, "And then by setting a broad
24  geographic, price and size ranges you can get an
25  immediate review of the entire Metropolitan

Page 64

1   ATTORNEYS EYES ONLY
2   Philadelphia commercial rental market. It could do
3   that as well?
4       Answer at line 19, "It should be able to
5   do that, yes."
6       A   It should be able to do that.
7       MR. CHENG: There's no question.
8       THE WITNESS: Okay.
9   BY MR. SMITH:
10      Q   You were asked that question and you
11  gave that testimony under oath several years ago?
12      A   Yes; that's the answer.
13      Q   Thank you.
14      MR. SMITH: Want to change the tape real
15  quick?
16      THE VIDEOGRAPHER: Yes. We are off the
17  record another 1114. This is the end of tape
18  No. 1.
19      (Change tape.)
20      This is the beginning of tape No. 2.
21  We're back on the record at 1115.
22  BY MR. SMITH:
23      Q   Mr. Bagdis, again on the second page of
24  Exhibit 47, the column on the lower left, there's
25  the heading, "How does WORKPLACE work?"

Page 65

1   ATTORNEYS EYES ONLY
2       And in the next paragraph, reads
3   "WORKPLACE allows you to point at a specific
4   location on the map, showing available properties
5   in the Metropolitan Philadelphia area; set a price
6   prior, ($/sq. ft.) and a size range (100-10,000,000
7   sq. ft.); zoom the map down to the township level
8   and select the properties of interest to you."
9       Do you see that?
10      A   Yes.
11      Q   Could the WORKPLACE software do that as
12  well?
13      MR. CHENG: Objection to form.
14      A   Which software are you talking about?
15  BY MR. SMITH:
16      Q   The client software.
17      A   The client software --
18      MR. CHENG: Objection to form.
19      A   The client software was capable of doing
20  that if it had the information to display.
21  BY MR. SMITH:
22      Q   Let me invite your attention to your
23  deposition on page 68 from Sarkisian.
24      A   Uh-huh.
25      Q   At line 20, "QUESTION: And skipping

17 (Pages 62 to 65)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 66

ATTORNEYS EYES ONLY

1  down now to the part that's at the bottom here
2  where it says WORKPLACE allows you to point at a
3  specific location on the map showing available
4  properties in the Metropolitan Philadelphia area;
5  set a price range it has a parenthesis price over
6  square feet and a size range 100 to 10 million in
7  parenthesis. Zoom the map down to the township
8  level and select the properties of interest to
9  you." Could you do that with the WORKPLACE
10  software as well?
11         And your answer at line 7, "I would
12  think, so, yes."
13         Do you see that?
14  A   Yes.
15  Q   Were you asked that question and did you
16  give that answer under oath?
17  A   Yes.
18  Q   Thank you.
19  A   Again, I think you're misrepresenting
20  what you're asking, but...
21  Q   Now at the time you wrote this article
22  you were describing what the -- strike that.
23         At the time you wrote this article you
24  were asserting that the WORKPLACE software could do

Page 67

ATTORNEYS EYES ONLY

1  the steps that we're just discussing; is that
2  right.
3         MR. CHENG: Objection to form.
4  BY MR. SMITH:
5  Q   At the time you wrote this article you
6  were representing to the public that the WORKPLACE
7  software would perform the steps we've just been
8  through?
9         MR. CHENG: Objection to form.
10  A   At the time I wrote this article, the
11  software was supposed to be able to do all of this
12  steps that were described in here. I wrote this
13  article prior to April 22nd 1988, and at the time
14  it was in anticipation of a publication date.
15  BY MR. SMITH:
16  Q   And the WORKPLACE software, as of this
17  point in time, was available for licensing, was it
18  not?
19         MR. CHENG: Objection to form.
20  A   The reason I asked about defining very
21  specifically the terms that you're discussing is
22  because there's obviously been some confusion over
23  the evolution of this whole process.
24         The WORKPLACE system was a group of

Page 68

ATTORNEYS EYES ONLY

1  hardware, software, telecommunications components
2  and everything else that was necessary to run the
3  system itself. The software was only one component
4  of it.
5  BY MR. SMITH:
6  Q   The software was available for license
7  at the time you wrote this article?
8         MR. CHENG: Objection to form.
9  A   The system was available for use. The
10  software wasn't licensed in the sense that someone
11  would get a license to use the software for
12  whatever purposes they want.
13         The system was available for licensing.
14  The software by itself couldn't do anything.
15  BY MR. SMITH:
16  Q   Let me invite your attention to your
17  deposition from the Sarkisian case, page 69 line
18  22?
19  A   Okay.
20  Q   Question: "The WORKPLACE software was
21  on sale at the time, at the time this article was
22  published?"
23         Answer at line 1 on page 70, "It wasn't
24  on sale, no. It was available for license. You

Page 69

ATTORNEYS EYES ONLY

1  could get the software which allowed you to get at
2  the database."
3         Were you asked that question and did you
4  give that answer?
5  A   Yes.
6  Q   Thank you.
7  A   Again, I think you're misrepresenting
8  the content of your questions.
9  Q   Sir, I'm simply quoting to you testimony
10  that you gave under oath several years ago and --
11  A   And I'm explaining to you there's been
12  confusion with the definition of the terms over the
13  ensuing period of time.
14  Q   Were you confused at the time you gave
15  your testimony in the Sarkisian case?
16  A   No, not confused.
17  Q   And that took place in June of 2006?
18  A   Correct.
19  Q   Over three years ago?
20  A   Yes.
21  Q   At a point in time which your memory
22  about events from 2002 was presumably more clear?
23         MR. CHENG: Objection to form.
24  A   What I'm saying to you is that you keep

18 (Pages 66 to 69)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 70

ATTORNEYS EYES ONLY

1 harping on the concept of the WORKPLACE software,
2 and I'm telling you that I was describing the
3 WORKPLACE system, of which the software was only a
4 component, and there has been confusion throughout
5 the ensuing period as to what those terms mean, so
6 in order to answer your questions today, I'm trying
7 to give you very explicit definitions of what I am
8 talking about.
9 BY MR. SMITH:
10    Q   I appreciate that.  Exhibit 47 is dated
11 April of 2002, correct?
12        MR. CHENG:  Objection to form.
13    A   What is Exhibit 47?
14 BY MR. SMITH:
15    Q   That's the article from the Times
16 Herald.
17    A   Yes.
18        MR. CHENG:  Wrong date.
19 BY MR. SMITH:
20    Q   Let me start over and we'll take a break
21 for lunch.  Exhibit 47 is dated April 1988?
22    A   Yes.
23    Q   And your testimony in the Sarkisian case
24 was dated June of 2006?

Page 71

ATTORNEYS EYES ONLY

1    A   Okay.
2    Q   Over three years ago?
3    A   All right.
4    Q   And was your recollection of the events
5 of 1988 better today or was it better three years
6 ago in 2006?
7        MR. CHENG:  Objection to form.
8    A   I think my recollection was fine.
9        MR. SMITH:  Okay.  Let's break for
10 lunch?
11        THE VIDEOGRAPHER:  We are off the record
12 at 11:21.
13        (Luncheon recess taken at 11:21 a.m. and
14 reconvened at 1:17 p.m.)

Page 72

ATTORNEYS EYES ONLY
AFTERNOON SESSION

1        THE VIDEOGRAPHER:  We are on the record
2 at 1317 hours.
3        MR. CHENG:  I note for the record that I
4 will be leaving the deposition at this time but
5 Mr. Husick who also represents The Real Estate
6 Alliance and Mr. Bagdis will be taking over me and
7 defending and objecting on behalf of both those two
8 clients.  Mr. Bagdis, I leave you in good hands.
9        THE VIDEOGRAPHER:  We are off the record
10 at 1318 hours.
11        (Mr. Cheng leaves deposition suite.)
12        We are back on the record at 1318 hours.
13 BY MR. SMITH:
14    Q   Mr. Bagdis, I'm going to show you a
15 document that we previously marked as Exhibit 48
16 (proffered).  Have you seen that document before?
17        (Exhibit 48 previously marked.)
18    A   Yes.
19 BY MR. SMITH:
20    Q   Did you prepare the text that's attached
21 to the second page of -- strike that.
22        Did you prepare Exhibit 48?
23    A   I didn't prepare the exhibit.

Page 73

ATTORNEYS EYES ONLY

1    Q   Did you cause the exhibit to be
2 prepared?
3    A   Yes; I had an artist draw it.
4    Q   The first page of Exhibit 48 says, "Meet
5 our Golden Retriever."  For what purpose was this
6 document prepared?
7    A   It was an advertisement that was placed
8 in the Black's Guide for Philadelphia.
9    Q   1988 edition?
10    A   I believe it was 1988.
11    Q   And what is Black's Guide?
12    A   Black's Guide is a listing of commercial
13 property.
14    Q   In this case in the Philadelphia area?
15    A   I believe it's nationwide, but this
16 issue was the Philadelphia.
17    Q   That was the intent of my question.  Did
18 this constitute an offer for licensing of the
19 WORKPLACE?
20        MR. HUSICK:  Object to form.
21    A   I think your term "licensing" is -- I
22 think we have to be very specific with terms that
23 we're using.  I understand licensing, I think,
24 means something very, very specific with respect to

19 (Pages 70 to 73)

M1892
EXHIBIT MX-52

Page 74

ATTORNEYS EYES ONLY

1     patent law but I'm not an expert on that, so I
2     don't know -- but if that's the context that you're
3     talking about, no. If licensing means to use the
4     software; yes, it was an attempt to.
5   BY MR. SMITH:
6       Q   Can you take a look at your deposition
7   that's there in front of you, page 57?
8       A   (Witness complied.)
9       Q   At this point you're being asked
10  questions in the Sarkisian deposition about --
11  strike that.
12          At this point you're being asked about
13  this document in your deposition in the Sarkisian
14  litigation, and at line 21 of page 57 you are
15  asked, "So it was an offer for sale?
16          "ANSWER:  Well, it wasn't for sale; it
17  was an offer for licensing.  It was a marketing
18  piece we wanted people to call."
19          Do you see that?
20      A   No.  What line is that?
21      Q   Lines 21 through 24 on page 57.
22      A   Okay.  I have that.
23      Q   Were you asked that question and did you
24  give that testimony under oath in your deposition

Page 75

ATTORNEYS EYES ONLY

1   in the Sarkisian litigation?
2       A   Yes.
3       Q   Now, if you would turn to the second
4   page of Exhibit 48.  You see about halfway down or
5   a little further in the left-hand column, it says,
6   "How do I use WORKPLACE?"
7       A   Yes.
8       Q   Paragraph reads, "Running on your PC,
9   the WORKPLACE software displays a map of the United
10  States.  You can then select the metropolitan area,
11  (for example, the City of Philadelphia and the
12  surrounding counties in Pennsylvania and New
13  Jersey) from a menu or by pointing to the city on
14  your PC screen."
15          Do you see that?
16      A   Yes.
17      Q   Did the WORKPLACE software perform that
18  function in the spring of 1988?
19      A   No.
20          MR. HUSICK:  Object to form.
21  BY MR. SMITH:
22      Q   Did the WORKPLACE system perform that
23  function?
24      A   No.

Page 76

ATTORNEYS EYES ONLY

1       MR. HUSICK:  Object to form.
2   BY MR. SMITH:
3       Q   Was the software that -- strike that.
4           You see in the lower left-hand corner
5   the second page of Exhibit 48 it says, "What next?"
6       A   Yes.
7       Q   It says, "For more information about how
8   to become a member of the WORKPLACE Network for the
9   location of the nearest WORKPLACE site or for
10  personal demonstration, contact..." and then it
11  gives an address in Blue Bell, Pennsylvania?
12      A   Yes.
13      Q   An address for your office in Blue Bell?
14      A   It's a building that I own in Blue Bell.
15      Q   Okay.  And was the software that would
16  permit that personal demonstration available at the
17  time of the publication of this document?
18          MR. HUSICK:  Object to form.
19      A   There was demonstration software at that
20  location at that time.
21  BY MR. SMITH:
22      Q   And that demonstration software would
23  demonstrate the entire system?
24      A   No.

Page 77

ATTORNEYS EYES ONLY

1       Q   Take a look at your deposition on page
2   61 from the Sarkisian matter?
3       A   (Witness complied.)
4       Q   Actually, let me start at the bottom of
5   page 60 line 22.
6           "QUESTION:  Was the software already
7   done when you had put this sheet, this document in
8   the Black's Guide for licensing."
9           Answer at the top of page 61, "Some
10  software was done.  The software continued to
11  evolve but there was a rudimentary way to
12  demonstrate this from this computer to that
13  computer to say that there was a network was, you
14  know, that's marketing."
15          Were you asked that question and did you
16  give that answer?
17      A   Yes.
18      Q   Further down line 9 on page 61.
19          "QUESTION:  And you didn't have the
20  data, so you didn't have a network built but you
21  had software that did demonstrate the whole system?
22          Answer at line 13, "That is correct."
23          Were you asked that question and did you
24  give that response under oath?

20 (Pages 74 to 77)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 78

ATTORNEYS EYES ONLY

1
2    A   I gave that.  That's the question and
3 that's the answer.
4    Q   Thank you.  Back on the second page of
5 Exhibit 48 in the top right-hand column, it says,
6 "How does WORKPLACE work?"  Do you see that?
7    A   Yes.
8    Q   It says, "WORKPLACE allows you to point
9 at a specific location on the national map to
10 select available properties in the metropolitan
11 area, consider price range ($/sq. ft.) and the size
12 range (100 to 10,000,000 sq. ft.) and zoom this map
13 down to the detail and select the properties of
14 interest to you."
15       Do you see that?
16    A   Yes.
17    Q   Would the WORKPLACE software perform
18 that function in the spring of 1988?
19    A   No.
20       MR. HUSICK:  Object to form.
21 BY MR. SMITH:
22    Q   Would the WORKPLACE system perform that
23 function?
24       MR. HUSICK:  Object to form.
25    A   No.

Page 79

ATTORNEYS EYES ONLY

1
2 BY MR. SMITH:
3    Q   If that's the case then why did you
4 write that into this document?
5    A   Because that's what the software was
6 supposed to do and the system was supposed to
7 perform at the time I wrote this document and
8 that's what the specification said.
9    Q   In words that you chose to reflect that
10 were "WORKPLACE allows you to," am I correct about
11 that?
12    A   Yes.
13    Q   Doesn't say the WORKPLACE software is
14 intended to or at some point in the time may; it
15 says "the WORKPLACE allows you to."
16       Am I correct about that?
17       MR. HUSICK:  Object to form.
18    A   That's what it says.
19 BY MR. SMITH:
20    Q   You use the present tense for "allows?"
21    A   Is that a question?
22    Q   Yes, sir.
23       MR. HUSICK:  Object to form.
24    A   Repeat the question then.
25 BY MR. SMITH:

Page 80

ATTORNEYS EYES ONLY

1
2    Q   The verb in the sentence that we've been
3 focussing on is the present tense, "allows"; am I
4 correct about that as a matter of English grammar?
5    A   That's correct.
6    Q   Now, let me show you a document that's
7 previously been marked as Exhibit 56 (proffered.)
8       (Exhibit 56 previously marked.)
9 BY MR. SMITH:
10    Q   These are a series of documents.  I'm
11 just going to ask you about a couple of them,
12 specifically the first page of Exhibit 56, which is
13 production No. BGDS436 in the lower right-hand
14 column.
15       Do you see the advertisement for
16 WORKPLACE in the lower left-hand portion of that
17 document?
18    A   Yes.
19    Q   Did you have anything to do with the
20 preparation of that advertisement?
21    A   Did I prepare it?  No.  Did I have
22 someone draw it up and lay it out?  Yes.
23    Q   That's my question.  This advertisement
24 appeared in the July 15, 1988 edition of the
25 Chester County Business -- look at the top?

Page 81

ATTORNEYS EYES ONLY

1
2    A   Chester County Biz, I believe it says.
3    Q   What was the Chester County Biz in 1988?
4    A   It was a publication that served the
5 Chester County, Pennsylvania commercial and
6 business community.
7    Q   And then the advertisement which, I
8 believe you indicated, you assisted or directed its
9 preparation, it says, "The WORKPLACE is the newest
10 concept in commercial property information
11 exchange."
12       Do you see that?
13    A   Yes.
14    Q   And then it says, "Whether you have or
15 want 250 or 2,500,000 square feet WORKPLACE matches
16 lessors and lessees."
17       Do you see that?
18    A   Yes.
19    Q   Would the WORKPLACE system do that in
20 the summer of 1988?
21    A   Did the WORKPLACE system?
22    Q   Yes, sir.
23    A   No; it didn't have any data.
24    Q   So the database was not populated with
25 listings; is that what you're saying?

21 (Pages 78 to 81)

CONFIDENTIAL                                   Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.                              2:07-CV-92185
ATTORNEYS EYES ONLY                                          Bernard Jay Bagdis                                           September 9, 2009

Page 82

ATTORNEYS EYES ONLY

1    A    That was one of the issues.
3    Q    Was the database capable of being
4  populated with listings?
5    A    I believe so.
6    Q    Then the advertisement says "For a free
7  demonstration call 215-272-7000."
8        Do you see that?
9    A    Yes.
10   Q    Whose telephone number was that?
11   A    That was the WORKPLACE Network's
12 telephone number.
13   Q    Was that also a telephone number for you
14 or your office?
15   A    The telephone rang in my building.
16   Q    This advertisement indicates that a free
17 demonstration of the WORKPLACE was available at
18 that time?
19   A    A demonstration was available; yes.
20   Q    Then if you look at the upper right-hand
21 portion of the first page Exhibit 56, there's text
22 under the heading "WORKPLACE available."  Do you
23 see that?
24   A    Yes.
25   Q    Did you write that text?  Just on the

Page 83

ATTORNEYS EYES ONLY

1  first page, sir.
3    A    Yeah; I'm reading it.
4    Q    Okay.
5    A    I believe it's a subset of the same text
6  that was on your Exhibit No. 48 which is the same
7  text that was in the -- your other Exhibit number,
8  I don't know the number.
9    Q    47?
10   A    You have 47?
11   Q    47 was the one with the Times Herald
12 article of April 22nd?
13   A    Yes.
14   Q    So the answer is you did cause the text
15 in the first --
16   A    I wrote the original text.  It looks
17 like it's been edited and evolved because I don't
18 believe that the words are exactly the same, so it
19 looks to me like somebody added to it or edited it
20 or changed it.
21   Q    Were you that someone?
22   A    I don't believe so.
23   Q    In the right-hand column of the first
24 page of Exhibit 56, the text says, and I'm reading
25 from the first full paragraph, "The WORKPLACE

Page 84

ATTORNEYS EYES ONLY

1  software runs on the IBM PC/XT/AT and most
3  compatibles.  This program as far as BOS version
4  2.0 or higher and 640 of RAM and will run with dual
5  360K floppy disk drives, one 1.2M floppy or hard
6  disk with at least 700K available.  The program
7  also requires at least 12,000 baud Hayes or
8  compatible modem in a CGA or EGA graphics monitor,
9  although not required, an EPSON MX-80 graphics
10 printer (or compatible) is recommended.
11       Was that a correct statement at the
12 time?
13   A    No.
14   Q    What was wrong with about it?
15   A    The program, you have 12000 baud Hayes
16 and it is actually 1200 baud, which leads me to
17 believe someone edited it, and because there's no
18 such thing as a 12000 baud Hayes or compatible
19 modem.
20   Q    Other the size of the modem or the baud
21 capacity, the modem, is the paragraph correct?
22   A    Well, a portion of the WORKPLACE
23 software runs on an IBM, ran on an IBM PC/XT/AT.  I
24 don't know which DOS Version, 2 was probably
25 sufficient and it should be 640K of RAM, not 640

Page 85

ATTORNEYS EYES ONLY

1  RAM.  I don't remember whether it would run on a
3  single floppy or required dual floppies.
4    Q    Other than that, is the statement there
5  accurate?
6    A    Well, it's like "other than that,
7  Mrs. Lincoln, what did you think of the play?"  I
8  mean, it's technically inaccurate; it's incorrect.
9    Q    In those respects?
10   A    In those respects it's incorrect.
11   Q    The next paragraph reads, "The
12 recommended configuration for best performance..."
13 and it goes on to describe the system.
14       Do you see that?
15   A    Yes.
16   Q    Was that, in fact, the recommended
17 configuration of the system at the time?
18   A    At the time, that system was
19 significantly more robust than the baseline system,
20 and it would have provided, at the state of the art
21 at that time, probably a little bit more
22 user-enjoyable interface given that the graphics
23 that involved were computer intensive.
24   Q    Was that, in fact, the recommended
25 configuration for the WORKPLACE system in July of

22 (Pages 82 to 85)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 86

ATTORNEYS EYES ONLY

1
2    1988?
3          MR. HUSICK:  Object to form.
4       A   Well, there were --
5    BY MR. SMITH:
6       Q   I'll rephrase the question.
7       A   Yes.
8       Q   Was that a recommended configuration for
9    the WORKPLACE system?
10      A   Yes, it was a recommended configuration.
11         MR. HUSICK:  Object to the form.
12   BY MR. SMITH:
13      Q   If you would turn in Exhibit 56 to the
14   page that ends in digits 443?  It's the
15   third-to-last page in the exhibit.
16      A   (Witness complied.)
17      Q   In the lower right it says, "FOCUS-
18   September 21.  It's a little hard to read but I
19   think it is 1988.  Do you see that?
20      A   Yes.
21      Q   What was FOCUS in September of 1988?
22      A   FOCUS was a magazine-type publication --
23   I don't know whether it was Philadelphia regionally
24   based on nationwide based but it was essentially a
25   business-directed publication.

Page 87

ATTORNEYS EYES ONLY

1
2       Q   Now, there is an advertisement with
3    regard to WORKPLACE in the lower left-hand portion
4    of this page of FOCUS.  Do you see that?
5       A   Yes.
6       Q   Did you either prepare that or cause
7    that advertisement to be prepared?
8       A   Yes.
9       Q   The text says, "Call WORKPLACE and let
10   us show you how we can help you find our lease
11   commercial office space.  Our business is helping
12   landlords find tenants and helping tenants find
13   space."
14         Do you see that?
15      A   Yes.
16      Q   Does that indicate that the WORKPLACE
17   system was fully operational at the time?
18      A   No; it says "let us show how we can help
19   you."
20      Q   If the system was not operational, how
21   did you propose to do that?
22      A   There was demonstration software.
23   Remember, we were soliciting property listings,
24   were soliciting landlords, we were soliciting
25   tenant inquires.

Page 88

ATTORNEYS EYES ONLY

1
2       Q   So, but for populating the database with
3    listings, was the system operational?
4       A   Not fully operational; no.
5       Q   Could the system at that point in time
6    help landlords find tenants and help tenants find
7    space?
8       A   The demonstration would show how that
9    could be done.
10      Q   Thank you.  Let me show you a document
11   we've marked as Exhibit 57 (proffered.)
12         (Exhibit 57 previously marked.)
13   BY MR. SMITH:
14      Q   This first page is titled "WORKPLACE
15   OVERVIEW, Philadelphia Metropolitan Area, Effective
16   May 1, 1988."  Have you seen this document before?
17      A   Yes.
18      Q   What is it?
19      A   This page?
20      Q   Of the document.
21      A   Or the entire document?
22      Q   The entire document, sir.
23      A   (Witness perusing exhibit.)
24      Q   Mr. Bagdis, let's do this if you don't
25   mind:  Tell us what the first page is and then

Page 89

ATTORNEYS EYES ONLY

1
2    we'll address the totality of the document.
3       A   The first page is an overview of the
4    WORKPLACE.
5       Q   Did you assist in the preparation of
6    this document, the first page of Exhibit 57?
7       A   Yes.
8       Q   And it says, "What is WORKPLACE?"
9          And then the document says, "WORKPLACE
10   is a proprietary patented and very new way to put
11   lessors and lessees of commercial real estate in
12   touch with each other."
13         Do you see that?
14      A   Yes.
15      Q   Did you cause that to be written?
16      A   I may have been one of the authors.
17   There were other people writing at the time.
18      Q   Who were they?
19      A   There were a couple of people on staff.
20      Q   On staff where?
21      A   In my office.  There were a couple of
22   people involved in.
23      Q   I'm trying to find out who were they
24   working for?
25      A   Well, they were freelancers.  They were

23 (Pages 86 to 89)

M1896
EXHIBIT MX-52

CONFIDENTIAL                                Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.                                2:07-CV-92185
ATTORNEYS EYES ONLY                                        Bernard Jay Bagdis                                              September 9, 2009

Page 90

ATTORNEYS EYES ONLY
1
2  working on a project-by-project basis. This
3  happened to be one of the projects that they worked
4  on.
5      Q   Who paid them for the work they did on
6  the WORKPLACE project?
7      A   WORKPLACE Network.
8      Q   And this document indicates it's
9  effective May 1, 1988. Do you see that?
10     A   Yes.
11     Q   As of that date was Workplace in fact a
12 proprietary patent and very new way to put lessors
13 and lessees of commercial real estate in touch with
14 each other?
15     A   The concept was.
16     Q   And it goes on to say, "WORKPLACE uses a
17 centralized database accessible through personal
18 computers to let users review maps of available
19 commercial properties and select those properties
20 of interest for further study via a published
21 custom search report prepared by WORKPLACE."
22         Do you see that?
23     A   It says "database access through
24 personal computers."
25     Q   I'm sorry. Did WORKPLACE, in fact, as

Page 91

ATTORNEYS EYES ONLY
1
2  of May 1, 1988, use a centralized database in that
3  way?
4      A   It had the capability of using a
5  centralized database.
6      Q   In that way as described in the
7  document?
8      A   Yes; a centralized database is access
9  through a personal computer.
10     Q   If you would turn to page 533 within
11 Exhibit 57. It should be the third to last page?
12     A   (Witness complied.)
13     Q   This is headed "WORKPLACE, Member Price
14 Structure, Effective May 1, 1988." Do you see
15 that?
16     A   Yes.
17     Q   Did you cause this document or this page
18 of Exhibit 57 to be prepared?
19     A   Well, WORKPLACE commissioned to have it
20 structured and staffed produced it.
21     Q   At this point in time what was your
22 relationship to WORKPLACE?
23     A   I was kind of like the honcho pushing
24 the project along.
25     Q   Project manager, for lack of a better

Page 92

ATTORNEYS EYES ONLY
1
2  phrase?
3      A   For lack of a better phrase.
4      Q   The document says, "Member status is
5  recommended for any WORKPLACE user who will access
6  WORKPLACE more than a few times. Real estate
7  agents may belong to this category if they do only
8  a small volume of commercial real estate business."
9          Do you see that?
10     A   Yes.
11     Q   As the project manager for WORKPLACE,
12 were you recommending member status for persons who
13 used WORKPLACE more than a few times?
14         MR. HUSICK: Object to form.
15     A   Repeat that question.
16         MR. SMITH: Can you can read that back,
17 please, sir?
18         (Question read.)
19     A   As the project manager I caused this to
20 be written.
21     Q   Okay.
22     A   And the idea was to solicit people to
23 join the network providing customers for the
24 network and data to be supplied through the
25 network.

Page 93

ATTORNEYS EYES ONLY
1
2      Q   And at the bottom of this page of
3  Exhibit 57, you set forth a payment structure for
4  the privilege of joining the WORKPLACE?
5      A   Yes.
6      Q   And was this document, in fact,
7  published, made available outside of WORKPLACE?
8      A   It wasn't made available outside of
9  WORKPLACE.
10     Q   Well, was this document distributed to
11 lessors and lessees of commercial real estate?
12     A   No. It was available in a marketing
13 book that was used when anybody wanted to come in
14 and have a demonstration.
15     Q   Was the marketing book made available to
16 persons who were not employed by WORKPLACE?
17     A   No.
18     Q   Did persons come in to WORKPLACE to
19 observe demonstrations or to -- I'm sorry. Go
20 ahead.
21     A   No; go ahead.
22     Q   Did persons come to WORKPLACE to seek
23 demonstrations of the WORKPLACE system in April/May
24 of 1988?
25     A   People came in, some people came in to

24 (Pages 90 to 93)

CONFIDENTIAL                                     Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.                    2:07-CV-92185
ATTORNEYS EYES ONLY                                           Bernard Jay Bagdis                                      September 9, 2009

Page 94

ATTORNEYS EYES ONLY

1  look at what was available over the system at any
2  particular time.
3      Q   And did that happen in April and May of
4  1988?
5      A   The system wasn't complete.
6      Q   Did persons come to see portions of it
7  that, according to you, were complete?
8      A   Well, you cannot be partially completed.
9  It's either complete and it works or it's
10 incomplete and it doesn't work.
11     Q   Let me show you a document that's been
12 marked as Exhibit 59 (proffered.)
13         (Exhibit 59 previously marked.)
14 BY MR. SMITH:
15     Q   You can set 57 down for a moment.
16     A   (Witness perusing exhibit.)
17     Q   59 is a one-page document entitled
18 Trans-O-Gram and appears to have been prepared by
19 yourself.  Did you, in fact, prepare this document?
20     A   (Witness perusing.)  Did I print it?
21 No.
22     Q   Did you cause it to be prepared?
23     A   Did I cause it to be prepared?  Did I
24 write it?  No.
25

Page 95

ATTORNEYS EYES ONLY

1      Q   Did someone write it at your direction?
2      A   Yes, someone wrote it at my direction.
3      Q   It says, "From: Sneak Preview Guest
4  Quarters, Plymouth Meeting, Pennsylvania."
5         Do you see that?
6      A   Yes.
7      Q   What was the purpose of this document?
8      A   This was to generate interest in the
9  WORKPLACE and in order to do that a sneak preview
10 was being offered at the Guest Quarters in Plymouth
11 Meeting, Pennsylvania.
12     Q   Did this document generate interest in
13 WORKPLACE?
14     A   Yes.
15     Q   And to whom was the document sent?
16     A   I believe it was sent to commercial
17 realtors, large property owners, large companies
18 that would be potential lessors, lessees of office
19 space, various media, and then anybody we could
20 think of that would be interested in looking at
21 this.
22     Q   Do you recall approximately how many
23 persons or entities this document was disseminated
24 to, Exhibit 59?
25

Page 96

ATTORNEYS EYES ONLY

1      A   I don't remember.
2      Q   Can you approximate it?
3      A   My guess it was in the thousands.
4      Q   And it refers to a preview to be held at
5  the Guest Quarters in Plymouth Meeting,
6  Pennsylvania on Tuesday, July 12th.  Do you see
7  that?
8      A   Yes.
9      Q   Tuesday, July 12, 1988.  Do you recall
10 about how many people attended that preview
11 session?
12     A   My guess it was a couple of hundred.
13     Q   Were you there?
14     A   Yes.
15     Q   And did you perform a demonstration of
16 the WORKPLACE system there?
17     A   Of parts of the system; no.  Of parts of the
18 software and parts of the features of the system,
19 yes.
20     Q   What parts of the system were you unable
21 to demonstrate?
22     A   There was no data in the database so
23 everything was synthetic.  There was no
24 telecommunications, so everything was static.
25

Page 97

ATTORNEYS EYES ONLY

1  There was -- it was basically a mockup of the
2  features of the system in, I guess at that time
3  they were called, viewgraph format, they would be
4  called Power Point today.
5      Q   Okay.  You used the word "synthetic".
6  What did that refer to?
7      A   It was static images of what would be
8  the normal output of the system at various stages
9  of its operation.
10     Q   In other words, identification of -- you
11 didn't have actual properties populating the
12 database of properties available for rent or for
13 sale?
14     A   We didn't have --
15         MR. HUSICK:  Object to form.
16     A   That's correct; we did not have actual
17 properties.
18 BY MR. SMITH:
19     Q   Instead, the database was populated with
20 synthetic or artificial property listings?
21         MR. HUSICK:  Object to form.
22     A   Yes, and the database was not in the
23 central computer; it was on the local computer in
24 the Guest Quarters in the room.
25

REPORTED BY: Carl W. Girard, RMR                              www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022          (404) 875-0400

M1898
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 98

ATTORNEYS EYES ONLY

1
2    BY MR. SMITH:
3        Q   But the software code was prepared that
4    would permit the system to access these synthetic
5    listings?
6            MR. HUSICK:  Object to form.
7        A   The software.
8    BY MR. SMITH:
9        Q   Software?
10       A   Some software.
11       Q   Some software code was prepared that
12   would permit the user to access these hypothetical
13   or synthetic listings?
14       A   Some software code was prepared.  It
15   wasn't complete because, if it was complete, we
16   would have used it.  It didn't work.
17       Q   Well, did you use software to access the
18   synthetic listings?  Were you able to do that at
19   this point in time?
20       A   They were all in the same computer, so I
21   could summon up information and present it.
22       Q   Okay.  Would the client software access
23   the database in which the synthetic listings were
24   contained?
25       A   No; it didn't.  It wasn't able to at

Page 99

ATTORNEYS EYES ONLY

1
2    that point.
3        Q   Why not?
4        A   Because it was still in development.
5    There were still bugs; it just didn't work.
6        Q   Then how did you access the synthetic
7    data did the software didn't work?
8        A   I didn't -- I had it on the same
9    computer.  I ran everything from the host computer.
10       Q   Okay.  There was a database of synthetic
11   listings, was there not?
12           MR. SMITH:  Object to form.
13       A   I guess I don't --
14   BY MR. SMITH:
15       Q   Well, you said you didn't have actual
16   listings?
17       A   No, we had no listings of real property
18   that was --
19       Q   Instead you indicated you had what you
20   called synthetic listings?
21       A   No; I said we made synthetic access to
22   the listings.
23       Q   What listings?
24       A   We had a made up database.
25       Q   Okay; you had a made-up database, may I

Page 100

ATTORNEYS EYES ONLY

1
2    call it artificial listing?
3        A   If that's what you want to call it.
4        Q   Is that okay with you?
5        A   I guess.
6        Q   Was there is software in a computer that
7    would access that database of artificial or made-up
8    listings?
9        A   There was some software that could
10   access some of the listings in that artificial
11   database.
12       Q   Okay.
13       A   It was all on the host computer, though.
14   Let me show you a document we previously marked as
15   Exhibit 58 (proffered.)
16           (Exhibit 58 previously marked.)
17       A   (Witness perusing exhibit.)
18   BY MR. SMITH:
19       Q   Do you recognize this document?
20       A   (Witness perusing.)
21       Q   Is this a document that relates to the
22   preview, that relates to the sneak preview held at
23   the Guest Quarters in Plymouth Meeting,
24   Pennsylvania on July 12, 1988?
25       A   I'm still going through it.

Page 101

ATTORNEYS EYES ONLY

1
2        Q   Yes, sir.
3        A   (Witness perusing.)
4            I believe this was the handout that was
5    distributed at the sneak preview.
6        Q   Was this document prepared at your
7    direction?
8        A   Yes.
9        Q   And your best recollection is it was
10   handed out at the sneak preview?
11       A   I believe it was; yes.
12       Q   Please take a look at the third page of
13   the document that ends in the number 017?
14       A   (Witness complied.)
15       Q   Do you have that?
16       A   Uh-huh.
17       Q   Again, at the top of it refers to the
18   Sneak Preview at Plymouth Meeting, Pennsylvania on
19   July 12, 1988?
20       A   Yes.
21       Q   And then down in the lower portion of
22   the document or refers to "Disclaimer of
23   Warranties, Limitation of Liability."
24           Do you see that?
25       A   Yes.

26 (Pages 98 to 101)

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

---

Page 102

ATTORNEYS EYES ONLY

1          ATTORNEYS EYES ONLY
2     Q   It says, "WORKPLACE of America, Inc. and
3  REALPRO Ltd. have made every effort to verify the
4  information in this database."
5       Do you see that?
6     A   Yes.
7     Q   Reference to this database is a
8  reference to the database of listings?
9       MR. HUSICK: Object to form.
10     A   I would -- yeah, I believe it listed the
11  property listing files as yet non-existent.
12  BY MR. SMITH:
13     Q   You write and disseminate to these
14  individuals attending the sneak preview that
15  "WORKPLACE of America, Inc., and REALPRO Ltd. have
16  made every effort to verify the information in the
17  database." Am I right about that?
18       MR. HUSICK: Object.
19  BY MR. SMITH:
20     Q   That's what the document says?
21     A   I don't understand the question.  The
22  document speaks for itself.  The document also
23  says, "This is a sample report prepared for
24  demonstration purposes only."
25     Q   And it has the specific disclaimer of

---

Page 103

ATTORNEYS EYES ONLY

1          ATTORNEYS EYES ONLY
2  warranties and limitation of liability?
3     A   All of this stuff was printed for
4  distribution with a report, so this is the -- this
5  is the cover page.
6     Q   Let me ask you to turn to page that ends
7  in digits 019 in Exhibit 58?
8     A   (Witness complied.)
9       Okay.
10     Q   Did you direct that this portion of the
11  exhibit be prepared?
12     A   This is the same document that we have
13  talked about.
14     Q   It's very similar; I agree with that.
15     A   The text is, I believe, the same.
16     Q   Let me ask you to look at the portion
17  "How do I use WORKPLACE?"  Do you see that?
18     A   Yes.
19     Q   The last paragraph says, "Superimposed
20  on this map is a series of points, each of which
21  represents at least one property in the WORKPLACE
22  database.  By setting broad geographic price and
23  size ranges you can get an immediate overview of
24  the entire Metropolitan Philadelphia commercial
25  real estate market."

---

Page 104

ATTORNEYS EYES ONLY

1          ATTORNEYS EYES ONLY
2       Now, could the system do that at the
3  time?  Was it capable of doing that at the time?
4       MR. HUSICK: Object to form.
5     A   The system wasn't capable of doing that.
6  The host computer was capable of doing that.
7  BY MR. SMITH:
8     Q   Okay.  It says, "By setting a narrow
9  geographic range, you can see every interesting
10  site in a small area.  The price and size ranges
11  operate as filters to allow you to select only
12  those properties that meet your specific needs and
13  help you concentrate on your specific objectives."
14       Do you see that?
15     A   Yes.
16     Q   Was the client or user software designed
17  to do that?
18     A   It was designed to do that.  That's what
19  the specifications called for.
20     Q   And the reference there in that last
21  sentence to "you" -- I'm sorry, "to allow you to
22  select," the "you" refers to the user, does it not?
23     A   I would believe so; yes.
24     Q   All right.  Let me show you a document
25  we previously marked as Exhibit 60 (proffered.)

---

Page 105

ATTORNEYS EYES ONLY

1          ATTORNEYS EYES ONLY
2       (Exhibit 60 previously marked.)
3     A   (Witness perusing exhibit.)
4  BY MR. SMITH:
5     Q   This document is titled "WORKPLACE
6  Workshop Sales Manual."
7       Have you seen this document before,
8  Mr. Bagdis?
9     A   I've seen versions of this document.
10     Q   Did you cause either this document or
11  versions of it to be prepared?
12       MR. HUSICK: Object to form.
13     A   Well, someone prepared it at my
14  direction or at my request.
15  BY MR. SMITH:
16     Q   Fair enough.  What was the purpose of
17  this document, this sales manual?
18     A   It was to explain what the products and
19  services offered to the WORKPLACE...let me go
20  through this (perusing).
21     Q   Are you familiar with the phrase "pilot
22  program?"
23     A   With respect to what?
24     Q   In general.
25     A   I mean, I know what a pilot program is.

---

27 (Pages 102 to 105)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 106

ATTORNEYS EYES ONLY

1
2    Q    To you, what is pilot program?
3    A    It's a small-scale attempt to generate
4  or to demonstrate a larger concept.
5    Q    Take a look at the second page of
6  Exhibit 60, please?
7    A    (Witness complied.)
8    Q    Under "Product and Service Overview,"
9  the third paragraph reads, "The WORKPLACE selected
10  the Philadelphia area for a pilot program to test
11  the viability of the concepts.  Results are
12  favorable and the WORKPLACE is proceeding to expand
13  nationwide."
14        Do you see that?
15    A    Yes.
16    Q    Was a pilot program, in fact, selected
17  for the Philadelphia area with regard to the
18  WORKPLACE work?
19    A    Yes; Philadelphia was the test market.
20    Q    When was that done?
21        MR. HUSICK:  Object to form.
22    A    When was what done?
23  BY MR. SMITH:
24    Q    When was this pilot test program
25  undertaken?

Page 107

ATTORNEYS EYES ONLY

1
2    A    Well, it was never completed.  It was
3  started; I think the sneak preview was probably the
4  kickoff of it.  There was a -- Philadelphia area
5  was selected because that's where we lived.
6    Q    Let me ask you to turn to page 523 in
7  the document --
8    A    (Witness complied.)
9    Q    -- Exhibit 60.  It says under the
10  heading "Benefits Provided by WORKPLACE," and the
11  last paragraph on that page reads, "Since the
12  WORKPLACE database contains current listings and
13  price information, the WORKPLACE service can be
14  sold to sophisticated users who can then gain broad
15  insights into regional marketing trends for
16  planning purposes."
17        Do you see that?
18    A    I think it says "market trends" not
19  "marketing."
20    Q    I beg your pardon.  Was the WORKPLACE
21  service available to be sold to sophisticated users
22  at this point in time?
23    A    No.
24        MR. HUSICK:  Object to form.
25  BY MR. SMITH:

Page 108

ATTORNEYS EYES ONLY

1
2    Q    But that's what the document says,
3  doesn't it?
4    A    This is an internal sales manual
5  prepared for a sales force.  This is not
6  distributed to the public.
7    Q    The sales force was to use this document
8  to assist in the marketing of WORKPLACE, was it
9  not?
10    A    When there was a sales force.
11    Q    (Pause.)
12        Bear with me just a moment.
13        THE WITNESS:  Off the record for a
14  moment.
15        THE VIDEOGRAPHER:  We are off the record
16  at 1402 hours.
17        (Pause.)
18        We're back on the record at 1403 hours.
19  BY MR. SMITH:
20    Q    Mr. Bagdis, I want to change subjects
21  for a bit.  Are you aware of efforts by -- I'm
22  sorry, efforts by Mr. Tornetta or others acting on
23  his behalf to license the '989 and '576 patents
24  prior to the formation of REAL in December of 2002?
25    A    Am I aware?

Page 109

ATTORNEYS EYES ONLY

1
2    Q    Yes, sir.
3    A    I know there were efforts being
4  conducted.
5    Q    That's my question.  What do you know
6  about those efforts?
7    A    Not very much.
8    Q    Tell me what you know.
9    A    I know that there were letters and
10  discussions with potential users of the software
11  and attempts to get them to license the software
12  for their own particular purposes.
13    Q    Were there also lawsuits brought against
14  certain companies for purported infringement of
15  those patents prior to the formation of REAL?
16    A    Yes; I believe there were a couple of
17  lawsuits.
18    Q    Mr. Husick litigated those lawsuits on
19  behalf of REAL?
20        MR. HUSICK:  Object to form.
21  BY MR. SMITH:
22    Q    He was counsel of record for REAL in
23  those lawsuits?
24    A    I wasn't involved in the lawsuits, so if
25  he was counsel of record, I'll take your word for

REPORTED BY: Carl W. Girard, RMR
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022

www.huseby.com
(404) 875-0400

M1901
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 110

ATTORNEYS EYES ONLY

1 it.
2
3    Q   Do you know Mr. Richard Jenkins?
4    A   I believe I met him once.
5    Q   What was his relationship, if any, to
6 Mr. Tornetta prior to the formation of REAL?
7    A   I think Mr. Jenkins was a counsel to RCA
8 where Mr. Tornetta was originally working and
9 Mr. Jenkins' role was to, for RCA, find potential
10 applications and users to exploit patented
11 technology that RCA had.
12       In that role I think that's where Mark
13 met him and Mark showed him or talked to him about
14 Mark's patents and I believe Mr. Jenkins was
15 commissioned to develop potential business partners
16 for the Tornetta patents.
17    Q   Who or what was RCA?
18    A   RCA is Radio Corporation of America
19 owned by General Electric.
20    Q   Let me show you a document previously
21 marked as Exhibit 119. It's a letter to
22 Mr. Michael Marvin at MapInfo from Mr. Jenkins
23 dated August 16th 1994. It references the '989
24 patent.
25       (Exhibit 119 previously marked.)

Page 111

ATTORNEYS EYES ONLY

1
2 BY MR. SMITH:
3    Q   Have you seen this document before?
4    A   No.
5    Q   Were you aware of Mr. Jenkins' writing
6 to MapInfo in August of 1994 --
7    A   No.
8    Q   -- about the '989 patent?
9    A   No.
10    Q   Let me show you a document previously
11 marked as Exhibit 69 (proffered.)
12    A   This identifies him as chairman. Is
13 there a letterhead that --
14    Q   Not that I have, Mr. Bagdis. I doubt he
15 was chairman of GE or RCA but we don't know that.
16 Let me show you a document marked as Exhibit 69.
17       This is from Mr. Tornetta to a
18 Mr. Richard Jansen at Realselect, dated December
19 30th, 1997 referencing the website www.Realtor.Com
20 and indicating that website may infringe the claims
21 of the '576 and '989 patents. Do you see that?
22    A   Yes.
23       (Exhibit 69 previously marked.)
24 BY MR. SMITH:
25    Q   Were you aware Mr. Tornetta wrote this

Page 112

ATTORNEYS EYES ONLY

1 document in late 1997 and sent it to Mr. Jansen in
2 Realselect?
3    A   No.
4    Q   Are you aware that Realselect is a
5 predecessor to Home Store?
6    A   Yes.
7    Q   Are you aware that Home Store is a
8 predecessor to Move?
9    A   I think so.
10    Q   Let me show you a document we previously
11 marked as Exhibit 70 (proffered.)
12       (Exhibit 70 previously marked.)
13 BY MR. SMITH:
14    Q   This is a letter from Mr. Tornetta to
15 Mr. Layne Morrill at The National association of
16 Realtors dated January 5, 1998, referring to the
17 website realtor.com and indicating that it may
18 infringe the claims of the '576 and '989 patents?
19       Do you see that.
20    A   Yes.
21    Q   Were you aware that Mr. Tornetta wrote
22 this letter?
23    A   No.
24    Q   Let me show you a document we previously

Page 113

ATTORNEYS EYES ONLY

1 marked as Exhibit 123 (proffered.)
2       (Exhibit 123 previously marked.)
3 BY MR. SMITH:
4    Q   This is a memorandum from Mr. Tornetta
5 to Mr. Layne Morrill, President of The National
6 Association of Realtors, dated January 29, 1989,
7 referencing, putting him on notice of possible
8 patent infringement on the '576 and '989 patents.
9       Have you seen this document before?
10    A   No.
11    Q   Now, you do -- what do you understand
12 The National Association of Realtors to be?
13       MR. HUSICK:   Object to form.
14    A   A National Association of Realtors.
15 BY MR. SMITH:
16    Q   Anything beyond that, any understanding
17 beyond that?
18    A   No.
19    Q   Was there discussion at this point in
20 time between you and Mr. Tornetta that The National
21 Association of Realtors, Realselect might be
22 infringing the claims of either the '576 or '989
23 patents?
24    A   In 1998?

29 (Pages 110 to 113)

REPORTED BY: Carl W. Girard, RMR
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022
www.huseby.com
(404) 875-0400
M1902
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY
Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis
2:07-CV-92185
September 9, 2009

Page 114

ATTORNEYS EYES ONLY

1
2      MR. HUSICK:  Object to form.
3   BY MR. SMITH:
4      Q   In 1997 and 1998.
5      MR. HUSICK:  Object to form, and caution
6   the witness not to reveal the content of any
7   attorney/client privilege.
8      MR. SMITH:  There's no indication he was
9   serving as the company's attorney at this point
10  with regard to those matters.
11     MR. HUSICK:  We don't even know what
12  company you're referring to.
13     A   Right.  I guess repeat the question
14  again.
15  BY MR. SMITH:
16     Q   Did you have any discussions with
17  Mr. Tornetta in late 1997 or early 1998 about the
18  possibility that The National Association of
19  Realtors was infringing the claims of either of
20  Mr. Tornetta's patents?
21     A   Any discussions that I would have had
22  with Mr. Tornetta during that period of time would
23  have been covered by attorney/client privilege.
24     Q   Were you acting as Mr. Tornetta's
25  attorney at that time?

Page 115

ATTORNEYS EYES ONLY

1
2      A   I acted as Mr. Tornetta's attorney for a
3   significant period of time, and in general my
4   experience has been that once you're a lawyer,
5   everybody thinks you're always their lawyer and I
6   conduct myself appropriately.
7      Q   Well, surely, Mr. Tornetta didn't think
8   that when you were negotiating the contract between
9   Synermation and his company and acting on
10  Mr. Acosta's behalf?
11     A   And there was a full disclosure of that.
12  I actually discussed -- I don't think I even
13  represented -- at the time the people were
14  face-to-face.
15     Q   What sort of legal services were you
16  providing Mr. Tornetta in late 1997, early 1998?
17     A   Primarily discussions in answering of
18  questions when he would have a question.
19     Q   Were all of his questions to you
20  strictly of a legal nature?
21     A   No; other than "you want to go have a
22  beer?"  Pretty much, Mark pretty much 100 percent
23  of the time business guy.
24     Q   Were you charging him for your legal
25  services?

Page 116

ATTORNEYS EYES ONLY

1
2      A   Well, my compensation for involvement in
3   this process was an equity interest in the ultimate
4   results of what happens.
5      Q   What equity interest was that?
6      A   That's the interest that was represented
7   ultimately at this point by the equity in the Real
8   Estate Alliance, Ltd. which is now the licensee of
9   the patents.
10     Q   Did you have any equity interest prior
11  to the formation of, any formal equity interest
12  prior to the formation of REAL in Mr. Tornetta's
13  patents or any revenues associated with licensing
14  those patents?
15     A   Yes.
16     Q   And how was that memorialized?
17     MR. HUSICK:  Object to form.
18     A   I don't really remember.
19  BY MR. SMITH:
20     Q   Was it memorialized?
21     A   I believe so.
22     Q   Was that in a document that you
23  prepared?
24     A   Probably.
25     Q   Did you sign it?

Page 117

ATTORNEYS EYES ONLY

1
2      A   Yes.
3      Q   Did Mr. Tornetta sign?
4      A   I assume he signed it.
5      Q   When have you most recently seen that
6   document?
7      A   A long time ago.  I mean --
8      Q   I'm sure the document in fact ever
9   existed?
10     A   Yes; I'm reasonably sure that the
11  document existed.
12     Q   Well, it hasn't the been produced and we
13  would, of course, like it.  I'll put that to your
14  lawyer.  We need to change the tape.
15     THE VIDEOGRAPHER:  We are off the record
16  at 1413 hours.  This is the end of tape No. 2.
17     (Change tape.)
18     MR. SMITH:  Mark that as the next
19  exhibit.
20     (Exhibit 153 marked for identification.)
21     THE VIDEOGRAPHER:  This is beginning of
22  tape No. 3.  We are back on the record at 1416
23  hours.
24  BY MR. SMITH:
25     Q   We have handed you a document,

REPORTED BY: Carl W. Girard, RMR
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022
www.huseby.com
(404) 875-0400

M1903
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY
Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis
2:07-CV-92185
September 9, 2009

Page 118

ATTORNEYS EYES ONLY

1
2  Mr. Bagdis, that was marked as Exhibit 153.  It
3  appears to be a letter from an attorney at the
4  Venable law firm to you dated February 20, 1998.
5      Do you recall receiving this document?
6      A  I don't recall receiving it but it has
7  our stamp on it.
8      Q  And is it sent to your correct address
9  as of February 1998?
10     A  I'm not sure.
11     Q  At some point did you have an office at
12  1536 Dekalb Pike, Blue Bell, Pennsylvania?
13     A  Yes.
14     Q  And the attorney's name at Venable
15  appears to be James Burdett.  Did you ever meet
16  him?
17     A  No; I don't think I met him.
18     Q  You spoke with him over the phone?
19     A  He says, "Thank you for taking my call,"
20  so I believe I did speak with him on the phone.
21     Q  Did you communicate with him about the
22  need for his client GeoSystems Global Corporation
23  to take a license to either of the '576 or '989
24  patents?
25     A  Did I communicate to him the need?

Page 119

ATTORNEYS EYES ONLY

1
2      Q  Yes.
3      A  I don't believe I said that.
4      Q  Did you communicate to him about
5  GeoSystems Global Corporation?
6      A  I don't believe I told -- said anything
7  about GeoSystems Global Corporation.
8      Q  What do you recall about your
9  communications with him?
10     A  I believe he called me and asked what
11  the patents were, and I probably explained it to
12  him and I sent him copies in response to the
13  request here.
14     Q  Do you have any understanding as to why
15  he contacted you about the patents?
16     A  My guess is that Mr. Tornetta gave him
17  my phone number.
18     Q  Did you discuss with him the possibility
19  that his clients might be infringing, or his client
20  might be infringing either of the two patents?
21     A  I'm sure he asked about that.
22     Q  Do you recall what your response was?
23     A  No.
24     Q  During the 1998 period did you initiate
25  any communications with anyone with regard to the

Page 120

ATTORNEYS EYES ONLY

1
2  need for them or perhaps their clients to take a
3  license to either the '576 or '989 patents?
4      A  What do you mean by initiate?
5      Q  You initiate the communications as
6  opposed to having someone contact you in the first
7  instance.
8      A  I didn't initiate any contacts.
9      Q  Do you recall having any communications
10  in the 1998 timeframe about persons or entities
11  taking licenses to either of the Tornetta patents
12  other than this communication with Mr. Burdett?
13     A  I know we discussed the situation with
14  Bill Gates.
15     Q  Of Microsoft?
16     A  Of Microsoft.
17     Q  Did you participate in those
18  discussions?
19     A  I did.  It was a face-to-face meeting.
20     Q  With Mr. Gates?
21     A  Yes.
22     Q  Did Mr. Gates' company take a license?
23     A  No.
24     Q  Did litigation between Mr. Tornetta and
25  MicroSoft later ensue?

Page 121

ATTORNEYS EYES ONLY

1
2      A  I know there's litigation; I don't know
3  the specific formal names of the parties involved
4  were.
5      MR. SMITH:  Can we have that marked as
6  the next exhibit number.
7      (Exhibit 154 marked for identification.)
8  BY MR. SMITH:
9      Q  We have handed you a document marked as
10  Exhibit 154.  It appears to be a Complaint filed in
11  the United States District Court for the Eastern
12  District of Pennsylvania marked Tornetta versus
13  MicroSoft Corporation and Moore U.S.A., Inc., and
14  on the last page it is dated December 2, 1998 and
15  was filed on behalf of the Plaintiff, Mark Tornetta
16  by Mr. Husick and Mr. Weinberger.
17      Do you see that?
18     A  I'm getting there (witness perusing
19  exhibit.)
20     Q  Have you seen the document before, sir?
21     A  I don't think so.
22     Q  Okay.  Do you recognize that as the
23  Complaint that Mr. Tornetta filed against Microsoft
24  and Moore U.S.A. in December of 1998?
25     A  Well, I recognize it as a Complaint;

31 (Pages 118 to 121)

REPORTED BY: Carl W. Girard, RMR
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022
www.huseby.com
(404) 875-0400
M1904
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

---

Page 122

ATTORNEYS EYES ONLY
1
2   yes.
3       Q   Do you know what the disposition of that
4   litigation was?
5       A   MicroSoft removed Home Adviser from the
6   Internet which made the action against Microsoft
7   moot.
8           MR. SMITH:  Well, I'm going to move to
9   strike the answer as non-responsive.
10      A   Ask the question again, then.
11      Q   Do you know what the disposition -- do
12  you know how the lawsuit -- do you know what the
13  disposition of the litigation was?
14      A   I believe the lawsuit was withdrawn.
15      Q   By Mr. Tornetta?
16      A   Yes.
17      Q   Can you mark that as our next exhibit,
18  please.
19          (Exhibit 155 marked for identification.)
20      A   (Witness perusing exhibit.)
21  BY MR. SMITH:
22      Q   Exhibit 155 appears to be dated July
23  27th 1999 and it is entitled "order" and it
24  indicates "AND NOW, this 26th day of July, 1999,
25  upon consideration of defendant MicroSoft

---

Page 123

ATTORNEYS EYES ONLY
1
2   Corporation's Motion for Summary Judgment and
3   Plaintiff Mark Tornetta's letter response stating
4   he does not oppose the motion and will re-file, is
5   ordered that Defendant's Motion for Summary
6   Judgment is granted."
7           Do you see that?
8       A   Yes.
9       Q   What do you understand a motion for
10  summary judgment to be?
11      A   What do I understand the motion for
12  summary judgment?
13      Q   Yes.
14      A   It is dispositive of whatever was
15  pending with or without prejudice.
16      Q   And this indicates that the action is
17  dismissed Without prejudice, does it not?
18      A   Right.
19      Q   Okay.  Later on, did Mr. Tornetta also
20  institute litigation against Moore U.S.A. and
21  MapQuest with regard to the '989 and '576 patents?
22      A   I believe so.
23      Q   Let me ask you to mark that as the next
24  exhibit, please.
25          (Exhibit 156 marked for identification.)

---

Page 124

ATTORNEYS EYES ONLY
1
2   BY MR. SMITH:
3       Q   Do you recognize Exhibit 156 (proffered)
4   to be a Civil Cover Sheet and a Complaint filed by
5   Mr. Tornetta against Moore U.S.A. and MapQuest in
6   December of 1999?
7       A   (Witness perusing exhibit.)
8           That's what it says.
9           MR. SMITH:  And, Mr. Husick, can we
10  stipulate to that?
11          MR. HUSICK:  This is not the signed
12  version and so with that reservation -- the Cover
13  Sheet is signed; the attached Complaint is not and
14  can't as we sit hear say that it's the Complaint
15  that accompanied the Cover Sheet.  We can stipulate
16  to the Cover Sheet.
17  BY MR. SMITH:
18      Q   Do you know what the disposition of this
19  litigation was, Mr. Bagdis?
20      A   I don't; no.
21      Q   Wasn't it, in fact, dismissed for lack
22  of prosecution?
23      A   I don't know.  I said I don't know.
24      Q   Let me show you the next exhibit.
25          (Exhibit 157 marked for identification.)

---

Page 125

ATTORNEYS EYES ONLY
1
2       A   (Witness perusing exhibit.)
3   BY MR. SMITH:
4       Q   Exhibit 157 is a document titled "Order"
5   in the lawsuit styled Mark Tornetta versus Moore
6   U.S.A. and others.  It is dated June 8, 2000 and
7   after several recitals it says, "It is ORDERED that
8   this case is dismissed for lack of prosecution in
9   accordance with Federal Rule of Civil Procedure
10  4(m)."
11          Do you see that?
12      A   That's what it says.
13      Q   Any reason to doubt that's what
14  happened?
15      A   No.
16      Q   Now, I'll tell you, Mr. Bagdis, I don't
17  have a copy of the document but at about this time
18  in late 1999, at the time of the lawsuit that's
19  been marked as Exhibit 156, there was a separate
20  lawsuit brought by Mr. Tornetta against Microsoft,
21  was there not?
22      A   I don't know that.
23      Q   Don't know that.  Did you ever hear
24  anything about a separate lawsuit against MicroSoft
25  for patent infringement brought by Mr. Tornetta?

---

32 (Pages 122 to 125)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

---

Page 126

ATTORNEYS EYES ONLY

1  
2    A   Separate as opposed to --
3    Q   The prior lawsuit that had --
4    A   The one that was dismissed or the one
5  that was withdrawn?
6    Q   Yes, sir.
7    A   I knew that there were -- I knew that
8  there were two lawsuits.
9    Q   We've seen one lawsuit against Microsoft
10  and Moore that was brought in December of 1998?
11    A   Yes.
12    Q   We've seen a second lawsuit in December
13  of 1999 against Moore and MapQuest. Are you aware
14  that there was also a third lawsuit brought by
15  Mr. Tornetta against just MicroSoft?
16    A   Not directly aware; no.
17    Q   What does that mean, directly? Were you
18  indirectly made aware?
19    A   I didn't know there was -- I didn't know
20  there was a separation of the lawsuits.
21    Q   Okay.
22    A   As far as I knew, there was litigation
23  with Microsoft and there was litigation with Moore.
24  The status of it or the procedural niceties I have
25  no idea about nor did I care.

---

Page 127

ATTORNEYS EYES ONLY

1  
2    Q   Okay.
3    MR. SMITH: Mark that, please.
4    (Exhibit 158 marked for identification.)
5  BY MR. SMITH:
6    Q   We've handed you a document marked as
7  Exhibit 158. It appears to be a string of e-mails
8  from September of 2000 with you copied on the
9  e-mails and the e-mails being between Mr. Mark
10  Shaftal S-H-A-F-T-A-L and Mark Tornetta.
11    Have you seen these before?
12    A   (Witness perusing exhibit.)
13    No, not all of them.
14    Q   Have you seen any of them before?
15    A   (Witness perusing.)
16    I'm trying to figure out which order
17  they are in. Are they --
18    Q   For the most part, it reads with the
19  most current e-mail first and --
20    A   It started here (indicating?)
21    Q   Yeah. Mr. Bagdis, I think your name
22  shows up first on the e-mail that appears in the
23  middle of the second page of Exhibit 158, that's
24  from Mr. Tornetta to Mr. Shaftal?
25    A   Which page is it?

---

Page 128

ATTORNEYS EYES ONLY

1  
2    Q   It ends in digits 023 in the lower
3  right-hand corner.
4    A   (Witness perusing.)
5    Q   You see there it says, "Hello, Max.
6  Thank you for scheduling this conference call.
7  Lawrence as well at Jay Bagdis (our other partner,
8  also a lawyer) will be ready to answer the
9  questions."
10    Do you recall having any discussions
11  with Mr. Shaftal about one of his clients?
12    A   Yes. That's what I was looking for. I
13  remember that e-mail.
14    Q   Okay. Did Mr. Shaftal or his client
15  ever take a license to either the '576 or '989
16  patents, to your knowledge?
17    A   Not to my knowledge.
18    Q   And then if you look on the first page
19  of Exhibit 158, in the middle of the page, is an
20  e-mail from Mark Tornetta to Max Shaftal's Tuesday,
21  September 5, 2000, 2:41 p.m. Do you see that?
22    A   That says "you're back on vacation?"
23    Q   Yes. What is -- the subject reads what?
24  Can you read that for us?
25    A   "Accusation of infringement of US Patent

---

Page 129

ATTORNEYS EYES ONLY

1  
2  No. 5,032,989 by equityoffice dot-com.
3    Q   Did you understand EquityOffice to be
4  Mr. Shaftal's client.
5    A   Yes.
6    Q   And EquityOffice and Mr. Tornetta here
7  refers to accusation of infringement of the '989
8  patent and to your knowledge EquityOffice never
9  took a license to the patent?
10    A   To my knowledge they did not.
11    Q   And to your knowledge did Mr. Tornetta
12  or any company controlled by him ever institute
13  patents infringement litigation against
14  EquityOffice over the '989 patent?
15    A   I don't know.
16    Q   You're not aware of any?
17    A   I'm not aware of any; no.
18    Q   Let me you show you a document that we
19  previously marked as Exhibit 116. It is obviously
20  rather voluminous and what I'd like to know at the
21  beginning, Mr. Bagdis, is if this is a document
22  that you have any familiarity with whatsoever, have
23  you ever seen it before?
24    (Exhibit 116 previously marked.)
25    A   (Witness perusing Exhibit.)

---

REPORTED BY: Carl W. Girard, RMR
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022

www.huseby.com
(404) 875-0400

M1906
EXHIBIT MX-52

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

---

Page 130

ATTORNEYS EYES ONLY

1
2    This document as it was put together?
3  BY MR. SMITH:
4    Q   Yes, sir; it was produced to us in this
5  fashion.
6    A   I've seen parts of it.
7    Q   Let me direct your attention to portions
8  of it because it is rather large, and I think, if
9  we break it down, it might be helpful.
10    A   Okay.
11    Q   I'm going to refer to the numbers in the
12  lower right-hand corner by the last three digits?
13    A   Yes.
14    Q   If you would take a look at 097 to 103
15  right at the very beginning of the document?
16    A   (Witness complied.)
17    Okay.
18    Q   Do you recognize these pages?
19    A   No.
20    Q   If you would turn to the next page 104?
21    A   (Witness complied.)
22    Q   This appears to be a one-page document
23  made November 28, 2002 to Mr. Rooke from
24  Mr. Jenkins.  Have you seen this document before?
25    A   No.

---

Page 131

ATTORNEYS EYES ONLY

1
2    Q   If you would turn with me to page 114?
3    A   (Witness complied.)
4    Q   Have you seen this document before?
5    A   I'm getting there.
6    Q   Yes, sir.
7    A   (Witness perusing.)
8    Okay.
9    Q   Are you familiar with this page?
10    A   No.
11    Q   If you would, take a look at pages 115
12  through 123?
13    A   (Witness complied.)
14    Q   They seem to be dated September,
15  November -- August through November of 2002.  Just
16  tell me if you've seen these pages before?
17    A   (Witness perusing exhibit.)
18    MR. HUSICK:  I'll just note for the
19  record it appears that the header and footer
20  information on these pages may not be related to
21  the content and that someone may have reused blank
22  printout pages for purposes of making notes.
23    MR. SMITH:  That's a possibility.
24    Q   Do you recognize these handwritten
25  pages?

---

Page 132

ATTORNEYS EYES ONLY

1
2    A   No.  The first time I saw them was
3  yesterday.
4    Q   You did see them yesterday?
5    A   Yes.
6    Q   Do you have any idea whose handwriting
7  this is?
8    A   No.
9    Q   Then if you would turn to page 122?
10    A   (Witness complied.)
11    Okay.
12    Q   Upper right-hand is a reference to Alex
13  Franco, patent counsel.  Do you see that?
14    A   Uh-huh.
15    Q   Do you know Mr Alex Franco?
16    A   No.
17    Q   If you would turn to page 124 to page
18  135?
19    A   Say it again.
20    Q   124-to-135?
21    A   Oh, okay.  (Witness complied.)
22    Q   Do you know -- have you seen these pages
23  before?
24    A   These particular page, no.
25    Q   All right.  Let's go over to page 139?

---

Page 133

ATTORNEYS EYES ONLY

1
2    A   This looks like it comes off a website.
3  I may have seen the website.
4    Q   The first reference is to realtor.com?
5    A   What page are you on?
6    Q   139.  Do you have any understanding as
7  to why --
8    A   What is -- I'm still back on Real Trends
9  500.
10    Q   Sorry.
11    MR. HUSICK:  Is your prior answer
12  related to the document which begins at page 124,
13  Mr. Bagdis?
14    THE WITNESS:  Yes.
15    A   I recall seeing this rank but not in
16  this form.  This looks like the 500, you know, like
17  the Fortune 500.  I believe I saw this on a
18  website.  I'm not sure -- I don't think I saw it in
19  this form but I'm familiar with it because I'm
20  looking at some of these companies.  I remember
21  looking them up at the time because I had friends
22  that were working at some of them.
23  BY MR. SMITH:
24    Q   Why did you look up these companies at
25  the time?

---

REPORTED BY: Carl W. Girard, RMR
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022

www.huseby.com
(404) 875-0400

M1907
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 134

ATTORNEYS EYES ONLY

1      A   I might have gotten -- I don't know, but
2  I believe I saw them on the Internet.
3      Q   Well, there was some purpose behind your
4  activities?
5      A   Yes; just the same thing as you look at
6  Forbes 400, and the Fortune 500.  This was
7  another -- I'm an information junky.  This was
8  another source of ranked information and things
9  like that.
10     Q   Were you looking at these companies as
11 potential licensees of the Tornetta patents?
12     A   We were always looking for potential
13 licensees of the Tornetta patents; that was the
14 whole game plan.
15     Q   Specifically, your exercise with regard
16 to the computer and the websites were you looking
17 for licensees?
18     A   We were all looking at licensees and
19 whenever anybody found something that would be a
20 potential candidate for a license, we either
21 printed it or shipped it to Mark or told it to mark
22 or whatever.  I did, all of my friends did, anybody
23 that I knew, you know, "Hey."
24     Q   You sent this information to
25

Page 135

ATTORNEYS EYES ONLY

1  Mr. Tornetta for what purpose?
2      A   Because he was maintaining basically a
3  marketing database as I would look at it as.
4      Q   Marketing database in what respect?
5      A   Potential business partners.  I mean,
6  the name of our business was Real Estate Alliance.
7      Q   Potential licensees?
8      A   Potential licensees, yeah, joint
9  venturers; some kind of deal.
10     Q   And, if necessary, defendants in patent
11 infringement litigation?
12     A   I suppose that's always a necessary
13 part.
14     Q   Let me ask you to turn over to page 139
15 through page 143 and ask you if you recognize that
16 portion of Exhibit 116?
17     A   (Witness complied.)
18         How far do we go?
19     Q   143.
20     A   (Witness perusing exhibit.)
21         Okay.  What's your question?
22     Q   Do you recognize that portion of Exhibit
23 116?
24     A   No.
25

Page 136

ATTORNEYS EYES ONLY

1      Q   Never seen it before?
2      A   I don't remember seeing it.  I remember
3  looking at the last legend Enviromapper.  I
4  remember there being discussions about a potential
5  application for environmental land swaps which
6  needed mapping to locate and there was a passing
7  remark and that's the extent of my knowledge of it.
8      Q   Page 144, do you recognize -- strike
9  that.  Page 144, have you seen that before?
10     A   No.
11     Q   And then pages 145 to 149, have you seen
12 those pages before?
13     A   Well, other than yesterday; no.
14     Q   Any -- strike that.  Do you know whose
15 handwriting appears on pages 145 to 149?
16     A   Do I recognize it?  No.  It's not mine.
17 It's too legible.
18     Q   Beginning on page 150 through 152, do
19 you recognize that document?
20     A   No.
21     Q   Any of the handwriting yours?
22     A   No.
23     Q   Flip over to 158?
24     A   (Witness complied.)
25

Page 137

ATTORNEYS EYES ONLY

1      Q   Through the end of the document, have
2  you seen those pages before?
3      A   What happened to 154?
4      Q   I think we skipped over it unless you
5  want to go back and tell me something about it?
6      A   No, you just -- I'm turning them in
7  sequence and I don't remember you talking -- all
8  right.  158.
9      Q   Do you recognize that handwriting?
10     A   No.
11     Q   Have you seen a portion of Exhibit 116
12 that begins at page 158 through the end of the
13 document, have you seen that before other than
14 yesterday?
15     A   No.
16     Q   You can put that one down.
17     A   You put this page in here, you asked me
18 about this one.  Wasn't that one of the other
19 pages?  Was that Alex Franco?
20     Q   It may be.  It may be in there twice.
21 What page?
22     A   167.
23     Q   There may be some minimal duplication in
24 there.
25

M1908
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 138

ATTORNEYS EYES ONLY
1
2    A    Yes; it's also 122.
3    Q    Okay.  Mr. Bagdis, I'm going to show you
4  a document now previously marked as Exhibit 118.
5  That appears to be a letter from you to Mr. Steve
6  Friedman at the Dilworth Paxson law firm.
7        (Exhibit 118 previously marked.)
8  BY MR. SMITH:
9    Q    Do you see that?
10   A    Yes.
11   Q    Is that your signature at the bottom?
12   A    Yes.
13   Q    Now, there doesn't appear to be a date
14  on this document.  Do you recall approximately when
15  you authored it and sent it to Mr. Friedman?
16   A    No.  I don't.
17   Q    Would it have been at or about the time
18  that Real Estate Alliance was formed?
19   A    It would have been after Real Estate
20  Alliance was formed.  My guess it would be; again,
21  it's a guess.
22   Q    You say, "We are pleased to enclose duly
23  executed elements of the Representation Agreement
24  we so carefully negotiated?"
25   A    Yes.

Page 139

ATTORNEYS EYES ONLY
1
2    Q    I take it this was what lawyers would
3  call an engagement letter or representation
4  agreement between the Dilworth Paxson law firm in
5  Philadelphia and the Real Estate Alliance?
6    A    Yes.
7        MR. HUSICK:  Object to form.
8  BY MR. SMITH:
9    Q    You participated in the negotiation of
10  that document?
11       MR. HUSICK:  Object to form.
12   A    Object to form.
13       Yes, I did.
14  BY MR. SMITH:
15   Q    And according to this letter at least it
16  was a carefully negotiated document?
17       MR. SMITH:  Object to form.
18   A    Yes.  Is that a question?
19  BY MR. SMITH:
20   Q    Yes.
21   A    Yes; it was.
22   Q    It was carefully negotiated?
23   A    Yes.
24   Q    Let me show you a document we previously
25  marked as Exhibit 117 (proffered.)

Page 140

ATTORNEYS EYES ONLY
1
2        (Exhibit 117 previously marked.)
3  BY MR. SMITH:
4    Q    That appears to be a Draft
5  Representation Agreement to Mr. Tornetta from
6  Mr. Friedman at Dilworth Paxson.
7        Have you seen this document before?
8    A    Yes.
9    Q    When have you most recently seen it?
10   A    Yesterday.
11   Q    Have you seen a subsequent version of
12  this Representation Agreement?
13   A    Yes.
14   Q    Did you see that yesterday?
15   A    Well, I saw it when it was executed.
16   Q    As per Exhibit 118, your transmittal
17  letter?
18   A    Yes.
19       MR. SMITH:  Mr. Husick, no big deal, one
20  of the younger lawyers at Proskauer Rose endeavored
21  to get that document to us yesterday and didn't
22  come through.  Do you by any chance have a copy?
23       MR. HUSICK:  I do not have a copy.  I'm
24  not permitted to bring my laptop in.
25       MR. SMITH:  We had the same sort of

Page 141

ATTORNEYS EYES ONLY
1
2  issue.  I don't think it is a big deal.
3    Q    Now, do you recognize Exhibit 117,
4  Mr. Bagdis, to be a draft of the proposed
5  Representation Agreement between the Dilworth
6  Paxson firm and Real Estate Alliance?
7    A    Yes; it's a draft.
8    Q    And in this particular -- strike that.
9        Do you know who prepared this draft?
10  Was it Dilworth Paxson or yourself?
11   A    Dilworth.
12   Q    And was the way things transpired that
13  Dilworth would prepare the drafts, forward them to
14  you and perhaps Mr. Tornetta and you would comment
15  on them and then return the drafts with possible
16  edits to Mr. Friedman at Dilworth?
17   A    That seems right.
18   Q    Then under "Scope of Engagement" on page
19  1, the draft letter states, "You have asked us to
20  represent you in connection with enforcement of
21  your U.S. Patent '989 in a substantial licensing
22  program involving numerous potential infringers and
23  with possible infringement litigation against one
24  or more significant infringers."
25       Do you see that?

36 (Pages 138 to 141)

M1909
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 142

ATTORNEYS EYES ONLY
1
2     A   Yes.
3     Q   An had represents of REAL as of
4  November -- I'm sorry.  As of November 25, 2002 had
5  Mr. Tornetta and others acting on his behalf, in
6  fact, asked Dilworth Paxson to assist with regard
7  to the '989 patent in these regards?
8     A   Yes.
9     Q   And then goes on to say, "The
10 enforcement program will proceed in three stages:
11 No. 1 is due diligence."
12        Do you see that?
13     A   Yes.
14     Q   And No. 2, "To develop a licensing
15 program."  Do you see that?
16     A   Yes.
17     Q   And the third stage of the enforcement
18 program will be "develop a litigation strategy
19 and litigation targets."
20        Do you see that?
21     A   Yes.
22     Q   Thank you.  I realize we don't have the
23 fully-executed engagement letter with us, but to
24 the best of your recollection did the final
25 Representation Agreement contain that three-step

Page 143

ATTORNEYS EYES ONLY
1
2  enforcement program?
3     A   Well, it was -- that was the order of
4  the proceedings.  It was the due diligence, then it
5  was licensing program and then it was litigation if
6  necessary.
7     Q   Mr. Bagdis, I'm going to show you a
8  document now that we've marked as Exhibit 75
9  (proffered).
10        (Exhibit 75 previously marked.)
11 BY MR. SMITH:
12     Q   This appears to be an agenda for meeting
13 of the Real Estate Alliance Shareholders and
14 Directors dated December 10, 2003.
15        It indicates that in attendance are
16 Mr. Tornetta, Mr. Rooke, Mr. Husick and yourself.
17        Do you see that?
18     A   Yes.
19     Q   Do you recall this meeting?
20     A   Yes.
21     Q   It starts off, "Salutations:  MC/HH."
22        Do you have any understanding as to who
23 MC and HH are?
24     A   Yes.
25     Q   Who are they?

Page 144

ATTORNEYS EYES ONLY
1
2     A   Merry Christmas and Happy Hanukkah.
3     Q   Very good.  And it then says, "What's
4  Next - who are the first targets - trusts, Tower,
5  MLS, Hotel, Portal, Builder???"
6        Do you see that?
7     A   Yes.
8     Q   What's that a reference to?
9     A   Where would the first efforts be
10 expended or the next efforts be expended in terms
11 of developing economic benefit from these patents
12 in whatever form.
13     Q   By whatever form, you mean either
14 licensing or, if necessary, litigation?
15     A   Yes.
16     Q   And No. 3, "How many in first round?"
17        Is that a reference to how many
18 companies or individuals the Real Estate Alliance
19 will pursue for either licensing or litigation
20 efforts?
21     A   Yes.  I think it had to do with the
22 scope of, we had finite resources and there were
23 thousands of potentials.
24     Q   You had Mr. Rooke's $4 million to work
25 with, too, didn't you?

Page 145

ATTORNEYS EYES ONLY
1
2     A   Yes.
3     Q   And then it says, "What needs to be done
4  prior to filing?"
5        What do you understand that to mean or
6  what did that mean?
7     A   Well, it meant exhausting all of the
8  peaceful alternatives of licensing, negotiation,
9  joint venture, whatever the arrangements could be
10 worked out, and, if not, filing would be a last
11 resort.
12     Q   Filing of litigation?
13     A   Filing of litigation.
14     Q   When did you most recently see this
15 document?
16     A   Yesterday.
17     Q   And item 5 "Records-Kreamer Rooke."
18        Do you see that?
19     A   Yes.
20     Q   What is that a reference to?
21     A   Kreamer Rooke is Andy Rooke's son.  He
22 was to put all of the records and stuff like that
23 that we went through with all this other stuff and
24 I guess in computerized usable format so that it
25 could be accessed efficiently.

37 (Pages 142 to 145)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 146

ATTORNEYS EYES ONLY

1
2   Q   And to your knowledge, did he do that?
3   A   I don't know.
4   Q   But the notion was that Mr. Andy Rooke's
5   son would computerize all the references to the
6   various companies and individuals who might
7   potentially need a license --
8   A   I actually do know.
9       MR. HUSICK:  Object to form.
10  A   He did some because there was a -- there
11  was a substantial data updated database created.
12  BY MR. SMITH:
13  Q   Who directed Mr. Kreamer Rooke to do
14  that?
15  A   I believe Mr. Tornetta and Andy, his
16  father.
17  Q   Do you know what happened to that
18  database?
19  A   No.
20  Q   Did you ever access it?
21  A   Did I ever access it?
22  Q   Yes.
23  A   No.
24  Q   What was on that database?
25  A   I didn't access it; I don't know.

Page 147

ATTORNEYS EYES ONLY

1
2   Q   Do you know what was intended to be in
3   the database?
4   A   I would assume name, rank, and serial
5   number, a web reference, but other than that, I
6   have no idea.
7   Q   Name, rank, serial number and web
8   reference to what?
9   A   Potential partners, licensees.
10  Q   And then it says, "License agreement -
11  changes, additions, your thoughts."
12      What does that mean?
13  A   I don't think there was a final license
14  agreement prepared.  I think it was still in flux
15  and to the best of my knowledge I didn't see a
16  final license agreement completed.
17  Q   Then item 7, "Tornetta Realty license -
18  Frank Tornetta."  What's a reference to?
19  A   Well, Tornetta was Mark's -- Frank
20  Toretta is Mark's brother.  The Tornetta family is
21  a very substantial commercial realtor in Montgomery
22  County, Pennsylvania, and I believe there was a
23  license that was being discussed as to how they
24  were going to handle that.
25  Q   Do you know if that license was ever

Page 148

ATTORNEYS EYES ONLY

1   finalized?
2   A   I don't know.
3   A   I don't know.
4   Q   Item 8 is, "Dilworth Performance Review.
5   Are we happy, can we do better?"  Was there some
6   dissatisfaction with the Dilworth firm in December
7   of 2003?
8   A   I believe that's privileged information
9   and I'm not going to discuss that.
10  Q   Well, mister -- I don't want to argue
11  with you, Mr. Bagdis, but if there were discussions
12  between REAL and the Dilworth firm, I might agree
13  with you but, if it's simply internal discussions
14  within these four individuals as to whether REAL --
15  whether Dilworth Paxson was performing its function
16  appropriately, I don't frankly see how that's
17  privileged.
18      MR. HUSICK:  Objection.  To the extent
19  that you can answer the question without revealing
20  the contents of discussions between Real Estate
21  Alliance and any of its counsel, you may do so.
22  A   There was a discussion of Dilworth's
23  performance.
24  BY MR. SMITH:
25  Q   Were there issues with regard to whether

Page 149

ATTORNEYS EYES ONLY

1
2   they were doing the job in an appropriate fashion?
3       MR. HUSICK:  Same objection.
4   A   I think that's privileged information.
5   BY MR. SMITH:
6   Q   Well, again, I don't want to argue with
7   either one of you, but, if the four of you were
8   just sitting around talking about the performance
9   of the law firm, I don't see how that relates to
10  the giving or receipt of legal advice, whether
11  you're simply discussing whether your lawyers are
12  doing a good job or good enough job.  Frankly I
13  don't see how that's privileged.
14      MR. HUSICK:  Same objection.  To the
15  extent that you can reveal the content without
16  revealing the content of any discussion with Real
17  Estate Alliance and any of its lawyers.
18  A   Two of the four people in that
19  discussion were attorneys, both of whom represented
20  Real Estate Alliance and Dilworth also represented
21  Real Estate Alliance, so it was executives and
22  attorneys discussing the performance of their
23  attorneys, and I'm not going to go into the content
24  of their discussion.
25  BY MR. SMITH:

38 (Pages 146 to 149)

REPORTED BY: Carl W. Girard, RMR
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022

www.huseby.com
(404) 875-0400

M1911
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY
Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis
2:07-CV-92185
September 9, 2009

Page 150

ATTORNEYS EYES ONLY

1   Q   Okay.  Well, we may to come back on
2   that.
3   A   That's fine.
4   Q   But probably a level of detail we don't
5   need to worry with.  The next item is "American
6   Bankers Association, Community Banks/Credit Unions
7   vs. Big Banks."
8       Do you see that?
9   A   Yes.
10  Q   What was that a reference to?
11  A   There was a potential for joint venture
12  agreement with this particular segment of the
13  market which was an outside-the-box solution.
14      They had access to a lot of real estate
15  information because of their mortgage activities,
16  and we felt that would be a potential joint
17  venturer for us with using the patents and we were
18  going to discuss approaching them.
19  Q   And did representatives of the Real
20  Estate Alliance approach these institutions?
21  A   It wasn't my department.  I don't know.
22  Q   Don't know.  Did any of these
23  institutions ever take a license to either of the
24  patents?

Page 151

ATTORNEYS EYES ONLY

1   A   I believe Lending Tree did.
2   Q   Anyone else?
3   A   Again, I was not involved in that.
4   Q   You would include an institution such as
5   Lending Tree within this listing of American
6   Bankers, Community Banks --
7   A   Yeah.  They're primarily on the
8   financing side rather than the brokerage side.
9   Q   Item 10, "Microsoft/Moore lawsuits."
10      What does that refer to?
11  A   I assume it refers to the two lawsuits
12  that were discussed earlier.
13  Q   Well, the latter of those lawsuits was
14  dismissed I believe in June of 2000.  That's over
15  three years earlier.  So why was it being discussed
16  three years later?
17      MR. HUSICK:  Caution the witness not to
18  reveal the content of any discussions between Real
19  Estate Alliance and its counsel.
20      THE WITNESS:  Okay.
21  A   Yeah, I'm not going to answer that
22  question for you.
23  BY MR. SMITH:
24  Q   Let me ask you this, do you have any

Page 152

ATTORNEYS EYES ONLY

1   recollection of the discussion without relating to
2   the substance of the discussion to me?
3   A   Well, my recollection was that MicroSoft
4   had pulled down their site, so there was nothing
5   further to pursue.
6   Q   You do understand that you can pursue
7   Microsoft, you could obtain damages for the period
8   of time when their site was up, if in fact they
9   were infringing and if the patents were, in fact,
10  valid and enforceable?
11      MR. HUSICK:  Object to form.
12  A   Yes, sort of a compound question in
13  there.  Did we realize that we could receive -- we
14  could obtain damages from MicroSoft?  Yes.  The
15  whole point though was to stop the infringement.
16      They took their site down and that was
17  the -- one of the remedies that was being sought in
18  the litigation.  As far as we're concerned that was
19  a success.
20  BY MR. SMITH:
21  Q   Do you know why Microsoft took its site
22  down?
23  A   I believe they respected the patents and
24  they realized they were infringing.

Page 153

ATTORNEYS EYES ONLY

1   Q   I asked you if you knew why Microsoft
2   took its website down?
3   A   Did Bill Gates write me a letter saying
4   so?
5   Q   Or anybody.
6   A   No; I don't know that.
7   Q   Now, item 11, "MapInfo Deal/Partnership
8   Agreement - Fractional Factor."  What does that
9   refer to?
10  A   I don't remember.
11  Q   Let me show you a document --
12  A   Actually, I do remember.
13  Q   Okay.  What do you remember?
14  A   MapInfo had better mapping and
15  programming technology than we could develop on an
16  economic basis, and I believe one of the
17  discussions was whether they would do the mapping
18  if we were to create for, for instance the
19  American Bankers Association, the -- if we were
20  going to create our other portal, we would need
21  mapping support to go with it, and I think that's
22  what that discussion was; it was a business
23  arrangement.
24  Q   Did that happen?

REPORTED BY: Carl W. Girard, RMR
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022
www.huseby.com
(404) 875-0400

M1912
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 154

ATTORNEYS EYES ONLY
1
2    MR. HUSICK: Object to form.
3    A   Did what happen?
4 BY MR. SMITH:
5    Q   What you just described, the business
6 arrangement between REAL and MapInfo.
7    A   I know there were discussions about it.
8 I don't know whether it was ultimately consummated.
9    Q   Do you recognize the handwriting on the
10 bottom of the page of Exhibit 75?
11   A   No.
12   Q   It's not yours?
13   A   No; it's legible.
14   Q   Fair enough.
15       We've handed you a document that's been
16 marked as Exhibit 131?
17   A   Can we take a break.  My eyes --
18   Q   Off the record.
19       THE VIDEOGRAPHER:  We are off the record
20 at 1501 hours.
21       (Recess taken.)
22       This is the beginning of tape No. 4.
23 We're back on the record at 1512 hours.
24       (Exhibit 131 previously marked.)
25 BY MR. SMITH:

Page 155

ATTORNEYS EYES ONLY
1
2    Q   Mr. Bagdis, I've handed you a document
3 previously marked as Exhibit 131.  It's a series of
4 e-mails from June of 2003.  If you look at the
5 e-mail that starts about a third of the way down on
6 the first page, you're shown as receiving a copy.
7       Do you see that?
8    A   Yes.
9    Q   Do you recall getting this e-mail
10 string?
11   A   I believe so.
12   Q   The e-mail that Mr. Tornetta sends out
13 on June 5, 2003 is to Mr. Rooke, Mr. Bagdis,
14 Mr. Husick, and also to Mr. Bantz and a Mr. Statro.
15       Do you see that?
16   A   Yes.
17   Q   Who is Mr. Bantz?
18   A   I don't know.
19   Q   If you look at the second page of
20 Exhibit 131 at the bottom it says, "Introduction";
21 do you see that, about two-thirds of the way down?
22   A   Right.
23   Q   It says, "The Real Estate Alliance, Ltd.
24 exploits U.S. Patents '989 and '576."
25       Do you see that?

Page 156

ATTORNEYS EYES ONLY
1
2    A   Yes.
3    Q   What did you understand the word
4 "exploits" to be?
5    A   Derives an economic benefit.
6    Q   By either licensing or, if necessary,
7 litigation?
8    A   That's reasonable.
9    Q   And then it says "REAL is" and it lists
10 Mr. Tornetta as Chairman, yourself as CEO,
11 Mr. Rooke as CFO and Mr. Husick as general counsel.
12       Do you see that?
13   A   Yes.
14   Q   And then if you turn to the next page in
15 Exhibit 131 there is delineation "History of REAL."
16       Do you see that?
17   A   Uh-huh.
18   Q   And that's a yes?
19   A   That's a yes.
20   Q   And you go down to about a third of the
21 way down the page it says 1999-2002 "Tornetta finds
22 1000 to 2000 infringers."
23       Do you see that?
24   A   Yes.
25   Q   And did you understand that was what

Page 157

ATTORNEYS EYES ONLY
1
2 Mr. Tornetta was doing when he was working on the
3 Internet attempting to locate companies that might
4 want to take a license to either of his patents or
5 might be infringing it?
6    A   Well, I think companies that might want
7 to take a license; that was always the preferred
8 alternative.
9    Q   Here Mr. Tornetta refers to those
10 companies as "infringers?"
11   A   Or potential infringers.  He refers to
12 them as just infringers.
13   Q   And then two entries down it says, "2003
14 D/P, performs patent validity study?"
15       Do you see that?
16   A   Yes.
17   Q   D/P is a reference to Dilworth Paxson?
18   A   That would be my guess.
19   Q   You understood that at the time, did you
20 not?
21   A   Yes.
22   Q   And then further down the 2003 "REAL/DP
23 patent attorneys say."
24       Do you see that?
25   A   Yes.

REPORTED BY: Carl W. Girard, RMR
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022

www.huseby.com
(404) 875-0400

M1913
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 158

ATTORNEYS EYES ONLY

1
2    Q    And it says, "'989 patents have March
3  1986 priority date.  Where law prepares prior art
4  to be dated one year prior - 3/18/85 or earlier.)"
5        Do you see that?
6    A    Yes.
7    Q    Does that reflect the Dilworth Paxson
8  attorneys gave REAL?
9    A    I don't know what that means.
10       MR. HUSICK:  Caution you not to reveal
11  any communication of substance between REAL and its
12  counsel.
13       MR. SMITH:  The cat's sort of out of
14  that bag, Mr. Husick.
15    A    What was that?
16    Q    That's not a question to you.  Let me
17  ask you this question:  Do you have an
18  understanding as to what that entry means?
19    A    No.
20    Q    The third entry is, "MapInfo v1.21 is
21  technically different from patents, required
22  modifications are not obvious."
23       Do you see that?
24    A    Yes.
25    Q    Do you know what that means?

Page 159

ATTORNEYS EYES ONLY

1
2    A    No.
3    Q    Then if you turn to the next page of
4  Exhibit 131 about halfway down it says, "In order
5  to move forward faster REAL needs," it says, "a
6  better understanding of MapInfo 1985 through 1989,
7  data information found on the Internet is not
8  clear/precise."
9        Do you see that?
10    A    Yes.
11    Q    Do you know what that means?
12    A    No.
13    Q    Do you know why REAL needed a better
14  understanding of MapInfo from 1985 through 1989?
15    A    Not really.
16    Q    What do you understand in that regard?
17    A    I understand there was an issue with
18  MapInfo because MapInfo kept coming up.  That's all
19  I know.
20    Q    What sort of issue with MapInfo?
21    A    There were date issues.
22    Q    What do you mean by date issues?
23    A    There were -- MapInfo had -- I don't
24  know what they had.  I know MapInfo did a lot of
25  mapping, and I recall hearing about MapInfo as a

Page 160

ATTORNEYS EYES ONLY

1
2  potential issue I guess it was, and I can't
3  really go into more details because I believe that
4  involves discussion we had with counsel.
5    Q    Was it an issue with regard to the
6  validity of the Tornetta patents?
7        MR. HUSICK:  Same caution with respect
8  to privilege.
9    A    Yeah.  I'm not going to discuss that,
10  either.
11  BY MR. SMITH:
12    Q    Let me show you very briefly a document
13  that's been marked as Exhibit 134?
14    A    Are we done with this?
15    Q    Yes, sir.
16       (Exhibit 134 previously marked.)
17  BY MR. SMITH:
18    Q    All I want to know, just confirm that is
19  a copy of your signature on the last page of the
20  document dated April 16th 2004?
21    A    (Witness perusing exhibit.)
22       Yes.
23    Q    And this is titled "Covenant Not To Sue
24  and Release Agreement."  The parties of MapInfo and
25  REAL.

Page 161

ATTORNEYS EYES ONLY

1
2        Did you prepare Exhibit 134 or assist in
3  its preparation?
4    A    No.
5    Q    We are done with that one.  Let me show
6  you a document we previously marked as Exhibit 135.
7  It appears to be a letter dated April 21, 2004 from
8  Mr. Friedman at Dilworth Paxson to among others,
9  yourself.
10       (Exhibit 135 previously marked.)
11  BY MR. HUSICK:
12    Q    Did you receive a copy of this letter?
13    A    Yes.
14    Q    Mr. Friedman writes in the second
15  sentence, "Upon a preliminary review of the
16  information provided by MapInfo, we believe, as we
17  have in the past, that the MapInfo system does not
18  disclose or suggest the method of locating
19  available real estate properties as claimed in
20  claim 1 of the '989 patent."
21       Do you see that?
22    A    Yes.
23    Q    Now, he refers here to a preliminary
24  review in which he expresses this belief.  Was
25  there a subsequent, more detailed, review provided

41 (Pages 158 to 161)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 162

ATTORNEYS EYES ONLY
1
2  from the Dilworth firm with regard to the
3  information provided by MapInfo?
4      A  I don't -- I can't answer that because I
5  don't know.
6      Q  How many attorneys provided advice to
7  REAL or Mr. Tornetta, to your knowledge, with
8  regard to the validity of the '576 and '989
9  patents?
10     A  I have no idea.
11     Q  Clearly Dilworth did.  Did Mr. Husick?
12     A  Right.
13     Q  Any other attorneys?
14     A  The people that processed the patent
15  application themselves; that would be -- I don't
16  remember the name of that firm.  I don't remember
17  the name of the firm.
18     Q  Do you know if that firm was aware of
19  the MapInfo product?
20     A  I have no idea.
21     MR. SMITH:  Can we mark that as the next
22  document, please.
23     (Exhibit 159 marked for identification.)
24  BY MR. SMITH:
25     Q  I'm just going to be asking you about

Page 163

ATTORNEYS EYES ONLY
1
2  the first page of Exhibit 159, Mr. Bagdis.  This
3  appears to be an e-mail dated August 11, 2004 from
4  Mr. Tornetta to Mr. Friedman with a copy to
5  Mr. Friedman and among others, yourself.
6      Do you recall getting this e-mail?
7      A  (Witness perusing exhibit.)
8      I don't specifically recall it but --
9      Q  It's actually addressed to Mr. Matthew
10  Alexander at Homestore dot-com.
11      Do you know what Homestore dot-com was
12  in August of 2004?
13      A  No.
14      Q  You do not understand that that is the
15  predecessor to Plaintiff, Move, Inc., in this case?
16      A  I believe you.
17      Q  You don't know that?
18      A  I don't know for a --
19      Q  If you read into Mr. Tornetta's e-mail
20  to Mr. Alexander about halfway down it says, "REAL
21  wants Homestore to take a license for '989.  I put
22  Realselect on notice sometime in 1998."
23      Do you see that?
24      A  Yes.
25      Q  Did REAL want Homestore to take a

Page 164

ATTORNEYS EYES ONLY
1
2  license to the '989 patent in August of 2004?
3      A  Yes.
4      Q  There's no reference there to the '576
5  patent.  Do you have any understanding as to why?
6      A  No; I don't.
7      Q  Was that viewed as a patent that simply
8  was not of much value to be infringed?
9      A  No, everything was always referred to as
10  the '989 patent.  The website was '989, REAL '989,
11  probably because it was the last in the series.
12      Q  The next bullet says, "Licenses are
13  available for limited time and costs are
14  reasonable."
15      Do you see that?
16      A  Yes.
17      Q  Do you have an understanding as to what
18  cost REAL was proposing for licenses to the '989
19  patent?
20      A  No.
21      Q  And then the next entry is, "My
22  executive team wants to discuss licensing '989 with
23  the Homestore with your executive team ASAP."
24      Do you see that?
25      A  Yes.

Page 165

ATTORNEYS EYES ONLY
1
2      Q  Did you consider yourself to be part of
3  Mr. Tornetta's executive team?
4      A  Yes.
5      Q  And did you want to discuss licensing
6  the '989 patent to Homestore in the summer of 2004?
7      A  Yes.
8      Q  Did those discussions in the summer of
9  2004 take place?
10     A  I don't remember when they took place
11  but there were discussions.
12     Q  Did they take place in the summer of
13  2004?
14     A  I don't remember when.
15     Q  Did you participate?
16     A  Yes.
17     Q  You did.  If I understand things
18  correctly, you ceased to be active in the company
19  in October of 2004?
20     A  October/November.
21     Q  So does that mean the discussions would
22  have predated October/November of 2004 since you
23  participated in them?
24     A  Well, I ceased to be very active.  I was
25  available for consultation, so I can't pin down a

42 (Pages 162 to 165)

REPORTED BY: Carl W. Girard, RMR
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022

www.huseby.com
(404) 875-0400

M1915
EXHIBIT MX-52

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

Page 166

ATTORNEYS EYES ONLY

1 timeframe on that. I don't know.
2  Q   Did you actually participate personally
3 in those discussions?
4  A   With -- yes.
5  Q   I mean, you were in the room with
6 representatives?
7  A   Yes, with representative of the
8 Homestore.
9  Q   Do you remember the individual's name?
10  A   No; they were from Atlanta, though.
11  Q   Do you remember where that took place?
12  A   In Media, Pennsylvania.
13  Q   Do you recall who was there from REAL?
14  A   Well, I was there.  Mr. Husick was
15 there.  Mr. Tornetta was, I think, there.  I
16 believe Mr. Rooke was there, but I'm not -- I'm not
17 sure about Tornetta.
18  Q   Okay.  Thank you.  Let me show you a
19 document previously marked as Exhibit 66
20 (proffered.)
21  A   Are you done with this one?
22  Q   Yes.
23     (Exhibit 66 previously marked.)
24 BY MR. SMITH:

(Note: line numbering adjusted — original shows lines 1–25)

Page 167

ATTORNEYS EYES ONLY

1
2  Q   This is an e-mail string from September
3 of 2004 between Mr. Tornetta and others including a
4 Stewart Morris with copies to you, Mr. Bagdis.
5     Do you know who Mr. Morris was in the
6 fall of 2004?
7  A   (Witness perusing exhibit.)
8     No.
9  Q   Do you recall getting a copy of the
10 e-mail that starts at the bottom of the first page
11 of Exhibit 66, about halfway down?
12  A   Say that again.
13  Q   Do you recall receiving the e-mail that
14 starts about halfway down the first page?
15  A   I don't specifically recall it but there
16 were lots of e-mails.
17  Q   In the fourth paragraph down,
18 Mr. Tornetta writes to Mr. Morris, with a copy to
19 among others, yourself, "REAL engaged Dilworth to
20 license and collect billions of dollars of patent
21 royalties from real estate brokers, owners and
22 portals.  REAL is a patent licensing company only
23 not an operating company."
24     Do you see that?
25  A   Yes.

Page 168

ATTORNEYS EYES ONLY

1
2  Q   Now, was Dilworth, in fact, engaged to
3 collect billions of dollars of patent royalties or
4 is that hyperbolic?
5  A   I think that's hyperbolic.
6  Q   And the next paragraph says, "Our
7 licensing efforts focus on licensing and growing
8 real estate networks through patent exploitation."
9     Do you see that?
10  A   Yes.
11  Q   What do you understand the phrase patent
12 exploitation to mean?
13  A   That's the same thing we talked about,
14 deriving economic benefit from the patents.
15  Q   By licensing or, if necessary,
16 litigation?
17  A   Well, licensing was always the preferred
18 alternative.
19  Q   Yes, sir, but with litigation in the
20 background?
21  A   Well, I think you have to have that in
22 the background.  It doesn't make any sense
23 otherwise.
24  Q   Then the next paragraph says, "REAL uses
25 a 'be reasonable, do it our way' strategy."

Page 169

ATTORNEYS EYES ONLY

1
2     Do you see that?
3  A   Yes.
4  Q   What did you understand that to mean?
5  A   Be reasonable, do it our way.
6  Q   In other words, our way or the highway?
7  A   No, our way -- our way was -- again, I
8 thought the most economic and reasonable
9 alternative out there.
10  Q   Even though Mr. Tornetta tells
11 Mr. Morris that "REAL has engaged Dilworth to
12 license and collect billions of dollars of patent
13 royalties?"
14  A   What's wrong with that?
15  Q   Well, you yourself said it was
16 hyperbolic?
17  A   So, yeah, because, 1 billion, 2 billion,
18 5 billion; what difference does it make?  Pretty
19 soon you start talking about real money.
20  Q   There's a rhetorician to that?
21  A   That's correct; class reference.
22  Q   So Mr. Tornetta says to Mr. Morris,
23 "REAL has engaged Dilworth to license and collect
24 billions in patent royalties from brokers, owners
25 and portals, and REAL is going to focus its

43 (Pages 166 to 169)

CONFIDENTIAL                                                                                    2:07-CV-92185
ATTORNEYS EYES ONLY                                                              September 9, 2009
Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

Page 170

ATTORNEYS EYES ONLY
1
2  licensing efforts on licensing" or its efforts on
3  licensing, as you say, with litigation always in
4  the background, and according to Mr. Tornetta
5  that's a "be reasonable, do it our way" strategy?
6        MR. HUSICK:  Objection to form.
7  Objection, asked and answered.
8  BY MR. SMITH:
9     Q   Am I right about that?
10    A   Yeah; I don't think there was a question
11 in there, either.
12    Q   Did you understand the
13 be-reasonable-and-do-it-our-way reference to be a
14 reference to licensing that would, according to
15 Mr. Tornetta, yield billions of dollars to REAL?
16    A   Do I believe that the licensing revenues
17 could be billions of dollars?  Yes, I believe they
18 could be.
19    Q   Did you believe that was a realistic
20 possibility?
21    A   I've done the math lots of times; yes.
22    Q   And to your knowledge, what order of
23 magnitude of licensing revenues has REAL obtained
24 from the patents to date?
25    A   I don't know that.  I haven't been

Page 171

ATTORNEYS EYES ONLY
1
2  involved in the financing since 2004.
3     Q   As of 2004 what royalties, order of
4  magnitude, had REAL achieved from the patents?
5     A   I don't know really know that, either.
6     Q   A couple of hundred thousand dollars
7  absolute max?
8     A   I don't know that.
9        MR. HUSICK:  Object to form.
10    A   I don't know that.
11 BY MR. SMITH:
12    Q   Do you know if REAL had obtained any
13 more than a hundred thousand dollars of royalties
14 from the patents as of 2004, when you ceased to be
15 active?
16    A   I don't know that, either.
17    Q   Don't know one way or the other?
18    A   No, I really don't.
19    Q   Let me show you a document we've marked
20 as Exhibit 110.
21        (Exhibit 110 previously marked.)
22    A   (Witness perusing exhibit.)
23 BY MR. SMITH:
24    Q   It says, "Unanimous Consent in Lieu of
25 Meeting of Directors" dated November 10, 2004, and

Page 172

ATTORNEYS EYES ONLY
1
2  you're not listed as an officer, are you?
3     A   No; I'm not.
4     Q   Had you resigned as an officer of REAL
5  by this date?
6     A   Yes.  Well, as of this date.
7     Q   On or before?
8     A   Yes, on or before.  I was at this
9  meeting.  I tendered my resignation; I left.
10    Q   Why did you tender your resignation?
11    A   I had other things I had to deal with.
12    Q   Such as?
13    A   I had other things I had to deal with.
14    Q   Due to an investigation?
15    A   I had other things I had to deal with.
16    Q   Can you name those other things for me?
17    A   I had other businesses that were
18 requiring attention.
19    Q   What were those businesses?
20    A   They were businesses that I was
21 operating and involved with.
22    Q   Okay.  Did those businesses just
23 suddenly come into being in the fall of 2004 or did
24 they exist prior to that?
25    A   Some of them existed prior to that.

Page 173

ATTORNEYS EYES ONLY
1
2  Some of them came at that time.
3     Q   Let me show you Exhibit 111.
4        (Exhibit 111 previously marked.)
5     A   (Witness perusing exhibit.)
6  BY MR. SMITH:
7     Q   This is a "Unanimous Consent in Lieu of
8  Meeting of Shareholders."  Do you see that?
9     A   Yes.
10    Q   And here the shareholders approved the
11 transfer of your stock to the MMV Trust and that
12 Mr. Rooke, be authorized to vote the shares in
13 accordance with the instructions provided to him?
14    A   Yes.
15    Q   Okay.  And at this point -- you tell me.
16 You're the corporate lawyer.  Were you no longer a
17 shareholder of REAL as of this point?
18    A   As of the time that the stock was
19 transferred to the trust, I ceased to be a
20 shareholder of the corporation.
21    Q   Okay.  Mr. Rooke, I'll just put it to
22 you straight:  Did you resign as a director and as
23 an officer and tender your shares into trust
24 because of the federal criminal investigation that
25 you became aware of in late October of 2004?

REPORTED BY:  Carl W. Girard, RMR                          www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022          (404) 875-0400

M1917
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 174

ATTORNEYS EYES ONLY
1
2     A   First of all, I'm not Mr. Rooke.
3     Q   I beg your pardon, Mr. Bagdis.  I
4  apologize for that.
5     A   And that was not the primary reason for
6  transfer.
7     Q   Was that it a reason?
8     A   It was involved in one of the reasons
9  but it was not a primary reason.
10    Q   What was the primary reason?
11    A   Estate planning.
12    Q   Yours or for your clients?
13    A   Mine.
14    Q   Let me show you a document we've marked
15  as Exhibit 141 (proffered)
16        (Exhibit 141 previously marked.)
17    A   (Witness perusing exhibit.)
18  BY MR. SMITH:
19    Q   Now, these are e-mails between Mr. Rooke
20  and Mr. Tatro from December of 2004.  You're not
21  shown as receiving any of the e-mails.  Have you
22  seen this document before?
23    A   No.
24    Q   At the top Mr. Rooke writes to
25  Mr. Tatro, December 15, 2004, he says, "Scott, I

Page 175

ATTORNEYS EYES ONLY
1
2  don't think either of these companies appear in our
3  database of infringers.  Accordingly, we can't help
4  too much with additional info.  Andy."
5        Do you see that?
6     A   Yes.
7     Q   What was your understanding, if you had
8  one, of "our database of infringers"?
9     A   That's the database that we discussed
10  earlier with Kreamer Rooke consolidating the data.
11    Q   Okay.  We are just about done.  Let me
12  show you a document previously marked as Exhibit 78
13  (proffered.)
14        (Exhibit 78 previously marked.)
15    A   (Witness perusing exhibit.)
16  BY MR. SMITH:
17    Q   This is a letter dated June 1, 2005 from
18  Mr. Husick to Ms. Sarkisian with attachments.  Are
19  you familiar with these materials?
20    A   (Witness perusing exhibit.)
21        I've seen this before.
22    Q   In what context have you seen this
23  document?
24    A   I saw the document before.
25    Q   Did you see it at or about the time it

Page 176

ATTORNEYS EYES ONLY
1
2  was authored in June of 2005?
3     A   I think I saw -- i don't remember when I
4  saw it, but I obviously saw it after June 1 of
5  2005.
6     Q   Do you know why miss -- strike that.
7        Do you understand that subsequent to
8  this letter being sent to Ms. Sarkisian, a lawsuit
9  was instituted against her by REAL?
10    A   Yes.
11    Q   Do you know what the resolution of that
12  lawsuit was to date?
13    A   No; I don't know the resolution to date.
14    Q   What's your most current information as
15  to the status of that litigation?
16    A   My understanding is that it's suspended
17  pending the action in California.
18        THE WITNESS:  Is that right?
19  BY MR. SMITH:
20    Q   Let's mark this as your next exhibit.
21    A   Are you done with this one?
22    Q   Yes, sir.
23        (Exhibit 160 marked for identification.)
24  BY MR. SMITH:
25    Q   The reporter has handed you a document

Page 177

ATTORNEYS EYES ONLY
1
2  dated December 11, 2006; it's been marked as
3  Exhibit 160, and it appears to be a transmittal by
4  facsimile to you from Mr. Scott Tatro.
5     A   Tay-tro.
6     Q   Tay-tro.  Have you seen this document
7  before?
8     A   (Witness perusing exhibit.)
9     Q   Have you seen the document before?
10    A   I believe so.
11    Q   Did you prepare and send it to Mr. Tatro
12  in December of 2006?
13    A   I sent it to him.  I didn't prepare it.
14    Q   Do you know who did?
15    A   No.
16    Q   At the time you sent the document to
17  Mr. Tatro, had you reviewed the document?
18    A   In '06, probably not.
19    Q   Why do you say that?
20    A   Because in '06 I wasn't actively
21  involved in doing this kind of stuff.
22    Q   The heading on the first page exhibit of
23  160 says, Scott Tatro, B. Jay Bagdis, 1200 Dekalb
24  Pike, Center Square, Pennsylvania.
25        Did you share office space with

REPORTED BY: Carl W. Girard, RMR                    www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022        (404) 875-0400

M1918
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 178

ATTORNEYS EYES ONLY

1
2   Mr. Tatro at that time?
3     A  No; I didn't.
4     Q  Have you seen this letterhead before
5  anywhere?
6     A  No.
7     Q  Okay.  Well let's do this.  Let's go off
8  the record.
9       THE VIDEOGRAPHER:  We are off the record
10  at 1540 hours.
11     (Recess taken.)
12     We are back on the record at 1547 hours.
13  BY MR. SMITH:
14     Q  I just got a couple of questions,
15  Mr. Bagdis.  I want to go back for a moment to
16  Exhibit 45, which is the Agreement from January of
17  1988 between RealPro, Ltd. and Synermation.  I'm
18  going to show it to you (proffered).
19     I believe you indicated that you
20  represented Mr. Acosta and Synermation in
21  connection with the negotiation of that document?
22     A  (Witness perusing exhibit.)
23     I sort of functioned as the referee
24  here.
25     Q  Did you represent Mr. Acosta and

Page 179

ATTORNEYS EYES ONLY

1
2   Mr. Tornetta?
3     A  Yes.
4     Q  In connection with the preparation and
5  execution of this document?
6     A  Is that a question?
7     Q  Yes; that's my question.
8     A  Well, I introduced the two of them.
9     Q  Did you act as their lawyer in
10  connection with the negotiation, preparation of
11  this document?
12     A  I acted as a lawyer.
13     Q  For both of them?
14     A  I answered the questions that each one
15  of them had.  So, yeah, I would say I acted for
16  both of them.
17     Q  Do you recall who prepared the document,
18  putting the handwriting to one side?
19     A  It looks like it was printed by
20  Mr. Acosta's computer.
21     Q  Do you know if there was any other
22  lawyer advising Mr. Acosta?
23     A  I don't know.  I know he had other
24  counsel.
25     Q  Was anyone else independently advising

Page 180

ATTORNEYS EYES ONLY

1
2   Mr. Tornetta?
3     A  I know his brother is an attorney.  I
4  know he had other people to talk about, so.
5     Q  Do you know if he did?
6     A  I don't know that he did.  I don't know
7  if either one of them did.
8     Q  Let me ask you to look at page 5 at the
9  top, number 068 in the lower right-hand corner,
10  paragraph 2.4.
11     It is fairly long but it says "within 30
12  days after RealPro has installed the licensed
13  software pursuant to paragraph 2.3, Synermation
14  will perform its own testing of the licensed
15  software and deliver to RealPro a written
16  evaluation of the licensed software.  If the
17  licensed software fails to operate" -- strike that.
18     Do you know if Synermation ever
19  delivered to RealPro that written evaluation of the
20  licensed software?
21     A  The software never functioned.
22     Q  Do you know if Synermation ever
23  delivered that written evaluation of the licensed
24  software?
25     A  I think it was the software doesn't

Page 181

ATTORNEYS EYES ONLY

1
2  work.
3     Q  Do you know if REAL -- if Synermation
4  ever delivered that written evaluation?
5     A  I don't know for sure; no.
6     Q  Fine.  The next paragraph says, "If the
7  licensed software fails to operate according to
8  Schedule B attached hereto," which we don't have,
9  "RealPro will have 14 days to correct any defects
10  and caused the licensed software to operate
11  according to Schedule B attached hereto.  If
12  RealPro is unable to correct such defects and cause
13  the licensed software to operate according to
14  Schedule B attached hereto, Synermation shall have
15  the right to terminate this Agreement by giving
16  written notice to RealPro within five days.  Within
17  five days after actually receiving such notice,
18  RealPro will return to Synermation the amounts paid
19  to RealPro pursuant to paragraphs 4.1(b) and
20  4.1(c)."
21     Do you see that?
22     A  Yes.
23     Q  Did Synermation ever invoke that
24  provision that permitted it to deman RealPro return
25  certain amounts paid to RealPro by Synermation, to

46 (Pages 178 to 181)

M1919
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 182

ATTORNEYS EYES ONLY

1  your knowledge?
2      A   I'm looking at the 4.1, 4(b)
3  provisions...(perusing) and 4(b), 4.1(b) and
4  4.1(c).  I don't believe (b) and (c) payments were
5  ever made.
6      Q   Do you know that?
7      A   I'm not 100 percent positive but I don't
8  believe that they were -- the payments were made.
9  If you look at 4.1(b) the Media Cybernetics was to
10  issue an acceptance letter to begin the payment on
11  paragraph 4.1(b), and I don't believe Media
12  Cybernetics ever accepted this offer, and,
13  therefore, (c) wouldn't have happened, either.
14      Q   What was Media Cybernetics?
15      A   That would have been, my guess Acosta's
16  technical expert.
17      Q   Mr. Acosta would know if those payments
18  were made, would he not?
19      A   Well, Mr. Acosta is deceased.
20      Q   That's my point:  He can't help us out.
21      A   I'm sure of that.
22      Q   Do you know who his representative at
23  Media Cybernetics was?
24      A   No.

Page 183

ATTORNEYS EYES ONLY

1      Q   Do you know if anyone else associated
2  with Mr. Acosta would be able to tell us if those
3  payments were made?
4      A   I remember what Cybernetics was about.
5  Media Cybernetics had a software package that was
6  licensed by Tornetta and was included in the
7  WORKPLACE software, and the part of the deliverable
8  was an Agreement to assign by Media Cybernetics to
9  Synermation the right to use their licensed
10  software that Tornetta had.
11      Q   Okay.  My question is, do you know if
12  anyone else associated with Mr. Acosta or
13  Synermation could tell us if those payments were in
14  fact made?
15      A   I would assume that his records, his
16  checkbook would show that.
17      Q   Do you know if those documents still
18  exist?
19      A   I don't.
20      Q   Let's go back briefly to Exhibit 47?
21      A   Are we done with this one?
22      Q   Yes, sir.  This is the Times Herald
23  article dated April 22, 1988.
24      A   (Witness perusing exhibit.)

Page 184

ATTORNEYS EYES ONLY

1      Q   We've been through the article in some
2  detail and I don't intend to rehash that, but as of
3  the date of this article, April 22nd 1988, was
4  there a computer that had a database, as you put
5  it, of artificial or synthetic properties contained
6  within it?
7      A   Yes; the host computer had a database in
8  it.
9      Q   And could the user or client using that
10  host computer access the database to select
11  properties, understanding there are artificial or
12  synthetic properties, having certain
13  characteristics?
14      A   A user or client would not have access
15  to the server computer under any set of
16  circumstances.
17      Q   Could representatives of WORKPLACE
18  access that host computer and select properties
19  with certain characteristics?
20      A   For demonstration purposes, probably.
21      Q   For demonstration purposes.  Okay.
22          Just a couple of other questions on a
23  different topic.  We saw in Exhibits 69, 70, and
24  123 -- and I'll hand those to you -- suggestions

Page 185

ATTORNEYS EYES ONLY

1  from Mr. Tornetta that a predecessor of Move and
2  the National Association of Realtors as far back as
3  December of '97 and January of 1998 might want to
4  take a license to the '989 and perhaps the '576
5  patents.  Do you recall that?
6      A   I recall looking at the documents.
7      Q   And you recall discussing the litigation
8  that Mr. Tornetta had with Microsoft and Moore and
9  MapQuest in 1998 to 1999 over their alleged
10  infringement of his patents.  Do you recall that?
11      A   Where is MapQuest?
12      Q   It was in that second lawsuit.  It
13  was -- second lawsuit was against Moore and
14  MapQuest.  I can dig the document out if you'd
15  like.
16      A   That would have been the third lawsuit.
17      Q   Depending on how you want to count it.
18  Putting aside how you count it, you do recall --
19      A   There's litigation against Microsoft and
20  Moore.
21      Q   Yes, sir.
22      A   Then there was a second litigation
23  against Microsoft along and then the third
24  litigation against Moore and MapQuest?

REPORTED BY: Carl W. Girard, RMR
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022

www.huseby.com
(404) 875-0400

M1920
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY
Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis
2:07-CV-92185
September 9, 2009

Page 186

ATTORNEYS EYES ONLY

1
2  Q   That's fine, if you want --
3  A   If that's the context you're talking
4  about, I understand that.
5  Q   Yes, and that was in 1998 through 2000?
6  A   The docket will speak for itself.
7  Q   Mr. Husick represented Mr. Tornetta in
8  those litigations?
9  A   I believe that the Plaintiff was Mark
10 Tornetta individually, so I believe Mr. Husick
11 signed the pleadings, so, yes, it would be
12 reasonable that Mr. Husick represented
13 Mr. Tornetta.
14 Q   Okay, and REAL was formed in December of
15 2002 for the purpose of licensing the '576 and '989
16 patents and litigating them, if necessary?
17 A   If necessary.
18 Q   And at that point in time Mr. Rooke had
19 pledged up to $4 million for 15 percent interest in
20 REAL?
21    MR. HUSICK:  Object to form.
22 A   Is that a question?
23 BY MR. SMITH:
24 Q   Yes, sir.  Do you recall that, that
25 Mr. Rooke --

Page 187

ATTORNEYS EYES ONLY

1
2  A   The documents speak for themselves.
3  Q   Okay.  And what they say is that
4  Mr. Rooke was willing to put up $4 million into
5  REAL in exchange for an equity interest in the
6  company?
7  A   Correct.
8  Q   And in early -- late 2002 early 2003,
9  the Dilworth Paxton firm was retained to represent
10 REAL in connection with patent licensing and
11 litigation efforts?
12 A   Yes.
13 Q   And Mr. Husick was still around as
14 another lawyer available to litigate patents or to
15 license them; am I correct about that?
16 A   Well, he was around as an equity
17 investor, he was around as general counsel to the
18 organization, and he's an attorney.
19 Q   Okay.  Who has the proven ability to
20 litigate patents?
21 A   Yes, he's a patent attorney as opposed
22 to me, who is not.
23 Q   And then we saw in Exhibit 159 in August
24 of 2004, Mr. Tornetta's e-mail to Homestore, that
25 he wanted Homestore to take a license to the '989

Page 188

ATTORNEYS EYES ONLY

1
2  patent.
3     Do you recall that (proffered)?
4  A   (Witness perusing exhibit.)
5     Yes.
6  Q   Then we also saw the document from the
7  summer of 2005 in which Mr. Husick wrote a letter
8  to Ms. Sarkisian with regard to the '989 and '576
9  patents.
10    Do you remember that?
11 A   Yes.
12 Q   And you also recall that there was
13 patent infringement litigation brought by REAL
14 against Ms. Sarkisian somewhat later?
15 A   Yes.
16 Q   So my question to you, sir, is from the
17 period 1997 to 2005, why, during that period of
18 time, did REAL not institute patent infringement
19 litigation against NAR or Move or one of its
20 predecessors?
21    MR. HUSICK:  And here I caution the
22 witness to answer only if you can do so without
23 revealing attorney/client confidences.
24 A   Yeah; I don't think I can answer that
25 question.

Page 189

ATTORNEYS EYES ONLY

1
2  BY MR. SMITH:
3  Q   Because of the attorney/client
4  privilege?
5  A   And I don't know anything, either.
6  Q   Well, those would be two pretty good
7  answers.  All right.  Those are all of our
8  questions, Mr. Bagdis.  We thank you for your time.
9     CROSS-EXAMINATION
10 BY MR. HUSICK:
11 Q   Mr. Bagdis, I have several questions for
12 you at this time.  I'd like you to refer to the
13 Exhibit No. 47 that you looked at before.
14 A   (Witness complied.)
15 Q   I believe you testified that you wrote
16 the words that appear on the second page of that
17 exhibit; is that correct?
18 A   That's correct.
19 Q   And where did you obtain the information
20 that is contained within the second page of this
21 exhibit?
22 A   From Mr. Tornetta.
23 Q   How did you obtain that information from
24 Mr. Tornetta?
25 A   By discussion, by fiddling around with

48 (Pages 186 to 189)

REPORTED BY: Carl W. Girard, RMR
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022
www.huseby.com
(404) 875-0400
M1921
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 190

BAGDIS - CROSS - HUSICK

1 the computers and trying to figure out how to
2 explain what the program is supposed to do.
3     Q   When you say "the program," to what
4 computer program are you referring specifically?
5     A   To what the WORKPLACE, entire system was
6 supposed to do from end to end.
7     Q   And do you recall whether you wrote the
8 words that appear on the second page of Exhibit 47
9 at some time before April 22nd 1988?
10     A   It was substantially before April 22nd.
11     Q   Do you recall how far in advance?
12     A   30-to-60 days would be my recollection.
13     Q   And at the time that you wrote those
14 words, was there a working copy of the WORKPLACE in
15 the WORKPLACE office?
16     MR. SMITH:  Objection to form.
17     A   A working copy of the WORKPLACE, the
18 complete system?  No.
19 BY MR. HUSICK:
20     Q   At the time noted on this page, which is
21 numbered BDGS000435 which is April 22, 1988, did
22 WORKPLACE exist?
23     A   There was no network.
24     Q   And at that time, April 22nd 1988, was

Page 191

BAGDIS - CROSS - HUSICK

1 WORKPLACE available in any form for licensing?
2     A   Well, we would accept commitments to
3 license to deliver at the time product.  Remember
4 there is a specification and there is a timeline in
5 the contract for the development, and within the
6 timeframe that was developed in this contract, all
7 of the marketing and everything else like that had
8 to be developed and the timing, so had someone come
9 in and said I wanted to license this or I wanted to
10 use this system, we would have done everything we
11 could to make it available to them.  As it turned
12 out in retrospect, it never worked.
13     Q   So what was the purpose of this article
14 that is Exhibit 47?
15     A   This was to generate interest in the
16 real estate professionals' community to come look
17 at this novel, new thing that we had.
18     Q   And was there is an expectation on your
19 part that everything that was written in Exhibit 47
20 would eventually come to pass?
21     A   Absolutely.
22     Q   And to the best of your recollection,
23 did it ever come to pass?
24     A   No.

Page 192

BAGDIS - CROSS - HUSICK

1     Q   I believe that Exhibit 47 was taken from
2 your own personal files.  Do you recall having this
3 document in your personal file?
4     A   This particular document?  I have parts
5 of it.  I mean...
6     Q   What specific parts did you have?
7     A   These look like the cutouts of the
8 purported supplement.
9     Q   And how did you receive the copy of this
10 supplement that was in your files?
11     A   I think I received ten copies in a
12 manila envelope either dropped off or in the mail
13 from the Times Herald.
14     Q   And at this time, in April of 1988, were
15 you a subscriber to the Times Herald?
16     A   Yes; it was our local newspaper.
17     Q   Do you recall receiving the Times Herald
18 paper on April 22nd 1988?
19     A   Yes.
20     Q   Did this material appear in the paper on
21 that date, to your recollection?
22     MR. SMITH:  Object to form.
23     A   Not to my recollection.
24 BY MR. HUSICK:

Page 193

BAGDIS - CROSS - HUSICK

1     Q   I'd like to refer you to Exhibit 45,
2 which is the Synermation license document and
3 specifically to the first page.  What is the date
4 of that the Agreement is made?
5     A   15th of January 1988.
6     Q   And then specifically I'd like to refer
7 you to paragraph 2.1 of the Agreement.
8     A   Okay.
9     Q   Which reads in part, "Within 30 days
10 after the effective date of this Agreement, RealPro
11 will deliver to Synermation, (a) five copies of the
12 user documentation identified in schedule A
13 attached hereto and (b) five copies of each item of
14 technical information in tangible form then in the
15 possession of RealPro and free of any restrictions
16 of the transfer thereof by a third party."
17     Do you recall whether within that 30-day
18 period from January 15th 1988 RealPro did deliver
19 those copies of documentation and technical
20 information to Synermation?
21     A   I don't believe they did within the 30
22 days.
23     Q   Referring you to paragraph 2.2 --
24     MR. SMITH:  Objection and move to strike

49 (Pages 190 to 193)

REPORTED BY: Carl W. Girard, RMR
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022

www.huseby.com
(404) 875-0400

M1922
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

Page 194

BAGDIS - CROSS - HUSICK

1 the answer as non-responsive.
2 BY MR. HUSICK:
3    Q   Referring to paragraph 2.2 reads in
4 part, "Within 30 days after the delivery of the
5 material provided for in paragraph 2.1, RealPro
6 will meet with Synermation for two man-days at no
7 expense to Synermation to assist Synermation to the
8 content of this material and transfer to
9 Synermation additional information which RealPro
10 has not in tangible form related to the technical
11 information."
12    Do you recall whether that meeting
13 between RealPro and Synermation took place?
14    A   I don't believe the meeting took place.
15    MR. SMITH:  Objection.  No foundation.
16 Move to strike as non-responsive.
17 BY MR. HUSICK:
18    Q   Referring you to now 2.3, which reads,
19 "Within 60 days after the effective date of this
20 agreement but after the delivery of the material
21 provided for in paragraph 2.1, RealPro will install
22 the licensed software and licensed hardware
23 provided by Synermation.  RealPro will conduct all
24 of its testing procedures on the licensed software

Page 196

BAGDIS - CROSS - HUSICK

1    A   (Witness complied.)
2    Q   On the first page of that exhibit at the
3 header, can you please read the date?
4    A   July 15th 1988.
5    Q   As of that date did the WORKPLACE exist?
6    A   No.  There was no network.
7    Q   As of that date, was the WORKPLACE
8 floppy disk that you've testified about before, I
9 believe you called it the user disk, had that been
10 distributed to any third party outside of
11 WORKPLACE?
12    A   No; no other third parties had that.
13    Q   Did you personally perform any of the
14 tests on the software system that was being
15 developed by Mr. Tornetta for WORKPLACE?
16    A   Yes.
17    Q   And did you ever have occasion to
18 conduct a demonstration of any of that software for
19 third parties?
20    A   I conducted demonstrations in the
21 office.  I attempted to conduct demonstration with
22 third parties at the National Convention of the
23 Society of Industrial and Office Realtors in
24 California in November of 1988 and the system

Page 195

BAGDIS - CROSS - HUSICK

1 to assure successful operation of the licensed
2 software according to Schedule B attached hereto."
3    What knowledge do you have with respect
4 to any occurrence that is referred to within
5 paragraph 2.3?
6    A   Synermation purchased and configured a
7 computer in accordance with the specifications of
8 RealPro.  RealPro installed, I believe, a copy of
9 the client software which didn't work.
10    At that point there was no reason to go
11 get an additional computer for the host software,
12 and I believe that they went back and forth for a
13 while.
14    Q   When you say client software didn't
15 work, how do you know it didn't work?
16    A   Because the client software was
17 installed in a computer that was at Acosta's
18 office, could not interface with the host software
19 which was in the RealPro office.
20    Q   Did there come a time when the client
21 software could access the host computer?
22    A   No; that never happened.
23    Q   I'd like to refer you to Exhibit 56,
24 which is the Chester County Biz article?

Page 197

BAGDIS - CROSS - HUSICK

1 failed.
2    I then attempted -- it was reworked.  I
3 then attempted to demonstrate it the Society of
4 Industrial Office Realtors' Regional Convention in
5 New York in, I believe it was, January of 1989 and
6 the system also failed.
7    Q   Did there ever come a time when the
8 WORKPLACE Network did operate properly?
9    A   No.
10    Q   Were descriptions to WORKPLACE ever
11 sold?
12    A   No.
13    Q   Were listings ever obtained for the
14 database in WORKPLACE Network?
15    A   No.
16    Q   Did WORKPLACE ever distribute any
17 software on floppy disks to third parties?
18    A   No.
19    Q   And what was the purpose of these
20 presentations and demonstrations that you have just
21 described?
22    A   Well, the first purpose was to generate
23 interest in the WORKPLACE Network itself.  The
24 second purpose of the demonstrations was to

50 (Pages 194 to 197)

REPORTED BY: Carl W. Girard, RMR
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022

www.huseby.com
(404) 875-0400

M1923
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY
Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis
2:07-CV-92185
September 9, 2009

Page 198

BAGDIS - CROSS - HUSICK

1
2 encourage people who had property for sale or lease
3 to put them into the database because without the
4 database the product had no real value, and we
5 failed in both areas.
6     Q   I'd like you to now refer to Exhibit 48,
7 which is the "Meet our Golden Retriever," and
8 specifically to the second page of that?
9     A   Okay. (Witness complied.)
10     Q   I'd like you to refer to the very last
11 textual line in that which reads
12 (\bin\protex\manual\wp.Rev space 10/88)."
13         Do you see that line?
14     A   Yes.
15     Q   What does that line mean to you?
16     A   That means that this version of the text
17 itself was created in October of '88. It was
18 printed on the back of the Golden Retriever ad,
19 which was a four-color process, leaflet that we had
20 ordered extras from when we had the ad placed in
21 Black's Guide and this was actually printed on the
22 back of it and that was our handout which I was
23 using in October/November of '88 to generate
24 additional interest and additional funding.
25     Q   I'd like to refer you now to Exhibit 60,

Page 199

BAGDIS - CROSS - HUSICK

1
2 which is the sales document?
3     A   (Witness complied.)
4     Q   Was there ever a time in which the
5 WORKPLACE Network hired individuals to become sales
6 people?
7     A   No.
8     Q   And to your recollection, was this
9 document ever distributed outside of WORKPLACE
10 itself?
11     A   No; there were only three copies of this
12 as far as I recall.
13     Q   I'd like to draw your attention now to
14 your deposition transcript from Sarkisian matter.
15     A   (Witness complied.)
16     Q   I'd like to have you look at page 69,
17 please?
18     A   (Witness complied.)
19     Q   Beginning at line 14, the question is,
20 "Right. This article was published at a certain
21 point. It is describing WORKPLACE software as we
22 were just discussing. You were saying at the time
23 this article was written this WORKPLACE software
24 could do the steps that we were just discussing; is
25 that correct?"

Page 200

BAGDIS - CROSS - HUSICK

1
2     And your answer was, "It was supposed to
3 be able to do that, yes."
4     Q   Do you see that?
5     A   Yes.
6     Q   And was that your testimony in the
7 deposition you gave in Sarkisian?
8     A   Yes; it was supposed to be able to do
9 everything that the article said it was supposed to
10 be able to do.
11     Q   And referring to the date, which is
12 April 22nd 1988, could the WORKPLACE software, in
13 fact, perform the functions?
14     A   No.
15     Q   Did there come a time when the Agreement
16 between RealPro and Synermation was terminated?
17     A   Yes.
18     Q   And do you recall when that was?
19     A   I don't specifically recall when it was.
20     Q   Was it sometime during 1989?
21         MR. SMITH:  Objection, leading.
22     A   Yes; I think it was in 19 -- it was
23 probably in the first quarter of 1989 after the
24 disaster in New York at SAOR.  It was clear that it
25 wasn't going to work.

Page 201

BAGDIS - CROSS - HUSICK

1
2         MR. SMITH:  Objection, non-responsive
3 and move the strike.
4 BY MR. HUSICK:
5     Q   Do you know who terminated that
6 Agreement?
7     A   Well, Synermation terminated the
8 Agreement because they refused to make the payment.
9         MR. SMITH:  Objection, move to strike,
10 non-responsive.
11 BY MR. HUSICK:
12     Q   Do you know why Synermation terminated
13 the Agreement?
14     A   They terminated the Agreement because
15 the product wasn't delivered as specified.
16         MR. SMITH:  Objection, no foundation,
17 personal knowledge.
18         MR. HUSICK:  I have no further
19 questions.  Thank you.
20         MR. SMITH:  Let's change the tape.
21 We'll have a few.
22         THE VIDEOGRAPHER:  We are off the record
23 at 1619.  This is the end of tape No. 4.
24         (Change tape.)
25         This is beginning of tape No. 5.  We're

REPORTED BY: Carl W. Girard, RMR
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022
www.huseby.com
(404) 875-0400

M1924
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

---

Page 202

BAGDIS - CROSS - HUSICK

1  back on the record at 1636 hours.
2          REDIRECT EXAMINATION
3  BY MR. SMITH:
4      Q   Mr. Bagdis, Mr. Husick asked you a
5  number of questions about Exhibit 47, and at one
6  point you indicated that the complete WORKPLACE
7  system wasn't working.
8          Now specifically what wasn't working.
9      A   The ability to search, isolate a set of
10 points, and display it on the client computer.
11     Q   But that ability was present on the host
12 computer, was it not?
13     A   It could be done on the host computer
14 but that's not --
15     Q   Okay.
16     A   -- part of it.  That's an essential part
17 of the network that wasn't working.
18     Q   Now, you're not a patent lawyer; we've
19 established that, right?
20     A   Yes.
21     Q   Blissfully.  And you don't know what the
22 extent of the claims of the '576 or '989 patents
23 are, do you?
24     A   No.

---

Page 203

BAGDIS - REDIRECT - SMITH

1      Q   So you don't know if the full extent of
2  the functionality as between the host computer and
3  the user computer is claimed in either of those
4  patents, do you?
5      A   I didn't understand the question.
6      Q   Fair enough.  Now, had Mr. Tornetta
7  written software, WORKPLACE software by the time
8  you wrote the words that appear in Exhibit 47?
9      A   He had written some software.  I think
10 you have to understand --
11     Q   Just answer my question.  We'll get out
12 of here.
13     A   All right.
14     Q   Now, you said that there was no
15 functioning network.  Was that because you didn't
16 have two computers hooked up that could communicate
17 to each other, that is to say, a host computer and
18 a user computer?
19     A   Correct.
20     Q   Now, was there one computer that could
21 access this database of artificial or synthetic
22 properties?
23     A   The database was on that computer so of
24 course it could access it.

---

Page 204

BAGDIS - REDIRECT - SMITH

1      Q   That was as of the time you wrote the
2  words in Exhibit 47?
3      A   Probably.
4      Q   And specifically throughout the second
5  page of Exhibit 47, you used verbs to describe what
6  WORKPLACE does, verbs that are in the present
7  tense; do you not?
8      A   Yes.
9      Q   Now, with regard to Exhibit 47, the
10 heading on both the first and the second pages is
11 the Times Herald, Friday April 22, 1988?
12         Do you see that?
13     A   Yes.
14     Q   Do you specifically recall receiving the
15 Times Herald on that day as you sit here?
16     A   We received it everyday.
17     Q   But do you specifically recall receiving
18 this issue of the Times Herald over 20 years ago?
19     A   This was a supplement to the issue.
20     Q   And supplements come out from time to
21 time in the Times Herald, do they not?
22     A   Right.
23     Q   It's not a one-shot deal?
24     A   No; they come out regularly.

---

Page 205

BAGDIS - REDIRECT - SMITH

1      Q   This particular supplement was a real
2  estate supplement, was it not?
3      A   Yes; that's what it was called.
4      Q   Okay.  And in your declaration, Exhibit
5  152, you specifically refer to that article; do you
6  not?
7      A   Yes.
8      Q   And you say that article was published
9  on April 22, 1988; do you not?
10     A   It was printed on a newspaper that I
11 received in the mail ten copies of.
12     Q   And the verb you used in your
13 declaration, which you signed under oath, "was
14 published," am I correct?
15     A   Correct.
16     Q   Thank you.  Now, there were meetings
17 between representatives of RealPro and Synermation
18 that you did not attend, correct?
19         MR. HUSICK:  Object to form.
20     A   I would believe so.
21 BY MR. SMITH:
22     Q   And there were verbal communications
23 between representatives of Synermation and RealPro
24 in which you did not participate, correct?

---

REPORTED BY: Carl W. Girard, RMR
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022

www.huseby.com
(404) 875-0400

M1925
EXHIBIT MX-52

CONFIDENTIAL
ATTORNEYS EYES ONLY

Move, Inc., et al. v. Real Estate Alliance, Ltd., et al.
Bernard Jay Bagdis

2:07-CV-92185
September 9, 2009

---

Page 206

BAGDIS - REDIRECT - SMITH

```
 1          BAGDIS - REDIRECT - SMITH
 2      A   Correct.
 3          MR. HUSICK:  Object to form.
 4  BY MR. SMITH:
 5      Q   Now, with regard to the user disk, you
 6  said it was not distributed to anyone outside of
 7  WORKPLACE.  In fact, it was offered for license to
 8  people outside of WORKPLACE, was it not?
 9      A   The disk was not -- the disk was not
10  offered for license.  The system was offered for
11  license.
12      Q   I stand corrected.  The WORKPLACE system
13  was offered for license to individuals outside of
14  WORKPLACE; am I correct about that?
15      A   Yes.
16          MR. SMITH:  Thank you.
17          MR. HUSICK:  No further questions.
18          THE VIDEOGRAPHER:  We are off the record
19  at 1641 hours.
20          (Signature reserved.)
21          (Deposition concluded.)
22
23
24
25
```

---

Page 207

```
 1          C E R T I F I C A T E
 2  Commonwealth of Virginia )
                             ) ss:
 3  County of Henrico        )
 4          I, Carl W. Girard, Registered
    Merit Reporter, and Notary Public within and
 5  for the Commonwealth of Virginia, at Large, duly
    commissioned and qualified, do hereby certify that the
 6  within named witness BERNARD JAY BAGDIS
    was by me first duly sworn to testify the truth,
 7  the whole truth and nothing but the truth in the
    cause aforesaid; that the testimony then given by
 8  him was reduced by me to stenotype in the
    presence of said witness, subsequently transcribed
 9  into English text under my direction, and that
    the foregoing is a true and accurate transcript
10  of the testimony so given.
11          I do hereby certify that this
    deposition was taken at the time and place as
12  specified in the foregoing caption and was
    completed without adjournment.
13
            I do hereby further certify that
14  I am not a relative, counsel, or attorney of either
    party or otherwise interested in the outcome of
15  this action.
16          In witness whereof, I  have
    hereunto set my hand this 12th day of September, 2009.
17
18  _____
            Carl W. Girard, R.M.R.
19
    My commission expires
20  January 31, 2011
    No. 218877
21
22
23
24
25
```

---

Page 208

```
 1          CHANGES AND SIGNATURE
 2  WITNESS NAME:  BERNARD JAY BAGDIS,      SEPTEMBER 9, 2009
 3  PAGE   LINE   CHANGE         REASON
 4  _____
 5  _____
 6  _____
 7  _____
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17      I, BERNARD JAY BAGDIS, have read the foregoing
18  deposition and hereby affix my signature that same is
19  true and correct, except as noted above.
20          _____
21              BERNARD JAY BAGDIS
22  Sworn to and Subscribed before me
23  _____, Notary Public.
24  This_____day of _____, 20____.
25  My Commission Expires:
```

---

REPORTED BY: Carl W. Girard, RMR                         www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022      (404) 875-0400

M1926
EXHIBIT MX-52